UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ESTHER SOLOMON,

                    Plaintiff,

        – *against* –

FORDHAM UNIVERSITY,

                    Defendant.

**OPINION & ORDER**

18 Civ. 4615 (ER)

R<small>AMOS</small>, D.J.:

Esther Solomon, proceeding *pro se*, has been a professor at Fordham University's Gabelli School of Business for over thirty years. During that time, she alleges, Fordham has paid her less than her male colleagues for the same work, discriminated against her because of her gender, age, and religion, defamed her, and breached a contract and other duties owed to her. Solomon alleges that, most recently, Fordham has assigned her an overwhelming and unprecedented class load because of her age, gender, and religion, and in retaliation for reporting the alleged discrimination. She brings these claims under a mix of federal and New York laws.[1]

---

[1] Solomon brings claims under the following federal statutes:

- Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*
- Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*
- The Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 to 634
- The Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 to 2654
- The Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d)

She also brings claims under the following New York statutes:

- The New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297
- The New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 8-131
- The Achieve Pay Equality Act of 2015, N.Y. Lab. Law § 194

Finally, she alleges defamation, breach of contract, breach of fiduciary duty, and tortious interference with current and prospective business relations under New York common law.

Fordham now moves to dismiss Solomon's Amended Complaint in its entirety. For the below reasons, that motion is GRANTED. Solomon may file a Second Amended Complaint.

## I. THE ALLEGATIONS

Solomon is a Jewish woman, who was 68 years old at the time she filed her complaint. AC ¶ 43. She is currently a tenured associate professor at the Gabelli School, which offers both graduate and undergraduate courses at the Rose Hill campus in the Bronx and the Lincoln Center campus in Manhattan. AC ¶¶ 42, 43. Solomon is the only woman on the tenured faculty in her area[2] and the only Jewish full-time faculty member in the area. AC ¶ 43. She describes the faculty of the Gabelli School as "predominantly" male. AC ¶ 43.

Solomon's Amended Complaint spans her entire career at the Gabelli School, dating back to her hiring in 1984. The allegations generally fall into one of five discrete time periods: her applications for promotion that were denied in 2001 and 2003; her 2013 attempt to be named area chair; the conflict surrounding a 2016 debate over the Gabelli School's curricula; events that occurred during a three-semester leave of absence in 2016 and 2017; and her 18-month disagreement with the Gabelli administration over her 2018 and 2019 teaching schedule.

### A. Denial of Promotions

Solomon joined the Gabelli School in 1984 and achieved tenure as an associate professor in 1987. AC ¶ 43. She was denied promotion from associate professor to full professor twice: once in 2001 and again in 2003. AC ¶ 106. In describing the tenure process, she points to a November 2001 letter from a University Tenure Review

---

[2] The Gabelli School is organized into a number of departments, called "areas." Solomon is currently a member of the Leading People and Organizations area. That area had been previously called "Organizational Behavior," and it was split off from a larger "Management Systems" area some time before. AC ¶ 43.

Committee, which characterized the "lack of tenure standards and procedures" as "patently unfair." AC ¶ 110.

The first time Solomon was eligible for promotion in 2001, according to the Amended Complaint, the promotion committee chair rescheduled the meeting from a Wednesday in Manhattan to a Friday afternoon in the Bronx. AC ¶ 107. She alleges that this kept two Jewish professors from voting due to their observation of the Jewish Sabbath. AC ¶ 108. She claims that this is the only time in her career where a promotion meeting was suddenly changed to conflict with the Sabbath. AC ¶ 109. Solomon's promotion was denied in an allegedly "very close" vote. AC ¶ 108. Both of the absent professors expressed "strong support" for Solomon. AC ¶ 108. Solomon alleges no facts concerning the 2003 promotion denial.

From 2004 to 2007, Solomon appealed the denials multiple times, arguing that she had been treated unfairly and that "[a]n objective review would determine that her qualifications were better than those" of the individuals who were ultimately promoted to full professor. AC ¶ 111, 112. Each of her appeals was denied, despite her allegations of procedural and substantive violations, several changes in the promotion procedures, and denial of her due process rights. AC ¶ 112. In September 2004, the office of Fordham's Vice President for Academic Affairs "announced the 'disappearance'" of Solomon's entire promotion record. AC ¶ 113. Also during this time, a former president of the Faculty Senate claimed that Solomon had orally withdrawn her request for a hearing regarding the denial of her promotions; Solomon alleges that this is false. AC ¶ 114.

**B. Nomination to Area Chair**

On September 25, 2013, 70 percent of the faculty in her area nominated Solomon to be the area's chair. AC ¶ 17. Solomon alleges that four days later, on September 29, the dean of the Gabelli School, Donna Rapaccioli, called her and orally proposed a contract for Solomon to serve as the area's chair for three years in return for a stipend of between $18,000 and $20,000, as well as a course load of one class per semester. AC

¶ 16.  Solomon told an international organization of which she was president, the Facet Theory Association, that she had been appointed area chair.  AC at 32.

Solomon alleges that Fordham reneged on this agreement on October 2, when the then-provost of Fordham, Stephen Freedman, spoke with Solomon, Dean Rapaccioli, and John Hollwitz — another professor in Solomon's area — and sought to jointly appoint Solomon, Hollwitz, and one other unnamed person to the chair position in a "tripartite" structure.  AC ¶ 117.  Later that day, Freedman told Solomon that he would appoint Hollwitz alone to the chair position.  AC ¶ 18, Ex. 10 at 3.

On October 7, Provost Freedman conducted a "Chair Termination Hearing," to seemingly remove Solomon from the chair position.  AC ¶ 118.  Solomon claims that the hearing "was humiliating, harassing and public," although during the meeting Freedman allegedly promised to honor Solomon's offer of compensation as discussed during her September 29 phone call with Rapaccioli.  AC ¶ 118, Ex. 10 at 3.  Rapaccioli announced the appointment of Hollwitz on October 18, during which she thanked the previous chair, Falguni Sen, "for his 'help.'"  AC ¶ 121.  Solomon alleges that Sen had "precluded [her] participation in many . . . appointments and programs . . . ."  AC ¶ 121.  Solomon alleges that men have chaired her area for most of her tenure at Fordham.  AC ¶ 122

Solomon later discussed the situation with Rapaccioli and Freedman over email.  Three weeks after the termination hearing, on Monday, October 28, Solomon sent an email to Rapaccioli describing the terms of the oral contract allegedly made on September 29.  That afternoon Rapaccioli responded, writing, "Thanks for your email.  Would you have time on Thursday at 10?"  AC Ex 10 at ECF 99.  After the meeting on October 31, Rapaccioli wrote Solomon, offering a course release "to allow you [Solomon] the additional time needed to publish your research."  AC Ex. 10 at ECF 100.

Unsatisfied with this response, Solomon emailed Freedman on November 5, again describing the alleged provisions of the September 29 oral contract.  AC Ex. 10 at ECF 101.  Freedman responded later that day, writing, "I will ask Donna [Rapaccioli] to

confer with John [Hollwitz] and recommend to me an appropriate plan of action." Despite additional correspondence between Solomon and the administrators, including in June and October 2017, Solomon never received either the stipend or the course releases she had allegedly been promised in September. AC ¶¶ 19, 20, Ex. 10. She informed the Facet Theory Association that she had been removed sometime later. AC at 32.

### C. Objections to Actions as Faculty Senator

Solomon's next set of allegations surround her input into a 2015 to 2016 curriculum revision in the Gabelli School's part-time MBA program. AC Ex. 1. The revision process made her concerned that a "lack of appropriate involvement of senior tenured faculty . . . precluded senior faculty from exercising their rights and contributing with expertise to the program quality." AC ¶ 124. She took her concerns to the Faculty Senate, of which she was a member representing the Gabelli School. AC ¶ 124. At a November 2015 meeting, Solomon specifically claimed that the revision procedures were in violation of the University Statutes of Fordham. AC Ex. 12 at 1.

Her actions provoked an adverse response from other members of the Gabelli faculty. On January 27, 2016, two members of Gabelli's Executive Committee, Bob Wharton and Sris Chatterjee, convened a meeting of approximately 40 faculty members. AC Ex. 14 at ECF 123. At the meeting, the faculty present passed a resolution seeking removal of Solomon and another professor concerned about the revision, Dorothy Klotz, as faculty senators for the Gabelli School. AC Ex. 14 at ECF 123. In a February email to the Faculty Senate's Executive Committee, Wharton and Chatterjee included a memo that called the behavior of Klotz and Solomon "unprofessional" and "predicated on a series of material misrepresentations made to the Faculty Senate." AC Ex. 14 at ECF 122. In March 2016, one of the members of the faculty, Michael Pirson, described Solomon as having a strong personalit[y]." AC ¶ 75.

In early March 2016, Solomon complained directly to the president of Fordham, Joseph McShane. AC Ex. 11 at 1. In that letter, she wrote that the removal resolution

passed by the Gabelli faculty had "injured [her] professional reputation and standing among [her] peers . . . ." AC Ex. 11 at 2. She wrote that "[t]he January 27 meeting was suffused with due process violations," and that the republication of its resolutions "perpetuate[s] the retaliation and total lack of due process that has characterized this entire matter." AC Ex. 11 at 2. McShane replied the next day, indicating that he was "very troubled and dismayed by the tone of the dialogue in the Senate, and the general lack of civility relating to a factual dispute among faculty." AC Ex. 11 at ECF 109. He wrote that he would "be speaking about this in the days and weeks to come." AC Ex. 11 at ECF 109.

### D. Leave of Absence in 2016 and 2017

Solomon took leave from Fordham during the Fall 2016 and Spring 2017 semesters to pursue a faculty fellowship. AC ¶ 65. She took an additional semester of unpaid leave in Fall 2017. AC ¶ 65.[3] In December 2016, during Solomon's faculty fellowship, she received a letter from Dean Rapaccioli "encouraging her to resign from her tenured position and take a 'phased retirement.'" AC ¶ 46.

In May 2017, she attended a council meeting for the Gabelli School where she "sought to support and preserve senior tenured professors['] ability to exercise their primary responsibilities for the quality of the curriculum and the education process and their rights to self-governance." AC ¶ 130. She alleges that the amended minutes of that meeting "portrayed [her] in an unfavorable light and as the only individual concerned . . . ." AC ¶ 130.

In June 2017, the Gabelli School appointed a new acting chair for Solomon's area. AC ¶ 85. Solomon asked Dean Rapaccioli to be considered as a candidate for the permanent position. AC ¶ 85. Solomon alleges that administrators introduced new rules

---

[3] Solomon alleges that Fordham initially denied her request to take the unpaid leave in Fall 2017. AC ¶ 86. She was granted permission after she found a replacement to teach her fall classes. AC ¶ 86. She claims that Fordham indicated it expected her to participate in recruiting efforts, something she claims is normally not expected of faculty on unpaid leave. AC ¶ 86.

for chair selection that "precluded [her] from even participating, much less being nominated as Chair." AC ¶ 85. "As a result of extraordinary efforts by the administration, including an appeal to the Faculty Senate," Solomon alleges, Pirson, a younger and non-Jewish man, was selected. AC ¶ 85.

Solomon attended two academic conference during her period of leave, one in August 2017 and the other in October 2017. AC ¶¶ 14, 87. She alleges that she had to pay for "most of her expenses" at the August conference and all of her expenses at the October conference; she claims that the expenses of younger faculty were covered by Fordham. AC ¶¶ 14, 87. She alleges that Fordham held a reception at the August conference, but did not invite or otherwise inform Solomon of the reception. AC ¶ 87.

In late summer and early fall, Pirson called two staff meetings. The first was scheduled in late August of 2017. AC ¶ 95. Solomon asked Pirson to reschedule the meeting since she had planned to be away from New York during that time, but the meeting took place as scheduled. AC ¶ 95. At the second meeting, in November, a professor in her area, James Stoner, allegedly "personally attacked [her] in a highly intimidating and threatening way, and humiliated her in front of her counterparts."[4] AC ¶ 96. Solomon claims that Pirson made no attempt to intervene and that she was the only female tenured faculty member at the meeting. AC ¶ 95.

On October 27, 2017, Solomon sent a letter to a vice president in the provost's office, copying Provost Freedman, Dean Rapaccioli, and another Fordham vice president. AC Ex. 10. In that letter, she recounted her 2013 experience surrounding the offer and withdrawal of the area chair position. She also complained that "the pattern of actions by members of Fordham University against [her] have continued and escalated." She described being excluded from administrative and curricular tasks at the Gabelli School,

_____

[4] Based on the accounts of other professors in her area, Solomon alleges that Stoner has "engaged in similar attacks against another older, female professor" in 2016. AC ¶ 97.

being "marginalized," and having "severe extraordinary actions taken" against her for her duties as a faculty senator.

### E.  Disagreements Over Spring 2018 Teaching Schedule

In the spring of 2017, Solomon began to prepare to return to teaching the next year, after her fellowship and unpaid leave.  In May 2017, Solomon spoke to Pirson, then the director of one of master's degree programs of the Gabelli School.  He indicated that she would be assigned two elective graduate courses for the Spring 2018 semester.[5]  AC ¶ 76.  Pirson assigned Solomon her Spring 2018 teaching schedule in September 2017, writing that the schedule was "in case you come back."  AC ¶¶ 66, 88.  She was assigned to teach two sections of an undergraduate management class in the Bronx, along with one graduate-level course in Manhattan.  AC ¶ 68.  She describes the undergraduate courses as "onerous" and normally assigned to junior faculty or contract instructors.  AC ¶ 67–69.

Solomon alleges that the undergraduate classes constituted an "unprecedented assignment for any senior tenured faculty member and one that has never been assigned to a senior male professor."  AC ¶ 68.  She alleges that Pirson did not assign either himself or Hollwitz, both tenured men, any sections of the introductory undergraduate course that she was assigned.  AC ¶ 73.  And she alleges that, while she was assigned 50 class sessions in Spring 2018, Pirson was only assigned 12 sessions and a student trip to Brazil, and Hollwitz was assigned between 4 and 16 class sessions.  AC ¶ 73.

The one graduate course Solomon was assigned to teach was eventually cancelled. Solomon alleges that the class was scheduled for a time inconvenient to students and assigned difficult-to-satisfy prerequisites.  AC ¶ 77.  Although she attempted to remove the prerequisites, she alleges that "opposition by male counterparts" and "non-applicable rules" were used to block her efforts.  AC ¶ 78.  She alleges that Pirson failed to advertise

---

[5] Ultimately, Solomon alleges, a male faculty member and an adjunct were assigned to these elective courses.  AC ¶ 76.  Additionally, a clinical instructor was assigned to teach a class normally taught by Solomon.  AC ¶ 76.

Solomon's course, causing too-few students to enroll and leading Fordham to cancel it. AC ¶ 79.  She alleges that Pirson scheduled a similar course, assigned an adjunct to teach it, and sufficiently advertised it.  AC ¶ 79.  Pirson also changed one of Solomon's undergraduate courses to a more inconvenient time, giving an adjunct, who is a priest, the original time slot.  AC ¶ 79.

Solomon alleges that Fordham normally gives the teachers of cancelled graduate classes, some of whom are men, a course release and an administrative or consulting assignment.[6]  AC ¶ 82.  In other cases, also involving male teachers, Fordham opens the class to undergraduates.  AC ¶ 82.  Solomon was given neither of these opportunities. AC ¶ 83.  Instead, Solomon was assigned a different graduate class scheduled from 8 p.m. to 10 p.m.  AC ¶ 83.

Her final schedule caused her to have a three-day class schedule — "unprecedented," she alleges, for a senior member of the faculty.  AC ¶ 83.  She indicates that she "does not want to teach these courses, at these locations, on these schedules," and that the schedule "make[s] it very difficult for her to have substantial blocks of time to engage in research and scholarship."  AC ¶ 74.  She also describes the class schedule as "physically taxing."  AC ¶ 99.

Solomon complained to Pirson about this schedule.  He refused to change it, however, writing in one November 2017 email, "either you teach in the Bronx, or you don't teach at all."  AC ¶ 91.  When Solomon "expressed her distress" at the comment, he indicated that he would consult with Fordham's general counsel, Elaine Crosson.  AC ¶ 133.  In December, when Solomon again asked for a change in schedule, he denied her requests.  AC ¶ 92.

---

[6] The Gabelli School, however, has no formal cancellation policy.  AC ¶ 80.

## F. Allegations of Code of Conduct Violations

Solomon alleges that her conflict with Fordham escalated in December 2017. She alleges she was attending a meeting regarding her undergraduate courses on December 13, during which she asked to change the time of one of the courses, which took place in the Bronx. AC ¶ 98. During this conversation, Pirson entered the room and cut Solomon off in an allegedly "abrupt and intimidating way." Solomon claims she "was effectively humiliated and silenced" for the remainder of the meeting.[7] AC ¶ 98.

Four days later, on December 17, Solomon learned that a proposal for research funding she had submitted for the summer of 2018 had been denied. AC ¶ 93. She claims that she was provided no reason for this denial. AC ¶ 15. In her Amended Complaint, Solomon does not describe who sent the email or the persons or offices responsible for evaluating her request.

Over the following few days, Solomon corresponded with Gabelli School administration and the Fordham's compliance department in simultaneous email chains.

### 1. Emails with Dean Rapaccioli Concerning Code of Conduct Allegations

In the morning of December 18, Dean Rapaccioli sent an email to Solomon, copying Pirson and a vice president in the provost's office:

> We have been informed that there has been some disagreement about course scheduling and that you have engaged in conversation that was viewed as lacking civility. It is the responsibility of all faculty to adhere to the Code of Conduct. If you have a grievance you can make use of the grievance process. In the mean time, we expect you to behave according to the Code of Conduct.

AC Ex. 3 at 1.

Two days later, in the morning of December 20, Solomon responded to Rapaccioli's email regarding the Code of Conduct allegations. Solomon asked

---

[7] She alleges that she went to Hollwitz, who was present, for assistance, "but he refused and ran out of the room." AC ¶ 98.

Rapaccioli to clarify the event and specific provision in the Code of Conduct to which she was referring. AC Ex. 3 at 1.

The next afternoon, on December 21, Rapaccioli responded to Solomon's email:

> As I explained I was informed that you engaged in a conversation that was viewed as lacking civility.
>
> The code I refer to is Section 6-03.01. Violations of the Code of conduct include:
>
>> (e) Harassment (verbal or other) . . .
>>
>> (h) Engaging in, or inciting others to engage in, conduct which interferes with or disrupts any University function, or which prevents or limits the free expression of ideas by others . . .
>>
>> (j) Engaging in . . . disorderly conduct

AC Ex. 3 at 2 (ellipses in original). A few hours later, Solomon, now copying General Counsel Crosson, asked Rapaccioli to provide her with written documentation of the conversations the dean referenced and the identity of the person who complained to her. AC Ex. 3 at 2.

### 2. *Emails with Compliance Office Concerning Past Complaints*

Simultaneously with the correspondence between Solomon and Dean Rapaccioli, Solomon wrote to Fordham's compliance office. The conversation started in the afternoon of December 18, when Solomon sent Anastasia Coleman, Fordham's Title IX coordinator and Director of Institutional Equity & Compliance, an email, copying General Counsel Crosson. In that email, Solomon asked for information on steps taken, if any, to investigate the complaints she had raised in her October 27 letter to Rapaccioli and Provost Freedman. AC Ex. 2 at 1. She referenced her recent conflict with the Gabelli administration regarding her course assignments and asked for Coleman's "plan to address and rectify the recent scheduling issues." AC Ex. 2.

In the afternoon of December 20, Coleman responded. She indicated that she had no records of contact between herself and Solomon in reference to Solomon "filing a discrimination and retaliation allegation." AC Ex. 2 at 2. Coleman asked Solomon to

send a copy of the October 27 letter and clarify the basis of Solomon's allegations. AC Ex. 2 at 2. She closed by saying that she was "very willing to investigate further . . . ." AC Ex. 2 at 2.

In the evening of December 21, Solomon wrote back. Solomon indicated that they had previously spoken by telephone in 2014 and that Klotz, the other senator who had complained about transparency in curriculum planning, had registered complaints in 2016 regarding those events. AC Ex. 2 at 3. In that email, Solomon wrote, "I asked you for the results of the EEOC investigation that Provost Freedman should have launched based on my ongoing complains [sic] regarding retaliation and discrimination against me." AC Ex. 2 at 3 (emphasis in original).

\* \* \*

Solomon alleges that she "had a contract offer in 2017 from an international colleague to develop new programs." AC at 32. She claims that she had to "forgo this prospective business opportunity" because of the above conversations. AC at 32.

### G. The EEOC Complaint and Subsequent Developments

Solomon filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") on January 11, 2018. AC ¶ 22. On February 5, General Counsel Crosson sent an email to Solomon indicating that she was aware of Solomon's EEOC complaint. AC Ex. A. Crosson wrote:

> [C]oncerns have been raised by some of your colleagues that you have accused them of unlawful discriminatory behavior and that you have expressed this in both a public and private forum. We recommend that you limit your comments to assert only factual allegations such as "I have filed a claim with the EEOC alleging discrimination by the University". To render public accusations of discrimination against other members of the University community concerning matters that have not yet been investigated may cause damage to the reputation of your colleagues and may subject you to legal exposure.

AC Ex. A.  Solomon next alleges that on February 8, 2018 Fordham threatened her with not meeting her professional responsibilities if she did not attend a meeting with a vice president in the provost's office.  AC ¶ 26.

The EEOC issued a Right to Sue letter on February 28, 2018.  AC ¶ 27.  Solomon alleges Fordham escalated its discrimination by assigning her Fall 2018 classes in the Bronx that were scheduled for late Friday afternoons and for times slots ending at 9:15 p.m.  AC ¶ 27.  She complained to Provost Freedman and Dean Rapaccioli on April 23 and May 2.  AC ¶¶ 28, 29.  She alleges that on May 4 Fordham assigned her three classes in the Bronx for Fall 2018.  AC ¶ 29.

Solomon filed this action on May 24, 2018.  Doc. 1.  On June 4, a new acting chair of Solomon's area announced another course schedule for her, covering three classes in Fall 2018 and three classes in Spring 2019.  AC at 33.  Solomon alleges that the schedule "included multiple sections of courses which counted as 1.5 credit [sic] for male younger faculty," but did not count as much for her.  AC at 33.  She characterizes this teaching load as "retaliatory" and "punitive," and she claims it is in excess of Fordham's "contractual teaching load."  AC at 33.

Solomon took leave pursuant to the FMLA during the Fall 2018 semester.  AC at 33.  She alleges that "non-existing rules were cited to penalize her with another heavier than normal teaching load the next semester . . . ." AC at 33.  Solomon requested a meeting in December 2018 with Dean Rapaccioli to discuss her Spring 2019 assignments.  AC at 34.  The same day she requested a meeting, Rapaccioli allegedly canceled a course to be taught by Solomon and "endorsed" a similar course taught by a younger man.  AC at 34.  Solomon describes the proposed three-class Spring 2019 schedule as "onerous" and "time-consuming" due to late evening classes in the Bronx.  AC at 34.

After attempting to negotiate a reduced spring course load, Solomon requested unpaid leave on December 12, 2018.  Ex. 17 at ECF 132–33.  In a December 14 email,

the acting chair of Solomon's area indicated "that the Provost Office [would] not be willing to grant an unpaid leave of absence for the Spring 2019 except if required by law." AC Ex. 17 at ECF 139. On December 16, Solomon emailed President McShane, requesting that he personally approve her unpaid leave of absence for the spring. AC Ex. 17 at ECF 130–31. Solomon was granted unpaid leave shortly after. AC at 34.

Solomon alleges that all of these events have reduced the willingness of her colleagues to work with her because they fear retaliation. AC ¶ 146. She claims that junior faculty that had planned to work with her pulled back after her nomination to be area chair failed and objections were raised concerning her actions as a faculty senator. AC at 32. She alleges that this has "been very personally damaging to her and continues to the present day." AC ¶ 146.

### H. Unequal Pay Allegations

Solomon also alleges that she has been underpaid compared to "similarly situated male faculty members and even younger faculty members" for much of her career at Fordham.[8] AC ¶ 2. During the 2017 and 2018 academic year, she was paid about $123,000 as an associate professor.[9] AC ¶ 8. Citing to Glassdoor, a salary comparison website, Solomon alleges that lower-ranked assistant professors make, on average, $137,000 per year. AC ¶ 8.

Solomon describes in some detail the salary of two comparator professors: Hollwitz and Pirson. Hollwitz, she alleges, earned a salary of $400,000 in 2010 for "performing the same Professor job as she does." AC ¶ 5. Hollwitz was appointed area chair in 2013 and served in that capacity until 2016. AC ¶¶ 18, 122. Hollwitz also was Fordham's Vice President of Academic Affairs in 2004. AC ¶ 113. She does not allege whether he is an associate or full professor.

---

[8] She alleges that women are systematically underpaid at Fordham, citing to a 2008 report from a Fordham task force. AC ¶ 4.

[9] Solomon alleges that she has received small, automatic raises in 2011 and 2016 because a Faculty Senate committee found that she made less than the lowest-paid assistant professor. AC ¶ 10.

Pirson allegedly earns $300,000 per year and is director of two interdisciplinary programs. AC ¶ 6. At the time Solomon filed her Amended Complaint, he served as acting chair of Solomon's area and was the "most recently tenured faculty." AC ¶ 6. Solomon does not allege whether he is an associate or full professor.

Solomon also lists faculty members Robert Wharton, Falguni Sen, Robert Hurley, Thomas Wright, and Benjamin Cole as tenured men who make more money than she does, although she does not list their salaries. AC ¶ 7. Wharton was an area chair for 23 years and a chair of a Gabelli School committee. AC ¶ 122. Sen served as area chair for three years. AC ¶ 122. Wright and Cole are alleged to have joined the faculty "more recently." AC ¶ 7. Solomon does not allege the rank or job duties of any of these professors.

## II.    STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Even though "a discrimination complaint need not allege facts establishing each element of a *prima facie* case of discrimination" to survive a motion to dismiss, "it must at a minimum assert nonconclusory factual matter sufficient to 'nudge its claims' across the line from conceivable to plausible.'" *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 680) (internal alternations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Courts should read *pro se* pleadings "liberally and interpret them to raise the strongest arguments that they suggest." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quotation marks omitted) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). The obligation to read a *pro se* litigant's pleadings leniently "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y. State Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). "However, even *pro se* plaintiffs asserting civil right claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Title VII and the ADEA require plaintiffs in New York to make a complaint to the EEOC within 300 days of the alleged adverse action in order for their claims to be considered timely in federal court. *Gindi v. N.Y.C. Dep't of Educ.*, 786 F. App'x 280, 282 (2d Cir. 2019) (citing 42 U.S.C. § 2000e-5(e)(1) and 29 U.S.C. § 626(d)). Given that this case was filed with the EEOC on January 1, 2018, only conduct occurring after March 7, 2017 is timely under Title VII and the ADEA. FMLA claims carry a statute of limitations of two years — three years if the violation of the statute is "willful." 29 U.S.C. § 2617(c); *see also Offor v. Mercy Med. Ctr* 676 F. App'x 51, 53 (2d Cir. 2017).

## III.  FEDERAL DISPARATE IMPACT DISCRIMINATION

Solomon argues that Fordham's actions[10] make the university liable to her under several federal civil rights statutes. Her allegations of gender and religious disparate treatment discrimination are brought under Title VII, and she brings an age discrimination claims under the ADEA.[11] Solomon also brings claims of a hostile work

---

[10] Unless otherwise specified, Fordham does not argue that it cannot be held liable for the actions of any of the individuals identified in Solomon's Amended Complaint.

[11] Solomon also brings a claim of employment discrimination under Title IX. Although the Second Circuit has declined to hold whether Title IX provides a right of action for aggrieved university employees alleging gender discrimination, *see Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013), a majority of courts

environment under each of these statutes, and she alleges that she was retaliated against in contravention of the relevant provisions of these laws, as well as the FMLA, which guarantees the right to family or medical leave. Finally, she brings claims of unequal pay under the Equal Pay Act, Title VII, and the ADEA.

"[T]o defeat a motion to dismiss . . . in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against [her], and (2) [her] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *See Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). When a plaintiff alleges that the discrimination is implicit, rather than direct and open, she must alleged that "(1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (alterations and citation omitted). This four-part analysis is followed by courts interpreting the ADEA, as well. *See Mazzo v. Mnuchin*, 751 F. App'x 13, 14 (2d Cir. 2018) (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001)).

The parties dispute only whether Solomon suffered an adverse employment action and whether there is a corresponding inference of discrimination. The Court will therefore first identify any properly alleged adverse actions and then determine whether there are allegations supporting an inference of discrimination.

### A. Adverse Action

An adverse employment action is a "materially adverse change in the terms and conditions of employment." *See Sanders*, 361 F.3d at 755 (internal citation removed). "To be materially adverse, a change in working conditions must be more disruptive than a

---

in this District have concluded that it does not. *See Gayle v. Children's Aid College Prep Charter School*, No. 18 Civ. 9874 (GBD), 2019 WL 3759097, at *5 n.3 (S.D.N.Y. July 29, 2019) (collecting cases). This Court joins their analyses and holds that Solomon does not have a cause of action under Title IX. In any event, her claims would fail for the same reasons articulated in this part of the opinion.

mere inconvenience or an alteration of job responsibilities." *Id.* (internal citation removed). "Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* (internal citation removed).

In her briefing and Amended Complaint, Solomon argues that a number of actions taken against her amount to discriminatory adverse employment actions. Of these, the Court finds that only her allegations of being assigned a more burdensome teaching schedule in Spring 2018 and afterwards are materially adverse. The others either are time-barred or fail to meet the necessary threshold of adversity.

*1. Denial of Promotions & Nomination to Area Chair*

Solomon alleges that Fordham's failure to promote her to full professor in 1987 and 2000, along with its failure to appoint her area chair in 2003, amount to adverse employment actions. Though a failure to promote can certainly be an adverse employment action, *see, e.g.*, *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007), all of these claims are time-barred under the federal claims' 300-day statutes of limitations, as her initial complaint was filed with the EEOC in January 2018. Solomon argues that the Court may still consider these actions as context for her other allegations, even though these actions are time-barred. This is true. *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012). But that is the only purpose for which the Court will consider these events. They cannot serve as a basis for liability on their own. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (holding that "discrete acts," such as failure to promote, "are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

*2. Leave of Absence in 2016 and 2017*

Solomon alleges that she suffered adverse employment actions next during her 2016 and 2017 leave of absence — in particular when she asked Dean Rapaccioli to be

considered as a candidate for acting area chair in June 2017 and when she attended two academic conferences in August and October 2017, but paid for them in part with her own funds. All of these events are timely under federal law. But, although they are timely, these claims are too conclusory to form the basis for a discriminatory adverse employment action.

Her allegations concerning her attempt to be appointed as acting area chair — blocked by a "new wave of rules" and "extraordinary efforts by the administration," AC ¶ 85 — are far too conclusory. For her to succeed, she "must allege that [she] applied for a specific position and was rejected therefrom, unless such a requirement would be 'quixotic' under a particular set of facts." *Lalanne v. Begin Managed Progs.*, 346 F. App'x 666, 667–68 (2d Cir. 2009) (citing *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998)). Solomon devotes only a single paragraph within her Amended Complaint to detailing this allegation and, in it, does not allege that she actually applied for the position, nor that attempts to do so would have been fruitless. She does not allege any facts that would make it plausible that the new wave of rules or efforts by the administration in fact made any attempt to apply "quixotic."

Her allegations concerning the failure of Fordham to reimburse her for attending research conferences are likewise too conclusory and do not show that she suffered any actual material *change* in her employment. Nowhere in her Amended Complaint does she allege that she ever received reimbursement for traveling to conferences like this, that she applied for reimbursement, or even facts that could lead the Court to conclude, even when viewing the facts in Solomon's favor, that the failures to reimburse were anything other than an inconvenience.

### 3. Teaching Schedule

Solomon does, however, allege a material change in her employment through her claims that Fordham assigned her an increased teaching load in and after Spring 2018. Fordham characterizes Solomon's complaints as complaints about not being assigned the

courses that she preferred to teach. If this were so, then such course assignments would not amount to a material change in employment. *See, e.g.*, *Klein v. N.Y. Uni.*, 786 F. Supp. 2d 830, 847 (S.D.N.Y. 2011). But Solomon alleges more.

She alleges that the schedule she had been assigned was "onerous" and "physically taxing," especially given the timing of the classes and their locations on two different campuses. She alleges that she normally was assigned to fewer courses, all of which were located only on one campus. She also alleges that the time needed to prepare for the undergraduate courses was more than was typical for the graduate courses she normally taught. And she alleges that this schedule negatively impacted her ability to fulfill her professional obligations and to find sufficient time to complete her research. These allegations are sufficient at the pleading stage to make a claim of an adverse employment action.

Indeed, her claims are similar to those of the plaintiff in *Vega v. Hempstead Union Free School District*, where the plaintiff complained of having to spend "disproportionately more time" preparing for class as a result of being assigned larger class sizes with students who did not speak English as a first language. 801 F.3d 72, 88 (2d Cir. 2015). The Second Circuit held that such a "material increase in [the plaintiff's] responsibilities without additional compensation" amounted to an adverse employment action. *Id.* Here, too, Solomon was forced to teach more classes for the same amount of pay as before, with the added burden of having to commute between the two campuses when she had not been required to do so before. Solomon sufficiently alleges an adverse employment action with these claims.

4. *Allegations of Code of Conduct Violations*

The final action approaching a material change in Solomon's employment is her allegation that she was denied research funding in December 2017. But the allegations surrounding this denial are too conclusory to state a claim. Solomon does not allege, for example, that she had any entitlement to it as part of her job responsibilities, that her

grant application was sufficient, that she had received such funding in the past, or even the impact such a denial had on her employment. Accordingly, this event does not properly make a claim for an adverse employment action.

## B. Inference of Discriminatory Intent

Based on the above analysis, the only action attributable to Fordham capable of giving rise to an adverse employment action are Solomon's assignment of a busier teaching schedule in Spring 2018. The Court will proceed to determine whether there is an alleged inference of discriminatory intent behind those actions.

### 1. Use of Comparators

Solomon first argues that she has pleaded discriminatory intent through a showing of disparate treatment. "To establish an inference of discrimination, a plaintiff must allege that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (internal citation removed). In making this determination, the Court looks to whether the alleged comparators were "subject to the same workplace standards" as the plaintiff. *Id.*

In reference to her increased workload, Solomon does make gender and religious comparisons. She alleges that no male or non-Jewish professor was assigned as difficult a workload as she was. Specifically, she cites two professors who are male and Jewish, Hollwitz and Pirson, who were alleged to have been assigned no more than 16 classes compared to her 50. She also generally alleges that her three-day schedule was "unprecedented." AC ¶ 83.

But merely alleging that men or non-Jews had a lighter schedule than she did is not enough. Rather, she must allege facts that plausibly show she was similarly situated to her comparators. That, she has not done. To the contrary, Solomon alleges that Pirson was acting chair of Solomon's area when the 2018 schedules were given out, and that Hollwitz was a more senior professor than she was, as well as a former vice president of

the university. Rather than allege that these two were subject to the same workplace standards, she alleges that they were differentiated in their administrative roles or seniority.

Furthermore, Solomon fails to allege the standards to which she is subject. She pleads that she is an associate professor, but she does not plead with any detail what her job responsibilities are in the role. For example, she does not plead the number of classes she is expected to teach under any contract she may have, the number of papers she must publish, or any other requirement of her job. Such baseline pleading is needed in order for the Court to determine whether her comparators are similarly situated to her.

   2.  *Pattern of Derogatory Statements*

Of course, although alleging that a comparator was treated differently is the most common way of showing an inference of discrimination, it is not the only way. *See Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Another method of alleging an inference discrimination is by showing that a decision-maker had displayed "a pattern of derogatory statements." *Id.* When those statements "could be viewed as reflecting a discriminatory animus," they "may give rise to an inference of discriminatory motive." *Gregory v. Daly*, 243 F.3d 687, 697 (2d Cir. 2001) (internal citation removed). But Solomon's allegations do not create such an inference.

Here, Solomon alleges that Pirson said in 2016 that she and another professor, who is a woman, had "strong personalities." This single comment made more than a year before Solomon was assigned her schedule is hardly "a pattern of derogatory statements."[12] In contrast, the Second Circuit in *Gregory* found a "continuous, escalating pattern" of discriminatory remarks culminated in a manger saying "get on board or quit" when the female plaintiff complained of the "insulting and ominous" conduct. 243 F.3d

---

[12] In her opposition, Solomon alleges that Pirson exclaimed, "[Y]ou are teaching leadership?" when informed that Solomon had been teaching a particular graduate course. Doc. 51 at 10. Even if the Court were to consider this allegation outside of Solomon's pleadings, this single, vague comment does not create a pattern of derogatory statements, either.

at 697.  Pirson's isolated comment is nothing like the pattern of behavior in *Gregory* — in length or severity.  Additionally, cases where such a pattern creates an inference of discriminatory motivation involve comments that have some connection to the alleged discrimination.  For example, in *Collins v. Cohen Pontani Lieberman & Pavane*, a law-firm managing partner indicated that a female associate "was not 'sweet' enough and needed to use more 'sugar' with any paralegal who was uncooperative."  No. 04 Civ. 8983 (KMW) (MHD), 2008 WL 2971668, at *9 (S.D.N.Y. July 31, 2008).  The court in that case found that these comments could create an inference that the partner failed to give the female associate sufficient work because she did not fulfill "sex stereotypes of 'sweetness . . . .'"  *Id.*

### 3.  Failure to Investigate

Finally, Solomon argues that allegations of Fordham's failure to investigate complaints she raised in October 2017 properly pleads discriminatory intent.  It is true that a failure to follow an anti-discrimination policy can give rise to an inference of discrimination.  *See, e.g.*, *Collins*, 2008 WL 2971668, at *10; *cf. Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) (noting that "departures from procedural regularity" could "raise a question as to the good faith" of a promotion process).  But Solomon has failed to plead the facts needed to make her case on this basis.  *First*, Solomon does not plead what Fordham's policy is for investigating complaints of discrimination, making it unclear whether any procedures Fordham did or did not follow were actually irregular.  *Second*, Solomon never filed a formal complaint, making it unclear whether any procedure should have been triggered.  Indeed, when Solomon gave Fordham's compliance director, Coleman, the email Solomon sent to Gabelli administration in October 2017, Coleman expressed confusion over the basis for and substance of the alleged discrimination against Solomon.  *Third*, the email that Solomon claims is her complaint of discrimination does not mention her gender, age, or religion at all, nor does it mention her course scheduling issues.

\* \* \*

Accordingly, Solomon's complaint fails to state a claim for employment disparate treatment discrimination under the federal civil rights statutes.  Fordham's motion to dismiss is GRANTED in reference to these counts.  Solomon is granted leave to replead.

## IV.    FEDERAL CLAIMS OF UNEQUAL PAY

In addition to her claims of disparate treatment discussed above, Solomon alleges that she is not paid the same as her colleagues for equal work, alleging claims under the federal Equal Pay Act and under the federal civil rights statutes.  "[T]o prove a violation of the EPA, a plaintiff must demonstrate that (1) the employer pays different wages to employees of the opposite sex;  (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions."  *E.E.O.C. v. Port Auth. of N.Y. & N. J.*, 768 F.3d 247, 254–55 (2d Cir. 2014) (internal quotation and alterations omitted).  Courts analyze equal pay claims under the ADEA and Title VII similarly to those brought under the EPA.  *See, e.g., Talwar v. State Island Univ. Hosp.*, 610 F. App'x 28, 30 n.2 (2d Cir. 2015).

Here, Solomon has plead with specificity two comparators:  Hollwitz and Pirson.  Both men are indeed paid more than she is, according to her pleading — Hollwitz was paid $400,000 per year in 2010 and Pirson earned $300,000 per year at the time of Solomon's complaint.  Solomon earned only $123,000 in 2017 and 2018.  As discussed in *supra* Part III.B, however, Solomon and her comparators are not equally situated.  Despite Solomon's pleading that Hollwitz and Pirson "perform the same Professor job as she does," AC ¶ 5, the remainder of the Amended Complaint conflicts with this bare assertion.  Pirson serves a director of two interdisciplinary programs and, at the time of Solomon's Amended Complaint, was the acting area chair.  Hollwitz was at one time the Vice President of Academic Affairs for Fordham.

Solomon points to *Chepak v. Metropolitan Hospital* to support the contention that her pleadings, as a *pro se* plaintiff, are sufficient to state a claim.  555 F. App'x 74 (2d Cir.

2014).  In *Chepak*, a *pro se* plaintiff pleaded that "that she was given a different title, but required to do the same job for less pay, as her male predecessors."  *Id.* at 76.  The panel found that this pleading was sufficient to give the defendant "fair notice of her claims and the grounds upon which they rested."  *Id.* (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).  But *Chepak* did not involve the conflict apparent on the face of the pleadings here.  "[J]ob content and not job title or description is the standard for determining whether there was a violation of the anti-discrimination laws."  *Id.* at 77 (citing Marshall v. Building Maint. Corp., 587 F.2d 567, 571 (2d Cir. 1978)).  Solomon has failed to plead enough of her and her comparator's job *content* to show that they are similarly situated.  Her Equal Pay Act and related claims are dismissed.  She is granted leave to replead.

## V.    FEDERAL HOSTILE WORK ENVIRONMENT CLAIMS

To plead a claim of hostile work environment under Title VII, Solomon must allege that her "workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . so long as there is a basis for imputing the conduct that created the hostile environment to the employer."  *Rasmy v. Marriott Int'l, Inc.*, — F.3d —, No. 18-3260-cv, 2020 WL 1069441, at *4 (2d Cir. Mar. 6, 2020) (internal citation and quotation removed).[13]  In analyzing Solomon's claim of a hostile work environment, the Court must examine the frequency of the alleged conduct, its severity, the degree to which it is threatening or humiliating, and the extent to which it interfered with Solomon's performance of her job.  *Id.*  Solomon must allege that her work environment was both subjectively and objectively hostile or abusive.  *Id.*  As the Court begins its analysis, it keeps in mind that Title VII is not a "general civility code for the American workplace,"  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S.

---

[13] The same analysis holds for the ADEA.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 469 F.3d 229, 240 (2d Cir. 2007).

53, 68 (2006), and that this Court is not "a court of personnel appeals." *Alfano v.*

*Costello*, 294 F.3d 365, 377 (2d Cir. 2002).

Solomon bases her hostile work environment claims on the following events:

- The lower pay she has received throughout her time at Fordham;
- The failure to appoint her to administrative positions and the events surrounding her nomination to area chair in 2013;
- The events surrounding the vote calling for her removal as a faculty senator in 2016;
- The scheduling assignments in Fall 2017;
- Her exclusion from meetings in Fall 2017;
- Comments made by faculty in March 2016, November 2017, and December 2017; and
- Allegedly false Code of Conduct allegations contained in Dean Rapaccioli's December 2017 email.

*See* Doc. 51 at 11–12.

Many of the events alleged are not hostile enough — if hostile at all — to support

a hostile work environment claim. *See Alfano*, 294 F.3d at 376–78 (examining the

complained-of events and determining which can support a hostile work environment

claim). None of Solomon's pleadings suggest the interactions concerning her pay, her

scheduling, or the failure to reschedule the Fall 2017 meetings were abusive or even rude.

Her allegations of her nomination and then denial of the area chair position, as well as the

allegations surrounding her duties as a faculty senator — despite being conclusorily

pleaded as "humiliating" — are outside the statutes of limitations as they took place

before March 2017.[14] And Solomon does not allege the way in which the emails she

---

[14] Solomon urges the Court to consider these events alongside her timely claims to form a single period of hostile work environment. But, "[i]n order for a timely incident to prolong a hostile work environment created by earlier action, the timely incident must be sufficiently related to the prior events so that they can be said to be part of the 'same' hostile work environment." *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F.App'x. 88, 91 (2d Cir. 2014) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)). Besides occurring years before the timely incidents, discussed *infra*, they do not involve any of the same individuals and were not similar at all in nature to the timely incidents. *Cf. McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 78 (2d Cir. 2010) (examining the timing, nature, and individuals involved when

describes as alleging violations of the Code of Conduct have caused anything approaching an abusive working environment.

The events that remain — the November 2017 meeting where a professor, Stone, allegedly personally attacked Solomon, and the December 2017 meeting in which Pirson abruptly cut Solomon off — neither individually nor as a group are severe or pervasive enough to state a claim for hostile work environment, especially since Solomon does not plead with any specificity what was said and makes no indication that they were connected in any way to her gender, age, or religion.  *Cf. Alfano*, 294 F.3d at 378–79 (finding that four instances of sexually explicit harassment and one non-sexual allegedly discriminatory act over four years did not constitute a hostile work environment under Title VII).  Solomon's hostile work environment claims are dismissed.

## VI.    RETALIATION

To allege a *prima facie* case of retaliation, Solomon must plead four elements: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019) (internal quotation and citation removed).

### A.  Title VII and the ADEA

Solomon alleges that she engaged in six activities protected by Title VII and the ADEA:

- The October 2017 letter to the provost's office describing complaining of the failed 2013 area chair nomination and the 2016 events surrounding her faculty senator duties, AC ¶ 23, Ex. 10;

- The November 2017 complaint to Pirson regarding her schedule, AC ¶¶ 24, 91, 133;

---

determining an untimely incident to be not related to timely claims).  The Court finds that these sets of incidents are not related and therefore do not form a single environment for purposes of this analysis.  In any event, none of the behavior complained of included any element of hostility towards Solomon because of her protected characteristics.

- The December 18, 2017 email to Fordham's compliance office, AC ¶ 25, Ex. 2;
- The January 2018 EEOC Complaint, AC ¶ 26;
- April 2018 complaints to the provost about teaching assignments, AC ¶ 28; and
- May 2018 complaints to the provost about teaching assignments, AC ¶ 29.

But only some of these activities trigger the protections of the anti-retaliatory provisions of the civil rights laws.

"[M]aking an internal complaint of discrimination is 'protected activity' when the employee can show a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Murphy v. City of Newburgh*, 785 F. App'x. 900, 902 (2d Cir. 2019) (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001)); *see also Kessler v. Westchester County Dept. of Social Services*, 461 F.3d 199, 205 (2d Cir. 2006) (applying same analysis to Title VII and ADEA claims). In evaluating whether an internal complaint, like Solomon's, showcases such a reasonable belief, the Court looks to whether the employer "understood, or could reasonably have understood, that the plaintiff's [complaint] was directed at conduct prohibited by" the applicable civil rights law. *Murphy*, 785 F. App'x at 902 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

Fordham could not have understood that Solomon's informal complaints were directed at gender, age, or religious discrimination. She did not mention any protected characteristic in her October or November 2017 complaints to the provost and Pirson. Indeed, although she recounts her complaints regarding the failure of her nomination to be area chair and the way she has been treated since, she never links that treatment to her being a woman, older, or Jewish. Accordingly, the first protected activity in which she engaged, drawing all inferences in her favor, is her December 18, 2017 email to Fordham's compliance department.

In her amended complaint,[15] Solomon alleges five actions she classifies as retaliatory that occurred after she sent the email to Fordham's compliance department:

- The December 21, 2017 email from Dean Rapaccioli, detailing elements of the Code of Conduct, AC ¶ 25, Ex. 3 at 2.
- A February 3, 2018 email from Fordham's general counsel threatening litigation, AC ¶ 26, Ex. A;
- A February 8, 2018 warning that Solomon would fail to meet her professional responsibilities if she did not attend an unspecified meeting, AC ¶ 26;
- February assignments of her Fall 2018 teaching schedule, AC ¶¶ 27; and
- The May revision to her Fall 2018 teaching schedule, AC ¶ 29.

None of these events, however, is an adverse employment action from which the civil rights laws protect Solomon. "An adverse employment action in a retaliation case includes conduct that is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Duplan v. City of New York*, 888 F.3d 612, 626–27 (2d Cir. 2018) (internal quotation and citation omitted). The December 2017 and February 2018 emails contain no threats in them and, as alleged, do not show anything more than administrators reminding Solomon of her responsibilities as a tenured faculty member. The February 2018 email advises Solomon to limit the extent to which she discusses her EEOC complaint in public, but it does not pressure her to drop it or otherwise limit her complaints' scope. And Solomon does not allege that her assigned classes increased in number or became more burdensome in their preparation — only that the classes changed locations and time slots. This small of a change from the status quo prior to her protected activities is not an adverse employment action. *See Klein v. New York Univ.*, 786 F. Supp. 2d 830, 847 (S.D.N.Y 2011) (finding that dissatisfaction with course assignments is not an adverse employment action).

---

[15] In her briefing, Solomon also claims that Fordham had discontinued her health coverage in May and July 2019 but reinstated it once Solomon contacted the school. Doc. 61 at 2. Even if the Court were to consider this allegation outside of Solomon's pleading, the fact that she suffered no actual deprivation in coverage and that Fordham promptly rectified the lapse shows that these actions were not adverse employment actions.

Accordingly, retaliation claims under Title VII and the ADEA are dismissed. Solomon is granted leave to replead.

### B. FMLA Retaliation

Solomon alleges that, in retaliation for taking a leave under the FMLA in Fall 2018, she was assigned a more onerous course schedule for Spring 2019. But the course schedule for Spring 2019 was no different than the schedule assigned for Spring 2018, the semester in which she most recently taught. *See* AC Ex. 17 at ECF 136. Solomon suffered no adverse employment action and her FMLA retaliation claim is dismissed.

## VII. NEW YORK STATE LAW CLAIMS

Where, as here, all federal law claims are eliminated before trial, the "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining state law claims. *Kolari v. N.Y. -Presbyterian Hop.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having dismissed all federal claims in the instant action, the Court declines to exercise supplemental jurisdiction over Solomon's New York state law claims. They are dismissed without prejudice.

## VIII. CONCLUSION

For the foregoing reasons, Fordham's motion to dismiss is GRANTED in its entirety. Should Solomon wish to file a Second Amended Complaint, she must do so by April 15, 2020, and Fordham is directed to file an answer or any objections to the complaint by May 6, 2020. Discovery in this case is STAYED until Fordham answers a Second Amended Complaint or the Court denies a motion to dismiss a Second Amended

Complaint.[16] The Clerk of Court is respectfully directed to terminate the motions, Docs. 39[17] and 47.

It is SO ORDERED.

Dated:   March 17, 2020
         New York, New York

EDGARDO RAMOS, U.S.D.J.

---

[16] The Court received a courtesy copy of Solomon's "Motion to Compel Compliance with Subpoenas, Compliance with Document Requests, and Compliance with Representations to the Court" on March 17, 2020. Given the stay of discovery entered with this Order, Solomon's motion is DENIED without prejudice. She is granted leave to refile her motion should the stay on discovery be lifted.

[17] Fordham's motion to stay discovery pending the decision on *this* motion to dismiss is DENIED as moot.