# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Esther Solomon

_____

_____

Write the full name of each plaintiff.

-against-

Fordham University

_____

_____

_____

Write the full name of each defendant. The names listed
above must be identical to those contained in Section I.

18    4615   ER
___CV_____

(Include case number if one has been
assigned)

Do you want a jury trial?

☒ Yes     ☐ No

## SECOND AMENDED
## EMPLOYMENT DISCRIMINATION COMPLAINT

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with
the court should therefore *not* contain: an individual's full social security number or full birth
date; the full name of a person known to be a minor; or a complete financial account number. A
filing may include *only*: the last four digits of a social security number; the year of an individual's
birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule
of Civil Procedure 5.2.

---

## I.   PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| Esther | | Solomon |
|---|---|---|
| First Name | Middle Initial | Last Name |

140 West 62 nd street

Street Address

| New York | New York | 10023 |
|---|---|---|
| County, City | State | Zip Code |

212 636 6187

| | etaki33@gmail.com |
|---|---|
| Telephone Number | Email Address (if available) |

### B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:   Fordham University Administration, Rose Hill Campus

Name

Administration Building, Cunniffe House        441 East Fordham Road

Address where defendant may be served
Bronx, New York 10458

| County, City | State | Zip Code |
|---|---|---|

Defendant 2:

Name

Address where defendant may be served

| County, City | State | Zip Code |
|---|---|---|

Defendant 3:

| | |
|---|---|
| **Name** | |
| **Address where defendant may be served** | |
| **County, City** | **State** | **Zip Code** |

## II.   PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:
Fordham University Gabelli School of Business

| | | |
|---|---|---|
| **Name** | | |
| 140 West 62 Street | | |
| **Address** | | |
| New York | New York | 10023 |
| **County, City** | **State** | **Zip Code** |

## III.   CAUSE OF ACTION

### A.  Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

☒ **Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17,** for employment discrimination on the basis of race, color, religion, sex, or national origin

The defendant discriminated against me because of my (check only those that apply and explain):

☐   race: _____

☐   color: _____

☒   religion: _____

☒   sex: _____

☐   national origin: _____

Page 3

☐ **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of race

My race is: _____

☒ **Age Discrimination in Employment Act of 1967**, 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

I was born in the year: _____*1949*_____

☐ **Rehabilitation Act of 1973**, 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

My disability or perceived disability is: _____

☐ **Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

My disability or perceived disability is: _____

☒ **Family and Medical Leave Act of 1993**, 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

**B.  Other Claims**

In addition to my federal claims listed above, I assert claims under:

☒ **New York State Human Rights Law**, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☒ **New York City Human Rights Law**, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☒ Other (may include other relevant federal, state, city, or county law):
Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); Breach of Contract; Defamation;
APEA-New York State Labor Law, Article 6, §194 Equal Pay
Title IX of the Education Amendments
Breach of Fiduciary Duties. Tortious Interference with current and
prospective Business Relations

## IV.   STATEMENT OF CLAIM

### A.  Adverse Employment Action

The defendant or defendants in this case took the following adverse employment actions against me (check only those that apply):

- ☐   did not hire me
- ☐   terminated my employment
- ☒   did not promote me
- ☐   did not accommodate my disability
- ☒   provided me with terms and conditions of employment different from those of similar employees
- ☒   retaliated against me
- ☒   harassed me or created a hostile work environment
- ☒   other (specify):  effective demotion, denial of faculty support, denial of benefits

### B.  Facts

State here the facts that support your claim. Attach additional pages if needed. You should explain what actions defendants took (or failed to take) *because of* your protected characteristic, such as your race, disability, age, or religion. Include times and locations, if possible. State whether defendants are continuing to commit these acts against you.

See Attached Second Amended Complaint

As additional support for your claim, you may attach any charge of discrimination that you filed with the U.S. Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or any other government agency.

## V.   ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☒   Yes (Please attach a copy of the charge to this complaint.)

       When did you file your charge?   January 11, 2018

☐   No

Have you received a Notice of Right to Sue from the EEOC?

☐   Yes (Please attach a copy of the Notice of Right to Sue.)

       What is the date on the Notice?   February 28, 2018

       When did you receive the Notice?   March 7, 2018

☐   No

## VI.   RELIEF

The relief I want the court to order is (check only those that apply):

☐   direct the defendant to hire me

☐   direct the defendant to re-employ me

☒   direct the defendant to promote me

☐   direct the defendant to reasonably accommodate my religion

☐   direct the defendant to reasonably accommodate my disability

☒   direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)
Compensatory and punitive damages, Retract defamatory statements, Make

salary adjustments, specific performance

Discontinue the discrimination and relation, restore status

## VII.   PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that:
(1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| April 14, 2020 | | |
| --- | --- | --- |
| **Dated** | | **Plaintiff's Signature** |
| Esther | | Solomon |
| **First Name** | **Middle Initial** | **Last Name** |
| 140 West 62nd street | | |
| **Street Address** | | |
| New York | New York | 10023 |
| **County, City** | **State** | **Zip Code** |
| 212 636 6187 | etaki33@gmail.com | |
| **Telephone Number** | **Email Address (if available)** | |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☒ Yes    ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

...ther Solomon ___ _

...w York, NY 10021

From: **New York District Office**
33 Whitehall Street
5th Floor
New York, NY 10004

On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| ...018-01611 | **Philip Reo,** **Investigator** | **(212) 336-3772** |

### EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

...e VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age
...crimination in Employment Act: This will be the only notice of dismissal and of your right to sue that we will send you.
...u may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your
...rsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be
...t. (The time limit for filing suit based on a claim under state law may be different.)

...ual Pay Act (EPA): EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the
...eged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)**
...fore you file suit may not be collectible.

On behalf of the Commission

_Kevin J. Berry_                                           2/28/18

**Kevin J. Berry,**
**District Director**

(Date Mailed)

Enclosures(s)

cc:      **Attn**
**Director of Human Resources**
**FORDHAM UNIVERSITY**
**Administration Bldg.**
**441 East Fordham Road**
**Bronx, NY 10458**

# Table of Contents
# Second Amended Complaint
### April 14, 2020

Attached to this Federal Complaint Form are the following documents, which together contain the factual allegations of the Complaint.

The Second Amended Complaint consists of Three Sections, as follows:

I.  Original Complaint:  (May 24, 2018) including US EEOC Filing
        Paragraphs:  ¶1—¶148;  Exhibits 1 – 13

II.  First Amended Complaint: (March 1, 2019)
        Paragraphs ¶149 – ¶199;  Exhibits 14 -- 19

III.  Second Amended Complaint April 14, 2020
        Paragraphs ¶200 -- ¶328;   Exhibits 18 -- 22

# I.  Original Complaint Section -- May 24, 2018

Page

Additional Facts and Causes of Action
Pay Discrimination…………………………………………………………..……...1
Breach Contract……………………………………………………………..…..……3
Retaliation for Filing EEOC Complaints……………………………………....………4
Defamation………………………………………………………………………..……5
Exhibit A……………………………………………………………………….…...…8
Complaint in Support of US EEOC Filing (January 11, 2018)
Table of Contents – US EEOC Complaint……………………………..…….………8
Introduction……………………………………………………………..……………9
Recent Complaint with Fordham EEOC and Subsequent Retaliation…………………11
Retaliation After the Fordham EEOC Filing………………………………..……………11
Progressively Harassing, Punitive Work Environment………………………………12
As of September 26, 2017 Learned of Her Effective Demotion and the Evolving
Retaliatory Measures ……………………………………………………………………12
Her Only Graduate Course, Leadership and Change, Targeted for Cancellation………. 14
The Hostile Environment:  Deliberate Exclusion and Verbal Harassment…………….17
Reference to Questions of Her Not Returning and Retirement……………………….18
Disparate Pay and Treatment of Female Professors: Fordham 2008 Report……………18
Denver Law School Reprimanded by EEOC for Pay Practices Against Female
Law Professors……………………………………………………………………………19
Serious Procedural Irregularities and Discrimination: Twice Denied Promotion………19
Area Chair Appointment; Removal without Explanation and Public Hearing……………21
Actions Against Business School Female Senator for Performing Senate Duties…………22

University Counsel Role Against the Two Female Senators.....................................23
Untrue statements Inserted in Minutes.....................................................................23
Pattern of Targeting Other Senior Professors..........................................................24
Not a New Situation; Since 2003, Female Professors Raised Discrimination Issues...... 25
Conclusion................................................................................................................25

## II.  First Amended Complaint Section -- March 1, 2019

Retaliation Subsequent to filing of 5/24/2018 Filing of Federal Complaint................ 27
Defamation ............................................................................................................. 28
Breach of Fiduciary duty........................................................................................29
Tortious Interference with current relations and prospective advantage....................30
Retaliation Subsequent to filing of 5/24/2018 Filing of Federal Complaint............... 32

## III.  Second Amended Complaint New Section-- April 15, 2020

Preliminary Statement.............................................................................................35
Discriminatory Intent: Comparators and disparate treatment.................................35
Discriminatory Intent: Statements and Secrecy ....................................................43
Discriminatory Intent: Failures to Investigate .......................................................46
Discriminatory Intent: The Pattern of Targeting.....................................................50
Latest Adverse Actions and Retaliation.................................................................51

## Exhibits

Exhibit
A.............................................................................................................................
Exhibits 1-13.........................................................................................................
Exhibits 14-17.......................................................................................................
Exhibits 18-22.......................................................................................................

# Original Complaint

**Original Complaint May 24, 2018 including EEOC Complaint**

## Table of Contents Section May 24, 2018
EEOC Section Consists of Pages 9-17 pages and Exhibits 1-13

                                                                                       Page

Pay Discrimination............................................................................................1
Breach of Contract.............................................................................................3
Retaliation for Filing EEOC Complaints...............................................................4
Defamation.......................................................................................................5
Exhibit A ..........................................................................................................8

Table of Contents of 1/11/18 USEEOC Complaint.................................................8
Introduction of 1/11/18 US EEOC Complaint .......................................................9

## Pay Discrimination

1. Plaintiff Dr. Esther Solomon, is a 68 year old female, who has been a Fordham University faculty member for over 34 years.  A tenured Associate Professor of Management Systems, she has been teaching exclusively at the Graduate Business Programs for approximately 24 of those years, at the Manhattan Lincoln Center campus, where her office has been since she joined Fordham.  Defendant Fordham University .....

2. Throughout Dr. Solomon's employment at the University and continuing to date, Dr. Solomon's pay has been significantly lower than similarly situated male faculty members and even younger faculty members.

<u>Contrast with Male Faculty in her Area</u>
3. Dr. Solomon, who is the only Female tenured faculty member in the Organizational Behavior /Leading People and Organization Area of the Business School, is significantly underpaid relative to the other male colleagues, for performing the same work. She also is not afforded the administrative and other special appointments, accommodations and teaching opportunities afforded her male colleagues, which carry significant compensation and benefits.

4. As far as Dr. Solomon understands, her male colleagues earn over $ 200,000, through upwards of $ 400,000 annually, while she is significantly underpaid relative to the male business school

faculty.  Although gender-based pay discrimination had been admitted ten years ago as occurring at Fordham University, this has not been corrected to date.  This was documented in the 2008 "Report of the Salary and Benefits Task Force on Indicators of Gender Salary Equity Among Faculty Members at Fordham University," and has continued to the present. (§ 63, Exhibit 5, EEOC filing)

5. For example, Dr. John Hollwitz whom the administration appointed Chair upon abruptly removing Dr. Solomon as Area chair in 2015 is among the high paid faculty performing the same Professor job as she does. Dr. John Hollwitz's salary was about $ 400.000 back in 2010 (Exhibit 6, EEOC filing)

6. Dr. Pirson who is the most recently tenured faculty has been appointed Director of two Interdisciplinary programs, with significant compensation beyond his base salary and great power to determine the faculty graduate schedules.  Additionally, he was appointed Acting Chair of Management Systems, with yet additional compensation and control over scheduling and faculty financial resources. Upon information and belief, his compensation is approximately 300.000 annually.

7. Similarly, Dr Solomon's compensation is far lower than other longtime faculty members in the Management Systems Area such as Drs. Robert Wharton, Falguni Sen, Robert Hurley, and faculty that joined more recently such as Drs. Thomas Wright and Benjamin.

**The Pay gap is reflected in compensation Lower than the Lowest in Lower Rank**
8. As a public website (https://www.glassdoor.com) indicates, a Fordham Assistant Professor of Business, a lower rank than Dr. Solomon who is an Associate Professor, earns an average salary of $137,000. Most Assistant Professors are recent hires and have no seniority.  In contrast, Dr. Solomon's salary was $122,947 for the 2017-21018 academic year, which is lower than the average for Assistant Professor salary, although she has been a Fordham faculty member for 37 years.

9. In recognition of the salary inequities, Dr. Solomon as an underpaid female faculty has received small periodic increases for "salary compression" at the University.  These far from corrected the pay disparities, which only become worse over time. Following periodic reviews by the Fordham Faculty Senate committees, her pay was deemed to be so unfairly low, that it was established to be "lower than the lowest salary at the lower rank" As stated in the **Faculty Senate Meeting Minutes # 422 of March 11, 2016 :**
> "So in Gabelli [Business School] we came up with another model. It consisted of making sure that no person in a given rank makes less than the lowest paid person in a lower rank. Thus if an associate professor of marketing was making $180,000 but all assistants were making at least $200,000 than that associate professor's salary would be raised."[Emphasis added]

10. The Faculty Senate committee on "Salary Compression" determined that Dr. Solomon was a faculty member in the rank of Associate Professor whose compensation was less than the lowest paid Assistant Professor at the Business School. As a consequence, she receives "salary compression adjustment" such as of $ 2,750 on June 15, 2016, and previously received a salary

"compression adjustment" of $1,083 in 2011, according to Provost Freedman's annual faculty letters.

### Compounding Base Pay Discrepancies: Improper Denials of Promotion

11. Even beyond the base salary, there is broad wage disparity through additional inequities. There is a big salary differential between ranks, including the promotion bonus and the annual increments for different ranks.  Compounding and even beyond the base salary, Dr. Solomon as a female faculty has been twice improperly denied promotion to Professor (see Complaint Paragraphs 66-74, and Exhibits 8-9).

### Compounding Base Pay Discrepancies: Denials of Administrative and Teaching Opportunities

12. Also compounding the initial disparities is the fact that Dr. Solomon as another female faculty who expressed such concerns, were deprived of administrative and teaching opportunities afforded to similarly situated males (see exhibits…See for example the Mooney- Solomon 2003 plea to Faculty Senate (Exhibit 13) and Dr. Solomon's concerns expressed to Provost Freedman expressed as recently as October 27, 2017 (Exhibit 2).

13. Additionally, even when Dr. Solomon had been voted by her colleagues and was appointed Area Chair in 2015, she was immediately removed for no reason, and the University has not honored that contract  (Exhibit 10).

### Examples of Discrimination in Other forms of Compensation and benefits

14. In October 2017, Dr. Solomon presented a paper and chaired a session at the Annual Strategic Management Society held in Houston, Texas.  Upon information and belief, although Dr. Solomon had to pay for most of her expenses of the Conference, younger faculty had their expenses fully covered by Fordham.

15. On December 17, 2017, Dr. Solomon was notified that she was denied any Summer Research funding whatsoever for 2018.  No legitimate reason was proffered.  Her summer research proposal was entitled: "CEO Perceptions and Values Structure: Leader Integrity in Corporate Governance" to be based on 960 responses by Chief Executive Officers.

# Breach of Contract

16. On the morning of Sunday, September 29, 2013, Dr. Donna Rapaccioli, the Dean of the Fordham Gabelli School of Business, called Dr. Solomon at her home and, on behalf of herself and Provost Freedman, offered her a contract to be the Area Chair of Management Systems for a 3-year appointment.  The compensation agreed included an annual stipend of $18-20.000 and a one-course teaching load per semester (teaching two rather than five courses per year). This was an oral contract, as customary regarding Area Chair appointments at the Business School. Dr. Solomon accepted.

17. Previously, on September 25, 2013, the Management Systems Area faculty had endorsed Dr. Solomon with a 70% majority vote supporting her for the Area Chair position.

18. Several days later, on October 2, 2013, the Provost and Dean announced that they would terminate Dr. Solomon's appointment as Chair, and appoint Dr. John Hollwitz, instead. However, she was told that the University would honor the compensation terms of her 3-year contract – both regarding the stipend and course releases associated with the Area Chair contract of September 29, 2013.

19. Fordham partially fulfilled the contract by providing Dr. Solomon with one-course release. On June 6, 2017, in a letter to Provost Freedman, she again requested that Fordham fulfill all the terms:
> "I would like to make arrangements over the next few semesters to now collect on this obligation. I am owed 9 courses, and so far I have only received a one-course reduction for the Spring, 2014 term, so I am still owed 8 more.
> In addition, you had stipulated that I would get a stipend of $18,000-20,000 annually for the 3-year term.  Please let me know if there are any specific arrangements I need to make to collect on these funds."

20. To this day, the University has not fulfilled its contract with Dr. Solomon.

## Retaliation for Filing EEOC Complaints

Retaliation for Filing EEOC Complaints Retaliation for asserting her rights according to the equal pay act

21. In the EEOC Complaint, Dr. Solomon documented the pattern of retaliation, including the December 2017 actions immediately following my filing a complaint with Fordham's EEOC department, even before my US EEOC Complaint. There were also subsequent retaliatory actions against her.  First, she was improperly and falsely accused in December 2018 of multiple University Code of Conduct violations, which have not been withdrawn.

22. Second, after her January 11, 2018 submission to the US EEOC Commission, the Fordham University Counsel threatened her with a lawsuit, under pretextual charges in the February 5, 2018 letter (see Exhibit 14). It contains new retaliatory threats of legal action against her related to her EEOC filing.  Ms. Crosson's letter includes untrue claims against her, without basis and again without specifics, with threats that the whole weight of the University will come down on her.  This was followed by discriminatory teaching assignments for the Fall, 2018 semester and denial of summer grant funding.

23. **Protected Action**: October 27, 2017 Complaint to Provost, Dean and Fordham Vice Presidents Regarding Ongoing Discrimination and Retaliation

24.  **Protected Action:**  Nov 30, 2017 Complaint of Discrimination and Teaching assignments to the Provost, the Dean and the Fordham Vice President
  - Nov 30, 2017 – Dr. Pirson Threat to go to University counsel

4

- Dec 1, 2017, Escalating Discrimination –Graduate course cancellation- More Damaging Teaching Assignments from Dean's office
- Dec 17, 2017, Denial Summer Faculty Research Support Application for Summer 2018
- Dec 18, 2017, Dean email regarding Code of Conduct violations

**25. Protected Action**:  Dec 18, 2017 Complaint to Fordham EEOC
- Dec 21, 2017   Dean Escalation of Disciplinary Charges re Code of Conduct

**26. Protected Action**:   Jan 11, 2018 Filing of Complaint with the US EEOC
- Feb 3, 2018  Threat of Litigation against Dr. Solomon by Fordham University Counsel
- Feb 8, 2018 -- Threat of Not meeting Professional Responsibilities re attending the meeting by Dr. Crystal of Provost's office

**27. EVENT**: Feb 28, 2018   Decision by US EEOC and Issuance of Right to Sue
- The EEOC Decision was Followed by the Escalation of Discriminatory Damaging Teaching Assignments for Fall 2018

**28. Protected Action**:   Apr 23, 2018 Complaint to the Provost, Dean about the Escalation of Discrimination in Teaching assignments for the Fall, 2018 semester

**29. Protected Action**:   May 2, 2018, Unanswered plea to Provost, Dean to address discrimination, retaliation re Fall 2018
- May 4, 2018, Further Escalation of Discriminatory Damaging Teaching Assignments re Fall 2018- 3 Bronx courses

---

## Defamation

---

**Series of Defamatory Emails**

30. On Dec 18, 2017 and subsequently on Dec 21, 2017 Dr. Rapaccioli Dean of the Gabelli School of Business sent to Dr. Solomon and disseminated to third parties including Vice-President of Fordham University Dr. Jonathan Crystal, and to Acting Chair Dr. Michael Pirson a series of emails citing the Fordham Code of Conduct in connection to conversations allegedly "lacking civility". These communications cite specific extremely serious violations of the Fordham University Code of Conduct. Whether this was the full distribution list is unknown and the full spread of these statements remains to be determined.

31. "Dec 18, 2017
> We have been informed that there has been some disagreement about course scheduling and that you have engaged in a conversation that was viewed as lacking civility. It is the responsibility of all faculty to adhere to the Code of Conduct.  If you have a grievance you can make use of the grievance process. In the mean time, we expect you to behave according to the Code of Conduct."

32. "Dec 21, 2017

As I explained I was informed that you engaged in a conversation that was viewed as lacking civility.
The code I refer to is
Section 6-03.01.  Violations of the Code of conduct include:
(e) Harassment (verbal or other)...
(h) Engaging in, or inciting others to engage in, conduct which interferes with or disrupts any University function, or which prevents or limits the free expression of ideas by others...
(j) Engaging in ...disorderly conduct."

------------------------------------------------------------------------------------------

33. The full text the 3 Code of Conduct Violations associated with Fordham University Discipline cited in Dean Rapaccioli's defamatory emails (e, h, j.) are as follows:

**"Chapter One: Rationale for University Discipline** §6-01.01 - Rationale for University Discipline
**Chapter Three: Violations §6-03.01 - Violations**
The following actions are considered violations of the University Code of Conduct and are punishable by sanctions imposed in accordance with the published judicial procedures of the University:
e.    Harassment (verbal or other) or physical abuse, threatening or attempting to inflict physical injury, or creating substantial risk of such injury to another member of the Fordham University community or to any person on University premises.
h.    Engaging in, or inciting others to engage in, conduct which interferes with or disrupts any University function, or which prevents or limits the free expression of ideas by others, or which physically obstructs or threatens to obstruct or restrain other members of the University community or visitors.
j.    Engaging in lewd, licentious or disorderly conduct.

34. Despite repeated communications by Dr. Solomon to find out what these "violations" presented as hers to this very day, Dr. Solomon has not received no response.

Dr. Solomon wrote back to Dean Rapaccioli on Dec 21, 2017 :
Although you have already drawn conclusions, you have not provided me with even a modicum of information of what you are accusing me of.
Who launched the charges, what are they, and what is the statement which supposedly lacked civility? What day, time, and event is this in reference to?  What meeting was alleged to have been disrupted?

35. The untrue and damaging to D. Solomon's reputation false assertions were communicated to third parties.  To date, these statements have not been retracted.

Part of an ongoing pattern of defamation, as a female, older, Jewish faculty member
36. This December 2017 defamatory communications are part of a pattern of untrue and defamatory communications against Dr. Solomon over the years- 2013, 2016, 2017.

37. In 2013, after being appointed Department Chair, she was abruptly removed and subjected to a **very public and defamatory Hearing** involving the administration and Faculty disseminated to both Lincoln Center and Rose Hill campuses by video feed.

38. In 2016, Dr. Solomon and the other female Business School Senator had false and defamatory statements communicated publicly and broadly disseminated to the entire Business School Faculty, the University Administration and unknown others by emails.  These were never retracted either.

39. Regarding the defamatory statements and actions, Professor Klotz wrote on Feb 5, 2016  to Professor Chatterjee and Professor Wharton:

> "….I am very dismayed you have been misrepresenting your role.   It is true you are two of the elected members of the Gabelli Joint Council's Executive Committee.   However, there are three other members, including the Dean who is the chairperson

> "…The current situation is out of hand largely due to the material misrepresentations of facts in the widely distributed emails sent by you and Professor Wharton to all Gabelli faculty and the larger university community, …..Your and Professor Wharton's actions were not merely disrespectful, they were slanderous and caused irreparable harm to both Professor Solomon and my reputations and careers.

> "…I have copied the University Council on this email and am requesting that she stop this public retaliation, defamation, and harassment of myself and Professor Solomon by you and Professor Wharton.

40. No retraction of these untrue defamatory statements, broadly disseminated by mass emails, has been made to this very day. No investigation and no disciplinary actions were taken against them. These are still contributing along with the ongoing defamation acts to the hostile, chilling work environment.

Exhibit A



## Accusations of Discriminatory Behavior

Elaine Crosson <ecrosson@fordham.edu>
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>                    Mon, Feb 5, 2018 at 2:34 PM

Dear Professor Solomon:

It has come to our attention that you have filed a complaint of discrimination pending before the EEOC. Fordham will respond to the specific allegations in your complaint at the appropriate time. In the meantime, concerns have been raised by some of your colleagues that you have accused them of unlawful discriminatory behavior and that you have expressed this in both a public and private forum. We recommend that you limit your comments to assert only factual allegations such as "I have filed a claim with the EEOC alleging discrimination by the University". To render public accusations of discrimination against other members of the University community concerning matters that have not yet been investigated may cause damage to the reputation of your colleagues and may subject you to legal exposure.

Thank you for your attention to this matter.

--


Elaine Crosson, Esq.
General Counsel
Office Of Legal Counsel
Fordham University •  441 East Fordham Road
Cunniffe House, Room 111 •  Bronx, New York 10458
Office Tel: 718-817-3111 • Cell: 347-344-2501

NOTICE: This e-mail message, and any attachments, contains privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, disclosure, distribution, copying, or any other use of the e-mail or its attachments is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify the sender immediately. You are further advised that no employee or agent is authorized to consent to any obligations on behalf of Fordham University or conclude any binding agreement with another party by e-mail without express written confirmation by the authorized Vice President or officer of Fordham University.

# January 11, 2018 US EEOC Filing

Complaint Submitted in Support of the Application with the US Equal Employment Opportunity Commission

## Table of Contents

**Introduction** .................................................................................................**9**

**Recent Complaint with Fordham EEOC and Subsequent Retaliation**............................**11**

    Retaliation After the Fordham EEOC Filing........................................................**11**

**Progressively Harassing, Punitive Work Environment**............................................**12**

    As of September 26, 2017 Learned of Her Effective Demotion and the Evolving

    Retaliatory Measures .................................................................................**12**

    Her Only Graduate Course, Leadership and Change, Targeted for Cancellation.......... **14**

    The Hostile Environment: Deliberate Exclusion and Verbal Harassment. ............... **17**

    Reference to Questions of Her Not Returning and Retirement.............................**18**

**Disparate Pay and Treatment of Female Professors: Fordham 2008 Report**..................**18**

    Denver Law School Reprimanded by EEOC for Pay Practices Against Female

    Law Professors.......................................................................................**19**

**Serious Procedural Irregularities and Discrimination: Twice Denied Promotion** .............**19**

**Area Chair Appointment; Abrupt Removal without Explanation and Public Hearing**.......**21**

**Actions Against the Business School Female Senator for Performing Senate Duties**...........**22**

    University Counsel Role Against the Two Female Senators....................................**23**

    Untrue statements Inserted in Minutes........................................................**23**

**Pattern of Targeting Other Senior Professors**......................................................**24**

**Not a New Situation; Since 2003, Female Professors Raised Discrimination Issues**...........**25**

**Conclusion**.............................................................................................**25**

**Exhibits**...............................................................................................**26**

## Introduction

41.  As set forth below, Dr. Esther Solomon is filing this complaint in the belief that discriminatory actions and retaliation in violation of her rights have been taken against her at Fordham University, Gabelli School of Business, because of her age, gender and religion.

42.  Dr. Solomon has been on the faculty of the Fordham University Gabelli School of Business for 34 years. Dr. Solomon's background is summarized in Exhibit 1 . Fordham University is a Jesuit school of higher education. It has two main campuses: one in the Bronx at Rose Hill, the other in New York, NY at Lincoln Center. The School of Business has both graduate and undergraduate divisions.

43.  Dr. Solomon joined the faculty at Fordham in 1984 and has been a tenured Associate Professor in Management Systems since 1987. She is a Jewish woman who is 68 years old. The faculty in the School of Business are predominately male. Dr. Solomon is the only female tenured faculty member in the Organizational Behavior (OB) Area[1] in the recently subdivided Management Systems Area. She is also the only Jewish full-time faculty member in the entire former Management Systems Area of the Business School. As explained more fully below, the University has discriminated against Dr. Solomon on the basis of her religion, sex, and age.

44.  Throughout Dr. Solomon's employment at the University and continuing to date, Dr. Solomon's pay has been significantly lower than similarly situated male and/or younger colleagues even though her abilities and accomplishments are equal to or better than those colleagues. The fact that women and older faculty have received lower salaries than men and/or younger faculty has been publicized within Fordham since at least 2008, as stated in the "Report of the Salary and Benefits Task Force on Indicators of Gender Salary Equity Among Faculty Members at Fordham University," and has continued to the present.

45.  In addition to being paid less than her colleagues because of her sex and age, Dr. Solomon has also been discriminated against in multiple ways, including recently in terms of the nature, time, and location of the classes she has been assigned to teach. It is clear that this treatment is geared towards trying to force Dr. Solomon to resign from her position.

46.  In December of 2016, the Dean of the Business School sent Dr. Solomon a letter encouraging her to resign from her tenured position and take a "phased retirement." Dr. Solomon did not accept that offer. After that a number of events occurred which made Dr. Solomon's working conditions much more difficult.

47.  In September 2017, the discriminatory conduct escalated. She has been exiled to the Bronx campus and given many low-level courses, placed under the supervision of a younger non-tenure track contract clinical instructor, to harass and humiliate her, have her suffer, and prevent her from conducting her research because of the time-consuming requirements that have been imposed on her. In contrast, similarly situated male colleagues have been advanced and rewarded, and have not been given such inferior and burdensome assignments. Finally, when she

---

[1] The Organizational Behavior Area/Department was recently renamed Leading People and Organizations.

was willing to tolerate the humiliation and harassment, the retaliation further escalated by raising supposed Code of Conduct violations to force her out.

Previous Egregious Pattern of Actions

48. These recent events were preceded by egregious discriminatory patterns of actions which include the following:

49. Throughout Dr. Solomon's employment at Fordham, she has received a significantly lower salary than similarly situated male, non-Jewish or younger faculty of lesser academic rank.

50. Dr. Solomon was improperly denied promotion on two occasions despite the fact that she was as qualified as similarly situated males and non-Jewish faculty and younger females. Moreover, the promotion reviews did not comply with the Fordham University's procedural requirements in many respects.

51. In 2013, Dr. Solomon was elected to be the Department Chair by the faculty and was appointed by the Dean and the Provost. Shortly after her appointment, Dr. Solomon was summarily removed without explanation by the Dean and the Provost and subjected to a hearing at which she was publicly humiliated, despite the fact that the faculty in her department reiterated that they had nominated her and that she should be treated fairly.

52. The Provost publicly and privately promised to compensate Dr. Solomon as a Chair and grant her the course releases and compensation for the three years of the term, for summarily removing her as Chair for no fault of her own. He has failed to fulfill Fordham's commitment to her.

53. In the 2015/2016 academic year, Dr. Solomon had severe extraordinary actions taken against her and was unfairly publicly condemned for performing her duties as a Gabelli Business School Senator. These activities, against Dr. Solomon, were undertaken with the knowledge of the Dean.

54. The pattern of events has created a hostile work environment for Dr. Solomon based on her gender, religion, and age, and are contrary to Fordham's policies and practices. Moreover, Fordham does not have any legitimate business reason for taking any of the preceding actions.

55. Previously, she has been precluded by male members and younger members of the Department from all administrative or quasi-managerial tasks at the Business School and precluded from appropriate leadership, administrative, managerial and teaching opportunities. Her classes have been disproportionately assigned to late evening 8-10 pm time slots, leading to lower student enrollment which predictably would have a harmful, adverse effect upon her.

56. Her treatment has been in marked contrast to the treatment afforded her tenured male counterparts, Drs. Wharton,  Sen, Stoner, Hollwitz, Pirson, Cole, Hurley, Wright and to the treatment afforded tenure-track faculty, and even male adjuncts, and younger contract clinical instructors as well as faculty who are not Jewish. These issues are well known to the

Administration, as they were notified at multiple points in time and have not taken any action to rein in the discriminatory and retaliatory conduct, instead it has escalated.

## Recent Complaint with Fordham EEOC and Subsequent Retaliation

57. The most recent discriminatory and retaliatory actions occurred in December 2017. On December 18, 2017, in the afternoon, Dr. Solomon filed an EEOC Complaint with Ms. Anastasia Coleman, Fordham's EEOC Officer, with copies to the University Counsel, Ms. E. Crosson, Esq. Dr. Solomon asked whether any Fordham EEOC investigation had followed her ongoing complaints regarding retaliation and discrimination against her, described in her October 27, 2017, letter to Provost Freedman, Dean Rapaccioli, Vice President Jonathon Crystal and Vice President Fahey-Smith.[2] The quote was as follows:

> "The very negative effects lasted long after, and the pattern of actions by members of Fordham University against me have continued and escalated. I am being precluded from all administrative or quasi-managerial tasks at the Business School, discriminated in receiving credit or rewards for my significant contributions, precluded from appropriate leadership and teaching opportunities particularly in the graduate MBA, MS, MA, and PhD programs of the Business School, have had severe extraordinary actions taken against me for performing my duties as a Business School Senator, and am being marginalized to this very day. It does not appear appropriate that senior Fordham Administrators turn a blind eye to these ongoing actions.
> Neither has the reason for my abrupt removal from my Area Chair position, to which I was appointed in full compliance with the University Statutes, ever been explained to me, or to the Management Area faculty at the Department Chair Termination Hearing".

On December 20th, Ms. Coleman answered saying that she had communicated with Vice President Dr. Jonathan Crystal in the Provosts Office regarding her EEOC complaint.

58. Dr. Solomon wrote back to Ms. Coleman on December 21st, asking about earlier investigations regarding 2013. She has received no answer to the present day. (See the email exchange between Ms. Coleman and Dr. Solomon. (Exhibit 2 )

## Retaliation After the Fordham EEOC Filing

59. On the morning of December 18th, before she sent her complaint to the Fordham EEOC Office, Dr. Solomon received an email from Dean Rapaccioli. It stated that 'there had been some disagreement about course scheduling" and that Dr. Solomon had engaged in a conversation "that was viewed as lacking in civility" and that "we expect [Dr. Solomon] to behave according to the Code of Conduct." The Dean's letter contained no specifics.

60. Two days later, on Wednesday, December 20th, Dr. Solomon sent an email to Dean Rapaccioli (copied to Dr. Crystal and Dr. Pirson) asking for specifics regarding the supposed lack of civility.

---

[2] Provost Freedman has previously reiterated the University obligation to investigate discrimination and retaliation complains, when he wrote as follows:
> "In your email, you have indicated that you have been subject to a hostile work environment and have been treated 'unequally'. The University has an obligation, under the law, to investigate such claims. I am referring the matter to the University's Counsel, Elaine Crosson for review".

61. The Dean's reply on December 21st, subsequent to the Fordham EEOC complaint was again void of any specific information, but now contained accusations against Dr. Solomon of multiple Code Violations. The Code she referred to was "Violations of the Code of Conduct": §6-03.01 – Violations and the Dean cited the following Violation Subsections (e), (h), (j).

62. This email sequence with Dean Rapaccioli, including Dr. Solomon's December 21 inquiries about still not having been told what she was accused of doing wrong, are included in Exhibit 3 .

63. As Dr. Solomon was told by other faculty, the Administration in the past had used supposed violations of the Code of Conduct as a method to terminate tenured faculty.

64. See an account by another Fordham Professor with certain similarities. [3] (Exhibit 4 )

**Progressively Harassing, Punitive Work Environment**
As of September 26, 2017 Learned of Her Effective Demotion and the Evolving Retaliatory Measures
65. Dr. Solomon was given faculty course assignments which were contrary to practice, discriminatory, and retaliatory. The Spring 2018 semester will be the first time since Spring 2016, when Dr. Solomon will be resuming her teaching. During the intervening time, she was on faculty fellowship for the 2016-17 academic year and then, one semester of unpaid leave. During that entire period, Dr. Solomon fully participated in meetings and fulfilled personnel responsibilities and was ready to resume her duties for Spring, 2018.

66. Dr. Solomon received her Spring 2018 teaching schedule from Dr. Michael Pirson, Acting Chair on September 26, 2017, following her request for the schedule the day before. Dr. Solomon had previously expressed her preferences for her Spring, 2018 and subsequent schedules. These preferences were now used as a roadmap to assign her the very courses, campus, and level of students which were most undesirable to her and physically taxing. Dr. Solomon had been exclusively teaching MBA students in the Graduate School of Business for over 25 years at the Lincoln Center Campus in Manhattan. She would now be scheduled to teach the most elementary and time-consuming undergraduate classes at Rose Hill at very inconvenient times in the Bronx. For a Fordham professor, she will also have an extremely unusual three-days per week schedule on two campuses.

Recent Set of Discriminatory Actions
67. Dr. Solomon has recently been discriminated against in terms of the nature, time, and location of the classes she has been assigned to teach. It has been the long-standing policy and practice at Fordham that full-time tenured faculty have priority in choosing the classes they are

---

[3] In a case with parallels, a Fordham professor describes a secret investigation of him and how the Fordham EEOC officer met with him but "refused to explain what I was accused of specifically or how what I supposedly did amounted to a Title IX violation."
The Fordham EEOC officer sent a July 14, 2014, letter to the Professor with copies to his Dean, Provost Freedman, and the University Counsel with the conclusion that he might have violated Section 6-03.01(h). His account of the events was entitled "Kafka Was the Rage." (See the Article and the July 14, 2014, letter in the accompanying exhibit)

assigned to teach. Dr. Solomon prefers to teach graduate classes on the Lincoln Center campus and had been assigned to those courses for most of her career at Fordham. During Dr. Solomon's 34 years at Fordham, junior faculty have been hired with the understanding that they will be assigned to teach primarily undergraduate courses. For example, the most recently hired tenure-track faculty member, Professor Hong, was assigned to teach undergraduates. Dr. Pirson and Dr. Cole, who were hired in 2008, also taught undergraduate courses when they were first hired, as had Dr. Solomon when she was a junior faculty.

68. Despite this long-standing policy and practice, Dr. Pirson assigned Dr. Solomon to teach the Core POM undergraduate business courses in the Bronx for Spring 2018. There was no legitimate business reason to assign these courses to Dr. Solomon. To the contrary, three contract clinical instructors were specifically hired in order to teach the undergraduate management Core POM. All three clinical instructors had been trained and had repeatedly taught those Core POM undergraduate courses, so it would have been very efficient and easy for them to teach these courses again in Spring 2018. However, none of the clinical instructors were assigned to teach the Core POM in Spring 2018. Instead, Dr. Solomon was assigned to teach 2 of the 3 Bronx undergraduate Core sections in the Bronx in addition to another class, an unprecedented assignment for any senior tenured faculty member and one that has never been assigned to a senior male professor. Moreover, it would be unheard of to require a senior male faculty member to teach two sections of this course simultaneously along with a third course, as is being required of Dr. Solomon.

69. The undergraduate Core POM is a very onerous course and because of this male faculty have received extra credit. For instance, Dean Rapaccioli offered Dr. Benjamin Cole, 1.5 credits per credit taught for this course. She stated:
> "Dear Ben, I have been thinking a great deal about the additional grading and student engagement responsibilities teaching multiple sections of Strategy I and Management I places on faculty. These responsibilities are especially challenging for tenure stream faculty and tenured faculty on 3/2 teaching loads. Until these additional responsibilities can be handled in a less onerous way, I will support the faculty most affected by allocating a 1.5 weight to these courses. This fall your 4 sections (6 credits) will translate into 9 credits so you will earn one course release or if you prefer you will be compensated for an overload. Let me know what you prefer"

Although Dr. Solomon is being required to carry a 3/2 teaching load, she has not been offered any such extra credit.

70. Moreover, Dean Rapaccioli had previously indicated that Dr. Solomon should be given a course release to prepare for the complexities and multi-party coordination required for teaching the undergraduate Core POM. However, Dr. Solomon has now been scheduled to teach those classes without any preparation.

71. To further humiliate Dr. Solomon, a junior contract clinical instructor was appointed to direct and supervise Dr. Solomon, a tenured faculty of 34 years at Fordham University. The clinical instructor was given two-course releases for performing this supervision.

14

72. Teaching such an extensive and challenging schedule, on 2 campuses, with new preparations for a course that the Dean admitted requires one semester's course release to prepare which Dr. Solomon never received, was intended to and will adversely impact Dr. Solomon's employment.

73. Dr. Pirson, the Director of the Masters of Management Program and the acting Chair of Organizational Behavior, did not assign either of the tenured male faculty, himself and Dr. John Hollwitz, to teach even one undergraduate Core POM at the Bronx campus for Spring 2018. They both teach graduate courses only or advanced electives of their choice. Dr. Hollwitz is scheduled to teach one course on four Saturdays during the entire semester, as listed on the University website and reportedly one statistics class. While Dr. Hollwitz will have four separate teaching sessions for one course and possibly 12 for another, Dr. Solomon is now scheduled for about 50 teaching sessions. Dr. Pirson's teaching schedule is a Special Topics course (12 sessions), and a student trip to Brazil. A junior clinical instructor was assigned to teach the graduate courses at Lincoln Center that Dr. Solomon was fully qualified to teach. Dr. Solomon will be the ONLY senior tenured faculty member assigned to the Bronx undergraduate Business Core POM.

74. These assignments have been made in spite of the fact that the University knows that Dr. Solomon does not want to teach these courses, at these locations, on these schedules. The teaching schedules assigned to Dr. Solomon make it very difficult for her to have substantial blocks of time to engage in research and scholarship.

75. Dr. Pirson has made sexist comments about Dr. Solomon and other women. For instance, in a meeting which occurred in March of 2016, Dr. Pirson described Dr. Solomon and another woman in the meeting as "having strong personalities". This was intended as a criticism of Dr. Solomon and the other female faculty member. Dr. Pirson did not describe any of the male faculty as having "strong personalities" even though their personalities are similarly "strong".

76. In May 2017, Dr. Pirson admitted to Dr. Solomon that she had been left out of the Masters of Management scheduling and promised that he would assign her two elective graduate courses in that program for Spring, 2018. Dr. Solomon said she was eager to teach in that program and described the courses she could develop. Dr. Pirson did not assign these courses to her, but instead, he assigned a male faculty member and an adjunct instructor to teach these courses. Also, Dr. Pirson assigned a clinical instructor to teach the graduate Fundamentals of Management Class, which Dr. Solomon had always taught in the past, rather than assigning Dr. Solomon to teach it.

Her Only Graduate Course, Leadership and Change, Targeted for Cancellation

77. Although Dr. Solomon was initially assigned one graduate Leadership course for spring 2018, that course was intentionally scheduled at a very inconvenient time for students, competing with another course and with a pre-requisite course that students could not possibly fulfill. The pre-requisites were placed only on the course assigned to Dr. Solomon and were inconsistent with the new curriculum modifications.

78. Dr. Solomon unsuccessfully attempted to remove prerequisites which were discriminatorily applied and were barriers to student enrollment in her Leadership Class. She was opposed for an

entire month, by use of non-applicable rules placed as obstacles, and opposition by male counterparts. On the very next day after Dr. Pirson admitted that Dr. Solomon was right and prerequisites could have been removed but said he was still exploring, Dr. Pirson canceled Dr. Solomon's Leadership class.

79. Also, Dr. Pirson failed to advertise Dr. Solomon's course. As a result, the course did not have the requisite number of students and the University canceled it. Shortly after Dr. Pirson canceled Dr. Solomon's course, he advertised another Leadership course with similar content. Instead of assigning Dr. Solomon to teach that course, Dr. Pirson assigned an adjunct to teach the course. Full-time tenured faculty has priority to courses over adjuncts and adjuncts should not be assigned courses if full-time faculty do not have a full course load, the situation faced by Dr. Solomon. Dr. Pirson also changed Dr. Solomon's Bronx Core undergraduate courses to a more inconvenient time, with larger classes and gave an adjunct, a priest, the time slot that Dr. Solomon had been initially given and which was preferable.

80. Typically, when the administration cancels courses, faculty are given an opportunity to make up the credits in a variety of ways. However, there is no known cancellation policy at the Business School, and practices are not uniformly applied. It was used in Dr. Solomon's case in a deliberate, discriminatory manner.

81. As Dr. Benjamin Cole wrote in 2015 to a colleague, Dr. Klotz regarding course cancellations:
> "Perhaps you are happy with last-minute cancellations of your classes, but a lot of Faculty are not….the accommodation is no different than the numerous one-off deals that Donna [Dean Rapaccioli] (acting as the Dean of Faculty at Gabelli) cut regularly with faculty when they take on various administrative tasks, such as what (I believe) you received when heading up the Integrated Core. There is no fundamental difference, in my mind, between Donna saying, "You don't have to teach one load if you help me with XYZ" and "If you teach two classes of 8 students, I'll count it as one load for you."

82. When their courses are canceled, some faculty are given course release time for administrative or other tasks that advance the University's interests. For example, when Professor Sen's course was canceled, he was given two consulting projects to make up the credits during the same semester as the canceled class. Another time, when a male adjunct's course did not fill up in the fall of 2017, the class was opened up to undergraduates so that there would be sufficient enrollment.

83. Upon canceling her class, Dr. Pirson did not offer to Dr. Solomon – unlike Dr. Sen – the opportunity to make up with consulting projects at the graduate school, despite the fact that there are many such projects during the Spring 2018 semester. Dr. Solomon found out from the website that Dr. Pirson – without asking her - had assigned her to a different graduate class, also 8-10 pm, on a third day, making that an unprecedented 3-day schedule for a senior faculty member.

84. In addition to the preceding assignments which were contrary to Dr. Solomon's wishes and much less desirable than the assignments made to male and younger full-time faculty, the

University engaged in other conduct which was geared towards making Dr. Solomon's employment situation untenable.

85. In June 2017 the administration introduced waves of new rules about procedures and who could serve as a Chair. Dr. Solomon had expressed to Dean Rapaccioli her wish to be considered for the Area Chair appointment again. Not only were these rules inconsistent with the University's governing documents, some rules precluded Dr. Solomon from even participating, much less being nominated as Chair. As a result of extraordinary efforts by the administration, including an appeal to the Faculty Senate, a younger, non-Jewish male was appointed Acting Chair of her area.

86. In July 2017, Dr. Solomon asked to take an unpaid leave of absence. Initially, Dr. Solomon was denied the leave and given reasons that were inconsistent with the governing policy. Moreover, the University has granted unpaid leave to younger, non-tenured, non-Jewish faculty. Again, they attempted to get Dr. Solomon to resign by telling her that she could go on unpaid leave if she entered into a phased retirement agreement. Only after Dr. Solomon was able to find a replacement to teach the courses she had been scheduled to teach in fall 2017 was she granted the leave. Even though Dr. Solomon was to be on unpaid leave, the Provost's office notified her that they expected her to participate in recruiting efforts and she was placed on the recruiting committee, academic functions not normally required of faculty while on unpaid leave.

87. In August 2017, Dr. Solomon went to the Annual Meeting of the Academy of Management at her own expense. Although the University was fully aware that Dr. Solomon attended the meeting, she was not invited to and did not know about a reception sponsored by Fordham University at the conference.

88. By email dated September 26, 2017, copied to Dean Rapaccioli, Dr. Pirson wrote to Dr. Solomon: "…in case you come back you would need to be scheduled for another Graduate class" for Spring 2018. Dr. Solomon had never given any indication that she would not return. To the contrary, she had just asked Dr. Pirson for her spring schedule.

89. In October 2017, Dr. Solomon presented a paper and chaired a session at the Annual Strategic Management Society held in Houston, Texas. Upon information and belief, although Dr. Solomon had to pay for most of her expenses of the Conference, younger faculty had their expenses fully covered by Fordham.

90. In October 2017, Dr. Solomon complained to Provost Stephen Freedman and Dean Rapaccioli about the on-going discrimination. Not only did the discrimination not stop, but shortly after her complaint, the retaliation escalated.

91. In November, when Dr. Solomon asked Dr. Pirson, for a more appropriate schedule, he told her, "either you teach in the Bronx, or you don't teach at all."

92. In December, Dr. Pirson continued to insist that Dr. Solomon had to teach additional courses and refused to accommodate her requests.

93. On December 17, 2017, Dr. Solomon received an email notifying her that she was denied any summer 2018 funding whatsoever for working on her research proposal: "CEO Perceptions and Values Structure: Leader Integrity in Corporate Governance" to be based on 960 responses by Chief Executive Officers.

94. I contrast, the males and the younger faculty have lower course loads, receive higher pay than Dr. Solomon and receive summer research funding.

The Hostile Environment: Deliberate Exclusion and Verbal Harassment
95. Dr. Solomon was deliberately excluded from the first of the two Area meetings held by Dr. Pirson during his tenure as Chair. Dr. Pirson notified the faculty one week before the first meeting that he intended to hold a meeting on August 30, 2017, before Labor Day. Dr. Solomon notified Dr. Pirson before the meeting that she had planned to be away during that summer week, and requested that he reschedule the meeting for September. Despite repeated requests by her, the meeting took place on August 30th in her absence. It was highly irregular, unprecedented and apparently purposeful to have a key department meeting before September.

96. During the second Area meeting on November 1st a male professor, Dr. James Stoner raised his voice, personally attacked Dr. Solomon in a highly intimidating and threatening way, and humiliated her in front of her counterparts. Dr. Pirson, who chaired the meeting, did not attempt to stop Dr. Stoner's outburst nor did he express any support for Dr. Solomon. Dr. Solomon had attended this meeting even though she was on unpaid leave. She was humiliated, harassed and silenced. She was the only female tenured faculty member in the room. Male faculty members are not subjected to such public attacks.

97. Dr. Stoner had previously engaged in similar attacks against another older, female professor during a 2016 meeting discussing dividing the Management Systems Area into different groups. One OB professor wrote at the time:
"Second, this meeting demonstrates why many of us do not trust in our colleagues to do the right thing. …. The conversation regarding whether one could be deemed acceptable (or unacceptable) in the other's group was "novel" to say the least, but totally unacceptable. Jesuit traditions of fairness and men and women for others were totally absent. No one of us should be threatened with exclusion, probation, or having to be on our "undefined" best behavior in the supposed context of pleasing a segment of the group. This is one reason why there is so much distrust and animosity in our area."
Another OB professor wrote:
"The fact that what we have proposed so far is unworkable comes a no surprise because there is an element to all of this that has to do with forming a "club" and excluding certain people unless they agree to the mission that club leaders wrote and behave in ways that these leaders deem positive.....when discourse is too characterized by speaking to inflict pain, deceiving others to gain advantage and a generally lack of respect and transparency, damaged relationships and distrust always results."

98. Another example of silencing outburst against D. Solomon occurred December 13, 2017, at a curriculum meeting on to discuss the undergraduate Core Principles of Management Course (POM). At the beginning of the meeting, Dr. Solomon was engaged in discussion with the

adjunct instructor, Dr. Teague, and Dr. Haber regarding potentially correcting a change in time for the worse in one of her undergraduate courses schedule in the Bronx. Dr. Pirson came in late to the conference room, and when he heard the conversation, he suddenly cut off Dr. Solomon in an abrupt and intimidating way. Dr. Solomon was effectively humiliated and silenced for the rest of the 2 ½ hour meeting. At the end of the meeting, she asked another male faculty member, Dr. Hollwitz, if he could help the situation as the former Chair, but he refused and ran out of the room.

Reference to Questions of Her Not Returning and Retirement

99. Dr. Pirson made multiple non-solicited written references to her not returning to Fordham, i.e., "retirement" which she thought very strange since she had never mentioned it and had no such plans. But in light of the assignments, and the refusal of Dr. Pirson or the Administration to modify the plans, it seems clear that these employment actions were a demotion and a plan to try to force her to leave. And despite the fact that she repeatedly pleaded to Dr. Pirson, no change in the physically taxing and unprecedented assignments would be made.

100. Earlier, between January 2017 and June 2017, the previous Acting Chair, Dr. Wu, appointed by Dean Rapaccioli had started the campaign against Dr. Solomon regarding course scheduling, to create an intolerable work environment. To conceal the discrimination against Dr. Solomon and the fact that she was effectively demoted, the initial email addressed both Dr. Solomon and Dr. James Stoner. It misleadingly stated that both would be treated the same way and would have to teach multiple sections of the undesirable undergraduate Core course. It also inaccurately stated that every member of the Management Systems would have to teach more than three courses in the next semester.

The January 20, 2017, email stated as follows:

> "so to fulfill our teaching load for the whole year, every management faculty have to teach more than 3 [undergraduate] sections in the fall. i know teaching is going to be tough…"

101. In fact, contrary to the email, none of the above applied to Dr. Stoner. He had previously signed up for phased retirement, and he was to teach only one course per semester. In fact, he was scheduled for and taught a single graduate course in the next semester. Additionally, no other management faculty taught more than three sections anywhere, particuarly not the undergraduate Core program.

102. Although inconsistent with policies and procedures, and to Provost Freedman's 2013 unfulfilled commitment, they repeatedly and unfairly asserted that she would need to make up for course previously canceled by the administration. However, the outstanding committment to compensate Dr. Solomon with the course releases and stipend for the three year term upon the abrupt removal as Chair, has not yet been fulfilled.

## Disparate Pay and Treatment of Female Professors: Fordham 2008 Report

103. The "Report of the Salary and Benefits Task Force on Indicators of Gender Salary Equity Among Faculty Members at Fordham University" was issued in 2008. Some of the findings were that:

> "… women at Fordham were still less likely to be full professors than men."

"These differences [in time at Fordham] are probably not large enough to account for women being underrepresented in the rank of full professor."
See (Exhibit [5]).

104. This disparate treatment had a major impact on her compensation. Although Fordham has paid female faculty unfairly and refused to honor its salary and other commitments to Dr. Solomon, others in the University are treated differently. (See Exhibit [6])

Denver Law School Reprimanded by EEOC for Pay Practices Against Female Law Professors
105. The Campbell Law Observer published an October 5, 2015, article ("EEOC Urges University of Denver Law School to Increase Female Law Professor Pay to Comply with Equal Pay Act") which describes a situation similar to that faced by Dr. Solomon.   This was also described in the September 1, 2015, article "EEOC: Female Law Professor at the University of Denver are underpaid, violating the Equal Pay Act." (See Exhibit [7])

**Serious Procedural Irregularities and Discrimination: Twice Denied Promotion**
106. Earlier, she had been denied promotion to full professor twice under dubious, irregular circumstances, in 2001 and again in 2003.  Her Appeal was rejected without explanation, and subsequently, she was denied access to the University's Formal Hearing.  This was in violation of her rights as an older female Jewish faculty member and violation of the Fordham procedures and the University Statutes requiring fair and equitable treatment.

Exclusion of Jewish Professors from Voting on Dr. Solomon's Promotion by Abrupt Rescheduling: From Wednesday to Friday Afternoon; From Manhattan to the Bronx
107. The Promotion Meeting to vote for the candidacy of Dr. Solomon to Full Professor was originally scheduled for Wednesday, November 7, 2001, at the Lincoln Center campus.  Dr. Robert Wharton, the Promotion Committee Chairman, abruptly changed the meeting time to Friday afternoon, November 9, 2001, at the Bronx Rose Hill campus.  This precluded two Jewish professors from voting, as they would have had to violate the Jewish Sabbath.

108. As one of them wrote on November 15, 2001, to the Business School Dean at the time:
"As you know, I could not attend the Joint Council Meeting nor the Promotion Meeting of November 9th.  Professor Wharton informed me that the Promotion Meeting vote for Esther Solomon was very close.  To the extent that her candidacy might benefit, I wanted to express my strong support for Professor's Solomon's promotion.  I believe her academic and professional contributions are significant and are consistent with the position of Full Professor." [emphasis added]
Another eligible Jewish Professor told Dr. Solomon of his strong support.

109. Upon her knowledge, this was the ONLY time in the past 30 years that the Promotion meeting was abruptly changed to a Friday afternoon, thus precluding observant Jewish Professors from voting.

University Tenure Review Committee Admits that the Tenure Process is "patently unfair to the candidates seeking tenure" in 2002

110. On November 1, 2001, the University Tenure Review Committee (UTRC) in a Memo to the University President, Vice-President for Academic Affairs (Provost) and Deans, the Committee stated that the lack of tenure standards and procedures:
> "create[s] avoidable problems for UTRC and the University, but (more importantly) is patently unfair to the candidates seeking tenure… The development of relatively explicit standards and procedures by each academic unit is essential to the fairness of the process…" (Exhibit [8])

111. Dr. Solomon believes that there were no explicit standards and procedures then for the promotion process as well. She was not treated fairly. An objective review would determine that her qualification were better than those selected for Full Professor, leading to the conclusion that impermissible reasons were expended in denying her promotion and denying her to appeal her second rejection.

112. There were multiple procedural and substantive violations, several changes and ad-hoc promotion procedures, and refusal to allow Dr. Solomon her due process rights during the promotion process. Between 2004 and 2007, Dr. Solomon made multiple attempts to get a hearing regarding the denial of her promotion to Full Professor. Her requests for administrative review and a Hearing failed despite multiple attempts. This is documented in the 2004 – 2007 Timeline, May 7, 2007, letter to Dr. Judith Mills, Interim Vice President for Academic Affairs and the May 14, 2007, Letter to Prof. Caldwell, Chair, Faculty Hearing Committee. Table 1 and Figure 1 from the 2003 Appeal Application and Timeline Requesting Hearing are included as Exhibit [9].

"Disappearance" of Dr. Solomon's Entire Promotion Record from the Office of Dr. Hollwitz, VPAA
113. On September 4, 2004, the Office of Dr. Hollwitz, then Vice President for Academic Affairs announced the "disappearance" of the entire promotion record of Dr. Solomon from his office.

Untrue Claims that Dr. Solomon "Orally" Cancelled her Formal Promotion Hearing
114. After Dr. Solomon had officially requested a formal Hearing regarding the denial of her promotion application, the former Senate President, Dr. Grace Vernon, Esq. claimed that Dr. Solomon had "orally" told her that she no longer wanted the Hearing. That was an untrue statement of fact, which foreclosed Dr. Solomon's rights. Supposed "oral" statements of Fordham members have been used as a tool by Fordham administrators in other situations as well. [4]

---

[4] Dr. Solomon is not the only member of the Fordham community who alleged that Fordham falsely claimed the withdrawal of a complaint. In another case involving discrimination at Fordham University, Patane v. Clark 05 Civ 10219 WCC, Ms. Eleanor Patane alleged that Fordham also falsely claimed withdrawal of an EEOC complaint.
> "On September 28, 2004, Arendocs [Ms. Georgina Arendocs, then Chief of Fordham's EEO] advised Plaintiff in writing that Plaintiff had supposedly informed her that she did not wish to prosecute her EEO complaint" (see Complaint, Paragraph 22).
That case never went to trial but ended after the Second Circuit Court of Appeals ruled against Fordham.

**Area Chair Appointment; Abrupt Removal without Explanation and Public Hearing**

115. In 2013, she was appointed Chair of the Management Department during a Sunday 10 am telephone call from Dean Rapaccioli. Within a week, she was fired from that position without a reason ever given.

116. In September 2013, Dr. Solomon was nominated with a 70% majority vote by her peers to be Area/Department Chair of Management Systems. Dean Rapaccioli appointed her as Chair on behalf of Provost Freedman on Sunday, September 29, 2013, in a 10 am telephone call, where she congratulated Dr. Solomon on her appointment and discussed details including her compensation and course loads associated with the Department Chair position.

117. On October 2, 2013, in a telephone conversation with Dean Rapaccioli, Dr. Solomon, and Dr. Hollwitz, Provost Freedman sought to change her Chair appointment instead to a "tripartite" Area Chair position with Dr. Solomon, Dr. Hollwitz along with an unnamed third party to lead the Management Systems Area.

**The Publically Humiliating Chair Termination Hearing on October 7, 2013**

118. Then in a move to appear to comply with the Fordham Bylaws on the removal of a Chair, Dr. Solomon was subjected to a Chair Termination Hearing conducted by University Provost Freedman on October 7, 2013. It was humiliating, harassing and public. This Hearing was attended by the faculty colleagues in her Department, by the Associate Vice President, Dr. Jonathan Crystal and others. It was held at the Lincoln Center, Manhattan Campus and video broadcast to the Rose Hill, Bronx campus. No reason was provided then, or since, for her Chair appointment termination.

119. Dr. John Hollwitz was appointed as Area Chair to replace of Dr. Solomon. He was a former Fordham Vice President for Academic Affairs before Dr. Freedman and, reportedly, a boyhood friend of Dr. Joseph McShane, SJ.

**Provost Freedman Reneges on Fordham's Obligations to Compensate Dr. Solomon After Her Appointment and Termination as Area Chair of Management**

120. In conjunction with the actions to remove Dr. Solomon from Chair of Management, Provost Freedman committed Fordham University to compensate her for her appointment as Chair. This was to include stipend monetary compensation and a teaching load of one course per semester for the duration of the three years of her appointment. This is explained in Dr. Solomon's October 27, 2017, letter to Associate Vice President Jonathan Crystal and her 2013 attached correspondence with Provost Freedman and Dean Rapaccioli. (Exhibit [10])

**Dean Rapaccioli Thanks Dr. Sen for his Help in the 2013 Area Chair Removal**

121. On October 18, 2013, Dean Rapaccioli announced Dr. Hollwitz's appointment as Management Area Chair, and thanked Dr. Falguni Sen, the previous male Chair of Management for his "help." She did not elaborate on what "help" Dr. Sen provided in the replacing of Dr. Solomon as Area Chair with Dr. Hollwitz. Dr. Sen, when he was Chair of Management Systems, precluded Dr. Solomon's participation in many of the appointments and programs outlined previously.

## Certain Males Have Dominated as Management Chairs for Decades

122. During most of Dr. Solomon's tenure at Fordham, Chairs of Management Systems have been males. Dr. Robert Wharton was Chair of Management Systems for 23 years (1987 -2010) as well as Chair of the Business School Personnel and Promotion Committee. Dr. Falguni Sen was Chair for three years (2010-2013) and Dr. John Hollwitz for three years (2013-2016). The current OB Chair (Acting), appointed instead of Dr. Solomon, is Dr. Michael Pirson.

## Actions Against the Business School Female Senator for Performing Senate Duties

123. In the 2015/2016 academic year, Dr. Solomon had severe extraordinary actions taken against her and was unfairly publicly condemned for performing her duties as a Gabelli Business School Senator. These events have created a hostile work environment for Dr. Solomon based on her gender, religion, and age and are contrary to Fordham's policies and practices.

124. In 2015, a major curriculum revision at the Business School did not appropriately involve the Management Systems faculty. Dr. Solomon, as Business School Senator, and another female Senator, brought these concerns to the Faculty Senate. The concerns pertained to the lack of appropriate involvement of senior tenured faculty in the curriculum revision process, which precluded senior faculty from exercising their rights and contributing with expertise to the program quality.

125. Following the concerns raised by the two older female Senators, they were targeted, defamed and retaliated against with communications throughout the University and Business School by two males Profs. Wharton and Chatterjee, claiming it was on behalf of the Business School Executive Committee, which Dean Rapaccioli chairs.

126. The Faculty Senate was so disturbed by what occurred that it passed the following resolution to protect the senior female Business School Senators from retaliation for their legitimate and appropriate role:
> "Resolved, That this Faculty Senate, as guardian of the University Statutes and Faculty Handbook, supports and encourages efforts by its members to voice at meetings of the Senate concerns respecting policies and procedures inimical to the nature of academic shared governance, without fear of internal or external constraints, intimidation or retaliation."

127. Dr. Dorothy Klotz, the other female Gabelli Senator, wrote to the Faculty Senate President on February 3, 2016, regarding the "lynching" which took place during the ad hoc meeting of a select group of Gabelli faculty, and the extrajudicial punishment by an informal group. Also attached are some of Dr. Klotz's other emails. (See emails of Dr. Klotz Exhibit 12).

128. Another female Senator described the damage from these discriminatory and retaliatory actions against the female Senators as follows:
> "But the actual reputational and emotional damage to our two colleagues, even more than the statutory violations, is to my mind the most chilling aspect of this -- and ultimately the most damaging to the Senate.

Who would be foolish enough to serve on the Senate (other than administrative proxies) if doing so (and bringing up governance concerns as is Dorothy and Esther have done) puts your job of 20 or 30 years in peril and damages a lifetime of working relationships?"

129. On March 1, 2016, Dr. Solomon sent a letter, to President Father Mc Shane, with copies to the Dean, Provost and a member of the Board of Trustees. (Exhibit 11). A planned vote against the two female Senators by the Business School Joint Council had been part of the Agenda for the next day, March 2, 2016. The letter described some of the events and the extreme harassment, retaliation, defamatory actions and discriminatory treatment she had received. The next day at the Joint Council Meeting the plan was not completed, but the serious damage to the female Senator's reputation was already done.

130. In Spring 2017, Dr. Solomon, along with other female Senators, sought to support and preserve senior tenured professors ability to exercise their primary responsibilities for the quality of the curriculum and the educational process and their rights to self- governance. These were challenged by proposed Amendments to the Business School Bylaws, introduced by the Business School Executive Committee for a faculty vote at the Joint Council Meeting of May 3, 2017. The amended minutes portrayed Dr. Solomon in an unfavorable light and as the only individual concerned, and her request to review the minutes in advance was denied.

University Counsel Role Against the Two Female Senators
131. The University Counsel had a role in advising different entities allied against the two female Senators, as noted in the email cited below.

132. After documentary evidence surfaced indicating that invitations were selectively sent Gabelli faculty regarding the January 27th Faculty Meeting, one of the female senators under attack, Dr. Klotz requested the email distribution list of faculty who had been invited. Dr. Robert Wharton and Dr. Sris Chatterjee replied to Dr. Klotz in a February 20, 2016, email:
"We are happy to address the following items in your [Dr. Klotz] email: (1) List of persons blind-copied on the Jan 25 e-mail with the subject heading of "Faculty Meeting on Wednesday, Jan 27. We have been advised by the University's General Counsel that there is no obligation to turn over our e-mails or to provide a list of e-mail recipients." [emphasis added]

133. On November 30th 2017 when Dr. Solomon expressed her distress over Dr. Pirson's comment "Either you will teach in the Bronx, or you do not teach at all" at the time she was asking for his help, he threatened her that he would get advice from the University attorney. As Dr. Pirson wrote:
"I will consult with Legal Council [sic] right away."

134. Dr. Pirson added Vice President Dr. Crystal's name to the list of administrators copied in the email sequence.

Untrue statements Inserted in Minutes
135. During the period between November 2015 and May 2016, individuals, some with administrative roles, repeatedly promulgated false accusations about Dr. Solomon's conduct,

which were spread widely throughout the University. Had she not found out about them and corrected them, they could have resulted in disciplinary actions against her for violations of the Code of Conduct. There were several such instances of untrue insertions regarding statements which Dr. Solomon never made, in letters and in Minutes including Faculty Senate Minutes, Joint Council Minutes and Departmental Minutes.

## Pattern of Targeting Other Senior Professors

136. The Business School has a pattern and practice of forcing tenured Professors to resign from their positions by engaging in the same conduct it is currently undertaking with respect to Dr. Solomon, i.e. assigning them primarily to the Bronx campus, requiring them to teach undergraduate instead of graduate courses and then accusing them of some sort of "misconduct."

137. As one targeted senior professor, forced to leave, wrote:
"thank you for your concerns.
Yes, I am not coming back. I have been exposed to concerted efforts of the new regime to push me out. I have been requested to teach undergraduates basic statistics and criticized for some snow days I missed due to illness...... They stopped my salary already, now I have to get some health insurance, and then I will fight for my retirement income."

138. Another older Business professor was sent to the Bronx and given an unusual and onerous three-day teaching schedule, following which she took phased retirement, giving up her tenure,

139. Regarding another older Jewish professor who had been at Fordham for many years and planned to continue his academic career, he suddenly "disappeared" without any announcement or even a farewell party by the University.

140. Another senior Jewish professor and former Area Chair in Management Systems who developed major Graduate Programs was demoted to the Bronx. He was given the humiliating assignment of teaching what he described as "baby math" to beginner undergraduates. He was repeatedly denied promotion despite his credentials and significant service to Fordham and its programs.

141. Two female Jewish professors from Ivy League universities were hired in 2008 at the same time as two male non-Jewish professors. One of the females was denied reappointment on illegitimate grounds. The other female was sent to teach exclusively at the Bronx, demoted to being a contract clinical from the tenure track and worked very productively on developing the undergraduate program. She subsequently left. The other two non-Jewish males, Drs. Cole and Pirson were hired at in the same year and have had flourishing careers at Fordham with tenure, promotion and major administrative appointments.

142. Another Jewish female was recruited as an Associate Dean for the Business School and received a tenure-track faculty appointment in the Management Systems Area. After the end of her administrative work, she was not allowed to teach in conformance with her contract. Dr. Wharton, the Area Chair at the time, told the faculty that she had refused to show up for classes. However, she had previously shared with her colleagues that she was working hard preparing for teaching her classes that fall.

**Not a New Situation; Since 2003, Female Professors Raised Discrimination Issues**

143. In 2003, the female professors in the Department of Management, Dr. Marta Mooney and Dr. Solomon, outlined in a 2003 Memo to the Faculty Senate Executive Committee the disparate treatment they were subjected to and the lack of transparency exhibited by the male professors that controlled the Department of Management. (Exhibit [13])

144. They noted the relevant governing Statutes and asked for a review of the [lack] of compliance with the spirit and wording of those requirements. Their disparate treatment occurred in multiple areas including exclusion from teaching and administrative opportunities, special benefits and privileges, special programs, etc. To this day, unfortunately, similar practices have continued as outlined in this filing.

145. The Administration, EEOC and University Counsel have been notified on repeated occasions regarding the violations against female and older professors. This goes as far back as 2003 with reports to the Faculty Senate, reports by Dr. Dorothy Klotz regarding actions against the female Senators, and a 2016 letter to President Father McShane. Despite being notified of these problems, the University has not undertaken any steps to address the discrimination or ensure that it does not continue.

146. As a result of these actions, other faculty have become reluctant to be seen interacting with her in public, fearing that they will also suffer retaliation for associating with her. Some faculty members will only speak with Dr. Solomon behind closed doors or when they otherwise cannot be observed. Junior faculty members have stopped working with her. This has been very personally damaging to her and continues to the present day.

**Conclusion**

147. The above supports the conclusion that discriminatory actions and retaliation in violation of her rights have been taken against Dr. Solomon at Fordham University, Gabelli School of Business, because of her age, gender and religion.

148. As a result of the preceding conduct, the University has made the working conditions faced by her untenable. She has not only been subjected to discrimination in every aspect of her employment, from pay, to being deprived of the opportunity to serve in administrative positions to which she was duly elected by the faculty, to onerous work assignments not made to similarly situated male faculty, to public humiliation for exercising her academic freedom and duties as an elected representative of the faculty.

# First Amended Complaint New Section

149. The purpose of the First Amended Complaint is threefold:

150. 1. First, to update the Court to events that occurred since the complaint was filed on May 24, 2018.

151. 2. Second, to provide specific quotes regarding the defamation per se, which expand and clarify the defamation claim in the original complaint, in the pattern of continuing wrongs. The additions provide specificity for statements in 2013, 2016, and 2017, seeking to clarify and document them.

152. 3. Third, to present two new claims of a) breach of fiduciary duty and b) tortious interference with business relationships and prospective advantage, which better characterize the continuing wrongs pattern relating to several key facts which have already been pleaded. The added claims are more precise, providing clarity and coherence to the events in the complaint, explaining them a more organized way.

153. These claims are intended to better capture the concerted efforts to discriminate and retaliate, and the use of improper means to deprive plaintiff from occupying duly elected positions and exercising deserved leadership in the Management Systems Area and the Business School. These were part of the effort to continuously discriminate and unfairly disadvantage plaintiff because of her gender, age, and religion, through usurping university processes and practices, in a series of actions culminating in different instances over time.

154. These relate to a pattern of wrongdoing and discrimination pertaining to:
    **I.** Her application for promotion to Professor which was twice improperly denied in violation of the University Statutes, and subsequent successful concerted efforts to preclude review of her appeal, and improperly foreclose her right to a Formal Hearing although authorized by the University Statutes.

155. The pattern used by Defendants to preclude her judicial review was also allegedly used against other victims as well, which was only discovered in 2018, while plaintiff was preparing this complaint.

156. **II.** Her election and appointment as Area Chair of Management Systems in the Business School in 2013 and subsequent removal through the public humiliating Chair Termination Hearing of October 7, 2013, held at the Lincoln Center, Manhattan Campus and video broadcast to the Rose Hill, Bronx campus.

157. **III.** Her performance of her duties as a Business School Senator (along with another female Senator) and the very public actions against her.

158. **IV.** The 2017 actions against her, and subsequent discrimination and retaliation continuing to today.

# Defamation

159. This updated defamation section is intended to provide specific quotes of defamatory statements regarding the ongoing defamation per se.  It expands and clarifies statements in the defamation claim in the original complaint, and events described in several sections throughout the complaint including paragraphs 30 through 40. This section provides additional specific quotes in the pattern of continuing wrongs,  to provide specificity for the defamatory statements.

160. Common in the per se defamatory communications and actions recurring over time were attempts to remove plaintiff from leadership positions, to fabricate supposed code of conduct violations to undermine her position and threaten her tenure, discriminating against her as a female, older, Jewish faculty member.

161. These included her leadership status as a Management professor, as a Management Systems Area Chair, and as a longtime Senator elected to represent her Business School colleagues at Fordham University's Faculty Senate. The per se defamation pattern converged in seeking to remove her from such positions of authority and diminish her status,

162. These actions are connected, based on the "continuing violations" or wrongs doctrine. Where there is a series of continuing wrongs, the continuing wrong doctrine tolls the limitation period until the date of the commission of the last wrongful act.

### Plaintiff as Management Systems Area Chair – 2013 Defamation

163. As stated in paragraph 37 of the Complaint, in 2013, after being appointed Department Chair, she was abruptly removed and subjected to a very public and **defamatory Hearing** involving the administration and Faculty disseminated to both Lincoln Center and Rose Hill campuses by video feed.  That meeting, on October 7, 2013, involved multiple administration officials including the Provost, Vice-Presidents of Fordham, a Dean of the Business School and the Management Area faculty.

### Plaintiff  as Business School Senator- 2016 Defamation

164. As stated in paragraph 38 of the Complaint: in 2016, Dr. Solomon and the other female Business School Senator had false **and defamatory** statements communicated publicly and broadly disseminated to the entire Business School Faculty, the University Administration and unknown others by emails.  These were never retracted.

165. During the period between November 2015 and May 2016, individuals, some with administrative roles, repeatedly promulgated false accusations about Dr. Solomon's conduct, which were spread widely throughout the University.  Untrue statements were repeatedly inserted in Minutes. There were several such instances of untrue insertions regarding statements, which Dr. Solomon never made, in letters and in Minutes including Faculty Senate Minutes, Joint Council Minutes and Departmental Minutes.

166. Professors Chatterjee and Wharton, stating that they represented the Business School Executive Committee of which Dean Rapaccioli is the Chair, sent the following secret allegations against plaintiff to third parties, not plaintiff directly, on February  4, 2016.  The

following Secret untrue allegations were first addressed to the Faculty Senate Executive Committee, not to plaintiff, pertaining to her and the other female Business School Senator performing their duties. The full distribution list, beyond that, is unknown.

167. The February 4, 2016 the email from Professors Chatterjee and Wharton stated as follows: (see Exhibit [14]14)

"….. We also feel that it should be clear to the other members of the Faculty Senate that the conduct of Senators Klotz and Solomon was not only unprofessional but was predicated on a series of material misrepresentations made to the Faculty Senate in connection with the PMBA Committee's processes.  We request that the Faculty Senate join the Gabelli School in seeking the removal of these two Senators for their material misrepresentations as members of the Faculty Senate. "[emphasis added]

168.  The context regarding the 2016 actions against plaintiff are described in her March 1, 2016 letter to Fordham President, Joseph M. McShane, SJ: (The complete letter is in Exhibit 11)

"In summary, without detailing all of the substantive and procedural improprieties that have occurred:

169.  (1) Unauthorized, draft minutes of Senate meetings—draft minutes to which I and others objected and that are required by Senate procedures to be confidential until approved—have been circulated within the business school faculty and utilized to accuse me and the Faculty Senate.  This is a continuing issue.

170.  (2) The **defamatory and retaliatory** use of this and other inaccurate and unauthorized materials led to a purportedly legitimate faculty meeting within the Gabelli School on January 27, 2016 that resulted in a series of condemning resolutions that further injured my professional reputation and standing among my peers, and the reputation of the faculty senate.

171.  (3) The January 27 meeting was suffused with due process violations, including: improper notice to faculty members; failure to notify and invite all eligible faculty members; lack of notice to me that I would be the subject of discussion or resolutions at the meeting; and procedural irregularities with the voting system used at the meeting, among other issues…

172.  …The republication of resolutions introduced at the January 27 meeting as the materials distributed in advance of tomorrow's faculty meeting to faculty, administrative staff and student representatives perpetuate the retaliation and total lack of due process that has characterized this entire matter."

---

**Breach of Fiduciary Duty**

---

173.   The Senior officers of the University, such as the Dean, Vice President of Academic Affairs, Provost, and the President, are fiduciaries as is the Board of Trustees who appoints them. (see Fordham University Statutes). As fiduciaries, they are required to attend to those whom they are to serve, such as the shareholders and all stakeholders, including the University faculty. They are expected to act in a manner consistent with the three forms fiduciary duties, referred to as the "triad" duties, which include the duties of care, of loyalty, and of candor.

174. According to the duty of care, fiduciaries are required to act as a reasonable and prudent person in a similar circumstance would act. According to the duty of candor, fiduciary must act with honesty and fully disclose information that may harm the business or individual that is owed the duty- here not try to harm the faculty member. According to the duty of loyalty, fiduciaries should act in good faith and with the best interests of the business or corporation in mind, putting them above their own personal interests.

175. As precedent indicates, "it is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect. This is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty. (citations omitted)." *(See Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466 (1989).*

176. Faculty members can have a justifiable expectation of loyalty.  For example, 3-05.04 Responsibilities of Dean of a Faculty state: "a. The Dean of a Faculty shall have the responsibility for providing leadership in the development of the faculties of the Schools or Colleges for which he/she is accountable. This shall include providing the opportunity for the professional and academic development of the faculty both individually and collectively."

177. Actions described in this complaint, particularly the events in 2003, 2013, 2016, 2017 and 2018 are inconsistent with the exercise of fiduciary duties and constitute their breach, to plaintiff's damage.

---

**Tortious Interference with Current and Prospective Advantage**

---

178. The pattern of actions described in the complaint, particularly those in 2013, 2016, 2017 and 2018 constitute tortuous interfere with plaintiff's business relations and future economic opportunities. The relations between faculty and the University, as well as the relations among faculty to each other within and among departments, are governed by the University Statutes, which constitute the contract. Additionally, the Business School bylaws specify additional contractual relations, power and composition of committees, eligibility to serve committees, represent different groups, and have access to information and resources.

179. Based on differences in faculty ranks, position, or departments, different rules apply. The existence of these contracts is known to all. Interference with these contracts can have very consequential impact on individuals involved, as plaintiff here.

180. The faculty status and business relations with each other at the Gabelli School of Business of Fordham University although their compensation is based on annual salaries, reflects significant differentials in access to administrative opportunities, resources for research, teaching with additional compensation, and potential benefits. The business faculty are set up so as to compete with each other for administrative, teaching, program development and supervisory assignments and directorships. Additionally, the system creates competition among faculty and contract employees with each other for research support, summer stipends, assistant support, development opportunities, special programs, directing centers, funding for attendance conferences, presentations of research in conferences, achieving collaboration with co-authors in research, opportunities for research resources and recognition, travel and collaboration or teaching in Gabelli's international programs and other beneficial assignment that carry significant financial and other advancement implications.

181. The failure to promote under improper circumstances, the removal as Department Chair compounded by the ongoing defamatory statements have been extremely harmful and disadvantaged plaintiff in her business relations both with faculty colleagues and administrators inside the university and with those outside the University. These public humiliating events and actions to which plaintiff has been subjected are particularly damaging as they relate to the her as a professional in her business and profession- to her detriment. Such unlawful actions intentionally and by improper means interfere with faculty members' perceived ability and character, impairing her from engaging in the competitive process and seeking/obtaining such advantages.  They also have broad negative implications on her future ability to effectively compete and engage in these and outside business relationships.

182. Improper denial of promotions, dissemination of untrue defamatory publications and public humiliation actions by the administration diminish faculty members' perceptions in the eyes of their faculty colleagues and administrators within the University.  They also have a profound effect on the perception by outsiders and potential for prospective business relationships.

183. As examples, the plaintiff was humiliated to the outside academic community, including international colleagues.  Plaintiff had a contract offer in 2017 from an international colleague to develop new programs with plaintiff and Fordham University.  Due to the action of the defendants by bringing her up on Code of Conduct allegation, threatening her very employment, she was forced to forgo this prospective business opportunity.

184. As President of an international professional organization, the Facet Theory Association, plaintiff, after announcing to them that she had been appointed Area Chair of Management Systems was obligated to explain that she had been removed.  Internally, junior faculty in the Area who were planning to work with plaintiff, praising her data and methodologies and expressing expectations to benefit from the research collaboration, suddenly pulled back following her public removal as Area Chair and after the Senate episode, rightfully fearful of contagion and retaliatory damage to their own careers.

## Retaliation Subsequent to 5/24/ 2018 Filing of Federal Complaint

185. This section updates and follows chronologically since the May 24, 2018 original Complaint, Served August 9, 2018.  This follows the original Complaint paragraphs 21-19 in the section entitled "Retaliation for Filing EEOC Complaints."  The present section updates that section.

186. **Protected Action**: May 24, 20 19 Filing of Federal Complaint

- 187. Announcement to plaintiff on June 4, 2018 of Fall 2018 retaliatory assigned teaching schedule, which would involve perpetual excessive overload planned for plaintiff. It consisted of 3-3-3 course teaching: 3 in Spring 2018, 3 in Fall 2018, 3 in Spring 2019. It was announced by a member of the Finance faculty Dr. Borun, who was newly appointed as Acting Area Chair of Management-LPO subdivision.
  It included multiple sections of courses which counted as 1.5 per credit for male younger faculty, but not plaintiff.  The planned assignments for her would amount to a retaliatory punitive teaching load 4 or 4.5 classes per semester, or 8 to 9 equivalent classes per year. The contractual teaching load for University faculty, which as of many years is required to be no more than 2+3=5 classes annually (Exhibit  15).

- 188.  August 23, 2018 and ongoing to present- Preclusion by the administration from answering student Ms. McLaughlin's letter to Dr. Solomon (Exhibit  16). Ms. McLaughlin characterized the actions of other students in the class as "borderline sexual harassment of you as professors." Regarding plaintiff and another female professor. The email was documented with exhibits, which included a distorted image "pumping up of Professor Solomon's face into some sort of demeaning cartoon."

- 189.  Despite follow up inquiries, communications, and requests by plaintiff, there was neither follow up or her involvement to this very day--regarding process or outcome of sexual harassment investigation, if any. The plaintiff was precluded from communicating further with Ms. McLaughlin, interfering with faculty's relations with her own students.

- 190.  This sharply contrasts to other University responses to other discriminatory acts in which Fordham President Father McShane became personally involved.

191. **Protected Action**: Exercised Rights in Family and Medical Leave Act of  1993

- 192.  Because of a qualified necessity, plaintiff exercised her rights based on the Family and Medical Leave Act of 1993 during the Fall 2018 semester. However, following the Family Medical Leave, non-existing rules were cited to penalize her with another heavier than normal teaching load the next semester, on account of returning to teaching from the Family medical Leave, in an unprecedented schedule for someone of her position.

TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ..................................................................35

**DISCRIMINATORY INTENT: COMPARATORS AND DISPARATE TREATMENT** ...35

Fordham Definition of Faculty and Tenure...........................................35

Job Content and Faculty Responsibilities.............................................36

Similarly Situated Male Comparators ...................................................36

Administrative, Area Chair and Faculty Positions ................................37

Disparate Treatment: Overview .............................................................38

Disparate Treatment: Pay ......................................................................40

Gender Plus Discrimination ..................................................................41

Disparate Treatment: Faculty Senate 2008 Report...............................42

Disparate Treatment: Examples ...........................................................42

**DISCRIMINATORY INTENT: STATEMENTS AND SECRECY** ......................43

The Pattern of Discrimination by the Same Group of Male Supervisors ...................................43

Secrecy By Male Area Chairs Instrumental in Concealing Discriminatory Intent ..................45

Plaintiff as a Leader Recognized by Her Peers ....................................45

**DISCRIMINATORY INTENT: FAILURES TO INVESTIGATE** ........................46

Internal Discrimination Complaints to Fordham and University Discrimination Policies .......46

Failure to Investigate Reports to EEOC Officer....................................47

**DISCRIMINATORY INTENT: THE PATTERN OF TARGETING** ....................50

Similarly Situated: Disparate Treatment of Older, Female or Jewish Professors ....................50

**LATEST ADVERSE ACTION IN RETALIATION** ........................................51

The Latest Retaliation: "An Event of Termination".............................51

Appeal to Fordham's President ............................................................52

EXHIBITS ...............................................................................................55

## PRELIMINARY STATEMENT

200.    Plaintiff pro se respectfully submits this Second Amended Complaint as authorized by the March 17, 2020 Court Order.

201.    The Second Amended Complaint new sections (¶200 - ¶328; Exhibits 18-22) address the following points among others: the latest retaliation, relevant Fordham Statutes on comparator information, disparate treatment, Fordham rules involved in failures to investigate, indicators of discriminatory intent.

202.    The Second Amended Complaint raises for the first time the latest adverse action against Dr. Solomon by Fordham of February 1, 2020 in retaliation for her anti-discrimination action: the removal of her health coverage and other benefits, three days after the Court Hearing.

203.    Fordham was on notice of the bases of her protected activities, not only in her direct complaints but also in her January 11, 2018 EEOC Complaint and her May 24, 2018 Federal Complaint and her March 13, 2019 Amended Complaint.

204.    Fordham first threatened this retaliation in a May 24, 2019 email from Dean Rapaccioli to Dr. Solomon.  They previously had discontinued her health coverage in May and July 2019 but reinstated after intervention by Ms. Crosson, Esq., Fordham Counsel.  Currently, Dr. Solomon is without salary, health care coverage or other Fordham benefits.


## DISCRIMINATORY INTENT: COMPARATORS AND DISPARATE TREATMENT
### Fordham Definition of Faculty and Tenure

205.    The Fordham University Statutes define Dr. Solomon's contract with the University as a tenured faculty.  This also applies to her male Comparators, who are all tenured.

206.    The term "Faculty" includes distinguished professors, university professors, professors, associate professors, assistant professors who are tenured or have received tenure-track appointments at Fordham University. Dr. Solomon and her tenured male Comparators are part of the "University Faculty" as codified by Statute §4-01.02: The Faculty, and specifically,  one of the Professional School Faculty - the Business School (Statutes: Exhibit 18).
>    "The University Faculty has primary responsibility for such fundamental areas as curriculum, subject matter and methods of instruction, research, faculty status, and those aspects of student life which relate to the educational process."

207.    In contrast, the term "Instructor" includes non-tenurable ranks.  These are appointments that cannot lead to tenure as defined in the Statutes under "4-02.02 -Non-tenurable Ranks." It includes clinical staff, adjuncts, instructors, visiting professors, research professors, and others teaching at Fordham University under contract.

208.    Tenure at Fordham is described in Statutes §4-05.04 Tenure, and it is granted by the Board of Trustees. (see Exhibit 18)

209.    Procedures for granting tenure and promotion are defined in the Statutes. Tenure is a guarantee of continuous appointment until a faculty member retires. The appointment of a tenured faculty member can only be terminated pursuant to disciplinary action or financial exigency (See §4-07.13(c) / §4-05.06(b)). [1]

## Job Content and Faculty Responsibilities

210.    Dr. Solomon's job content, as well as her comparators, is defined in the Statute section entitled "Faculty Responsibility" §4-03.01. Section A states that "Appointment as a faculty member is a contract for full-time engagement in faculty responsibilities during the academic year." It goes on to state the responsibilities in Section 1-11, as indicated in the paragraphs below. The work content responsibilities are teaching, research, and service.

211.    Specifically, the responsibilities of Dr. Solomon and comparator professors include fulfillment of teaching duties in teaching /assigned courses, including development and update of teaching materials, the holding of classes, examinations, grades, assigning and providing feedback to students on special projects, cases etc.; preparation, proctoring and grading of student examinations, direction, reading and evaluation of student papers, reports, academic counseling and guidance of students.

212.    Their responsibilities beyond teaching include research and scholarly publication; service, participation in learned societies and professional organizations; participation in University, School, Division and Department meetings, and commencements; Service on committees; tenured faculty participate in peer review of junior faculty, recruiting and peer review evaluating reappointment, tenure and promotion of junior faculty- tenure track but also clinical instructors and adjuncts, as part of faculty self-governance. They also include Service on committees [see § 4-06] and cooperation in the observance of University regulations.

213.    The teaching load responsibilities are described under Teaching Load in Statutes §4-03.02 as modified by Senate Minutes. The maximum faculty teaching load currently is no more than five courses per year (2-3 or 3-2 courses/semester). The faculty course load can be reduced to 2-2 courses, or even less annually, through course releases.

214.    The course load may be reduced for individual faculty members engaged in major research projects, faculty who spend much of the time in the direction of graduate student research, for faculty members involved in the direction of fieldwork or other activities which justify a reduction of course load. Chairpersons and other faculty with significant administrative responsibilities are given consideration in the reduction of their teaching load.

## Similarly Situated Male Comparators

215.    All male comparators are tenured professors at the same Business school and subject to the same rules in the Fordham Bylaws Statutes and Faculty Handbook, as is Dr. Solomon. All

---

[1] Tenure is a guarantee of continuous appointment. Termination of Appointment (§4-05.08 ) can be done only pursuant to Disciplinary Action (§4-07.13) or due to financial exigency. The Dean and the group that repeatedly tried to exclude Dr. Solomon, as with other members of protected classes from Gabelli Business, used the pretext of supposed violation of the University Code of Conduct, inefficient service, or breach of their employment contract.

male Comparators are tenured professors and hold PhD degrees or the equivalent doctoral degree, as required for faculty by the AASB, the accrediting organization for business schools. They have been evaluated by the Personnel Faculty Committee of the Business School regarding reappointment, tenure, and promotion. (see Statutes, Exhibit 18) They are all subject to the same teaching, research, and service standards.

216.    The male Comparators in the Management Systems Area  are listed with the year each joined the Area: Professors Robert Wharton 1981,  Falguni Sen 1986,  John Hollwitz 2007 Area (Fordham 2000) Michael Pirson 2008,  James Stoner 1970s, Benjamin Cole 2008, Robert Hurley 2003 Area, (1992 Fordham),  Thomas A. Wright 2012, Milan Zeleny 1982,  Nicolas Georgantzas 1987, Victor Borun 2018 Area (Fordham 1980).  Male Comparators in the Business School, but outside Management include David Gauchi 2010, Sris Chatterjee (Finance) 1989, Aditya Saharia (Information) 1997.

217.    The male Comparator's positions are substantially equivalent to Dr. Solomon's. The Comparators are all subject to the same performance evaluation and discipline standards, and comparable when engaged in similar conduct.

**Administrative, Area Chair and Faculty Positions**
218.    According to Fordham's Statutes, Chairs of the Areas/Departments are required to be voted on by their colleagues and then appointed by the Administration. (Statutes, Exhibit 18) This was the process with Dr. Solomon's appointment to Area Chair of Management Systems in 2013.    As Dr. Solomon wrote to Dean Rapaccioli and Provost Freedman on October 2, 2013:
> "As a follow up of our conversation yesterday, I reviewed the University Statutes again. All the steps were followed for my selection as a Department Chair preceding my appointment on Sunday, September 29th when you conveyed to me the Provost's decision (-see § 406-50 c through e). I was nominated by the Management Systems nominating Committee by secret ballot, and my name was one of the two transmitted to you, on the basis of which you conferred with the Provost. In my appointment, you specified the stipend as Chair (§ 406-50 e) and my course release.  I accepted the appointment in that conversation.
> As a longtime Fordham faculty member, I believe that such high visibility actions regarding the Business School leadership have broad implication for faculty morale and trust.  This is to reaffirm that I look forward to serving as Management Systems Area Chair you and the University in that position.  The University Statutes should continue to be respected in all aspects of this continuing process."

219.    Currently, Chairs serve three years.  Although in an administrative position, Area Chairs are considered faculty, not administrators.  After they leave the Chair position, they are simply professors again, equivalent to Dr. Solomon.  For instance, Dr. Hollwitz was VP for Academic Affairs prior to teaching as professor in the Management Area. He is in a comparable position as Dr. Solomon, and he was appointed by the Administration to replace Dr. Solomon as Area Chair following her Chair Appointment and the termination Hearing of October 7, 2013.  Similarly, Dr. Pirson is a Comparator with Dr. Solomon and was appointed "Acting Chair"[2] where neither he nor Dr. Solomon received a majority of votes in June 2017. Even as Chairs, faculty are still

---

[2] The Statutes §4.06-51(a) "If a Department is unable to make any nominations for Chairperson, ... may appoint an Acting Chairperson for a period not to exceed one academic year."

required to teach and are subject to the same standards, receiving a course release and stipend, until again returning to regular faculty course load when their term ends.

220.    Some Comparators, who are now faculty, have come through the administrative route: Dr Hollwitz who moved to being faculty after his removal as Vice-President for Academic Affairs, Dr. Gauchi who was Dean of the Graduate Business School, Dr. Janet Marks who was Associate Dean of the Business School and Dr. Borun, former Associate Dean of the Business School. After the end of their administrative position, they moved back to tenured faculty.

221.    Some faculty are given administrative appointments such as Area Chairs, Directors of Programs, Coordinators of Programs. These involve additional compensation, course releases, power and privileges, decision-making. However, they are still considered faculty with the same teaching, research and service responsibilities according to the Fordham Statutes.

**Disparate Treatment: Overview**
222.    There are two components to compensation at the Business School- salary and income from administrative and extra teaching assignments.

223.    As the Faculty Senate noted, salaries could be doubled in the Business School.
> Although it was argued at times that since Gabelli faculty have the opportunity to double their salary in some cases by teaching overloads, weekend courses, or summer school,... that they can take on external consulting which often results in massive external pay, and that their stipends for administrative responsibilities are paid at a similar rates as these overloads, and that these extra financial sources should be taken into consideration when making any adjustments, the committee felt strongly that it was impossible to assess objectively any additional pay or capacity for additional pay and thus we should only address actual salary. Faculty Senate Meeting Minutes # 422 of March 11, 2016 :

224.    But those benefits were kept from the Plaintiff and handed out to her male comparators. As of 2003, Drs. Mooney and Solomon, the two older female faculty in the male dominated Management Systems Area raised the issue of their exclusion from administrative and teaching opportunities and the associated secrecy. As they wrote to the Faculty Senate Executive Committee on April 2, 2003: (Exhibit 13)
> "University statutes [Paragraph 4-01.02]assign to faculty primary responsibility for curriculum design, delivery, and assessment. Over the past few years, the Graduate Business School has developed or is developing a number of new Special MBA programs that are dominated by management courses and involve extra compensation, course releases, and other special benefits and privileges (Deming MBA, Global MBA, Transnational MBA, Beijing MBA, Entrepreneurship). Assignments are based on undisclosed criteria, so we do not know if they are merit based, objective, or equitable. Information about these programs, including development, staffing, and administration tends to be tightly controlled, blocking opportunities for qualified interested faculty to contribute to their success.
>
> A Systemic Problem
> The general concern underlying these and other specific issues, is a pervasive absence of transparency. The selectivity in gathering and disseminating information over a range of issues includes new hires, contract renewal, promotion, tenure, transfer, new program development, staffing and assessment; allocation of summer research stipends, grants,

> research assistants, course release, and specially compensated teaching and administrative opportunities.
> This absence of transparency, we believe, is enabled by our unique structure and the power of the Management Systems Area Coordinator [Chair], who has held this position for fifteen years, and has been on multiple committees, which assign and dispense most business faculty resources."

225.    No investigation or remedy was taken to fix these issues since 2003. It occurred during Dr. Hollwitz's tenure as Vice President of Academic Affairs.

226.    Another older Management professor complained of discrimination and a hostile Gabelli work environment. His complaints were not investigated or remedied either. In a Dec 15, 2015 mass email to the Provost entitled : " Larkin Reappointment and Hostile Gabelli Work Environment"

> "This must be done as the Gabelli School of Business has become what organizational behavior scholars describe as a hostile and toxic work environment. I will provide a brief recap for these newly copied colleagues and then provide my new information and dialogue to everyone.
> … There is increasing discussion from various sources of late regarding the issue unequal pay for *similar* work. The Dean has engaged in the practice of unequal pay for the *same* work. The Management 1 Gabelli CORE course is a 1.5 unit course that requires much more than 1.5 units of work. In recognition of this extra workload, Dean Rapaccioli decided to allocate the faculty teaching this course a 1.5 weight (2.25 semester credit equivalent; see Integrated Core.pdf). That is, all faculty members except me."

227.    The Provost responded on Dec 16, 2015:

> "In your email, you have indicated that you have been subject to a hostile work environment and have been treated 'unequally'. The University has an obligation, under the law, to investigate such claims. I am referring the matter to the University's Counsel, Elaine Crosson for review.
> Lastly, the content and tone of your email is inappropriate. It lacks collegiality and may in fact be defamatory. The University does not condone this type of communication and I am requesting that you refrain from further communications of this nature. Failure to refrain from such communications may result in legal liability."

228.    No investigation ever followed that complaint either, despite Fordham discrimination policies. (Exhibit 19)

229.    This disparate treatment afforded Dr. Solomon was described in her December 18, 2017 email to Ms. Coleman, Fordham EEOC director. This reiterated what she had written to VP Crystal, the Dean, and Provost on October 27, 2017:

> "…and the pattern of actions by members of Fordham University against me have continued and escalated. I am being precluded from all administrative or quasi-managerial tasks at the Business School, discriminated in receiving credit or rewards for my significant contributions, precluded from appropriate leadership and teaching opportunities particularly in the graduate MBA, MS, MA, and PhD programs of the Business School, have had severe extraordinary actions taken against me for performing my duties as a Business School Senator, and am being marginalized to this very day. It does not appear appropriate that senior Fordham Administrators turn a blind eye to these ongoing actions."

230.    She has been precluded from all administrative or quasi-managerial tasks at the Business School and precluded from appropriate leadership, administrative, managerial and teaching opportunities. Her classes have been disproportionately assigned to late evening 8-10 pm time slots, leading to lower student enrollment which predictably would have a harmful, adverse effect upon her.

231.    Her treatment has been in marked contrast to the treatment afforded her tenured male counterparts, Drs. Wharton, Sen, Stoner, Hollwitz, Pirson, Cole, Hurley, Wright, and to the treatment afforded tenure-track faculty, and even male adjuncts, and younger contract clinical instructors as well as faculty who are not Jewish. These issues were well known to the Administration, as they were notified at multiple points in time, but did not take any action to rein in the discriminatory and retaliatory conduct – instead, it has escalated to the present.

232.    Males in Management Systems have been given special privileges with additional compensation, which has not been available to older females. Dr. Wharton has been a senior advisor to the Dean and Director of Applied Statistics, Dr. Sen has been director of the health care center and Area Chair, Dr. Pirson has been director of the MS of Management, and Area Chair, Dr. Cole has been director of Full and Part-time MBA Programs and Area Chair, etc. Dr. Hurley and Dr. Hollwitz teach regularly in the Executive MBA program – Dr. Solomon was excluded. Only Dr. Pirson and Hollwitz and non-faculty colleagues are allowed to teach in the Masters of Management program – Dr. Solomon is precluded.

233.    A senior faculty member wrote that teaching the undergraduate principle of management classes involved "the practice of unequal pay for the same work," for older versus younger faculty. This was the situation Dr. Solomon has faced, which has exacerbated since Fall, 2017, which continues through the Spring, 2020 semester.

**Disparate Treatment: Pay**
234.    The pay discrimination is explained in this Complaint's Paragraphs 1- 15. The Sections include:_Contrast with Male Faculty in her Area (¶3 through ¶7); The Pay gap is reflected in compensation Lower than the Lowest in Lower Rank (¶ 8through ¶10); Compounding Base Pay Discrepancies: Improper Denials of Promotion (¶11); Compounding Base Pay Discrepancies: Denials of Administrative and Teaching Opportunities (¶12 through ¶13); Examples of Discrimination in Other forms of Compensation and benefits (¶14 through ¶15) .

235.    Throughout Dr. Solomon's employment at Fordham, her pay has been significantly lower than similarly situated male and/or younger colleagues, even though her abilities and accomplishments are equal to or better than those colleagues. The fact that women and older faculty have received lower salaries than men and/or younger faculty has been publicized within Fordham since at least 2008, as stated in the "Report of the Salary and Benefits Task Force on Indicators of Gender Salary Equity Among Faculty Members at Fordham University," and has continued to the present.

236.    First, Dr. Solomon is significantly underpaid as a professor compared to her male colleagues for performing the same work. The data from Fordham is shocking and speaks for itself. Dr. Solomon is one of the *lowest-paid* faculty members in that area, even though she has

been at Fordham for decades. Indeed—according to *Fordham's own data*—Dr. Solomon earns *approximately half* of what her similarly situated male colleagues earn. For example, Dr. Solomon's salary for the 2017-2018 academic year as a professor at Gabelli was $122,947.

237.    In 2017, her younger male counterparts at Gabelli in the same position made nearly double her salary: according to data provided by Fordham, one male professor in his 40s in the Business School made $212,859, while a male professor in his 50s made $219,482. In 2018, the discrepancy widened; Dr. Solomon's salary was approximately $126,000; the first professor above earned $238,129, and the second professor earned $239,330. Compared to her male colleagues, Dr. Solomon has performed substantially similar work that requires equal skill, equal effort and equal responsibility: everything but the pay has been equal.

238.    Second, the pay disparity is even more significant than the foregoing numbers suggest because Dr. Solomon has repeatedly and improperly been denied promotion, teaching and administrative opportunities. For example, in 2013, Dr. Solomon was nominated by her colleagues to an Area Chair position and was appointed to the position by the Dean. Among other things, Area Chairs are awarded a stipend of $18,000-$20,000. But Dr. Solomon never saw any of these benefits: she was removed as Chair without explanation almost immediately upon her appointment and replaced with a male colleague.

239.    In recent years, Dr. Solomon has been forced to teach more onerous and time-consuming undergraduate courses at Fordham's Bronx campus (courses historically assigned to junior faculty), while tenured male faculty were not required to do so. These actions have exacerbated what is already blatant pay discrimination on the basis of sex.

240.    In 2005, a memo from Associate Dean Borun to then Business School Dean Tuchman documented the pay discrepancies. As he stated: (Exhibit 15)
>    "that new faculty [Assistant Professors] would have to be hired on a 2-2 load
>    basis [courses/ semester] ...at $120,000/year."

241.    In contrast, Dr. Solomon, already at Fordham for ~20 years, was earning $87,795 for the same 2005-2006 academic year, with the rank of Associate Professor. In addition, younger faculty would receive lower teaching loads, versus 3-2 for Dr. Solomon, an older faculty.

242.    As Dr. Benjamin Cole wrote in 2015 to a colleague regarding special deals given to certain Comparators replacing teaching load with other assignments:
>    "....the accommodation is no different than the numerous one-off deals that
>    Donna [Dean Rapaccioli] (acting as the Dean of Faculty at Gabelli) cut regularly
>    with faculty when they take on various administrative tasks, such as what (I
>    believe) you received when heading up the Integrated Core. There is no
>    fundamental difference, in my mind, between Donna saying, "You don't have to
>    teach one load if you help me with XYZ" and "If you teach two classes of 8
>    students, I'll count it as one load for you."

**Gender Plus Discrimination**

243.    Dr. Solomon, as an older female professor, has also been discriminated against when compared to younger females (gender plus disparate treatment). These include tenured young female comparators and female instructors (non-tenure track).

244.    Younger female comparator professors in the Business School include Dr. Ying Hong 2014, Dr. Jinhui Sara Wu 2006, and newly hired, Dr. Sophia Town 2020, all of whom have higher salaries and better benefits than Dr. Solomon.  Also tenurable faculty and instructors who are younger are given higher salaries and privileges than Dr. Solomon.

245.    Also younger females, not faculty but contract instructors, have been given privileges and positions not available to Dr. Solomon, an older female.  These include Dr. Haber, who is now Director of the Full-time MBA program, Dr. Christine Jannsen, who is Director of the Entrepreneurship Program and Program Director of Online MS in Management.  Dr. Solomon's base salary is also lower than all younger instructors in non-tenure track positions in the Management systems Area.

**Disparate Treatment: Faculty Senate 2008 Report**
246.    The December 9, 2008 Fordham Senate Report on Gender Salary Equity concluded that females were paid less than males and less likely than males to acquire full professor status. (Exhibit 5)

247.    As documented in the Faculty Senate Report, Fordham recognized the disparity in income for older professors such as the Plaintiff.  The Faculty Senate meet once a month and are usually attended by the President and Vice President for Academic Affairs.  The Senate Minutes were sent to Fordham administrators, including the President, Fr. McShane, and the Board of Trustees.  Business School documents were often broadcast throughout the School.  This has not been addressed.

248.    The fact that Dr. Solomon's salary was lower than that of the lowest Assistant Professor was recognized by the University. Instead of rectifying the disparity, they increased her salary by a small amount, which they oddly called "compression," payments to supposedly compensate for the ongoing discrimination against female professors.

**Disparate Treatment: Examples**
249.    It had been a long-standing practice that junior faculty, adjunct, and clinical instructors teach the Bronx undergraduate classes.  It was extremely unusual, burdensome and physically taxing to teach three days/week on two campuses, an unprecedented assignment for a senior tenured faculty member and one that had never been assigned to a senior male professor.[3] (¶ 66) There was no legitimate reason for the demotion, as three clinical instructors who had been hired to teach these undergraduate classes were available, but none were assigned     (¶ 67-68).

250.    Other male junior faculty have been granted 1.5 credits per course by Dean Rapaccioli, an effective 50% pay increase equivalent (¶ 69).  As per the Dean, these courses were "especially challenging" and "onerous" (P 135). No senior tenured faculty wanted to teach them: as one wrote, it involved  "the practice of unequal pay for the *same* work." For Plaintiff,  it meant a negative compensation impact, contrary to males in the Area.

_____
[3] Transfer and demotion from Lincoln Center Graduate to Bronx elementary undergraduate teaching had been applied previously to other Graduate professors who were older, female and/or Jewish, <u>targeted for retaliation, removal and/or forced retirement.</u> (¶ 136-142).

251.    The Dean told Plaintiff she would get the necessary time to prepare; this was not done (¶ 70). To further humiliate, a junior contract instructor was appointed to supervise her, a senior tenured faculty member (¶ 71).

252.    The Plaintiff was scheduled for ~50 teaching sessions; other senior male professors: ~12 and ~14 sessions (¶ 73). This demotion made it very difficult for her to engage in research, a key faculty duty  (¶ 74). Fordham canceled her only remaining graduate course, Leadership,[4] at Lincoln Center in contrast to the treatment of a younger, male professor (P 44)

253.    On December 17, 2017, she learned that she was arbitrarily denied summer research funds for 2018, which could have amounted to $25,000 (¶ 15).  In October 2017, she presented a paper and chaired a session at the Strategic Management Society Meeting but, unlike younger faculty, her expenses were not fully paid (¶ 15)

## DISCRIMINATORY INTENT: STATEMENTS AND SECRECY
### The Pattern of Discrimination by the Same Group of Male Supervisors

254.    During most of Dr. Solomon's tenure at Fordham, males have dominated as Chairs of Management Systems.  Dr. Robert Wharton was Chair of Management Systems for 23 years (1987 -2010) as well as Chair of the Business School Personnel and Promotion Committee. Dr. Falguni Sen was Chair for three years (2010-2013) and Dr. John Hollwitz for three years (2013-2016). The current OB Chair appointed instead of Dr. Solomon in 2017 is Dr. Michael Pirson has continued their practices.

255.    The same supervisors actively engaged in the three sets of discriminatory action against Dr. Solomon: the two promotion applications in 2001, 2003; the Area Chair termination in 2013; the attempts against Dr. Solomon and another older female Senator, Dr. Klotz in 2016,  to bring them on false charges –which could have led to dismissal under Code of Conduct violations. They have been  in positions of authority, blocking her progress, creating a glass ceiling and a hostile work environment for her.

256.    Groups outside the Business School had to intervene: the Fordham University Faculty Senate in 2016 with its unanimous Resolution against Retaliation, and the short-lived intervention by the Fordham Board of Trustees, after being copied in the letter to University President [P106-107, ¶ 129].

257.    Led by the same supervisors in 2013, Dr. Solomon was replaced as Area Chair with Dr. Hollwitz following her Management Area Chair appointment.  The October 2013 public Chair Termination Hearing to replace her with Dr. Hollwitz was led by Senior University Administrators.  It was video broadcast on both campuses, and the Management faculty who had endorsed her by a 70% vote to be the Area Chair were asked to attend and watch her humiliated among her peers. [¶16-20, Attachment 1]

---

[4] Plaintiff was President of the Facet Theory Association, 2013-2015.  She brought the 15th International Facet Theory Association Conference to Fordham in August, 2105, obtaining grants from Cornell and the Society Multivariate Experimental Psychology.  (P 32, 47)

43

258.    Although no reason was given for her removal as Area Chair, apparently it was intended to not disrupt the discrimination, secrecy, and exclusion, and to continue the domination by the male Area Chairs.

259.    At the Chair Termination Hearing held on October 7, 2013 before the entire Management Systems Area and senior administrators who came from the Rose Hill Campus, made remarks that can only be described as sexist and demeaning towards Dr. Solomon (from the audio transcript):

> PROVOST FREEDMAN:... but I've been in situations where individuals—on a Sunday— really believe something happened and on a Monday morning, the situation changes. Those things happen...
> PROVOST FREEDMAN:       ...and I agree with you: what one has to do in a situation where on [a] Sunday one is given a certain understanding and then on Monday morning, that's changed; we all deal with our children in this way, then end up being disappointed in the situations where they were led to believe a certain way and we all deal with professionals in the same way but changes happen; decisions change.

260.    The sexist and demeaning comment from a senior administrator "we all deal with our children in this way, in referring to Dr. Solomon as the Area Chair is probative of discriminatory intent. sets the tone in the entire Area and University.

261.    In the telephone conversation on October 2, 2013 with Provost Freedman, Dean Rapaccioli, Dr. Hollwitz and Dr. Solomon, Provost Freedman made the following stereotypical sexist comment:

> "Esther obviously has very strong opinions about this [her removal as Area Chair] for reasons that are hers. I want to incorporate those strong opinions in my decision. But I don't want her strong opinions and Esther, I'm saying this with all respect, I do not want your strong opinion to unduly influence what is what is best for the department going forward. I want to make a judgment, a decision that really reflect all of all of the input that I receive OK." [emphasis added]

Led by the same supervisors are also the 2016 actions, when the two older female Business School Senators performing their required duties, raised Business School Statutory violations disadvantaging older faculty at the Faculty Senate. They were retaliated against, by the same actors (Drs. Wharton, Chatterjee-Sen, Hollwitz, under the guise of the Business School Executive committee chaired by the Dean, seeking to remove them as Senators through extraordinary public actions, and  false Code of Conduct accusations. These were communicated in mass emails distributed to Senior Administration, the Senate, the Faculty, staff, and student representatives and beyond- never retracted [¶123-130]. Each of these actions alone, as well as the Dean's December 21, 2017 false Code of conduct accusations are severe and pervasive to create a hostility and adversity for a University Professor's work environment.
262.    Jewish Professors were excluded from voting on Dr. Solomon's first promotion attempt to become a Full Professor.  The Promotion Meeting to vote for her candidacy was originally scheduled for Wednesday, November 7, 2001 at the Lincoln Center campus.  Dr. Wharton, the Promotion Committee Chairman, abruptly changed the meeting time to Friday afternoon, November 9, at the Bronx Rose Hill campus.  This precluded two Jewish professors from voting, as they would have had to violate the Jewish Sabbath.

263.   Upon Dr. Solomon's knowledge, this was the only time in the past 30 years that the Promotion meeting was abruptly changed to a Friday afternoon, thus precluding observant Jewish Professors from voting.

264.   Years later, in 2013, Dean Rapaccioli thanked one of the discriminators, Dr. Sen for his "help" when Dr. Solomon was removed as Area Chair and replaced by Dr. Hollwitz.  Dr. Sen, when he was Chair of Management Systems, precluded Dr. Solomon's participation in many of the appointments and programs outlined previously.

265.   Currently, they have excluded her from teaching at Lincoln Center, have continued the exclusion from any administration posts or leadership posts, have continued her exclusion from the executive programs, stripped her of teaching her Graduate courses, prevented her from teaching in any of the new master's programs,

## Secrecy By Male Area Chairs Instrumental in Concealing Discriminatory Intent

266.   The Area Chairs and administrators kept a tight lid on information about courses and programs and the other opportunities. This was noted in a 2003 email by Drs. Mooney and Solomon and continued. (Exhibit 13) The secrecy attempted to shield the advantages and perks given to the males in the Area.

267.   The lack of transparency and selective information continues to present.  On October 8, 2019, Dr. Solomon asked Dr. Pirson by email "what other Graduate courses and leadership courses will be offered as electives … next semester…" Dr. Pirson wrote back: "…I will compile general information that can be shared without privacy concerns." [emphasis added]

268.   Dr. Sen, when he was Chair of Management, replied to Dr. Solomon's question about teaching distribution.  He answered: I will not tell you what other programs there are and who is teaching them, even if both Deans [Graduate Dean Gauchi[5] and Undergraduate Dean Rapaccioli] tell me I have to disclose those schedules.  This occurred in an Area Meeting in ~2013.

## Plaintiff as a Leader Recognized  by Her Peers

269.   She has been repeatedly acknowledged by her peers for her leadership and governance abilities.  She has been voted to the Faculty Senate multiple times, been appointed to Faculty Senate Committees by her Faculty Senate peers from other schools within Fordham, and been elected as President of the International Facet Theory Association.  She was also voted on by 70% of her peers to be Chair of her Area, only to be removed under unusual circumstances.

270.   Under her leadership as President,  the International Facet Theory Conference was held at Fordham University in 2015.  For that conference, she obtained two outside grants for conference support and doctoral student participation.  She is currently Acting President of the

---

[5] Dean Gauchi was abruptly removed as Graduate Business School Dean shortly after Dr. Solomon was removed from being Area Chair of Management Systems. Her removal was done through the Chair Termination Hearing under the Fordham Statutes. Dr. Gauchi, who is also older, currently remains a professor, teac
hing a regular schedule at the Business School.

International Facet Theory Association with the upcoming International Conference, originally planned for July 2020 in Prague, Czechoslovakia, postponed.

271.    During 2017 – 2019, she had been the Editor of a special issue on the mathematically oriented facet theory methodology for the International Studies of Management and Organization. Social Sciences Facet Theory, and published papers in refereed journals in the last two years. This more than fulfilled requirements for "academically qualified faculty," the highest level according to the AACSB standards for Business school faculty.

272.    Her training and experience qualify her to teach in the graduate, PhD programs, Executive Education programs, and the Master of Science Programs at the Fordham Business school.

## DISCRIMINATORY INTENT: FAILURES TO INVESTIGATE
### Internal Discrimination Complaints to Fordham and University Discrimination Policies
273.    Fordham has regulations and policies prohibiting discrimination and requiring investigation of complaints. Relevant policies taken from Fordham Documents include Non-discrimination and Title IX Coordinator's Office, University Whistleblower Policy including non-retaliation, Affirmative Action Policy, Sexual Harassment Prevention Policy, included as examples in Exhibit 19. The Fordham University Statutes include specific Procedures both Formal and Informal for investigating matters related to Faculty, and are included in Exhibit 18

274.    There were multiple failures to investigate, even before the complaint to the EEOC office and the subsequent formal filings with the EEOC and Federal Court.

These include:
275.    The 2003 plea by the older, female faculty to the Faculty Senate when Dr. Hollwitz was Vice President for Academic Affairs (¶12 and Ex 13);

276.    The exclusion of Jewish Professors from voting on Plaintiffs Promotion in 2001 (¶107-109);

277.    The 2002 University Tenure Review Committee admission that the tenure process was "patently unfair to the candidates seeking tenure," which extended to the promotion process (¶110-111);

278.    The due process violations in Plaintiffs 2003 promotion application included: the "disappearance" of the promotion record from the office of the VPAA, Dr. Hollwitz and the falsity that she "orally" canceled a Hearing request, among multiple irregularities (¶106, 111-114 and Ex 9);

279.    The Provost's 2015 acknowledgment of the "obligation, under the law, to investigate such claims" which he referred "to the University's Counsel, Elaine Crosson, for review" (¶57 and footnote 2);

280.    Drs. Wharton and Chatterjee, Executive Committee member's, February 5, 2016 response to one of the older female Senators "I apologize ... I'll speak to the [Fordham EEOC Officer]." (Ex 12);

281.    The March 1, 2016 letter to Pres. Fr. Mc Shane, with copies to a Bd. of Trustee member, et al., which described the Ad Hoc meeting and charges against the female Senators; the "harassment, retaliation, defamatory actions and discriminatory treatment .... " (¶129 and, Ex 11);

282.    The October 27, 2017 email to Fordham officials: It is not "appropriate that senior Fordham administrators turn a blind eye" to preclusion, discrimination, marginalization. (¶ 91, Ex 10);

283.    The December 18, 2017 letter to the EEOC officer, Ms. Coleman, asking that the Plaintiff be informed about the "investigation on [her] ongoing complain[t]s ... "(¶57-58 and Ex 2); No reply to Dr. Solomon.

284.    The December 2017 Code of Conduct defamatory emails and the failure to provide information, written documentation or any investigation despite multiple requests. (¶ 30-33 and Ex 3);

Letters to the President, Senior Administration and Board of Trustees
285.    Dr. Solomon has written as least three additional letters to the President of Fordham and other administrators regarding discrimination and retaliation against her.  Dr. Solomon has been involved in no investigation except has faced escalating retaliation.

**Failure to Investigate Reports to EEOC Officer**
286.    The EEOC Officer, Ms. Coleman, was directly informed regarding the discrimination complaints.   She also received two emails from Dr. Solomon: December 18 with three attachments and December 21, 2017 with three attachments.  The correspondence with Ms. Coleman with the attachments is in Exhibit 20.  The correspondence itself, without attachments, is in Exhibit 2.

287.    Dr. Solomon's Complaint to Ms. Coleman indicated that the discriminatory animus was directed at Dr. Solomon's because of her gender and age.  The December 18 email included, as an attachment, Dr. Solomon's December 11, 2018 email to Dr. Pirson,   Dr. Solomon wrote:
          "...changes are being made to subsequently further disadvantage me, a female senior tenured faculty member, to accommodate a male, who is not even a faculty member" [emphasis added]
288.    It is clear that Dr. Solomon was complaining of disparate treatment because of her protected characteristics: age and gender.

289.    Ms. Coleman stated on December 20, 2017 that:
          "It is not clear from the emails as to what basis you are alleging you have been discriminated against and what action has happened that has caused you to allege

retaliation in the course assignment for spring 2018.  Could you please clarify this
for me?

290.   Dr. Solomon wrote a second email to Ms. Coleman on December 21, 2019 with three
attachments stating in part:

"My colleague Professor Klotz registered complaints with you as the EEOC
officer regarding the 2016 actions directed against both of us as the two female
Business School Senators." [emphasis added]
In my December 18 email I asked you for the results of the EEOC investigation
that Provost Freedman should have launched based on my ongoing complains
regarding retaliation and discrimination against me…

291.   It appears clear that the EEOC officer was on notice regarding the basis for Dr.
Solomon's "retaliation and discrimination" complaints: gender.

292.   It is also telling that Ms. Coleman never answered Dr. Solomon's December 21 second
email. Dr. Solomon received no results of any EEOC investigation regarding the 2016 actions
against the older female Senators.

293.   There was also no follow-up investigation by the EEOC office regarding the December
21 actions by the Dean regarding charges of Code of Conduct violations in the third attachment
to Ms. Coleman on December 21. (Exhibit 20)

294.   As Director of the Office of Institutional Equity & Compliance and Title IX Coordinator,
Ms. Coleman was responsible for the University's overall compliance with federal, state and
local anti-discrimination and anti-harassment regulations and guidance, including Titles VI, VII,
IX, the Violence Against Women Act, Americans with Disability Act, Equal Pay Act, Equal
Employment Opportunity Act and NY Education Law.  Her office drafted policies and
procedures, conducted internal sensitive investigations, and provided training and awareness to
the University community.

### The Dean's  December 21, 2017 False Code of Conduct Accusations

295.   The December 17 and 21, 2017 emails (¶31, P32), sent to the Provost's office,
cited specific, serious violations of the Fordham University Code of Conduct Section 6-03.01,
Violations (e), (h) and (j). These included harassment, disrupting University function and
disorderly conduct Under New York Penal Law 240.20, disorderly conduct is a violation
punishable in part by jail time.  Taken together, they state, as a fact, that the Plaintiff seriously
violated Fordham's Code of Conduct.  The Provost's office deals with disciplinary actions and
Code of Conduct violations can –and have been--- used to fire innocent faculty, leading to
termination of a  tenured lifetime appointment. The  Code of Conduct accusations are an integral
part of a retaliatory discharge process.

296.   Dean Rapaccioli's December 21, 2017 Code of Conduct violation email[6] is extremely
consequential and has not been retracted to this very day- it is in plaintiff's permanent record at
the University, to be followed up by the administration any day.

---

[6] Supposed "Code of Conduct violations" were used by Administration because tenure according to the
University Statutes, are contractual provisions that preclude the termination of tenured faculty
employment without cause.

297.    The significance of the December 21, 2017 defamatory email is that the Dean of the Business School reported false misconduct allegations to Vice Provost Crystal and others against a tenured faculty.  Allegations of Code of Conduct violations against a tenured Professor are prelude to retaliatory discharge, and have a specific reason when uttered formally by the Dean: intended to deprive Plaintiff of her tenure[7].

298.    If Dean Rapaccioli believed <u>any single</u> of the three code of conduct violations had occurred by a Faculty member- much more all 3 of them—she had an obligation to initiate procedures and investigate. At the minimum, she should have notified the faculty member of what she was accused.
>    The Dean accused Plaintiff of the following: Violations of the Code of Conduct
>    e-- Harassment (verbal or other) or physical abuse, threatening or attempting to inflict physical injury, or creating substantial risk of such injury to another member of the Fordham University community or to any person on University premises.
>    h-- Engaging in, or inciting others to engage in, conduct which interferes with or disrupts any University function, or which prevents or limits the free expression of ideas by others, or which physically obstructs or threatens to obstruct or restrain other members of the University community or visitors.
>    j-- Engaging in lewd, licentious or disorderly conduct.

299.    The Dean should have triggered the following procedures if she really believed that there had been possible misconduct:
>    "Statutes §4-07.13 Disciplinary Action., (a) Members of the instructional staff [see §4-01.01] may be disciplined by admonition, censure, suspension (with or without pay) or dismissal for one or more of the following reasons: (4) Violation of the University Code of Conduct (see Article 6).PART II, Procedures Applicable to Cases of Discipline, Suspension or Dismissal §4-07.11 - Initiation of Procedures to Discipline, Suspend or Dismiss Members of Instructional Staff, and subsequently Informal Procedures and Formal Procedures in the Fordham Statutes. (Exhibit 18)

300.    However, none of these were done, and Dr Solomon was not even told what she supposedly had done wrong. The Senior administration did not follow the mandated Fordham Statutes peer review and disciplinary processes that would be necessary.  had the Dean believed a Code of Conduct violation occurred.

301.    Nor the EEOC Officer to whom Dr. Solomon sent the correspondence with the Dean in December 2017. Her requests for information remained unanswered.

302.    Regarding plaintiff, the December, 2017 defamatory emails are not the only ones, but the second attempt by the Dean to bring the Plaintiff up on false, pretextual Code of Conduct Violations. In 2016, the first attempt had been made against her and the other female older Business School Senator, Prof Klotz. (¶ 38; P 39-40, Ex 14).

---

[7] <u>A new attempted retaliatory discharge also occurred in December 2018</u>, following Plaintiff's Federal Complaint [PO12].

303.    According to Fordham University's Handbook for Administrators and University Policies, it is a violation of Code of Conduct to falsely accuse someone to authorities. However, no investigation and no action has been taken against Dean Rapaccioli for doing so against Plaintiff.

## DISCRIMINATORY INTENT: THE PATTERN OF TARGETING
### Similarly Situated: Disparate Treatment of Older, Female or Jewish Professors

304.    The following are similarly situated Comparators in the Business School who have been treated in a disparate way like Dr. Solomon. They are either older, female, or Jewish, or a combination. They include Drs. Marek Hessel, Janet Marks, Milan Zeleny, Edmond Weiss, Joel Hochman, Soshana Dobrow, Rachael Wells, Alan Schiff, Joyce Orsini, Thomas Wright, David Gauchi, Martha Mooney. See paragraphs 136-146.

305.    Over the decades, Fordham has had a pattern targeting older professors, female professors, and Jewish professors. This was not prevalent with other, non-protected groups. Similarly situated male, younger or non-Jewish professors were not so treated. Although an administrator or supervisor will never admit to any prejudicial conduct, the following examples from these underrepresented groups can only lead to the inference of discrimination.

306.    Dr. Marek Hessel, a Jewish professor, and former Area Chair in Management Systems who developed major Graduate Programs was demoted to the Bronx, like Dr. Solomon. He was given the humiliating assignment of teaching what he described as "baby math" to beginner undergraduates. He was repeatedly denied promotion despite his credentials and significant service to Fordham and its programs. He faced a similar situation, which later occurred with Dr. Solomon, another Jewish professor.

307.    Other older professors who were targeted were also sent to pasture in the Bronx as was Dr. Solomon. These include, besides Dr. Hessel, Drs. Zeleny and Orsini.

308.    Dr. Janet Marks, a Jewish female, recruited from NYU as an Associate Dean for the Business School, received a tenure-track faculty appointment in the Management Systems Area. After the end of her administrative work, she was not allowed to teach in conformance with her contract. Dr. Wharton, the Area Chair at the time, told the faculty that she had refused to show up for classes. This was not the case, only pretext was that she supposedly refused to teach.

309.    Another older Jewish professor, Dr. Edmond Weiss left after his working conditions were changed to intolerable, after many years at Fordham. As he wrote to the Business Faculty upon his departure:

> "Unfortunately, however, certain petty and rancorous discussions at that same Personnel Committee led almost directly to a dramatic change in my working conditions for the next semester and beyond. While these changes may seem unremarkable to most of the faculty – a nuisance at worst -they are much more than that to an older man... Indeed, they constitute a new set of demands that make my continuation at Fordham Business physically untenable and professionally in practical. In short, the job is now more trouble than it is worth.

... I am retiring from the Fordham Business faculty at the end of the current, fall
semester. It's sooner than I planned and not as it should have been."

310.    Another older professor, Dr. Milan Zeleny was also sent to the Bronx to teach
undergraduates. As he wrote:

"Thank you for your concerns. Yes, I am not coming back. I have been exposed to
concerted efforts of the new regime to push me out. I have been requested to teach
undergraduates basic statistics and criticized for some snow days I missed due to
illness...They stopped my salary already, now I have to get some health
insurance, and then I will fight for my retirement income."

311.    Dr. Dobrow and Dr.Wells, two female Jewish professors from Ivy League universities,
were hired in 2008 at the same time as two male non-Jewish professors. One of the females was
denied reappointment on illegitimate grounds. The other female was sent to teach exclusively at
the Bronx, demoted to a contract clinical from the tenure track, sent to work in the Bronx as
junior faculty, and left. The other two non-Jewish males, Drs. Cole and Pirson were hired in the
same year and have had flourishing careers at Fordham with tenure, promotion, and major
administrative appointments.

## LATEST ADVERSE ACTION IN RETALIATION
### The Latest Retaliation: "An Event of Termination"

312.    The latest adverse action against Dr. Solomon by Fordham of February 1, 2020 in
retaliation for her anti-discrimination action: the removal of her health coverage and other
benefits, three days after the Court Hearing.

313.    Fordham was on notice of the bases of her protected activities, not only in her direct
complaints but also in her January 11, 2018 EEOC Complaint and her May 24, 2018 Federal
Complaint and her March 13, 2019 Amended Complaint. Fordham first threatened this
retaliation in a May 24, 2019 email from Dean Rapaccioli to Dr. Solomon. They previously had
discontinued her health coverage in May and July 2019 but reinstated after intervention by Ms.
Crosson, Esq., Fordham Counsel. Currently, Dr. Solomon is without salary, health care coverage
or other Fordham benefits.

314.    Over the course of this litigation, Defendant represented to this Court that Dr. Solomon's
status at Fordham remained unchanged, including at the January 29, 2020 Court Hearing. Among
other issues Defendant has omitted that, during the pendency of this litigation, Fordham has
twice removed Dr. Solomon's healthcare insurance benefits, only reinstated when Dr. Solomon
discovered the lapses and wrote emails.

315.    On February 1, 2020, Dr. Solomon's health and other Fordham benefits were removed,
requiring her to pay through Cobra for terminated employees. This will cost Dr. Solomon $
41,978.88 annually out of pocket to continue Fordham health insurance. She was also deprived
of her salary for Spring 2020 of ~$60,000 per semester by Fordham's refusal to allow her to
teach a normal schedule.

316.   Dr. Solomon received a letter after the Court Hearing indicating Fordham's adverse action. The letter from Cobra (Consolidated Omnibus Budget Reconciliation Act of 1985) stated: (Exhibit 21)

> "You are receiving this letter because on 2/1/2020 <u>you experienced an event of a/an Termination</u> which constitutes a qualifying event under the Fordham University group health plan(s) ("the plan"). ...Federal law requires that most group health plans (including this plan) give employees and their families the opportunity to continue their health care coverage through COBRA when a <u>"qualifying event" that would result in a loss of coverage</u> under the employer's plan." [emphasis added]

317.   The COBRA Election Form states:

> "Election Event Date:   2/1/2020
> Event Type:   <u>Termination</u>"   [emphasis added]

318.   When the Court indicated at the January 29, 2010 Hearing that Fordham had represented that Dr. Solomon continued to be a tenured faculty and asked the Fordham attorney to respond, Ms. Dryer stated:

> "Dr. Solomon ... remains a tenured faculty member at Fordham University."
> (Transcript page 14)

319.   However, a new adverse action in retaliation was to be taken by Fordham just two days later.

**<u>Appeal to Fordham's President</u>**

320.   On January 2, 2020, Dr. Solomon wrote an appeal to Fordham President Fr. McShane and Provost Jacobs stating in part: (Exhibit 22)

> "His [Vice Provost Crystal's] email informed me that I would not be teaching in the Spring 2020 semester while placed on unpaid leave without benefits. As I understand the implications, I would be removed from the Fordham payroll without due process, after ~35 years as a tenured faculty member.
>
> I am reiterating and appeal again to you that I want to teach in Spring 2020. I believe that my teaching schedule of two graduate courses - comprising a regular, tenured faculty schedule -should be restored, and I should receive my full regular faculty salary during Spring 2020.
>
> <u>Faculty Leave?</u>
> The December 23 email conveys seemingly inconsistent messages on several issues. While stating that I am given leave, the same email also states the opposite: "The Provost's office is not prepared to approve your leave on either ground." The preceding sentence apparently refers to Fordham University Statutes §4-05.10(b): For faculty development purposes for "study and research" or "when deemed to be in the interest of the University". Please clarify what is true, am I given leave or not?
>
> As I understand the December 23 email, I think it could be interpreted as charging me with violation of my faculty responsibilities and a breach of contract. It incorrectly states ([that I] "continued to choose not to teach" and [that I am not] "teach[ing] the courses [I] have been assigned." If there are such accusations, they would require official charges, a formal Hearing and findings potentially resulting in termination of a faculty's tenured

position, if found true. As outlined in the Fordham Statutes, such adverse University action requires prior reviews and determination by the Faculty Hearing Committee §4-07.12, §4-07.12, and should involve the Faculty Senate Executive Committee.  Instead, this appears to be an undisclosed, de facto tenure termination, bypassing due process.  Please clarify, and if there are any implied charges, I am hereby requesting to be given notice, a formal hearing and the opportunity to be heard, exercise my full rights and defend myself.

Untruly Implying I Refused to Teach in Spring 2020
I am fully prepared to teach the two graduate courses at Lincoln Center, which I was assigned for Spring 2020 but instead I am precluded from teaching. I ask you to review the voluminous correspondence between October 7 through December 2019, with Dr. Pirson, Dr. Crystal, and Dean Rapaccioli, involving these issues. (examples in Exhibit 3) The correspondence and record document that I have been given what I believe are untenable assignments, discriminatory, retaliatory and a humiliating demotion.  The Spring 2020 semester involves three different course preparations, commute between two campuses including the undergraduate Principles of Management Course (POM), also called CORE. The refusal to allow me to teach a two-course schedule during Spring 2020 and three in Fall as normal for tenured faculty, seems also inconsistent with the April 12, 2019 representations on "workload assessment" in the Faculty Senate Minutes (Exhibit 4).

Not mentioned is the fact that I already taught POM courses at the Bronx campus during Spring 2018, prior to my Fall 2018 Family medical leave.  Younger faculty were granted 1 ½ credit  per credit hour for teaching CORE courses, due to their onerous nature. Such credit is not granted to me. Younger faculty only teach 2-2 schedules vs. 2-3. The POM has become a sine qua non in all my assigned schedules since my 2017 demotion.  In November 2017, I was warned prophetically: "either you teach at the Bronx, or you do not teach at all."

As I noted, I am currently the Acting President and organizer of the International Facet Theory Conference to take place in July 2020 in Prague. Among my suggestions for Spring 2020, was a request for one-course release, needed to allow time for scientific paper review and administrative duties for the upcoming conference, but I received no response. My Area just hired a young faculty who appears to be my replacement, receiving preferential treatment over me in all these matters. Similarly, preferential treatment is afforded other junior faculty, as well as tenured male faculty, non-faculty, clinical instructors, and visitors.

321.    In Dr. Crystal's response on January 9, 2020, he stated the following:

> "Let me add that at no time has the University accused you of violating your faculty responsibilities or being in breach of contract. Fordham has not sought to initiate the disciplinary process and, during spring 2020, you retain your status as a tenured faculty member."

Twice Discontinued  Health Benefits without Notice
322.    Dr. Solomon's health care was first threatened regarding the future in a May 24, 2019 email from Dean Rapaccioli. Fordham later cut off Dr. Solomon's health benefits in May 2019 and July 2019. Dr. Solomon was without Fordham health coverage twice, without notice.

323.    Dr. Solomon wrote emails on June 9 and August 6, 2019, copied both to Mr. James Ryan, Fordham's outside counsel, and Ms. Elaine Crosson, Fordham's Corporate Counsel, regarding the health coverage lapses. Dr. Solomon's health coverage was reinstated then.

Direct Reports to the Court
324.    At the April 5, 2019 Court Hearing prior to any of these incidents, Dr. Solomon expressed her concerns regarding ongoing Fordham retaliation:
> "Basically I have in my complaint a section in which I discuss retaliation for filing the EEOC, pages 14 to 15. And under retaliation subsequent to the 5-24-2018 filing of the federal complaint and on pages 43 to 44 the specific events that happened after I engaged in protective action there was immediate retaliation. It is going on to this very day. I would be facing this issue come September if this case is not addressed at that point. So this is essentially an ongoing issue of retaliation for my having basically exercised my rights according to my federal rights." (Transcript Dkt# 40)

325.    On April 10, 2019, Fordham had written to the Court, in what now appears to be an inaccurate statement:
> "More importantly, Dr. Solomon is a current tenured professor in Fordham's Gabelli School of Business and the status quo remains preserved."

326.    On December 23, 2019, the same day Dr. Solomon was warned that Fordham would take further adverse actions against her, Fordham attorneys filed a letter with Federal Court (Dkt #63). It referenced the: "potential for a more global, amicable resolution of this matter" in the Federal case.

327.    However, Dr. Solomon is now without salary or Fordham health care. She apparently remains a tenured faculty in name only, without any of the benefits she had previously received.


Dated: April 15, 2020                         Respectfully submitted,

                                              Esther Solomon
                                              Plaintiff Pro Se

# EXHIBITS

1

Summary regarding Dr. Solomon's Background

Dr. Solomon's research areas include corporate governance, social cognition in leadership, stakeholder dynamics in organizational change, and process-oriented innovations. She has expertise in applications of the Facet theory methodology integrating quantitative and qualitative orientations. Most recently, she was Session Chair for the Annual Strategic Management Society where she also presented a paper. Her latest publication entitled "Organizational learning, integrity, and value through process-oriented innovations" is forthcoming in the Journal Human Systems Management.

Among her recent activities, she was President of the Facet Theory Association from 2013 to 2015. As the President, Dr. Solomon organized the 15th International Facet Theory Conference, which took place at the Fordham Lincoln Center campus between August 16th - 19th, 2015. This Scientific Conference brought to Fordham research scientists from all over the world, which helped the visibility and prestige of the University. She also obtained two grants paid to Fordham, which helped to cover expenses. The first grant was from SMEP-Society of Multivariate Experimental Psychology, to support in part, costs for Ph.D. student participation and the all-day Introductory Workshop to the Facet Theory Methodology. The second grant was from Cornell University. In connection with that, she was also the Co-Editor of the Conference Proceedings, which along with the information on the Conference are in the Fordham Bepress portal. She is the Guest Editor of an upcoming Special Issue on Facet Theory at the International Studies of Management and Organization journal.

Attached is her 2015 letter she was asked to contribute with based on her expertise regarding the Fundamentals of Management Graduate courses. It addresses the Professional MBA Graduate committee for the Gabelli Business School at Fordham University.


FORDHAM

**ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>**          Sun, Sep 27, 2015 at 9:52
                                                                               PM
To: Benjamin Cole <bmcole@fordham.edu>, Aditya Saharia <saharia@fordham.edu>
Cc: Robert Hurley <drbobhurley@gmail.com>, "cc: Mozes@Fordham. Edu" <mozes@fordham.edu>, Stephen
Bryan <sbryan@fordham.edu>, SRIS CHATTERJEE <chatterjee@fordham.edu>, John Fortunato
<JFortch@aol.com>, hollwitz HOLLWITZ <hollwitz@fordham.edu>, Sertan Kabadayi <kabadayi@fordham.edu>,
"Ayan@Fordham. Edu" <ayan@fordham.edu>, Evangelos Katsamakas <katsamakas@fordham.edu>, Elizabeth
Cosenza <pinho@fordham.edu>, "Rapaccioli@Fordham. Edu" <rapaccioli@fordham.edu>, Dorothy Klotz
<dorothy.klotz@gmail.com>, "robert-wharton@comcast.net Wharton" <robert-wharton@comcast.net>, Cell Sen
<fsen@fordham.edu>, Solomon ESTHER <esolomon@fordham.edu>, Dawn Lerman <lerman@fordham.edu>,
Adam San Miguel <asanmiguel@fordham.edu>

Dear Ben, Aditya, and all,

Thank you for inviting me to provide input to the draft proposal for a redesigned Professional MBA
(Part-time MBA) curriculum based on concerns expressed at the Faculty Forum on September
25th. That meeting was the first opportunity for faculty to discuss the proposal. In further reinforcing
Bob's points above, I believe that adding just some behavioral topics in the pre-program "Bootcamp"
does not address the most important issue.

This is to respectfully reiterate that we should not move to exclude from the required "Fixed" Core
the management course devoted to addressing fundamentals of human behavior (The course could be
entitled "fundamentals of management", "organizational behavior", etc). Topics in this course should
include motivation and cognition, individual values and ethics, leadership, personal awareness
feedback and learning, team dynamics in business process improvement, stakeholder participation
and decision making, conflict and negotiations, communication and global issues, organizational
change etc. These appear essential in an integrative approach with foundational skill building to
enable our students' personal and career development as entrepreneurs or future leaders of complex
organizations.

Under the current proposal for the redesigned Professional Part-time MBA, students can graduate
from our program with technical skills, but without ever having taken a single course incorporating
behavioral science applications and skill development. It appears that this would deprive our students
of the opportunity to improve personal insights and leadership capabilities to address individual,
team, and organizational dynamics.

In reviewing practices outside Fordham on this issue, I looked at a number of MBA programs
including NYU, Columbia, Harvard, Yale and Wharton. They include such a requirement at the front
and center of their MBA programs, part time or full time.

Finally, it also seems that a required course on fundamentals of human behavior and leadership
should not be excluded if we try to fulfill the Gabelli School of Business Vision. The Vision defines
a Gabelli alumnus as "an articulate and compassionate leader who is aware of moral and ethical
complexities in the global multi-cultural business world."

Respectfully submitted,
Esther

2

1/6/2018                                        Fordham University Mail - EEOC Complaint

 FORDHAM

ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>

## EEOC Complaint
3 messages

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>          Mon, Dec 18, 2017 at 2:56 PM
To: acoleman11@fordham.edu, TitleIX@fordham.edu
Cc: Elaine Crosson <ecrosson@fordham.edu>

Dear. Ms. Coleman,

Following my earlier contacts with you, I am asking you as the EEOC officer to inform me about the Fordham EEOC department investigation on my ongoing complains regarding retaliation and discrimination against me which I have repeatedly addressed to Provost Freedman and Dean Rapaccioli.

Recently, in my October 27, 2017 letter which I sent to Provost Freedman, Dean Rapaccioli, Dr. Crystal, and Vice President Dr. Fahey-Smith, I raised specific issues regarding ongoing retaliation and discrimination, as follows:

> "The very negative effects lasted long after, and the pattern of actions by members of Fordham University against me have continued and escalated. I am being precluded from all administrative or quasi-managerial tasks at the Business School, discriminated in receiving credit or rewards for my significant contributions, precluded from appropriate leadership and teaching opportunities particularly in the graduate MBA, MS, MA, and PhD programs of the Business School, have had severe extraordinary actions taken against me for performing my duties as a Business School Senator, and am being marginalized to this very day. It does not appear appropriate that senior Fordham Administrators turn a blind eye to these ongoing actions.
> Neither has the reason for my abrupt removal from my Area Chair position, to which I was appointed in full compliance with the University Statutes, ever been explained to me, or to the Management Area faculty at the Department Chair Termination Hearing".

Provost Freedman has previously reiterated the University obligation to investigate discrimination and retaliation complains, when he wrote as follows:
> "In your email, you have indicated that you have been subject to a hostile work environment and have been treated 'unequally'. The University has an obligation, under the law, to investigate such claims. I am referring the matter to the University's Counsel, Elaine Crosson for review".

Dr. Freedman and Dean Rapaccioli are also aware of the retaliatory and discriminatory course assignment given to me regarding Spring 2018, with subsequent unfair cancelations, and continuously changing to the worse. The three attachments below includet recent correspondence.

Please let me know as soon as possible regarding your investigation and results in response to my October 27, 2017 complaint to Provost Freedman regarding ongoing and escalating retaliation and discrimination against me. Also please let me know how you plan to address and rectify the recent scheduling issues.

Thank you and best regards,

Esther Solomon
Associate Professor
Gabelli School of Business

Cc Elaine Crosson Esq.

1/6/2018                                    Fordham University Mail - EEOC Complaint

3 attachments

 **Spring 2018 Correspondence Nov 30 2017.pdf**
149K

**Spring 2018 Course Correspondence Dec 1, 2017.pdf**
89K

**Spring 2018 Course Correspondence Dec 11, 2017.pdf**
205K

---

**Anastasia Coleman** <acoleman11@fordham.edu>                    Wed, Dec 20, 2017 at 4:00 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Elaine Crosson <ecrosson@fordham.edu>

Dear Prof. Solomon,

I am receipt of your email to me dated December 18, 2017. I have reviewed my files, emails and voicemail and have no
previous contact with you for filing a discrimination and retaliation allegation with me. Stephen Freeman is not in the
office this week and I do not have a copy of the letter that you reference in your email to me that you that you had sent to
him on October 27th. Jonathan Crystal has provided me with an email dated Oct. 27th that was addressed to Jonathan
and it is unclear if this is the letter that you refer to in your email to me. Please send me a copy of the letter to review.

I have reviewed the attachments you provided to me regarding your course assignments and scheduling for Spring 2018
teaching courses. It is not clear from the emails as to what basis you are alleging you have been discriminated against
and what action has happened that has caused you to allege retaliation in the course assignment for spring 2018. Could
you please clarify this for me?

I am very willing to investigate further but will need these clarifications from you. Please let me know as I look forward to
hearing from you.

Thank you,
Anastasia

Anastasia Coleman
Director of Institutional Equity & Compliance
Title IX Coordinator / 504 Officer
Fordham University
441 East Fordham Road
Cunniffe House, Room 114
Bronx, New York 10458
Telephone: (718) 817 - 3112
Fax: (718) 817-3115
acoleman11@fordham.edu
Stay Connected:


[Quoted text hidden]

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>                    Thu, Dec 21, 2017 at 5:55 PM
To: Anastasia Coleman <acoleman11@fordham.edu>

Dear Ms. Coleman,

I personally spoke with you in 2014, when I contacted you by telephone to register a concern, and it was referenced in several letters in 2014. My colleague Professor Klotz registered complaints with you as the EEOC officer regarding the 2016 actions directed against both of us as the two female Business School Senators. My name appears in Dr. Klotz's extensive correspondence, and the issues were discussed in meetings you had together and with the Provost in 2016. Attached below are examples of correspondence in some of which you were copied, with my name referenced.

In my December 18 email I asked you for the results of the EEOC investigation that <u>Provost Freedman should have launched</u> based on my ongoing complains regarding retaliation and discrimination against me.

Since I only wrote one letter on October 27, 2017 addressed to Dr. Jonathan Crystal (at the Provost's request) with copies sent to Provost Freedman, Dean Rapaccioli, and Vice President Dr. Fahey-Smith, the email Jonathan gave you should contain the quoted paragraph in page 4 of the letter (attached to the 1-line email). If it does not, please send me what Jonathan gave you, so I can review it to resolve your question.

Attached below is the latest correspondence regarding the most recent actions of retaliation against me.

Please let me know what was the process and outcome of your EEOC investigation regarding that 2016 matter.

Thank you and best regards,

Esther Solomon

[Quoted text hidden]

**3 attachments**


**To  Wharton Chatterjee 2016.docx**
28K


**Gabelli Concerns Feb 2016.docx**
27K


**Code of Conduct.docx**
105K

3

 FORDHAM

---

**(no subject)**
4 messages

---

**Donna Rapaccioli** <rapaccioli@fordham.edu>          Mon, Dec 18, 2017 at 10:24 AM

To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Michael Pirson <pirson@fordham.edu>, "JONATHAN M. CRYSTAL" <crystal@fordham.edu>

Dear Esther,
We have been informed that there has been some disagreement about course scheduling and
that you have engaged in conversation that was viewed as lacking civility. It is the responsibility
of all faculty to adhere to the Code of Conduct.  If you have a grievance you can make use of the
grievance process. In the mean time, we expect you to behave according to the Code of
Conduct.
Donna

--
Donna Rapaccioli, PhD
Fordham University
Dean of the Gabelli School of Business
718-817-4105 or 212-636-6205
rapaccioli@fordham.edu

---

**ESTHER Solomon [Staff/Faculty**          Wed, Dec 20, 2017 at
**[Business]]** <esolomon@fordham.edu>          11:49 AM
To: DONNA RAPACCIOLI <rapaccioli@fordham.edu>
Cc: Michael Pirson <pirson@fordham.edu>, "JONATHAN M. CRYSTAL" <crystal@fordham.edu>

Dear Dean Rapaccioli,

Regarding your December 18, 2016 email, can you please kindly clarify what day, time, and
event  you refer to, in the statement "disagreement about course scheduling and that you
have engaged in conversation that was viewed as lacking civility"?

Can you also please let me know what the violation was , and which part of the "Code of
Conduct" you refer to?

If there is any written documentation regarding such complaint, please send me all such
relevant documentation.

Thank you and best regards,

Esther

---

**Donna Rapaccioli** <rapaccioli@fordham.edu>          Thu, Dec 21, 2017 at 12:50 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Michael Pirson <pirson@fordham.edu>, "JONATHAN M. CRYSTAL" <crystal@fordham.edu>

1

Dear Esther,
As I explained I was informed that you engaged in a conversation that was viewed as lacking civility.

The code I refer to is
Section 6-03.01. Violations of the Code of conduct include:
(e) Harassment (verbal or other)...
(h) Engaging in, or inciting others to engage in, conduct which interferes with or disrupts any University function, or which prevents or limits the free expression of ideas by others...
(j) Engaging in ...disorderly conduct

Thank you,
Donna

(Quoted text hidden)
--
Donna Rapaccioli, PhD
Fordham University
Dean of the Gabelli School of Business
718-817-4105 or 212-636-6205
rapaccioli@fordham.edu

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>    Thu, Dec 21, 2017 at 2:13 PM
To: "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>, DONNA RAPACCIOLI <rapaccioli@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>, "Michael Pirson [Staff/Faculty [BUS]]" <pirson@fordham.edu>
Cc: Elaine Crosson <ecrosson@fordham.edu>

Dear Dean Rapaccioli, Provost Freedman, Dr. Crystal, and Dr. Pirson,

Although you have already drawn conclusions, you have not provided me with even a modicum of information of what you are accusing me of.
Who launched the charges, what are they, and what is the statement which supposedly lacked civility? What day, time, and event is this in reference to? What meeting was alleged to have been disrupted?

I am entitled to any written documentation regarding such complaint if any exists. To the extent that Dean Rapaccioli does not have that information and documentation, I am asking you Dr. Freedman, Dr. Krystal and Dr. Pirson to send that to me if you have it.

Thank you and best regards,

Esther Solomon

cc Elaine Crosson, Esq.
(Quoted text hidden)

2

4

# Tablet   Israel Boycott Fordham Ben Atar

*Doron Ben-Atar is a professor of History at Fordham University and a playwright. Teatron, Toronto's Jewish theater, is producing his play* Peace Warriors *this month.*

===============================



## Kafka Was the Rage

**At a Catholic school, a professor fighting the academic boycott of Israel is investigated on secret charges**

By Doron Ben-Atar
October 13, 2014 • 12:00 AM

The email arrived on the last Friday afternoon of the spring term shortly before 5:00 p.m. Anastasia Coleman, Fordham's Director of Institutional Equity and Compliance, and its Title IX Coordinator, wanted to meet with me. "It has been alleged," she wrote, "that you may have acted in an inappropriate way and possibly discriminated against another person at the University."

I was stunned. My wife, kids and friends have been warning me for years that, in these prudish times, my outrageous sense of humor and intellectual irreverence (my lastbook is about bestiality) could get me in trouble. I imagined myself brought before an academic disciplinary tribunal from Francine Prose's *Blue Angel*, where all my past transgressions would be marshaled to prove that I don't belong in the classroom. My mind raced, recalling the many slips of the tongue I had in three decades of teaching. I perspired profusely and felt the onset of a stomach bug. What would I tell my mother?

"Did it have anything to do with a student?" I shot back anxiously, hoping to get a sense of my predicament before the director left for the weekend. I was lucky. Coleman responded immediately. "This does not involve students and is about your behavior regarding American Studies."

What a relief. But it was also very odd. The decision of the American Studies Association to boycott Israeli universities in December 2013 had upset me. I wrote emails, circulated articles, and was pleased that my university president quickly declared his opposition to the measure. I joined a national steering committee that set out to fight the boycott and participated in the drafting of a few statements. As an American historian who delivered in 1987 his first paper at the annual meeting of the American Studies Association and served on the executive committee of Fordham's American Studies program, I wanted Fordham's program to sever official ties with the national organization until it rescinded the measure. Other programs have taken this courageous symbolic step, and I thought it proper for the Jesuit university of New York to take the moral stand against what most scholars of anti-Semitism consider anti-Semitic bigotry.

It was this stand that led Fordham's Title IX officer to launch the proceedings. During an emotional meeting convened to discuss the appropriate response to the measure, I stated that should Fordham's program fail to distance itself from the boycott, I will resign from the program and fight against it until it took a firm stand against bigotry. The program's director, Michelle McGee, in turn filed a complaint against me with the Title IX office, charging that I threatened to destroy the program. (As if I could? And what does this have to do with Title IX?) This spurious complaint (the meeting's minutes demonstrated that I did not make such a threat) ushered me into a bruising summer that taught me much about my colleagues, the university, and the price I must be willing to pay for taking on the rising tide of anti-Zionism on American campuses.

The following Monday, Coleman appeared in my office to conduct her investigation. Alas, she refused to explain what I was accused of specifically or how what I supposedly did amounted to a Title IX violation. Remaining vague, she hinted that others, including perhaps Fordham College's dean, who chaired the fateful meeting, supported the complaint. Who are the others, I asked? Is there anything beyond that supposed one sentence? She would not disclose. I told Coleman that I took the complaint very seriously, but at the advice of my attorney I needed to think things through. Coleman told me she'd be in touch with my attorney, and we parted ways.

Over the next few weeks, Fordham's general counsel, Tom DeJulio, and my attorney engaged in a few friendly conversations, in which we were led to believe that Fordham agreed I was perfectly within my First Amendment rights to oppose the boycott. We informed DeJulio that I'd be happy to meet with Coleman, even though we were still not informed what the specific charge was. I resigned from Fordham's American Studies program because it refused to distance itself from anti-Semitic bigotry. Five other Jewish members of the program did the same. Not a single non-Jewish member resigned in solidarity.

Coleman never asked to meet me, and I assumed that the attempt to muzzle my opposition to the boycott died down. In late July, however, I received Coleman's report in which she cleared me of the charge of religious discrimination. It was the first time that I learned what I was actually accused of doing, so I'm still not sure how opposing anti-Semitism amounts to religious discrimination. But Coleman was not satisfied to leave things at that. She went on to write that I refused to cooperate in the investigation (even though my attorney informed DeJulio weeks earlier of my willingness to meet her), and concluded that my decision to use an attorney was an indication of guilt. Coleman determined that in declaring I would quit the American Studies

program should it not distance itself from anti-Semitism, I violated the university's code of civility.

It was a sobering summer. I have had to defend my reputation against baseless, ever-evolving charges, ranging from sex discrimination to religious discrimination. I went through a Kafkaesque process in which I was never told exactly what I supposedly did wrong, nor was I ever shown anything in writing. Eventually I learned that the charge was religious discrimination born of my opposition to anti-Semitism. The implication is that anti-Semitism needs to be tolerated at Fordham, and that those who dare to fight it run afoul of university rules.

Administrators and colleagues failed to protect my First Amendment rights, and fed the assault on my character. A person utterly unqualified to understand anti-Semitism sat in judgment of a scholar who publishes on and teaches the subject. A report has been issued without letting me even defend myself. My choice to have legal representation has been cited as proof of my guilt. Most painful was realizing that my commitment to fighting anti-Semitism, so central to who I am, has been used against me in a most unethical manner not only by the member of the faculty who filed the baseless charge, but also by the office of the University Counsel.

Fordham remains my intellectual home. Some colleagues, appalled by the charge and proceedings, turned out to be actual loyal friends who supported me through the ordeal. But I also learned about another part of the university where colleagues resort to legal bullying to settle political scores; where heartfelt utterings at faculty brainstorming become evidence for politically motivated character assassinations; where those charged with protecting women against real abuses engage in a politically motivated witch-hunt; where fighting against the oldest hatred—anti-Semitism—makes one a pariah. The Jesuit University of New York should do better.

\*\*\*

*Like this article? Sign up for our Daily Digest to get Tablet Magazine's new content in your inbox each morning.*

*Doron Ben-Atar is a professor of History at Fordham University and a playwright. Teatron, Toronto's Jewish theater, is producing his play* Peace Warriors *in November.*



**FORDHAM UNIVERSITY**

THE JESUIT UNIVERSITY OF NEW YORK

July 7, 2014

PERSONAL AND CONFIDENTIAL

Dear Professor Ben-Atar,

This letter will confirm that my office has concluded its investigation of a complaint filed by Professor McGee, Director of Fordham's American Studies Program. This matter has been referred to the Office of the Provost for review and appropriate action.

Professor McGee alleged that your actions were inappropriate and that you verbally harassed and discriminated against her by inferring that she was anti-Semitic, and that you also communicated this to third parties. Also, in a meeting of the American Studies program on February 24, 2014, you stated that you would "fight" against the actions or inactions of the Program in the future if the program did not comply with your demands.

I reported the facts to the Office of the Provost and expressed my opinion that your statements do not rise to the level of religious discrimination.

However, I also reported to the Office of the Provost that your words and actions about "fighting" the American Studies Program in every forum if the program did not comply with your demands, created an atmosphere of incivility that could lead one to make a claim of intimidation or harassment. Because you initially refused to participate in the investigation without your attorney present, and in the absence of your explaining or clarifying what you meant by your stated intention to "fight" against the Program, you subject yourself to a possible violation of relevant sections of the University Code of Conduct, including Section 8-03.01(h) which reads "Engaging in, or inciting others to engage in, conduct which interferes with or disrupts any University function."

Please note that Professor McGee is simultaneously receiving notice of the outcome of my investigation. Although your statements and opinions about the actions or inactions of the American Studies program are not subject to sanction, the form and manner of your expression and the nature of the communications with others outside the program can lead the Program Director to feel intimidated or harassed. That is the issue of serious concern that has been brought to my attention and the Office of the Provost.

I am also obligated to remind you that the University prohibits any attempts to interfere, restrain, coerce, discriminate against or harass or harass (whether overtly or covertly) an individual who has responsibly pursued with my office a complaint regarding harassment or discrimination.

Thank you for your full compliance with the University Code of Conduct.

Sincerely,

Anastasia Coleman
Director of Institutional Equity &
Compliance/Title IX Coordinator

Cc:  Stephen Freedman, Provost
     John Harrington, Dean
     Thomas E. DeJulio, General Counsel

5

# REPORT OF THE SALARY AND BENEFITS TASK FORCE ON

# INDICATORS OF GENDER SALARY EQUITY AMONG FACULTY

# MEMBERS AT FORDHAM UNIVERSITY*

### December 9, 2008

* Members of the Task Force are: Chaya. Piotrkowski, (Chair), Larry Farmer, and Emily Rosenbaum. We wish to thank Rebeca Velazquez and David Stuhr in Academic Affairs for their prompt responses to our requests for information and clarification.

## INTRODUCTION

Despite the fact that women have increased their presence in academia, disparities in rank, tenure and salaries between male and female faculty members persist (Haignere, 2002). Hundreds of universities and colleges in North American have conducted analyses to determine if there is a gender bias in salaries. To our knowledge, Fordham University has not done such a review. Therefore, on Nov. 11, 2005, the Faculty Senate of Fordham University passed the following resolution:

*"The Salary and Benefits Committee should work to obtain information, disaggregated for each school and rank, about average faculty salary, including standard deviations within each school and the range (maximum and minimum) within each rank."*

Subsequently, some preliminary work was done to assess gender salary equity, but questions arose about the appropriate analysis and methodology to be used. Therefore, on April 4, 2008, the Faculty Senate voted to *"direct the S & B [Salary and Benefits] Committee to form a Taskforce by May 1, 2009 to gather data and report back to the Senate on gender equity in salaries by Nov. 1, 2008 using the AAUP's methodology."* A Task Force was formed to carry out this charge.

The AAUP has identified at least two approaches to examining gender equity in salaries at institutions of higher learning. One approach, described in Haignere (2002), involves statistical analyses that attempt to determine the contribution that gender makes to salaries, after controlling for a host of factors. This strategy is costly and especially labor intensive, and the Task Force determined that such an analysis was premature.

Instead, we adopted a more modest approach. Our goal was to make a preliminary determination about whether or not gender inequity in salaries *might* be a problem at Fordham, as it is at other institutions nationwide. Therefore, we adopted the approach used in *AAUP Faculty Gender Indicators, 2006* (West & Curtis, 2006), which involves examining gross indicators of inequity. The Task Force followed the analytic strategy described by this AAUP report closely, although a few additional analyses are reported. Therefore, this report should be considered only an initial step in determining if there might be a problem in gender-based salary inequity at Fordham.

Based on our albeit limited examination of data for the 2007-2008 academic year, we concluded that further examination of possible gender inequities at Fordham is warranted.

Equity Indicators

Faculty salary is influenced by many factors, including tenure status and faculty rank, with those of higher rank presumably being more likely to be tenured and also earning higher salaries. Consequently, West and Curtis (2006) examine four indicators of possible gender inequities related to salary: (1) employment status; (2) tenure status; (3) full professor rank; and (4) average salary. The first indicator (employment status) was not considered by this Task Force, for it refers to the gender composition of those in part time versus full time positions. With regard to indicator four (average salary), we also report median salaries because averages are very sensitive to outliers (i.e., extremes).

## DATA ANALYSIS AND ITS LIMITATIONS

Fordham's Office of Academic Affairs provided the Task Force with the necessary data to conduct these analyses using formats that would protect the anonymity of individual faculty members. We received information

2

for the academic year 2007-2008 for all full time tenured and tenure-track faculty (N=545).[1]  Excluded were full time nontenure-track instructional staff, Marymount faculty, and so forth.  Therefore, the information we report may differ slightly from the information reported in the *The Annual Report on the Economic Status of the Profession, 2007-2008* (AAUP).  Salary data were not included for the 21 faculty members who were classified as "administrators" for the purposes of annual reports to the AAUP.  However, these administrator/faculty members were included in some analyses where appropriate.  Distinguished Professors were treated as full professors for these analyses.

The data included base salary and excluded special administrative or other stipends or grants.  Information about tenure and rank are public, but salary data are not, posing special challenges for the Task Force. The original Senate resolution of November 2005 required that average salary data be disaggregated by school and rank, with minimum and maximum salaries reported.  However, the numbers in some academic units and ranks are very small; such analyses would have meant violating confidentiality.  Therefore, data for salaries were reported separately only for (1) the Law School and (2) all other departments and schools at Fordham, combined. To protect confidentiality, minimum and maximum salaries are *not* provided.

We were guided by the AAUP analyses, so there were important limitations to the analyses.  We list some of these limitations here.

■ Data are presented in aggregate form, masking possible differences between academic units.  Some schools and departments may have gender equity in salary, tenure and rank, while others may not. Moreover, there may be a confounding of discipline and gender that might account for possible differences in salaries.

■ Merit increases were not considered.  Such increases may increase salary discrepancies between men and women, they may decrease salary discrepancies, or they may not affect them at all.

■ Administrative and other stipends were not included.  These also might have an impact on gender differences in salaries.

■ Possible racial bias and the interaction between gender and race were not considered.  A serious examination of possible racial disparities in salary and subtle forms of racial and gender discrimination were outside the charge of the Task Force and would likely require broader methodologies than the numerical analyses adopted by the AAUP and the Task Force.

■ We did not conduct historical analyses to determine if possible inequities were the remnants of older inequitable practices rather than the result of current practices.

■ We did not determine whether inequities stemmed from rank at initial hiring or reappointment, tenure and/or promotion practices.

■ We did not determine if any salary inequities stemmed from salary differences at initial hire.

■ We did not examine possible inter-campus salary inequities because it was beyond the charge of the Task Force;

---

[1] Three faculty members who were classified as tenure-track "instructors" in the data set were coded as tenure-track assistant professors.  They had been classified as instructors until their Ph.D. or other necessary degree was conferred.

With these caveats in mind, we submit this report from the Salary and Benefits Task Force on Gender Equity in Salaries.

## FACULTY GENDER EQUITY INDICATORS

### Tenure Status

West and Curtis note that "the tenure process represents [an]....inequitable hurdle for women in academic career progression." (p. 9, 2006). They found that women held 41% of tenure-track jobs (i.e., not yet tenured) at doctoral universities in 2005-2006, which is somewhat less than the percentage of women receiving Ph.D.s They also found that men held 74.2% of tenured faculty positions in institutions granting doctorates while women held 25.8% of such positions.

Fordham did somewhat better. In the 2007-2008 academic year, men (n = 332) held 64.6% of tenured positions while women (n = 213) held 35.4% of all tenured positions.[2] There are several other ways to look at this distribution of tenure and gender at Fordham:

■ Overall, 31.6% of all faculty at Fordham held non-tenured tenure track positions; 38% of women held these positions, while men held 27.4% .

■ 62.0% of female faculty at Fordham held tenured positions, while 72.6% of male faculty members held tenured positions.

■ Women held 39.1% of all faculty positions, but they held 35.4% of all tenured positions. Men held 60.9% of all faculty positions, but they held 64.6% of tenured positions.

■ Women held 39.1% of all faculty positions, but they held 47.1% of all non-tenured tenure-track positions. Men held 60.9% of all faculty positions, but they held 52.9% of non-tenured tenure-track positions.

*In sum, although Fordham had a higher percentage of female tenured faculty members than other doctoral institutions nationwide, women still were less likely than men to be in tenured positions and more likely than men to be in tenure-track untenured positions.* One possible explanation of the overrepresentation of women among non-tenured faculty is that Fordham has been making greater attempts to hire women. Possibly, more non-tenured female faculty today might lead to more tenured female faculty later. A propos this possibility, West and Curtis conclude that it is unlikely that the lower rates of tenure for female faculty members are explained by a "lag in employment practices" that will improve over time.

### Full Professor Status

West and Curtis found that in 2005-2006, the lowest percentages of women were found in the most highly paid and prestigious rank—that of full professor. While the increase in the proportion of women full professors has been relatively rapid, the starting point was quite low. (Women were 10% of full professors in 1974-75.) They conclude that women faculty will not attain equity in full professorships for "many years," and that "promotion to

---

[2] If we include faculty members on administrative lines (n = 21), men held 64.5% of tenured positions, while women held 35.5% of all tenured positions. Thus, including faculty/administrators does not change the findings in any substantive way.

full professor constitutes a further point where inequities persist." In doctoral institutions nationwide, women held only 19.3% of full professorships in 2005-2006 (West & Curtis, 2006).

Fordham did somewhat better. In the 2007-2008 academic year, men held 70.5% of full professorships, while women held 29.5%.[3] There are several other ways to look at this distribution of rank and gender at Fordham:

■ Overall, women held 39.1% of all faculty positions, but they held 29.5% of all full professorships. Men held 60.9% of all faculty positions, but they held 70.5% of all full professorships.

■ 26.3% of women faculty held the rank of full professor, compared to 40.4% of men who held this rank.

*In sum, although female faculty at Fordham held a higher percentage of full professorships than women nationwide, women at Fordham were still less likely to be full professors than men.* Women are considerably underrepresented among full professors relative to their representation in the population of faculty members at Fordham. It should also be noted that there is variation in academic units in the percentage of full professorships held by women. Eight of the 25 departments and schools at Fordham have no female full professors at all.

It also is possible that this difference in rank between men and women is due to men having been at Fordham longer. Among tenured faculty only, men have been at Fordham for 21.1 years on average, compared to women who have been at Fordham for 19 years. Among tenured associate professors, men have been at Fordham for 19 years, compared to women who have been at Fordham for 17.2 years.[4] These differences are probably not large enough to account for women being underrepresented in the rank of full professor.

<u>Salary</u>

In 2005-2006, women faculty earned 81% of what male faculty earned, a number that has remained virtually unchanged since the 1970s (West & Curtis, 2006). West and Curtis attribute women's salary disadvantage in part to women being more likely to work at lower paying institutions and being less likely to hold senior faculty positions. Based on the data provided to the Task Force, in 2007-2008 women faculty at Fordham earned 91.8% of what men earned on average. (If we look at median salaries, women earned 89.2% of what men earned.)

West and Curtis also report that women do not reach salary parity with men, even when controlling for rank and type of institution. At private-independent doctoral universities in 2007-2008, female professors earned 91.9%% of what men did, female associate professors earned 91.3%of what males did, and female assistant professors earned 91.2% of what males did (AAUP, 2008, calculated from Table 5).

The Task Force analyzed salaries for those in tenured and tenure track faculty positions only, comparing the salaries of men and women within ranks. Salaries at the Law School were analyzed separately. Both average and median salaries are reported in Tables 1 and 2 below. No salary data are reported where cells are less than eight individuals.

---

[3] If we include faculty members on administrative lines (n = 21), men held 70% of full professorships, while women held 30% of professorships. Thus, including faculty/administrators does not change the findings in any substantive way.

[4] Administrators/faculty members are included in these numbers.

Table 1.  Law School.  Means, Standard Deviations, and *Medians* (in parentheses) by Gender and Rank.

| | Associate Professors | Professors |
|---|---|---|
| Female (n = 20) | 164,800. (sd =9,753.) *(161,300.)* | 197,875. (sd =12,436) *(196,500.)* |
| Male (n = 37 ) | 167,164. (sd=20,823.) *(158,500.)* | 195,563. (sd =15,243.) *(199,625.)* |
| Females as % of Males (averages) | 98.6% | 101.2% |
| *Females as % of Males (medians)* | *101.8%* | *98.4%* |

Table 2.  All Fordham, without Law School.  Means, Standard Deviations, and *Medians* (in parentheses) by Gender and Rank.

| | Assistant Professors | Associate Professors | Professors |
|---|---|---|---|
| Female (n = 193 ) | 78,168. (sd =21,631.) *(70,300.)* | 80,924. (sd=11,324.) *(78,503.)* | 102,348. (sd=10,437.) *(101,935.)* |
| Male (n = 295 ) | 78,181. (sd= 20,848). *(70,000.)* | 84,511. (sd =12,469.) *(81,112.)* | 109,771. (sd =19,924.) *(106,670.)* |
| Females as % of Males (averages) | 100.00% | 95.8% | 93.2% |
| *Females as % of Males (medians)* | *100.4%* | *96.8%* | *95.6%* |

These analyses suggest that there is relative gender equality in salary at the Law School (where discipline is controlled) and also among Assistant Professors in general.  This latter finding suggests that Fordham is achieving success in addressing the gender salary equity issue, at least at the point of hiring. *However, whether we consider average or median salaries women lag behind men in annual salaries within the ranks of associate professors and full professors within Fordham, excluding the Law School.* Haignere (2002) notes that an annual salary difference between men and women of $1,000 would result in a difference of $84,550 over a forty-year career, assuming an annual 3.5% increase in salaries.  Here, the mean and median salary differences between men and women in the ranks of associate and full professor are substantially more than $1,000 annually.  Pensions based on retirement contributions that are a percent of salary also are substantially reduced, as are supplemental retirement contributions.

6

Of course, this analysis does not take into account differential market wages in the various disciplines and professional schools, nor does it take into account possible merit increases in salary or length of service.[5]

## CONCLUSIONS AND RECOMMENDATIONS

Faculty salaries are intimately tied to tenure and promotion. Based on national data from public and private universities in the United States, West and Curtis (2006) conclude that women are disadvantaged compared to men in several ways: they are underrepresented among faculty and particularly, tenured faculty; they are underrepresented among full professors; and they earn less than men, even with rank controlled. They go on to note that many studies have found a disadvantage of several percentage points in the average salaries of men and women faculty that are "unexplained," even after controlling for many variables. The reader is reminded that a salary disadvantage as low as $1000. per year, becomes a substantial salary and pension disadvantage when multiplied over a forty year career.

This analysis of faculty data from the academic year 2007-2008 gives a picture of both positives and negatives. On the positive side, Fordham is doing better than other doctoral universities nationwide in the percentage of our women faculty who are tenured and who are full professors. There also appears to be gender equity in salaries at the Law School and also among Assistant Professors over the University, which may bode well for the future. However, this preliminary analysis suggests that there still may be work to be done.

### Overview of Findings

In reviewing findings, the reader should be cautioned regarding the limitations of the data analysis noted above (p. 3-4). With these caveats in mind, we found:

■ *Like universities nationwide, women appear to less likely to be in tenured positions than men are and more likely to be in non-tenured tenure track positions.*

From the data available, there was no way to determine why this is occurring at Fordham. We do not know if women are more likely to leave the University voluntarily prior to tenure or whether they are less likely to be reappointed and/or tenured than men.

■ *Like universities nationwide, women appear to be less likely to be full professors than men, with some academic units having no female full professors.*

---

[5] Data on merit were not available nor was a study of merit part of the Task Force charge. However, years of service can serve as a gross indicator of number of years that merit increases might have been received. Therefore, we calculated measures of association (Spearman *rho*) between salary and length of service among tenured associate and full professors not in the School of Law. There were modest significant correlations for associates (*rho* = .21, $p \leq .01$) and professors (*rho* = .22, $p \leq .01$), indicating some positive relationship between years of service (or possibilities for merit) and salary. We repeated these analyses controlling for both rank and gender. Only among female associate professors (*rho* = .30, $p \leq .05$) and among female full professors (*rho*= .39, $p \leq .01$) was length of service (and perhaps possible merit increases) positively related to salary. The associations in the case of males were not statistically significant. (All tests were two-tailed.) These types of analyses must be treated as very preliminary, but they suggest the possibility that women's salaries may have been augmented by merit increases.

7

We do not know if female associate and full professors are more likely than their male peers to leave voluntarily for other institutions; if more males than females are hired with the rank of professor; if women are less likely than men to apply for promotion to full professor; or if women are less likely to be successful than men when applying for promotion to full professor.

■ *In the Law School and among the ranks of assistant professors elsewhere in the University, there appears to be gender equity in salaries.*

■ *As in universities nationwide, with the exception of the Law School, there appear to be some gender salary inequities in the ranks of associate and full professors, with women earning less than men.*

Complicating the salary comparison are possible differences in market wages between disciplines and professions. Such market wage differences might account for lack of gender parity in salaries, if men are more likely to be in the higher paying academic and professional disciplines. Small numbers sizes limited discipline-specific analyses.

### Recommendations

At this time, we do not think it is necessary to move towards a more complex statistical analysis of the unique contribution gender makes to faculty salaries, as described in Haignere (2002). Instead, we recommend that the Office of Academic Affairs, with faculty participation and review, undertake further analyses of gender salary equity. The exact analyses should be determined by a joint task force made up of representatives of Academic Affairs and the Senate.

The following is a list of the types of further analyses that could be pursued:

■ Determine if some of the inequities in tenure, rank and salary are a function of past practices or are continuing.

■ Identify academic units in which women faculty may be underrepresented in tenured positions and determine the causes of their being underrepresented. Are women applicants tenured at the same rate as male applicants?

■ Identify academic units in which women faculty may be underrepresented in full professorships and determine the causes. Are women applicants promoted at the same rate as male applicants? Do women apply for promotion to professor at the same rate as men?

■ Identify academic units in which women faculty may be underpaid relative to men. This task might be undertaken in conjunction with a salary compression review. Also useful would be an analysis of the starting salaries of men and women and their salary histories.

■ Determine if positions in the disciplines in which women are concentrated pay less than positions in the disciplines in which men are concentrated.

■ Determine if women have been hired into tenure-track positions at rates that are equitable with men.

■ Determine if women have been hired into tenured positions at rates that are equitable with men.

■ For each academic unit in which problems are identified, determine how best to remedy inequities and problems.

■ Determine if insufficient "family friendly" policies are discouraging women from remaining at Fordham.

■ Make an annual or biannual report to the Faculty Senate to monitor our progress on gender equity at Fordham Univeristy

8

In conclusion, Fordham can take a leadership role among Jesuit universities in identifying, monitoring and remedying faculty gender inequities.  Taking on this serious task would make us an especially attractive place to work.

## REFERENCES

Haignere, L. (2002). *Paychecks, A guide to conducting salary-equity studies for higher education faculty.* Washington, DC:  American Association of University Professors.

American Association of University Professors (2008). *The Annual Report on the Economic Status of the Profession, 2007-2008.* www.aaup.org

West, M.S., & Curtis, J.W. (2006). *AAUP Faculty Gender Equity Indicators 2006.*  American Association of University Professors.

6

Contrasting Compensation for Professor Hollwitz, Provost Freedman and Dean Rapaccioli versus Fordham's Refusal to Honor their Commitment

Although Fordham has paid female faculty unfairly and refused to honor its salary and other commitments to Dr. Solomon, the school is generous in its compensation to those who have targeted Dr. Solomon. This is highlighted in the tables below.

IRS Forms 990 (2009, 2013, ~~2014~~) and the CitizenAudit.org download detail the compensation packages of the following:

| Year | Provost Freedman | Dean Rapaccioli | Professor Hollwitz |
|------|------------------|-----------------|--------------------|
| 2009 | $ 469,016 | | $ 432,083 |
| 2010 | $ 476,2010 | $ 428,102 | $ 426,450 |
| 2011 | | | |
| 2012 | $ 534,230 | $ 420,734 | |
| 2013 | $ 530,653 | $ 574,050 | |
| 2014 | $ 544,349 | $ 729,213 | |
| 2015 | $ 564,036 | $ 705,489 | |

Fordham University's 2009 IRS Form 990, Schedule L (Transactions with Interested Persons) lists the following loans to Professor Hollwitz, former Provost, and Provost Freedman. The terms of the loans are not listed. The filing suggests that the Board of Trustees or a "committee" did not give their approval for these loans. Who gave these loans is not disclosed. Fordham's IRS Form 990 does not list any loans for Professor Hollwitz in 2013 or 2014.

The documents demonstrated that between 2009 and 2014, Provost Freedman made no payments on at least the principle of the loan. His $1,637,500 loan was still listed as not in default. Whether Provost Freedman has made subsequent payments on the Fordham loan is unknown.

| | Form 990 Year | Original Principal Amount | Balance Due | In Default? | Approved by board or committee | Written Agreement |
|---|---|---|---|---|---|---|
| Professor Hollwitz | 2009 | $ 592,000 | $ 422,502 | No | No | Yes |
| Provost Freedman | 2009 | $ 1,637,500 | $ 837,500 | No | No | Yes |
| Provost Freedman | 2013 | $ 1,637,500 | $ 837,500 | No | No | Yes |
| Provost Freedman | 2014 | $ 1,637,500 | $ 837,500 | No | No | Yes |

7

campbelllawobserver.com

# EEOC Urges University of Denver Law School to Increase Female Law Professor Pay to comply with Equal Pay Act

*About Regan Gatlin, Ethics Editor (41 Articles)*



*Photo by KUSA.*

Earlier last month, the Equal Employment Opportunity Commission (EEOC) determined that female law professors at the University of Denver's Sturm College of Law were illegally paid less than men, in violation of the Equal Pay Act.  The EEOC found that the pattern of

unequal pay disparities for female law professors as opposed to their counterpart male law professors at the University of Denver was a "continuing pattern" dating back to 1973.

*After this pay discrepancy was brought to the EEOC's attention, the EEOC inquired into the pay scheme, and particularly the merit pay evaluations for law professors.*

The EEOC discovered this gender pay gap and violation of the Equal Pay Act after a complaint filed by a law professor at the University of Denver, Lucy Marsh. Marsh's salary was $109,000 annually in 2012, but was still considered the University's lowest paid full time law professor. While employees typically do not discuss their salaries with other employees, Marsh was notified of this discrepancy in her pay as opposed to her male colleagues when the Law School Dean, Martin Katz, issued a memorandum discussing merit raises.

The memorandum sent by Dean Katz not only included the notification of potential merit raises, but it contained salary comparisons bringing to Marsh's attention the discrepancy of salaries. The memorandum stated that female full time law professors were paid $16,000 less than their male colleagues on average. Rather than leaving the discrepancy at that, Katz further stated that there were several factors that came into play regarding the discrepancy, not sex-based. The "several factors" noted were differing merit raises and starting pays.

After this pay discrepancy was brought to the EEOC's attention, the EEOC inquired into the pay scheme, and particularly the merit pay

evaluations for law professors.  The University Chancellor, Rebecca Chopp, stated that the "historical system" for evaluation and merit pay for law professors was based on professor ranks, duties, age, and performance scores.  This evaluation was specifically reviewed by a consultant utilized by the university—no connection between pay and gender for the laws school was found.

The University Chancellor's statement indicated that Marsh's salary was lower due to her "substandard performance in scholarship, teaching and service."  However, Marsh states that she has won several teaching awards, and her Tribal Wills Project was recognized recently by the Denver Supreme Court.

... [T]he EEOC noted that the University knew about the gap in pay between male and female law professors since 2012 ... and the University failed to take action on this realization.

After its investigation into the University of Denver's law school and its pay schemes for male and female full time law professors, the EEOC notified the law school of its determination.  In its findings, the EEOC noted that the University knew about the gap in pay between male and female law professors since at least 2012 when the memo from the Dean was issued, and the University failed to act on this realization.  The EEOC further stated that the University's failure to take action resulted essentially in a condoning and formalizing of a history of unequal pay for men and women in the legal education profession.

In order to comply with the Equal Pay Act and anti-discrimination laws, the university had to increase the wages of the female full

time law professors and give them back pay for the lost wages they incurred by not being provided fair and equal pay. The EEOC threatened to initiate lawsuit over the discrepancy in pay between male and female law professors based on the "continuing pattern" of this gender pay gap at the University if they failed to comply with the back pay and increase in female law professor salaries. The University was not given a formula to utilize in determining back pay; that was left to the University's discretion in order to comply with the EEOC's advisement.

The University has expressed its contentment with the way the pay structure has operated historically. It is unclear whether the University will make changes to the pay structure to eliminate the discriminatory impact it has on female full time law professors, or whether the University will change the pay structure so as to prevent the discriminatory effect.

[The Equal Pay Act] states that men and women doing the same job at the same place are required to receive the same amount of money for the same work.

The Equal Pay Act, signed in 1963, was created to protect all workers, particularly female workers, from being treated unfairly and being given less pay than men with the same or similar qualifications for the same amount and type of work. The Act's purpose is to "prohibit discrimination on account of sex in payment of wages by employers engaged in commerce or in the production of goods for commerce." It states that men and women doing the same job at the same place are required to receive the same amount of money for the same work. The Equal Pay Act also

EOC Urges University of Denver Law School to Increase Female...          about:reader?url=http://campbelllawobserver.com/eeoc-urges-univer...

creates the minimum wage requirement.

Essentially, when a pay structure is created that results in unequal pay between certain genders or races, for example, even if the discrimination is not intentional, the pay structure must be adjusted so as to avoid this disparate impact. Disparate impact discrimination is discrimination that results from an action or a requirement that has the effect of disqualifying a protected class of people or that excludes that protected class. When such a disparate impact is discovered, it must be remedied.

While the EEOC's findings do not necessarily mean that there will be a lawsuit filed against the University of Denver's law school, they do provide insight into how the Commission handles and treats instances of gender wage gaps. The EEOC's findings here also provide guidance for other universities and employers on forms of improper pay schemes that may be utilized today.

While unintentional, [unequal pay schemes] are still not legal, and the fact that the pay scheme has been in existence for a particular period of time does not negate its discriminatory effect.

What effect does this finding in Denver have on other states, universities, and other employers across the nation? This case shows that the EEOC is prepared to take action against various pay schemes that have such a disparate impact with regard to the pay received by men and women. To this day, there are still gender pay discrepancies, and sometimes these discrepancies are in fact unintentional. While unintentional, they are still not legal, and the

fact that the pay scheme has been in existence for a particular period of time does not negate its discriminatory effect.

It appears there is a trend in the realm of labor and employment law cases.  More and more we see discrimination cases come up, but lately there have been many instances of challenges to pay structures and payment generally for work.  We see here an Equal Pay Act challenge based on a pay structure resulting in a disparate impact on female full time law professors.  In other cases we see challenges arising from unpaid interns claiming they are deserving of payment, or student athletes claiming they are entitled to payment for their service to the University.  Similarly, we see more challenges to payment structures for hourly workers who claim to be misclassified.

While these cases may all appear to be very different, they are in fact quite similar in their effect.  These cases present an interesting trend, where workers are beginning to become more aware of their rights and the law surrounding their payments and reimbursements.  As such, employers may take this opportunity to do internal audits of their pay structures, what they are paying their workers, and check for anything that might resemble pay discrepancies.  If such a payment scheme is found to have such a disparate impact on a particular protected class of workers, the employer can take the chance to change the payment structure and adjust in a way that will provide those employees proper payment, and prevent lawsuits.

**EEOC: Female law profs at the University of Denver are underpaid, violating the Equal Pay Act**

HomeDaily NewsEEOC: Female law profs at the University...

LAW PROFESSORS

# EEOC: Female law profs at the University of Denver are underpaid, violating the Equal Pay Act

POSTED SEP 01, 2015 10:21 AM CDT

BY DEBRA CASSENS WEISS

Tweet



The Equal Employment Opportunity Commission has determined that the University of Denver's Sturm College of Law is violating the Equal Pay Act by paying its female professors less than males.

The EEOC threatened suit over the gender pay gap in a letter sent to the university on Friday, report the Denver Post and KUSA. The agency said pay disparities at the law school appear to be a "continuing pattern" dating back to 1973. To comply with federal law, the university has to boost the wages of female law professors and give them back pay, the letter says.

The EEOC acted in response to a complaint filed by University of Denver law professor Lucy Marsh, whose $109,000 annual salary in 2012 made her the school's lowest paid full professor. Marsh learned about the salary differences in a 2012 memo from the school dean that discussed merit raises and made salary comparisons.

The memo by law dean Martin Katz indicated that female full professors made $16,000 less on average than male full professors. Katz noted the pay disparity but said salary differences may be due to several factors, including differing merit raises and starting pay.

The law school defended its system of evaluation and merit pay for law professors in a statement by Chancellor Rebecca Chopp. The school cites a consultant's findings that pay differences are due to a professor's rank, duties, age and performance scores. The statement said Marsh's salary was lower because of her "substandard performance in scholarship, teaching and service."

Marsh counters that she has won several teaching awards and her Tribal Wills Project was recently recognized by the state supreme court.

Previous:

Next:

8

# MEMORANDUM

**To:**   Rita Guare, Faculty Senate President

**Cc:**   Faculty Senate members, President of the University, Vice President for Academic
Affairs, Associate Vice Presidents for Academic Affairs, Deans

**From:**  University Tenure Review Committee (Patricia Brownell, Benjamin Crooker, William
Egelhoff, Jeanne Flavin, Giselle Esquivel, Martin Hegyi, S.J., Scott Hoenig, Joseph W.
Koterski, S.J., Leonard Nissim, George Shea)

**Re:**   Request for tenure-granting standards and procedures statement from all University
Schools and Departments

**Date:**  November 1, 2002

In reviewing the 2001-2002 tenure cases, the University Tenure Review Committee (UTRC) has
observed that many of our University's academic units do not have explicitly stated tenure
standards and procedures. The committee is charged with reviewing "all positive tenure
recommendations by Departmental or Professional School Faculty...to ensure that the university
norms for granting tenure are adhered to by the unit making the recommendation." The lack of
such explicit statements allows for the real possibility of considerable variety among the units and
across the years in regard to the *de facto* standards that are used to recommend tenure and in the
evidence required to support favorable tenure decisions. It has sometimes been difficult for
UTRC to determine precisely what was used as the minimum standard for tenure and/or the kind
of evidence required to support favorable tenure decisions by the academic units whose
recommendations we are charged to consider. Not only does this create avoidable problems for
UTRC and the University, but (more importantly) it is patently unfair to the candidates seeking
tenure.

While the area of tenure standards lacks the visibility and scrutiny being given to faculty
governance in general, it is no less important to the effective functioning of a university. Since
few see this problem as closely or thoroughly as we who serve on UTRC, we believe that it is our
duty to speak up more loudly. We raised this problem a year ago (with a weaker voice), but the
University has yet to resolve the problem, and so we have decided to write the present letter. The
Faculty Senate and the University Administration share responsibility for this issue of faculty
governance.

The development of relatively explicit standards and procedures by each academic unit is
essential to the fairness of the process of reviewing tenure requests. The current absence of
explicitly stated standards and procedures in many academic units poses the risk that the tenure
cases brought for our review reflect standards developed *ad hoc* by members of various personnel
committees rather than by the considered policies of each academic unit. We request your
assistance in assuring that all academic units develop these standards. We have provided a set of
recommendations to aid in the process.

Recommendations

9

**Figure 1**
**Processes in My 2003 Promotion Application**



Code: [ ▢ ]  =  Not performed

As Figure 1 indicates, many of the key evaluation processes were not performed regarding my promotion application.  First, the votes by the interdisciplinary Business School Committee were taken without the benefit of complete information and without prior documentation which should have become part of the record.

In addition, particularly significant was the absence of a three-member peer review committee that would have provided transparency and accountability in the data collection and balance in the assessment of candidate qualifications.  The committee would have also been responsible for a comprehensive written report on the candidate and an objective presentation at the interdisciplinary Promotions Committee. The opinion of the peer evaluation committee carries great weight.  Its members make a balanced presentation of the record and are accountable for answering factual questions at the meeting, based on their in depth analysis of the record and the clarifying discussions with the candidate.  Instead, communication with me on any of the substantive aspect of my record was absent from this process entirely.

Furthermore, there was no area meeting of Management Systems Professors where the performance data on the two candidates could be reviewed and compared.  There were no written records and no area votes that would be presented, explained and considered at the interdisciplinary Promotions Committee meeting.  Additionally, there was no accurate written report on candidate qualifications by explicit criteria (Exhibit 13, sample report format) that should have been distributed to all Professors attending the meeting.  From my experience of

9

Table 1

| Comparative Research Records of Full Professors in the Management Systems Area and 2003 Applicants* | | |
|---|---|---|
| | **CITATIONS (RESEARCH IMPACT)** | **ARTICLES IN SEARCHES** |
| Professor K | -- | 28 |
| Professor L | -- | 18 |
| Professor M | 35 | 13 |
| Professor N | -- | 12 |
| Professor Solomon* | 80 | 11 |
| Professor O | -- | 8 |
| Professor P | -- | 7 |
| Professor Q | -- | 6 |
| Professor R | 19 | 5 |
| Professor Klotz* | 2 | 2 |
| Professor S | -- | 1 |

Code: — = Not available
Limitation: Caution must be exercised regarding possible inadvertent omissions of data sources, or other unknown error. The Hearing Committee should have access to complete Curriculum Vitae, and may consider independent citation and article searches.

My record compares favorably to those of Management Systems Professors in terms of the key research indicators of citations, quantity and quality of publications. The number of citations of my published work favorably compares to the three full Professors on whom data is available. A citation search of the articles published by the Management applicant promoted in 2003 resulted in two citations of that work.

Table 1 also documents that my research record is at the higher end of the distribution relative to the Management Systems Professors, rank-ordered by the number of publications appearing in the online searches. Several of my articles appear in high quality journals, including single authored publications that would meet standards for faculty in research Universities. The quality of these journals favorably compares to those of the other area Professors.

A very small number of the Management Systems Professors have single authored articles in the online searches, and I have several, leaving no ambiguity about the contributions I made to these works. The Management candidate promoted to Professor in 2003 is listed as the second co-author in both articles appearing in the online searches.

**Teaching**
My teaching is rigorous, receiving evaluations comparable to those of Management Systems faculty holding the rank of Professor. I have played a central role in the development of our pioneering "Process Management" program, informed in part by my research on integrative process perspectives for organizational renewal and change.

FacultyHaering C 4-14-2007 TIMELINE

**EXHIBIT 5    TIMELINE**

| 2004 | |
|---|---|
| 2/9/2004 | To VPAA letter regarding serious repeated irregularities, statutory violations, and distortion of record |
| 4/4/ 2004 | <u>Notice of Appeal</u> - Page 1 of Appeal – request for Hearing with Com, opportunity to respond to opposition |
| 9/ 2004 | Announcement by VPAA's office re "<u>disappearance</u>" of my entire promotion record |
| 11/4//2004 | To Senate President request to investigate "disappearance" of Promotion Record |
| 11/21//2004 | To VPAA and Dean, letters regarding "disappearance" of Promotion Record |

| 2005 | |
|---|---|
| 5/2/2005 | <u>Denial of Appeal by Hearing Committee</u> Never permitted to meet Hearing Committee |
| 5/12/2005 | To Senate President requesting that Executive Committee review Appeal, directed by Senate President |
| 5/12/2005 | To Senate President email, to enable expedited review by Executive Committee |
| 6/24/2005 | From Senate President - apologizing for delay to respond, "will be reviewed by the Executive Committee" |
| 6/29/2005 | To Senate President, request to meet the Executive Committee |
| 9/13/2005 | From Senate President –"Executive Committee found no reason to revisit the findings of the Hearing C" Never permitted to meet the Executive Committee |
| 11/30/2005 | To Senate President from Executive Committee member re my appeal follow-up request visit (Unanswered) |

| 2006 | |
|---|---|
| 4/24/ 2006 | To Sen President & Exec C. Request to, return to Hearing Com for reconsideration , Hearing (Unanswered) |
| 9/14/ 2006 | To Sen President & Exec C. Request to, return to Hearing Com for reconsideration Hearing (Unanswered) |
| 9/28/2006 | To Executive Com member requesting response to unanswered requests |
| 10/2/2006 | To Executive Committee member reply |
| 10/12/2006 | To Executive Committee member explaining foreclosure of review in any forum, rights to formal hearing |
| 11/1/ 2006 | From Senate President (after 14 months), first **acknowl. rights to formal Hearing**, time req. not May 2004 |
| 11/26/2006 | To Senate President, VPAA repeated request to schedule a Formal Hearing                    (Unanswered) |

| 2007 | |
|---|---|
| 1/28/2007 | To Hearing Committee direct repeated request to schedule a Formal Hearing      cc: all         (Unanswered) |
| 3/9/2007 | To Hearing Committee direct repeated request to schedule a Formal Hearing      cc: all         (Unanswered) |
| 4/24/2007 | From outgoing Interim VPAA letter, instead of Faculty Hearing Committee |
| 5/4/2007 | Senate President at Faculty Senate meeting – Senate has no jurisdiction to hear this matter |
| 5/11/2007 | To outgoing Interim VPAA reply objections |
| 5/14/2007 | To Hearing Committee reiterate outstanding repeated requests to schedule a Formal Hearing |

10

October 27, 2017

Dear Dr. Crystal,

Thank you for your June 8, 2017 response on behalf of Provost Freedman (Exhibit 1), which addresses my June 6 email to the Provost requesting that he fulfill the commitments he made to me on behalf of Fordham University when I was appointed Area Chair in 2013.

Your response was quite surprising to me. Although it seems to question whether I was appointed Management Systems Area Chair (which occurred on September 29, 2013), you were involved in some of the official actions regarding my 2013 Area Chair position. Along with Provost Freedman and Assistant Vice President and Chief of Staff Ellen Fahey-Smith, you participated in the October 7, 2013 Department/Area Chair Termination Hearing to remove me as Management Systems Area Chair. That Hearing followed steps described in the Fordham University Statutes §4-06.50 - Department Chairperson. Why go to such lengths and go through that process to remove me if I were never appointed Chair?

At the same time, this June 8 response argues that the Provost's supposedly non-existing commitment to compensate me fully as Area Chair is somehow satisfied by 1 course release for one semester in 2014, implying that the entire obligation has already been fulfilled. However, as stated in my email June 6 2017 email to the Provost Freedman:

> "I am owed 9 courses, and so far I have only received a one-course reduction for the Spring, 2014 term, so I am still owed 8 more. In addition, you had stipulated that I would get a stipend of $18,000-20,000 annually for the 3-year term."

Your email response is not supported by facts.

On the issue of my appointment as Area Chair of Management Systems, please see Exhibit 2 for the relevant University Statutes, and Exhibit 3 for relevant correspondence. Although your email states that "there is no evidence that I was appointed," there is ample documentation and correspondence on these events.

The following are key dates regarding my 2013 Area Chair appointment and brief tenure:

| | |
|---|---|
| September 25, 2013 11 am | Department Chair Nomination |
| September 29, 2013 10 am | Department Chair Appointment |
| October 2, 2013 9.30 am | of Provost Proposal of "Tripartite" Chair position offered jointly to me and Dr. .witz along with an unnamed third party. |
| October 2, 2013 3:00 pm | Announcement of Department Chair removal, Provost Commitment to compensate me as Area Chair for the 3 years |
| October 7, 2013 3:00 pm | Department Chair Termination Hearing, Provost Public Commitment to compensate me as Area Chair for the 3 years, made publicly prior to his requesting the faculty vote |
| October 18, 2013 | Department Chair Replacement Announcement with Dr. Hollwitz as Chair |

Initial Appointment Events

I was nominated as the chairperson of the Management Systems Area /Department of the Business School on Wednesday, September 25, 2013 following my endorsement by a 70% vote of the Area Faculty.  Following my nomination, on Friday, September 27, 2013 at 5:21 pm, I

1

received an email from Dean Rapaccioli [1] seeking to speak with me over the weekend, and after we set a time and she called me on Sunday morning, September 29, 2013 at 10am. Dean Rapaccioli informed me that Provost Freedman [2] had appointed me as the Management Systems area Chair, and that both the Provost and she were looking forward to working with me as the Area Chair.  Dean Rapaccioli also asked me how Provost Freedman should make the announcement, by email or otherwise.

She specified that the term of appointment as Management Systems Area Chair was for 3 years, and that I would receive an annual stipend of $15.000-20.000 and a teaching load of 1 course per semester for the 3-year term. I accepted the appointment during that phone conversation with Dean Rapaccioli. We discussed plans for the Area, and she asked me who I would like appointed to help me with the tasks as Chair. I told her I would think about it, and would let her know when we would meet in person.

Steps Following my Area Chair Appointment
Dean Rapaccioli met with me at her Lincoln Center office on Tuesday October 1, 2013 at 11am to follow up on my plans for the Area as Chair. I was astonished when Dean Rapaccioli told me that the Provost and her were thinking of reneging on my appointment. My 12:30 pm email that day to Dean Rapaccioli following that meeting describes these events, and my request to personally meet with Provost Freedman to discuss my Chair appointment.

Provost Freedman and Dean Rapaccioli then met with me that same day around 4.30 pm at Dean Rapaccioli' s Lincoln Center office. Although I had been offered and accepted the Chair appointment, they now expressed ambiguity as to the future. But we extensively discussed issues and plans for the Area and the Business School, particularly the unification in the Business School between the Graduate and undergraduate programs.  They asked what my thoughts were, since as an Area Chair, I would play an important role in the unification.

In the late afternoon on Tuesday October 1st (at 5:39 pm), I received an email from the Provost's office seeking to schedule a 4-party Conference Call for the next day "to discuss the leadership in the Management Systems Area." The 4 parties: Provost Freedman, Dean Rapaccioli, me, and Dr. Hollwitz [3], the other Chair nominee.

On Wednesday morning October 2nd before the 4-party Conference Call, I wrote to Dean Rapaccioli and Dr. Freedman:
> "As a follow up of our conversation yesterday, I reviewed the University Statutes again. All the steps were followed for my selection as an Area Chair preceding my appointment on Sunday, September 29th when you conveyed to me the Provost's decision (-see § 406-50 c through e). I was nominated by the Management Systems nominating Committee by secret ballot, and my name was one of the two transmitted to you, on the basis of which

---

[1] Dr. Donna Rapaccioli was the Dean of the Faculty and Dean of the College of Business Administration, FordhamUniversity in 2013.

[2] Dr. Stephen Freedman's title as Provost corresponds to Vice President for Academic Affairs in the Fordham University Statutes.

[3] Dr. John Hollwitz was previously the Vice President for Academic Affairs at Fordham University. Dr. Freedman succeeded Dr. John Hollwitz in that position, and the title was converted to Provost.

you conferred with the Provost. In my appointment, you specified the stipend as Chair (§ 406-50 e) and my course release. I accepted the appointment in that conversation."

During the 4-party Conference call, Provost Freedman offered to me and Dr. Hollwitz a "Tripartite" Chairmanship position, together with an unnamed third party. I indicated that I was willing to accept that change in my Chair position. However, Dr. Hollwitz indicated that he would not participate in any shared Area Chairmanship. Dr. Hollwitz found out for the first time from me at the meeting that I had previously been appointed Area Chair, although he indicated he had heard "rumors" to that effect.

Later that same day (October 2nd), Dr. Freedman initiated a 3:00 pm, 3-party conference call with Dean Rapaccioli and me. Provost Freedman announced to me that he had changed his mind regarding his morning proposal for a "Tripartite" Area Chair and announced to me that he decided to appoint Dr. Hollwitz as Area Chair instead of me. However, he assured me that the University would keep its commitment to compensate me as the appointed Area Chair after my arbitrary removal, as per my Sunday morning, September 29, 2013 Chair appointment.

The Department Chair Termination Hearing on October 7, 2013
On October 7, 2013 Provost Freedman and his administrative staff conducted a Department Chair Termination Hearing to remove me from my appointment as Management Systems Area Chair and replace me with Dr. Hollwitz. A team of Senior Fordham University Administration from the Rosehill Campus in the Bronx came to the Lincoln Center Campus in Manhattan to effectuate Dr. Solomon's Department Chair Termination Hearing of October 7, 2013. The following were the Participants:

Dr. Stephen Freedman, Provost
Dr. Jonathan M. Crystal, Associate Vice President and Associate Chief Academic Officer,
Dr. Ellen Fahey-Smith Assistant Vice President and Chief of Staff Office of Provost at Fordham,
Seventeen of the 21 Management Systems Faculty members,
Dean David Gautchi [4], Dean of the Graduate School of Business, who came towards the end of
    the Hearing, left after about 10 minutes.
Dean Donna Rapaccioli did not attend the October 7, 2013 Chair Termination Hearing.

During the October 7, 2013 Department Chair Termination Hearing Provost Freedman repeated, in public, the University's commitment to provide me an annual stipend of $18.000-20.000 and a teaching load of one course per semester for 3 years. After the promise that I would be compensated as Area Chair, the same faculty who had nominated her two weeks earlier, consented to the Provost's request to grant him the right to remove me and replace me with Dr. Hollwitz.

Events After the Department Chair Termination Hearing
As to events after the October 7, 2013 Department Chair Termination Hearing, your June 8 response selectively made partial reference to an October 31, 2013 email from Dean Rapaccioli to me, which stated in full:

---

[4] Dr. David A. Gautschi was the Dean of the Graduate School of Business Administration, Fordham University in 2013.

3

"Thank you for meeting with me and Victor this morning. As I mentioned I would like to offer a course release for the Spring 2014 to allow you the additional time needed to publish your research.
I am confident that this release time will help you in your career.
You are a valued colleague and I thank you again for all you do for Fordham."

However, your June response fails to mention my October 31 reply to Dean Rapaccioli:
"Although I appreciate your offer, in no way does it address the real issue about which I wrote to you on Monday (see below). [Emphasis added]

Also, your June response does not include Dean Rapaccioli's Nov 5, 2013 response to my subsequent requests to Provost Freedman to fulfill the Area Chair position commitments he made to me, which were sent back to her, when she wrote:
"As we have discussed last week we would like to offer a course release for the Spring 2014 term. This has been approved and authorized by the Provost as the appropriate response." [Emphasis added]
However, clearly that was not the "appropriate response" or the University's commitment.

Regarding the Hearing to remove me as Area Chair on October 7, 2013, the Provost promised in the presence of the faculty (as well as to me, for a second time) that I would be compensated with the stipend and course releases, associated with my Area Chair position. This was presented during the Hearing as a promise by the administration to treat me as an Area Chair as they arbitrarily decided to remove me for no fault of my own.

Although that was a public commitment upon which the faculty relied and gave the Provost the vote he requested, it in no way softened the enormous blow and public humiliation to me, a Fordham faculty member of close to 30 years at that time. After the vote was cast in favor of the Provost's wishes, and the Administration received what they wanted -- the faculty vote -- the Administration never fulfilled their end of the commitment.

Ongoing Actions and Conclusion
The very negative effects lasted long after, and the pattern of actions by members of Fordham University against me have continued and escalated. I am being precluded from all administrative or quasi-managerial tasks at the Business School, discriminated in receiving credit or rewards for my significant contributions, precluded from appropriate leadership and teaching opportunities particularly in the graduate MBA, MS, MA, and PhD programs of the Business School, have had severe extraordinary actions taken against me for performing my duties as a Business School Senator, and am being marginalized to this very day. It does not appear appropriate that senior Fordham Administrators turn a blind eye to these ongoing actions.

Neither has the reason for my abrupt removal from my Area Chair position, to which I was appointed in full compliance with the University Statutes, ever been explained to me, or to the Management Area faculty at the Department Chair Termination Hearing.

I have provided you with documentation you requested.  Therefore, please advise the Fordham Administration to provide the course reductions and stipends that have been promised to me.

4

Please let me know as soon as possible how and when you will fulfill the University commitment to me.

Sincerely,

Esther Solomon

Cc: Provost Freedman
    Dean Rapaccioli
    Vice President Fahey-Smith

1/6/2018                                Fordham University Mail - Compensation re Area Chair Position

 FORDHAM

ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>

## Compensation re Area Chair Position
2 messages

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>                    Fri, Oct 27, 2017 at 11:54 AM
To: Jonathan Crystal <crystal@fordham.edu>
Cc: "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>, DONNA RAPACCIOLI <rapaccioli@fordham.edu>,
Ellen Fahey-Smith <faheysmith@fordham.edu>

Dear Dr Crystal,

Please find below my response and 3 exhibits, addressing your June 8, 2017 email on behalf of Provost
Freedman.
Thank you and best regards,

Esther

---

4 attachments

📄 **Follow-up regarding my Management Systems Ara Chair Position.pdf**
100K

📄 **Exhibit 1.pdf**
116K

📄 **Exhibit 2 Fordham University Statutes Chairperson.pdf**
831K

📄 **Exhibit 3 Area Chair Correspondence.pdf**
144K

---

**Jonathan Crystal** <crystal@fordham.edu>                                          Tue, Oct 31, 2017 at 12:19 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>, DONNA RAPACCIOLI <rapaccioli@fordham.edu>,
Ellen Fahey-Smith <faheysmith@fordham.edu>

Dear Dr. Solomon,

Thank you for this email.

As I stated in my previous communication to you, the University Statutes clearly indicate that it is the Provost who
makes Area Chair appointments. I did not see, in your collection of exhibits, an appointment letter from the Provost. Nor
did I attend a "Department Chair Termination Hearing" on October 7. 2013 in which any commitments of stipends or
course reductions were made.

I therefore must reiterate the position of the Provost Office that was communicated to you on June 8, 2017. We are
unable to provide the monetary stipends or the 8 course reductions that you are requesting.

I understand this is a disappointing decision.  As a faculty member, you have the right to initiate a grievance procedure, as delineated in the University Statutes §4-07.31.

Sincerely,
Jonathan

Jonathan Crystal, PhD
Associate Vice President & Associate Chief Academic Officer, Office of the Provost
Associate Professor of Political Science
Fordham University
Cunniffe House, Room 225
441 E. Fordham Road
Bronx, NY  10458

phone:  (718) 817-0136
email: crystal@fordham.edu
[Quoted text hidden]

Exhibit 1

 **FORDHAM**      ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>

---

## Compensation re Area Chair Position
3 messages

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>      Tue, Jun 6, 2017 at 10:18 AM
To: "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>

Dear Provost Freedman,

 According to the commitment you made to me on October 2, 2013 and reiterated on October 7, 2013, you assured me that I would be granted the reduced teaching load of 1 course per semester for three years, and I would get an annual stipend of $ 18,000 – $ 20,000 for the 3-year term.  These promises were made to me consistent with my appointment as the Area Chair of Management Systems in October 2013.

 In reviewing my teaching schedule since Fall 2013, I see that I have not been granted the reduced teaching load of 1 course per semester for three years.  I would like to make arrangements over the next few semesters to now collect on this obligation. I am owed 9 courses, and so far I have only received a one-course reduction for the Spring, 2014 term, so I am still owed 8 more.

 In addition, you had stipulated that I would get a stipend of $18,000-20,000 annually for the 3-year term.  Please let me know if there are any specific arrangements I need to make to collect on these funds.

Thank you and I look forward to hearing from you.

 With best regards,

Esther

Esther Solomon
Fordham University
Gabelli School of Business
140 West 62nd Street
New York, NY 10023
Phone 212 636 6187
Fax    212 765 5573
esolomon@fordham.edu

---

## Exhibit 1

**Stephen Freedman <sfreedman@fordham.edu>**

Tue, Jun 6, 2017 at 7:22 PM

To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: CRYSTAL Jonathan <crystal@fordham.edu>

Dear Esther
I will ask Dr. Crystal to discuss this matter with the dean and get back to you as soon as possible.
Thank you for your patience and understanding.
Stephen

---

**Jonathan Crystal <crystal@fordham.edu>**                    Thu, Jun 8, 2017 at 2:50 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: STEPHEN FREEDMAN <sfreedman@fordham.edu>, DONNA RAPACCIOLI
<rapaccioli@fordham.edu>

Dear Esther,

Thank you for your email. As Dr. Freedman directed, I looked into this matter and discussed it with the Dean.

Although you state that these commitments were made consistent with your "appointment" as area chair, I have not been able to find any evidence that you were in fact appointed as area chair during the time period in question. As you are aware, the University Statutes are very explicit that, while the faculty within a department/area *nominate* candidates for the chair position, it is the Provost who makes the *appointment*. (Section 4-06.50.5). Since you were not appointed as chair, I have to confess that I am somewhat confused as to why you would be entitled to receive course reductions and/or stipends that are attached to the chair position.

Dean Rapaccioli shared an email communication that she and you had on October 31, 2013. In that communication she offered, and you accepted, a one course reduction for spring 2014 in order to "allow you the additional time needed to publish your research." She also shared an email of December 8, 2015, reminding you of your teaching load.

If you have documentation of communications or commitments that I have not seen and that would substantiate the statements in your email below, I would respectfully ask you to share them with me. Otherwise, I regret that I'm not able to provide the course reductions or stipends that you are requesting.

Best,
Jonathan


Jonathan Crystal, PhD
Associate Vice President & Associate Chief Academic Officer, Office of the Provost
Associate Professor of Political Science
Fordham University
Cunniffe House, Room 225
441 E. Fordham Road
Bronx, NY  10458

phone:  (718) 817-0136
email: crystal@fordham.edu

2

Exhibit 2 Fordham University Statutes Chairperson

FORDHAM UNIVERSITY

About  Academics  Admissions and Aid  Research  Student Life  Resources

Home  About  Leadership and Administration  Board of Trustees  University Statutes
Part of Four Policies and Procedures for Faculty  Chapter Six Faculty Role in University Governance

Article Four: Policies
and Procedures for
Faculty

Chapter 6: Faculty Role in
University Governance

## Chapter Six: Faculty Role in University Governance

### §4-06.50 - Department Chairperson

a.  Chairperson  A faculty member shall serve as Chairperson of each Department. The Chairperson's duties shall be carried out in consultation with the faculty members of the Department.

b.  Responsibilities of the Chairperson. The Chairperson's duties shall be carried out in accordance with these Statutes and other policies of the University, Faculty, School or Department.

   1.  Representational Duties. The Chairperson shall represent the Department in dealing with units of the University and administrators, informing them of the needs, policies and procedures of the Department. The Chairperson shall communicate University and School policies to the members of the Department.
   2.  Administrative Duties. The Chairperson shall administer the Department including calling and presiding at meetings, implementing University, Faculty, School or Department policies and procedures, supervising the staff and facilities, preparing the budget and supervising expenditures of the unit.
   3.  Curricular and Instructional Duties. The Chairperson shall be responsible for planning and implementing the curriculum, instructional programs and schedules, and ensuring proper evaluation of teaching effectiveness, according to procedures established by the University, Faculty, School or Department.
   4.  Counseling Duties. The Chairperson shall arrange for the registration and counseling of students.
   5.  Duties Relating to Faculty. The Chairperson shall take an active role in recruitment of faculty and instructional staff, shall preside at meetings of personnel committees as provided in these Statutes and shall review progress with each probationary faculty member at least annually (see §4-05.02(e)(2)).

c.  Selection of Chairperson

   1.  The Chairperson normally shall be selected from among the tenured Professors and Associate Professors of the Department.
   2.  The nominating committee shall consist of all full-time faculty with the rank of Assistant Professor or higher who have completed one academic year of service at the University.

      A.
      If there are fewer than five faculty members who meet the above requirements, the full-time faculty members of the Department shall elect from among themselves by written secret ballot the number of persons necessary to secure a five member nominating committee.
      B
      In Departments where there are fewer than five full-time faculty members, the entire faculty shall constitute the nominating committee.

1

Exhibit 2 Fordham University Statutes Chairperson

C.

Any member of the faculty serving under a terminal notice of contract shall be eligible to participate in nominations for Chairperson only if such person will serve under the Chairperson to be appointed

D.

Eighty (80) percent of a nominating committee shall constitute a quorum for the transaction of all business

E.

Faculty members on faculty fellowship or leave of absence and administrators tenured in the unit may vote as members of a nominating committee if they are present at the meeting but they shall not affect the presence or absence of a quorum

3.   The Dean of Faculty shall meet with the nominating committee for the purpose of sharing perspectives.

4.   The nominating committee shall vote separately on each nominee for Chairperson. The Committee shall forward all the names (up to three) from among those who received a majority of the votes cast. The vote shall be by written secret ballot. The Committee shall transmit the names to the Dean of Faculty. Each academic unit may use its own procedures for the process of nominating candidates for the unit's recommendation of a chair, but these procedures must be put in written form, must respect Robert's Rules for Order, and must be approved by the members of that academic unit prior to beginning the nomination process. These procedures should be forwarded by the unit to the appropriate deans, to the Office of the Provost, and to the Faculty Senate in the same way in which it must declare its procedures for merit considerations.

5.   The Dean shall add comments, and transmit the names of the nominees to the Vice President for Academic Affairs, who shall appoint the Chairperson.

A.

If the Vice President for Academic Affairs declines to appoint any of the nominees, the Vice President shall meet with the Committee and the Dean to discuss the matter. A quorum is not required at this meeting, unless another nomination for a permanent chairperson is to be made by the committee, in which case the usual 80% quorum will be required.

B.

If agreement on a Chairperson is not achieved, the Vice President for Academic Affairs may appoint an Acting Chairperson [see §2-06.5I]

d.   Term of Office. The term of office of a Chairperson is three years, renewable for one sequential term. A shorter appointment may be made in special circumstances. Notwithstanding the foregoing, a Chairperson who has served two consecutive three-year terms may be continued in Office by reappointment for one-year terms, subject to the nomination process described in §4-08.50(c).

e.   Stipend. In addition to receiving a reduced teaching load, the Chairperson shall receive an appropriate stipend.

f.   Termination of Appointment. A proceeding for termination of the appointment of a Chairperson may be commenced by petition to the Dean of Faculty made by at least two thirds of the eligible nominating committee; or by the Dean with the consent of a majority of the eligible nominating committee. If the Dean is unable to reconcile the matter, the Dean shall inform the Vice President for Academic Affairs, who shall conduct a hearing at which all parties may be represented. The decision of the Vice President for Academic Affairs shall be final.

2

Exhibit 3

 **FORDHAM**

## Area Chair Follow up
3 messages

from:   "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
to:      Donna Rapaccioli <rapaccioli@fordham.edu>
date:    Mon, Oct 28, 2013 at 8:46 AM

Dear Donna,

This is to inquire how you will implement Provost Freedman's commitment to compensate me for the stipend and course release consistent with my appointment as Chair of Management Systems on September 29, 2013 following my nomination by the faculty vote.  As you had indicated on that day, it would amount to an annual stipend of $18-20,000 and a teaching load of one course per semester for the 3-year term.  Please let me know.

Thank you and best regards,

Esther

---

from:   Donna Rapaccioli <rapaccioli@fordham.edu>
to:      "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
date:    Mon, Oct 28, 2013 at 2:56 PM
subject:  Re: Area Chair Follow up

Dear Esther,

Thanks for your email.
Would you have time on Thursday at 10?
Assuming things remain stable I will be at Lincoln Center.
Best regards

Donna

--
Donna Rapaccioli, PhD
Fordham University
Dean of Business Faculty &
Dean of the Gabelli School of Business
718-817-4105

---

from:   ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu> to:      Donna Rapaccioli <rapaccioli@fordham.edu

date:    Mon, Oct 28, 2013 at 8:01 PM
subject: Re: Area Chair Follow up

Dear Donna,
 Thursday at 10 is fine.
 With best regards,
Esther

 **FORDHAM**              ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>

---

**Thank you**
3 messages

Donna Rapaccioli <rapaccioli@fordham.edu>              Thu, Oct 31, 2013 at 10:20 AM
To: esolomon@fordham.edu
Cc: borun@fordham.edu

Dear Esther,
Thank you for meeting with me and Victor this morning. As I mentioned I
would like to offer a course release for the Spring 2014 to allow you the
additional time needed to publish your research.
I am confident that this release time will help you in your career.
You are a valued colleague and I thank you again for all you do for
Fordham.
Best regards
Donna

---

ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>              Thu, Oct 31, 2013 at 12:09 PM
To: Donna Rapaccioli <rapaccioli@fordham.edu>

[Quoted text hidden]
Dear Donna,

I appreciate your offer in our meeting today in the presence of Dean Borun to have me teach
2 instead of the 3 courses I am scheduled to teach this coming semester, so I will teach the
Leadership and Change and one instead of the two Fundamentals of Management courses,
for more research time, to help the School accreditation. Such change is not that important to
me at this point under the circumstances. As I said to you, I can teach my regular teaching
load, as I have done for the past 3 decades at Fordham.

Dean Borun said that he would send the official documentation regarding today's meeting to
the Provost.

Although I appreciate your offer, in no way does it address the real issue about which I wrote

2

to you on Monday (see below). Apparently, you cannot address the Provost's commitment following my appointment as an Area Chair of Management Systems.

Thank you and best regards,

Esther

---

 **FORDHAM**

ESTHER Solomon
[Staff/Faculty [Business]]
<esolomon@fordham.edu>

## Area Chair follow up
4 messages

**ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>**          Tue, Nov 5, 2013 at
To: "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>                                  10:29 AM

Dear Provost Freedman

This is to inquire how you will implement the commitment you made to me on October 2, 2013 to compensate me for the stipend and course release consistent with my appointment as Chair of Management Systems. On September 29, when Dean Rapaccioli informed me of your joint decision to appoint me as the Area Chair which I accepted, she indicated that the compensation would amount to an annual stipend of $18-20,000 and a teaching load of one course per semester for the 3-year term.

Please let me know how you plan to implement this commitment.

Esther Solomon, Ph.D.
Graduate School of Business

---

**STEPHEN Freedman [Staff/Faculty] <sfreedman@fordham.edu>**          Tue, Nov 5, 2013 at 12:31 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Rapaccioli Donna <rapaccioli@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>

I will ask Donna to confer with John and recommend to me an appropriate plan of action.
Stephen
[Quoted text hidden]

---

**Donna Rapaccioli**          Tue, Nov 5, 2013 at 12:59 PM

3

<rapaccioli@fordham.edu>
To: "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>
Cc: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>, John Hollwitz
<hollwitz@fordham.edu>, Victor Borun <borun@fordham.edu>

Dear Esther,
As we have discussed last week we would like to offer a course release for the Spring 2014 term.
This has been approved and authorized by the Provost as the appropriate response.
Sincerely,
Donna
[Quoted text hidden]
--
Donna Rapaccioli, PhD
Fordham University
Dean of Business Faculty &
Dean of the Gabelli School of Business
718-817-4105
rapaccioli@fordham.edu

 **FORDHAM**

**ESTHER Solomon [Staff/Faculty [Business]]**
**<esolomon@fordham.edu>**

---

## Area Chair follow up
4 messages

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>

Tue, Nov 12, 2013 at
4:50 PM

To: "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>

Dear Provost Freedman,

The purpose of my previous email was to inquire whether you would or would not honor
the commitment you personally made to me in our October 2, 2013 3 pm Three-Party
conference call: to continue the stipend and course release which were part of my
appointment as Area Chair of Management Systems, offered and accepted on September
29.

   That October 2 afternoon promise was in connection with your announcing to me that
you were planning not to keep my appointment as Area Chair. Apparently, you also had
changed your mind about your second offer to me of that same morning regarding a Joint
Area Chair appointment. That October 2 morning, during the 9.30 am Four-Party
Conference Call, including Dean Rapaccioli, Dr. Hollwitz and myself, you had proposed
that I share with Dr. Hollwitz a Joint Appointment as Area Chair or a Tripartite Area
Chair structure (with an unnamed third party). Dr. Hollwitz was very surprised to learn
that this was taking place after I had already been appointed Area Chair, and he
repeatedly refused, unlike me, any shared leadership arrangement.

   Later that same October 2 afternoon, however, you called the above-mentioned 3pm

4

Three-Party Conference Call including Dean Rapaccioli and myself to announce to me that you decided, in the interim, not to keep me as the Area Chair under any arrangement. Instead, you would replace me with Dr. Hollwitz, and you intended to call a meeting with the entire Management Systems area faculty on this matter. In connection with my abrupt removal, you said that you would honor all promises that were made to me in conjunction with my appointment as the Area Chair of Management Systems.

At the "Management Systems Area Leadership Meeting" that you held on October 7, attended by 17 Management Systems Area faculty and 2 other administrators from your office, and video broadcast on both campuses, your promise to fully keep the commitments for stipend and course release associated with my Area Chair appointment was also publically discussed.

That same Management systems Area faculty had endorsed me with a 70% vote as an Area Chair nominee about two weeks before. I only sought that Chair position after Dean Rapaccioli urged me to seek it, gave me her enthusiastic support, and as she asked me, I presented to my faculty colleagues my proposed agenda as Chair during the nomination meeting of September 25. In any event, Dean Rapaccioli's October 31 decision to assign me a two rather than three-course teaching schedule for research in the Spring semester does not fulfill the Area Chair position commitments you made.

Such public actions have broad leadership implications. My Area Chair appointment was in full compliance with the University Statutes. My removal was not.

Please let me know if you plan to meet any of these latest commitments.

Sincerely yours,

Esther Solomon, Ph.D.
Graduate School of Business

---

**STEPHEN Freedman [Staff/Faculty]** <sfreedman@fordham.edu>          Wed, Nov 13, 2013 at 9:00 AM

To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Rapaccioli Donna <rapaccioli@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>

Dear Esther,
I have tried  my best to respond to your recent and past inquiries with care and concern.
At this point I will ask Donna to work closely with John  to respond to this email and any additional questions you may have.

Stephen
[Quoted text hidden]

---

**ESTHER Solomon [Staff/Faculty [Business]]**          Tue, Dec 10, 2013 at 11:43 AM
<esolomon@fordham.edu>

To: "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>

Dear Provost Freedman,

This is to reiterate my unanswered request to you, to please let me know if you plan to meet any of your commitments to me regarding my Area Chair appointment.

Sincerely yours,

Esther Solomon, Ph.D.
Graduate School of Business
[Quoted text hidden]

---

**STEPHEN Freedman [Staff/Faculty]** <sfreedman@fordham.edu>    Tue, Dec 10, 2013 at 3:11 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>,
Jonathan CRYSTAL <crystal@fordham.edu>, Ellen Fahey-Smith <faheysmith@fordham.edu>

Dear Esther,

I am referring your email to the dean and area chair and I suggest you discuss this matter with them at your convenience.

Stephen

11

Esther Solomon, PhD
Gabelli Graduate School of Business
Fordham University
113 West 60th Street
New York, NY  10023
esolomon@fordham.edu

March 1, 2016

Joseph M. McShane, SJ
President
Fordham University
Bronx, New York 10458

Dear Father McShane:

I write to seek the assistance of our University's leadership to defuse and resolve an on-going controversy within the Gabelli Graduate School of Business faculty arising at the Faculty Senate regarding the question of appropriate faculty involvement in the process of designing the new curriculum for the Professional MBA program in a manner consistent with the University statutes.  A meeting of the faculty and administrators in the Joint Council of the Gabelli business school is scheduled for tomorrow, March 2, 2016 at 10:00 A.M.  For the reasons summarized below, I respectfully request that the Office of the President and other responsible University leaders copied on this letter clearly request that the Joint Council take no action on proposed resolutions and that those resolutions and related issues be taken off the agenda for the meeting scheduled by the Executive Committee over the role of the Faculty Senate in the University for tomorrow.  I further request a meeting with you or other members of the Board of Trustees you wish to involve to fully discuss this situation and to seek a resolution that will protect the interests of the University, the business school and the Faculty Senate without further damage to my professional reputation and standing within the University faculty and community.

As you may know, I am one of three elected representatives of the Gabelli business school in the Faculty Senate.  Serving in this role has been an honor as well as an important professional obligation that I have carried out at all times in good faith and out of devotion to an institution I have been privileged to serve as a faculty member for over 30 years.  Throughout the Faculty Senate's consideration of the Professional MBA program's new curriculum, on behalf of my colleagues on the business school faculty, I raised concerns regarding process to ensure that all faculty perspectives on the issue were given full consideration and that an informed decision would be fairly reached in a manner consistent with the university statutes.  At all times, my representation of faculty perspectives in my area of management systems and the faculty at large was carried out professionally and in good faith.  Reasonable people disagree on some of the curriculum issues involved as well as on the process carried out to reach a recommendation and decision.  That is, of course, not unusual in organizations, and is the reason that the business school and other University divisions participate in the Faculty Senate.  At no time during this entire process has anyone ever identified any action that I took that could reasonably be

Joseph M. McShane, SJ
March 1, 2016
Page 2

considered inconsistent with my legitimate and appropriate duties as a member of the Faculty
Senate or the business school faculty.

Nevertheless, in retaliation for my properly enacting my role as a Senator, I have been subjected
to a series of defamatory accusations and condemning resolutions within the business school
with inaccurate information to the faculty in violation of my rights, apparently culminating in the
meeting scheduled for tomorrow. I cannot and do not wish to burden you by detailing here the
retaliatory actions that have been taken by some who opposed my exercise of my appropriate
duties and responsibilities as a Faculty Senator representing the business school.

In summary, without detailing all of the substantive and procedural improprieties that have
occurred:

(1)      Unauthorized, draft minutes of Senate meetings—draft minutes to which I and others
objected and that are required by Senate procedures to be confidential until approved—have
been circulated within the business school faculty and utilized to accuse me and the Faculty
Senate. This is a continuing issue.

(2)      The defamatory and retaliatory use of this and other inaccurate and unauthorized
materials led to a purportedly legitimate faculty meeting within the Gabelli School on January
27, 2016 that resulted in a series of condemning resolutions that further injured my professional
reputation and standing among my peers, and the reputation of the faculty Senate.

(3)      The January 27 meeting was suffused with due process violations, including: improper
notice to faculty members; failure to notify and invite all eligible faculty members; lack of notice
to me that I would be the subject of discussion or resolutions at the meeting; and procedural
irregularities with the voting system used at the meeting, among other issues.

Aware of this process within the business school and concerned about its impact on the role of
the Faculty Senate and the protection of Senators from retaliation for their legitimate and
appropriate role in advocating on University policy matters, the Faculty Senate passed the
following resolution (See Action Minutes #421) at is February 26, 2016 meeting:

> "Resolved, That this Faculty Senate, as guardian of the University Statutes
> and Faculty Handbook, supports and encourages efforts by its members to
> voice at meetings of the Senate concerns respecting policies and
> procedures inimical to the nature of academic shard governance, without
> fear of internal or external constraints, intimidation or retaliation."

The republication of resolutions introduced at the January 27 meeting as the materials distributed
in advance of tomorrow's faculty meeting to faculty, administrative staff and student
representatives perpetuate the retaliation and total lack of due process that has characterized this
entire matter.

This entire episode and process has been most unfortunate for our University, its Faculty Senate
and the business school. Professional discussions at the Faculty Senate regarding faculty

Joseph M. McShane, SJ
March 1, 2016
Page 3

consultation on curriculum to ensure compliance with statutes should not be mischaracterized to challenge the reputation and professional standing of a long-standing faculty member and Faculty Senator acting at all times in good faith.  For me, however, this has become more than an unfortunate set of circumstances; it has become a retaliatory effort that, if not appropriately defused and resolved, may result in further grave harm to my professional reputation and standing, which have already been damaged as a result of these actions.

For these reasons, I ask that before any further action is taken I have an opportunity to meet with you or other members of the Board of Trustees and your designee(s) to discuss the matter.  I would, of course, be glad to engage in that process with any others who may have differing views of what has occurred.  Surely you will agree that the collegial norms of our institution, due process, and fundamental fairness to a faculty member in good standing for more than 30 years require no less.

Sincerely yours,


Esther Solomon, PhD
Fordham University Gabelli School of Business
esolomon@fordham.edu


cc:  Elaine M. Crosson, Esq.

 **ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>**

## Letter from Father McShane
1 message

**Dorothy Marinucci** <marinucci@fordham.edu>                    Wed, Mar 2, 2016 at 12:26 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>

Dear Dr. Solomon,

Below, please find a letter from Father McShane.  Thank you.

With kind regards,

Dorothy



2 March 2016

Dr. Esther Solomon

Gabelli School of Business

Via email transmission:  esolomon@fordham.edu


Dear Dr. Solomon,


Thank you for your letter. I am very troubled and dismayed by the tone of the dialogue in the Senate, and
the general lack of civility relating to a factual dispute among faculty. As you know, there are appropriate
fora for the resolution of disputes like the one with which both the Senate and Joint Council are wrestling at
the present time set forth in our governance documents (including the by-laws of the Senate).   Oddly (and
unfortunately) enough, no member of the faculty has pursued those fora.  We must do better, and we shall.
I will be speaking about this in the days and weeks to come.


Thank you again for sharing your concerns with me.


Joseph M. McShane, S.J.

12

**Dorothy Klotz** <dorothy.klotz@gmail.com>                         Fri, Feb 5, 2016 at 3:15 AM
To: "Sris Chatterjee [Business]" <chatterjee@fordham.edu>
Cc: Anne Fernald <fernald@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hombeck" <hornbeck@fordham.edu>,
"DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, Jennie Park-Taylor <parktaylor@fordham.edu>, "ESTHER
Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>, "Martin Chase [Staff/Faculty
[A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>, Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer
[Staff/Faculty [GSS]]" <farmer@fordham.edu>, Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt
<gogwilt@fordham.edu>, Richard Gyug <gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "JUDITH Jones
[Staff/Faculty [GSAS]]" <jujones@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]" <ekeller@fordham.edu>, Michelle McGee
<mmcgee@fordham.edu>, Harry Nasuti <nasuti@fordham.edu>, Henry Schwalbenberg <schwalbenber@fordham.edu>, Grace
Vernon <vernon@fordham.edu>, Elaine Crosson <ecrosson@fordham.edu>, Anastasia Coleman <acoleman11@fordham.edu>

Professor Chatterjee and Professor Wharton;

I am very dismayed you have been misrepresenting your role.  It is true you are two of the elected
members of the Gabelli Joint Council's Executive Committee.  However, there are three other
members, including the Dean who is the chairperson (see attached Gabelli Joint Council
ByLaws).  I would also like to draw your attention to the Section II of the Gabelli Joint Council ByLaws
which state the Joint Council's powers and objectives, in particular the second item.

> "To be responsible for the academic policies of GSBA and GBA in accordance with
> University Statutes and subject to review by the Board of Trustees."

Professor Solomon asked Provost Freedman during the November senate meeting whether he was
aware of the process followed in developing the PMBA program.  She raised specific concerns that
the process was in violation of the University Statutes (see attached minutes).  It is Professor
Solomon responsibility as a faculty member and a Senator to make sure that academic polices are in
accordance with the University Statutes.

I would also like to make clear that the purpose of the Faculty Senate is to promote the best interests
of Fordham University (see attached Constitution and ByLaws of the Faculty Senate).  The schools of
business do elect three members, but a Senator's role is not as you claim to represent the interests of
an individual school; a senator's role is to promote the best interest of Fordham University.  I am sure
you'll agree that adherence to the University Statutes is in the best interest of Fordham University.

The factual inaccuracies in your accounts of events and lack of full disclosure are inexcusable.  You
indicate in the attached Memo #1 that Professor Saharia aptly refuted the baseless accusation from
Senator Klotz and Solomon in his email dated November, 16.  Please note that I did not even
address the issue until the December senate meeting.  You also failed to mention that I sent to all
Senators on 12/17/16 in response to Professor Saharia's email.  The contents of that same email
were discussed the previous week at the Executive Committee Meeting with the provost on
12/8/16.  The provost requested at that meeting that I provide written documentation with respect to
all my assertions on curriculum, which I did on 12/11/16.  Since there was an ensuing meeting
between the provost, dean and senate president to discuss the matter, for you to assert that the
concerns I have expressed about governance issues in Gabelli are baseless accusations is a true
material misrepresentation.  I would also like to point out that you did not seek clarification on these
matters from me or from Professor Solomon at any time before or after you sent out an invitation to
faculty on 1/25/16 for an ad hoc meeting of select Gabelli faculty.

I have copied the University Council on this email and am requesting that she stop this public
retaliation, defamation and harassment of myself and Professor Solomon by you and Professor
Wharton.

1

Dorothy

[Quoted text hidden]

**3 attachments**

**Schools of Business Bylaws 4 17 2013.docx**
25K

**Approved Nov Senate Minutes.pdf**
295K

**Senate Constitution and ByLaws.pdf**
126K

---

**Sris Chatterjee [Business]** <chatterjee@fordham.edu>                    Fri, Feb 5, 2016 at 6:59 AM
To: Dorothy Klotz <dorothy.klotz@gmail.com>
Cc: Anne Fernald <fernald@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck"
<hornbeck@fordham.edu>, "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, Jennie
Park-Taylor <parktaylor@fordham.edu>, "ESTHER Solomon [Staff/Faculty [Business]]"
<esolomon@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>,
"Martin Chase [Staff/Faculty [A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>,
Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer [Staff/Faculty [GSS]]" <farmer@fordham.edu>,
Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt <gogwilt@fordham.edu>, Richard Gyug
<gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "JUDITH Jones [Staff/Faculty [GSAS]]"
<jujones@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]" <ekeller@fordham.edu>, Michelle McGee
<mmcgee@fordham.edu>, Harry Nasuti <nasuti@fordham.edu>, Henry Schwalbenberg
<schwalbenber@fordham.edu>, Grace Vernon <vernon@fordham.edu>, Elaine Crosson
<ecrosson@fordham.edu>, Anastasia Coleman <acoleman11@fordham.edu>

Dear Prof. Klotz,

You are correct about the responsibilities of a Senator and about the role of the Gabelli School's
Executive Committee. Prof. Wharton and I were requested to hold an ad-hoc faculty meeting by many
colleagues and we were subsequently asked to convey their sentiments to the Senate President.

It is clear to me that the current situation is getting out of hand. It cannot be a good thing that the
faculty of the University are fighting among themselves and that you and I are exchanging these e-
mails. I have the highest personal respect for you as a colleague (as I do for other Senators from
Gabelli and across the University) and I apologize to you if my actions have been disrespectful and
unnecessary.

We did communicate with each other before the ad-hoc meeting was called. But that is perhaps not
very important any more. For someone who has spent more than 25 years at Fordham and who is
proud of the achievements and progress at the Business School that you and I have jointly served, I
am as dismayed as you are that we have reached this inexplicable nadir in the history of the Senate.
Perhaps all of us share some responsibility.

I pray for good sense from all and at all levels. I'll speak to Ms. Anastasia Coleman at her
convenience.

With best wishes and best regards,
Sris.

[Quoted text hidden]

**Dorothy Klotz** <dorothy.klotz@gmail.com>                                    Fri, Feb 5, 2016 at 11:14 AM
To: "Sris Chatterjee [Business]" <chatterjee@fordham.edu>
Cc: Anne Fernald <fernald@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck"
<hornbeck@fordham.edu>, "DOROTHY Klotz [Staff/Faculty [Business]" <klotz@fordham.edu>, Jennie
Park-Taylor <parktaylor@fordham.edu>, "ESTHER Solomon [Staff/Faculty [Business]]"
<esolomon@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>,
"Martin Chase [Staff/Faculty [A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>,
Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer [Staff/Faculty [GSS]]" <farmer@fordham.edu>,
Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt <gogwilt@fordham.edu>, Richard Gyug
<gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "JUDITH Jones [Staff/Faculty [GSAS]]"
<jujones@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]" <ekeller@fordham.edu>, Michelle McGee
<mmcgee@fordham.edu>, Harry Nasuti <nasuti@fordham.edu>, Henry Schwalbenberg
<schwalbenber@fordham.edu>, Grace Vernon <vernon@fordham.edu>, Elaine Crosson
<ecrosson@fordham.edu>, Anastasia Coleman <acoleman11@fordham.edu>, "Stephen Bryan
[Staff/Faculty [Business]]" <sbryan@fordham.edu>, Stephen Bryan <stephenhbryan@aol.com>,
cakici@fordham.edu, John Carey <johncarey@fordham.edu>, johncarey@optonline.net,
rchen@fordham.edu, chidambaran@fordham.edu, "Benjamin M. Cole, Ph.D." <bmcole@fordham.edu>,
conrad@fordham.edu, Mark Conrad <sportslaw@aol.com>, "KENNETH Davis [Staff/Faculty [Business]]"
<kedavis@fordham.edu>, "HOOMAN Estelami [Staff/Faculty [Business]]" <estelami@fordham.edu>,
finnerty@fordham.edu, finnerty@finnecon.com, flicker@fordham.edu, jfortunato@fordham.edu,
"JFortch@aol.com" <jfortch@aol.com>, David Gautschi <dgautschi@fordham.edu>, Nicholas
Georgantzas <georgantzas@fordham.edu>, rogeorge@fordham.edu, fuinvestments@yahoo.com,
"GAUTAM Goswami [Staff/Faculty [Business]]" <goswami@fordham.edu>, gautam goswami
<gautamgoswami@yahoo.com>, "ALBERT N. GRECO" <agreco@fordham.edu>, angreco@gmail.com,
Iftekhar Hasan <ihasan@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>, "Brent Horton
[Staff/Faculty [Business]]" <horton@fordham.edu>, hovakimian@fordham.edu, Bob Hurley
<rohurley@fordham.edu>, Robert Hurley <drbobhurley@yahoo.com>, kjackson@fordham.edu,
keltyjack@yahoo.com, "SERTAN Kabadayi [Staff/Faculty [BUS]]" <kabadayi@fordham.edu>,
sertan50@hotmail.com, kachersky@fordham.edu, "Evangelos Katsamakas [Faculty-Business]"
<katsamakas@fordham.edu>, lking@fordham.edu, LARRY KING <king44@optonline.net>, Dorothy Klotz
<profklotz@verizon.net>, "DEAN Leistikow [Staff/Faculty [Business]]" <leistikow@fordham.edu>,
lothian@fordham.edu, jrmlothian@aol.com, Katalin Marton <marton@fordham.edu>,
kmartonfordham@aol.com, Paul McNelis <mcnelis@fordham.edu>, Paul McNelis
<pdmcnelis@gmail.com>, "HAIM Mozes [Staff/Faculty [Business]]" <mozes@fordham.edu>, HARRY
ALAN NEWMAN <hnewman@fordham.edu>, ypeng@fordham.edu, emmapennuo@hotmail.com,
Elizabeth Cosenza <pinho@fordham.edu>, elizabethpinho@yahoo.com, "Michael Pirson [Staff/Faculty
[BUS]]" <pirson@fordham.edu>, Wullianallur Raghupathi <raghupathi@fordham.edu>,
w_raghupathi@hotmail.com, Steven Raymar <raymar@fordham.edu>, "TRAVIS Russ [Staff/Faculty
[BUS]]" <russ@fordham.edu>, ADITYA SAHARIA <saharia@fordham.edu>, "ALLEN Schiff [Staff/Faculty
[Business]]" <schiff@fordham.edu>, "Falguni Sen [BUS]" <fsen@fordham.edu>, jshon@fordham.edu,
john.shon@gmail.com, "Mark S. Silver" <silver@fordham.edu>, simaan@fordham.edu,
"stoner@fordham.edu" <stoner@fordham.edu>, ytang@fordham.edu, veliotis@fordham.edu,
stanleyveliotis@sbcglobal.net, waisman@fordham.edu, FRANK MARTIN WERNER
<fwerner@fordham.edu>, Bob Wharton <whartonphd@fordham.edu>, Wharton Robert <robert-
wharton@comcast.net>, "Wright, Thomas" <twright17@fordham.edu>, Wu Sarah <jiwu@fordham.edu>,
jinhuiwu@gmail.com, yxie@fordham.edu, yuxu@fordham.edu, xu10000@yahoo.com,
syoung16@fordham.edu, Dongli Zhang <dzhang@fordham.edu>, Miguel Alzola <alzola@fordham.edu>,
Navid Asgari <nasgari@fordham.edu>, abuoye@fordham.edu, abuoye@gmail.com,
mcarnevale3@fordham.edu, ichiang@fordham.edu, Meghann Drury <mdrury@fordham.edu>, "Danielle

Dunne [Staff/Faculty [Business]]" <ddunne@fordham.edu>, dunnedanielle@hotmail.com, aermolov1@fordham.edu, gonzalezalan@fordham.edu, agopaldas@fordham.edu, ahir.gopaldas@gmail.com, BillDHerman@gmail.com, Danielle.Higgins@baruch.cuny.edu, Ying Hong <yhong24@fordham.edu>, Yuliya Komarova <ykomarova@fordham.edu>, hsl210@lehigh.edu, Alex Markle <amarkle@fordham.edu>, bmierzejewska@fordham.edu, Chaitra Nagaraja <cnagaraja@fordham.edu>, chaitran@yahoo.com, mnejad@fordham.edu, geoconnor@fordham.edu, nreisel@fordham.edu, jren11@fordham.edu, bsegal1@fordham.edu, ltong2@fordham.edu, bwang46@fordham.edu, ywang151@fordham.edu, myan@fordham.edu, mengyan2005@gmail.com, dobinyim@alumni.brown.edu, "Dobin Yim [Staff/Faculty]" <dyim@fordham.edu>, hzhang45@fordham.edu, yzhou62@fordham.edu

Professor Chatterjee and Professor Wharton;

The current situation is out of hand largely due to the material misrepresentations of facts in the widely distributed emails sent by you and Professor Wharton to all Gabelli faculty and the larger university community, the failure of the Senate president to respond appropriately by inserting herself and taking sides in the politics of a school, and a failure of the provost to clearly communicate his role and actions on the matter.   Your and Professor Wharton's actions were not merely disrespectful, they were slanderous and caused irreparable harm to both Professor Solomon and my reputations and careers.

You and Professor Wharton proceeded down this path knowingly.  I would like to remind you of my words in the corresponded I initiate with you and Professor Wharton on 1/27/16 in an attempt to provide clarity and correct your material misrepresentation.

> "So far Sris, you have called a meeting based on an inaccurate account of events which is in conflict with the written minutes published by the Senate.  And now you are now suggesting that the Senate Executive Committee of Gabelli is going to respond to the Senate and the University with only a partial knowledge of a very sensitive situation.  Is this in the best interest of Gabelli?"

Because other colleagues allegedly asked you to take actions based on the misinformation you supplied them does not absolve you or Professor Wharton from responsibility for the resulting damage.

To begin the healing process, I have also copied my colleagues in Gabelli so that they begin to appreciate the extent of the misrepresentation which has taken place.  Professor Solomon has been at Fordham for 32 years and I for 26 years.  Both of us deserve a very public and sincerely apology from both you and Professor Wharton.

Dorothy

[Quoted text hidden]



---

## Gabelli concerns
2 messages

---

**Anne Fernald** <fernald@fordham.edu>                                    Tue, Feb 2, 2016 at 11:18 AM
To: "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, "ESTHER Solomon [Staff/Faculty
[Business]]" <esolomon@fordham.edu>
Cc: Andrew Clark <anclark@fordham.edu>, "J. Hornbeck" <hornbeck@fordham.edu>, Jennie Park-
Taylor <parktaylor@fordham.edu>, Dorothy Klotz <dorothy.klotz@gmail.com>, Elaine Crosson
<ecrosson@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>

Dear Dorothy and Esther,

I'm writing to ask you to write up a full list of the complaints you have regarding governance in your school.
From there, we can work together to determine which among the extant remedies to try. When/if they don't
work, we can pursue the next level of complaint until the matter gets resolved. The Senate Exec (of which
Dorothy is a member) can help determine how to proceed going forward, but what is most urgently needed
now is a complete list--leaving nothing out--of the full measure of your concerns.

This list can be addressed to the Senate Exec., the Provost, and the General Counsel if you like. I have
spoken with them and they, too, are eager to see the list and work together to see that available remedies
have been exhausted before we move further. I have copied them on this message.

Thank you in advance for your help with this. In spite of the structural challenges, I remain hopeful that we
can work together for a stronger school and university.

Sincerely,

Anne
--
Anne E. Fernald
Professor of English and Women's Studies
President of the Faculty Senate
Fordham University
fernald@fordham.edu
Cunniffe 117
718-817-3014 (Senate office, Rose Hill)
Lowenstein 921B
212-636-7613 (Department office, Lincoln Center)

*Mrs. Dalloway*, now available from Cambridge UP

---

**Dorothy Klotz** <dorothy.klotz@gmail.com>                               Wed, Feb 3, 2016 at 11:49 AM
To: Anne Fernald <fernald@fordham.edu>
Cc: "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, "ESTHER Solomon [Staff/Faculty
[Business]]" <esolomon@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck"
<hornbeck@fordham.edu>, Jennie Park-Taylor <parktaylor@fordham.edu>, Elaine Crosson
<ecrosson@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>,
"Martin Chase [Staff/Faculty [A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>,
Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer [Staff/Faculty [GSS]]" <farmer@fordham.edu>,
Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt <gogwilt@fordham.edu>, Richard Gyug

<gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]"
<ekeller@fordham.edu>, Michelle McGee <mmcgee@fordham.edu>, Harry Nasuti
<nasuti@fordham.edu>, Henry Schwalbenberg <schwalbenber@fordham.edu>, Grace Vernon
<vernon@fordham.edu>

Dear Anne,

Would you like names so that other individuals too can be publicly humiliated and their character impugned
for saying something that damages Gabelli's reputation? Certainly, the provost and anyone copied on
Professor Chatterjee's email dated 1/2/16 would consider this a real possibility, given the "lynching" which
took place during the ad hoc meeting of a select group of Gabelli faculty. I am describing the meeting as a
lynching because, in my opinion, what happened was an extrajudicial punishment by an informal group. It
is particularly disturbing that the meeting was called under false pretenses. Specifically, the proceeding of
the Fordham University Senate and the actions taken by Gabelli Senators were misrepresented in the
meeting invitation. So I am not willing to provide names at this time and risk having those individuals suffer
a similar fate, especially given that I do not believe that there are extant remedies to address the full
measure of concerns associated with governance issues in Gabelli.

Elaine Crosson, Anastasi Coleman and I met on 1/12/16 to discuss the allegations made by Professor
Wright of a hostile and toxic work environment in Gabelli in the widely distributed email dated
12/14/15. We discussed the term averse job action with reference to EEOC regulations concerning
retaliation against members of a protected group. In that discussion, I pointed out that a fairly severe
adverse job action for senior faculty is damage to one's reputation that inhibits the ability to find
employment elsewhere. As you all know, it is very difficult for tenured faculty to move to a comparable
institution with tenure at the same rank, at least for those that are not as professionally accomplished as
Professor Wright. This is especially true for faculty members labeled as trouble causers who lack integrity.
I suspect the overwhelming majority of faculty in Gabelli who were invited to (not all were invited) and
attended the ad hoc meeting on 1/12/16, or who were a recipient of Professor Chatterjee's email on
1/12/16, were left with the opinion that both Professor Solomon and I are trouble causers who lack
character and good judgement. I do not believe there is an extant remedy for that.

Considering the manner in which concerns associated with Governance in Gabelli have been handled to
date, I am not convinced that the full measure of my concerns would be taken seriously and
investigated.  In round one, in the provost's meeting with the Executive Committee on 11/3/16 when the
issue of retaliation was raised, the provost said he would speak with John Hollwitz to assess the
situation. He did not. I have repeatedly been told, as have other faculty who have raised similar concerns,
that unfair treatment of faculty is not a Faculty Senate matter and the only statutory recourse is to file
grievance with the Hearing Committee. The problem with harassment and retaliation is that it is often a
culmination of many small acts. The hearing committee is not appropriate remedy for individual acts when
viewed in isolation. Finally, in the most recent round, I was told to recuse myself from a meeting scheduled
on 1/26/16 in which the provost and the Executive Committee were going to consider how to move forward
in light of the Senate resolution on Governance Issues in Gabelli. Several of these email demands for me
to recuse myself were made with Diane Cuomo (from the provost's office) copied on the email. The reason
cited was that I am a member of the school and closely involved in the matter. What has changed between
now and then?

So to answer your request, I am not willing to accommodate your request for "a complete list –leaving
nothing out—of the full measure of my concerns", nor am I willing to provide a list of the concerns raised by
other Gabelli faculty, at least not at this time. It is a shame this request did not come sooner as I and
others have been seeking some sort appropriate remedy for quite some time.

Dorothy

[illegible]

Joseph M. McShane, SJ
March 1, 2016
Page 2

considered inconsistent with my legitimate and appropriate duties as a member of the Faculty
Senate or the business school faculty.

Nevertheless, in retaliation for my properly enacting my role as a Senator, I have been subjected
to a series of defamatory accusations and condemning resolutions within the business school
with inaccurate information to the faculty in violation of my rights, apparently culminating in the
meeting scheduled for tomorrow. I cannot and do not wish to burden you by detailing here the
retaliatory actions that have been taken by some who opposed my exercise of my appropriate
duties and responsibilities as a Faculty Senator representing the business school.

In summary, without detailing all of the substantive and procedural improprieties that have
occurred:

(1)      Unauthorized, draft minutes of Senate meetings—draft minutes to which I and others
objected and that are required by Senate procedures to be confidential until approved—have
been circulated within the business school faculty and utilized to accuse me and the Faculty
Senate. This is a continuing issue.

(2)      The defamatory and retaliatory use of this and other inaccurate and unauthorized
materials led to a purportedly legitimate faculty meeting within the Gabelli School on January
27, 2016 that resulted in a series of condemning resolutions that further injured my professional
reputation and standing among my peers, and the reputation of the faculty Senate.

(3)      The January 27 meeting was suffused with due process violations, including: improper
notice to faculty members; failure to notify and invite all eligible faculty members; lack of notice
to me that I would be the subject of discussion or resolutions at the meeting; and procedural
irregularities with the voting system used at the meeting, among other issues.

Aware of this process within the business school and concerned about its impact on the role of
the Faculty Senate and the protection of Senators from retaliation for their legitimate and
appropriate role in advocating on University policy matters, the Faculty Senate passed the
following resolution (See Action Minutes #421) at is February 26, 2016 meeting:

> "Resolved, That this Faculty Senate, as guardian of the University Statutes
> and Faculty Handbook, supports and encourages efforts by its members to
> voice at meetings of the Senate concerns respecting policies and
> procedures inimical to the nature of academic shard governance, without
> fear of internal or external constraints, intimidation or retaliation."

The republication of resolutions introduced at the January 27 meeting as the materials distributed
in advance of tomorrow's faculty meeting to faculty, administrative staff and student
representatives perpetuate the retaliation and total lack of due process that has characterized this
entire matter.

This entire episode and process has been most unfortunate for our University, its Faculty Senate
and the business school. Professional discussions at the Faculty Senate regarding faculty

Joseph M. McShane, SJ
March 1, 2016
Page 3

consultation on curriculum to ensure compliance with statutes should not be mischaracterized to
challenge the reputation and professional standing of a long-standing faculty member and
Faculty Senator acting at all times in good faith.   For me, however, this has become more than
an unfortunate set of circumstances; it has become a retaliatory effort that, if not appropriately
defused and resolved, may result in further grave harm to my professional reputation and
standing, which have already been damaged as a result of these actions.

For these reasons, I ask that before any further action is taken I have an opportunity to meet with
you or other members of the Board of Trustees and your designee(s) to discuss the matter.   I
would, of course, be glad to engage in that process with any others who may have differing
views of what has occurred.   Surely you will agree that the collegial norms of our institution, due
process, and fundamental fairness to a faculty member in good standing for more than 30 years
require no less.

Sincerely yours,

Esther Solomon, PhD
Fordham University Gabelli School of Business
esolomon@fordham.edu

cc:   Elaine M. Crosson, Esq.

Fordham University Mail - Letter from Father McShane                                    Page 1 of 2



**ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>**

## Letter from Father McShane
1 message

**Dorothy Marinucci** <marinucci@fordham.edu>                        Wed, Mar 2, 2016 at 12:26 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>

Dear Dr. Solomon,

Below, please find a letter from Father McShane.  Thank you.

With kind regards,

Dorothy



**Office of the President**

2 March 2016

Dr. Esther Solomon

Gabelli School of Business

Via email transmission:  esolomon@fordham.edu

Dear Dr. Solomon,

Thank you for your letter. I am very troubled and dismayed by the tone of the dialogue in the Senate, and the general lack of civility relating to a factual dispute among faculty. As you know, there are appropriate fora for the resolution of disputes like the one with which both the Senate and Joint Council are wrestling at the present time set forth in our governance documents (including the by-laws of the Senate).  Oddly (and unfortunately) enough, no member of the faculty has pursued those fora.  We must do better, and we shall. I will be speaking about this in the days and weeks to come.

Thank you again for sharing your concerns with me.

Joseph M. McShane, S.J.

12

**Dorothy Klotz** <dorothy.klotz@gmail.com>                                      Fri, Feb 5, 2016 at 3:15 AM
To: "Sris Chatterjee [Business]" <chatterjee@fordham.edu>
Cc: Anne Fernald <fernald@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck" <hornbeck@fordham.edu>,
"DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, Jennie Park-Taylor <parktaylor@fordham.edu>, "ESTHER
Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>, "Martin Chase [Staff/Faculty
[A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>, Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer
[Staff/Faculty [GSS]]" <farmer@fordham.edu>, Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt
<gogwilt@fordham.edu>, Richard Gyug <gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "JUDITH Jones
[Staff/Faculty [GSAS]]" <jujones@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]" <ekeller@fordham.edu>, Michelle McGee
<mmcgee@fordham.edu>, Harry Nasuti <nasuti@fordham.edu>, Henry Schwalbenberg <schwalbenber@fordham.edu>, Grace
Vernon <vernon@fordham.edu>, Elaine Crosson <ecrosson@fordham.edu>, Anastasia Coleman <acoleman11@fordham.edu>

Professor Chatterjee and Professor Wharton;

I am very dismayed you have been misrepresenting your role.   It is true you are two of the elected
members of the Gabelli Joint Council's Executive Committee.  However, there are three other
members, including the Dean who is the chairperson (see attached Gabelli Joint Council
ByLaws).  I would also like to draw your attention to the Section II of the Gabelli Joint Council ByLaws
which state the Joint Council's powers and objectives, in particular the second item.

> "To be responsible for the academic policies of GSBA and GBA in accordance with
> University Statutes and subject to review by the Board of Trustees."

Professor Solomon asked Provost Freedman during the November senate meeting whether he was
aware of the process followed in developing the PMBA program.  She raised specific concerns that
the process was in violation of the University Statutes (see attached minutes).  It is Professor
Solomon responsibility as a faculty member and a Senator to make sure that academic polices are in
accordance with the University Statutes.

I would also like to make clear that the purpose of the Faculty Senate is to promote the best interests
of Fordham University (see attached Constitution and ByLaws of the Faculty Senate).  The schools of
business do elect three members, but a Senator's role is not as you claim to represent the interests of
an individual school; a senator's role is to promote the best interest of Fordham University.  I am sure
you'll agree that adherence to the University Statutes is in the best interest of Fordham University.

The factual inaccuracies in your accounts of events and lack of full disclosure are inexcusable.  You
indicate in the attached Memo #1 that Professor Saharia aptly refuted the baseless accusation from
Senator Klotz and Solomon in his email dated November, 16.  Please note that I did not even
address the issue until the December senate meeting.   You also failed to mention that I sent to all
Senators on 12/17/16 in response to Professor Saharia's email.  The contents of that same email
were discussed the previous week at the Executive Committee Meeting with the provost on
12/8/16.  The provost requested at that meeting that I provide written documentation with respect to
all my assertions on curriculum, which I did on 12/11/16.  Since there was an ensuing meeting
between the provost, dean and senate president to discuss the matter, for you to assert that the
concerns I have expressed about governance issues in Gabelli are baseless accusations is a true
material misrepresentation.  I would also like to point out that you did not seek clarification on these
matters from me or from Professor Solomon at any time before or after you sent out an invitation to
faculty on 1/25/16 for an ad hoc meeting of select Gabelli faculty.

I have copied the University Council on this email and am requesting that she stop this public
retaliation, defamation and harassment of myself and Professor Solomon by you and Professor
Wharton.

Dorothy

[Quoted text hidden]

**3 attachments**

   **Schools of Business Bylaws 4 17 2013.docx**
   25K

   **Approved Nov Senate Minutes.pdf**
   295K

   **Senate Constitution and ByLaws.pdf**
   126K

---

**Sris Chatterjee [Business]** <chatterjee@fordham.edu>                    Fri, Feb 5, 2016 at 6:59 AM
To: Dorothy Klotz <dorothy.klotz@gmail.com>
Cc: Anne Fernald <fernald@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck"
<hornbeck@fordham.edu>, "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, Jennie
Park-Taylor <parktaylor@fordham.edu>, "ESTHER Solomon [Staff/Faculty [Business]]"
<esolomon@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>,
"Martin Chase [Staff/Faculty [A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>,
Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer [Staff/Faculty [GSS]]" <farmer@fordham.edu>,
Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt <gogwilt@fordham.edu>, Richard Gyug
<gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "JUDITH Jones [Staff/Faculty [GSAS]]"
<jujones@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]" <ekeller@fordham.edu>, Michelle McGee
<mmcgee@fordham.edu>, Harry Nasuti <nasuti@fordham.edu>, Henry Schwalbenberg
<schwalbenber@fordham.edu>, Grace Vernon <vernon@fordham.edu>, Elaine Crosson
<ecrosson@fordham.edu>, Anastasia Coleman <acoleman11@fordham.edu>

   Dear Prof. Klotz,

   You are correct about the responsibilities of a Senator and about the role of the Gabelli School's
   Executive Committee. Prof. Wharton and I were requested to hold an ad-hoc faculty meeting by many
   colleagues and we were subsequently asked to convey their sentiments to the Senate President.

   It is clear to me that the current situation is getting out of hand. It cannot be a good thing that the
   faculty of the University are fighting among themselves and that you and I are exchanging these e-
   mails. I have the highest personal respect for you as a colleague (as I do for other Senators from
   Gabelli and across the University) and I apologize to you if my actions have been disrespectful and
   unnecessary.

   We did communicate with each other before the ad-hoc meeting was called. But that is perhaps not
   very important any more. For someone who has spent more than 25 years at Fordham and who is
   proud of the achievements and progress at the Business School that you and I have jointly served, I
   am as dismayed as you are that we have reached this inexplicable nadir in the history of the Senate.
   Perhaps all of us share some responsibility.

   I pray for good sense from all and at all levels. I'll speak to Ms. Anastasia Coleman at her
   convenience.

   With best wishes and best regards,
   Sris.

[Quoted text hidden]

**Dorothy Klotz** <dorothy.klotz@gmail.com>                           Fri, Feb 5, 2016 at 11:14 AM
To: "Sris Chatterjee [Business]" <chatterjee@fordham.edu>
Cc: Anne Fernald <fernald@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck"
<hornbeck@fordham.edu>, "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, Jennie
Park-Taylor <parktaylor@fordham.edu>, "ESTHER Solomon [Staff/Faculty [Business]]"
<esolomon@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>,
"Martin Chase [Staff/Faculty [A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>,
Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer [Staff/Faculty [GSS]]" <farmer@fordham.edu>,
Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt <gogwilt@fordham.edu>, Richard Gyug
<gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "JUDITH Jones [Staff/Faculty [GSAS]]"
<jujones@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]" <ekeller@fordham.edu>, Michelle McGee
<mmcgee@fordham.edu>, Harry Nasuti <nasuti@fordham.edu>, Henry Schwalbenberg
<schwalbenber@fordham.edu>, Grace Vernon <vernon@fordham.edu>, Elaine Crosson
<ecrosson@fordham.edu>, Anastasia Coleman <acoleman11@fordham.edu>, "Stephen Bryan
[Staff/Faculty [Business]]" <sbryan@fordham.edu>, Stephen Bryan <stephenhbryan@aol.com>,
cakici@fordham.edu, John Carey <johncarey@fordham.edu>, johncarey@optonline.net,
rchen@fordham.edu, chidambaran@fordham.edu, "Benjamin M. Cole, Ph.D." <bmcole@fordham.edu>,
conrad@fordham.edu, Mark Conrad <sportslaw@aol.com>, "KENNETH Davis [Staff/Faculty [Business]]"
<kedavis@fordham.edu>, "HOOMAN Estelami [Staff/Faculty [Business]]" <estelami@fordham.edu>,
finnerty@fordham.edu, finnerty@finnecon.com, flicker@fordham.edu, jfortunato@fordham.edu,
"JFortch@aol.com" <jfortch@aol.com>, David Gautschi <dgautschi@fordham.edu>, Nicholas
Georgantzas <georgantzas@fordham.edu>, rogeorge@fordham.edu, fuinvestments@yahoo.com,
"GAUTAM Goswami [Staff/Faculty [Business]]" <goswami@fordham.edu>, gautam goswami
<gautamgoswami@yahoo.com>, "ALBERT N. GRECO" <agreco@fordham.edu>, angreco@gmail.com,
Iftekhar Hasan <ihasan@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>, "Brent Horton
[Staff/Faculty [Business]]" <horton@fordham.edu>, hovakimian@fordham.edu, Bob Hurley
<rohurley@fordham.edu>, Robert Hurley <drbobhurley@yahoo.com>, kjackson@fordham.edu,
keltyjack@yahoo.com, "SERTAN Kabadayi [Staff/Faculty [BUS]]" <kabadayi@fordham.edu>,
sertan50@hotmail.com, kachersky@fordham.edu, "Evangelos Katsamakas [Faculty-Business]"
<katsamakas@fordham.edu>, lking@fordham.edu, LARRY KING <king44@optonline.net>, Dorothy Klotz
<profklotz@verizon.net>, "DEAN Leistikow [Staff/Faculty [Business]]" <leistikow@fordham.edu>,
lothian@fordham.edu, jrmlothian@aol.com, Katalin Marton <marton@fordham.edu>,
kmartonfordham@aol.com, Paul McNelis <mcnelis@fordham.edu>, Paul McNelis
<pdmcnelis@gmail.com>, "HAIM Mozes [Staff/Faculty [Business]]" <mozes@fordham.edu>, HARRY
ALAN NEWMAN <hnewman@fordham.edu>, ypeng@fordham.edu, emmapennuo@hotmail.com,
Elizabeth Cosenza <pinho@fordham.edu>, elizabethpinho@yahoo.com, "Michael Pirson [Staff/Faculty
[BUS]]" <pirson@fordham.edu>, Wullianallur Raghupathi <raghupathi@fordham.edu>,
w_raghupathi@hotmail.com, Steven Raymar <raymar@fordham.edu>, "TRAVIS Russ [Staff/Faculty
[BUS]]" <russ@fordham.edu>, ADITYA SAHARIA <saharia@fordham.edu>, "ALLEN Schiff [Staff/Faculty
[Business]]" <schiff@fordham.edu>, "Falguni Sen [BUS]" <fsen@fordham.edu>, jshon@fordham.edu.
john.shon@gmail.com, "Mark S. Silver" <silver@fordham.edu>, simaan@fordham.edu,
"stoner@fordham.edu" <stoner@fordham.edu>, ytang@fordham.edu, veliotis@fordham.edu,
stanleyveliotis@sbcglobal.net, waisman@fordham.edu, FRANK MARTIN WERNER
<fwerner@fordham.edu>, Bob Wharton <whartonphd@fordham.edu>, Wharton Robert <robert-
wharton@comcast.net>, "Wright, Thomas" <twright17@fordham.edu>, Wu Sarah <jiwu@fordham.edu>,
jinhuiwu@gmail.com, yxie@fordham.edu, yuxu@fordham.edu, xu10000@yahoo.com,
syoung16@fordham.edu, Dongli Zhang <dzhang@fordham.edu>, Miguel Alzola <alzola@fordham.edu>,
Navid Asgari <nasgari@fordham.edu>, abuoye@fordham.edu, abuoye@gmail.com,
mcarnevale3@fordham.edu, ichiang@fordham.edu, Meghann Drury <mdrury@fordham.edu>, "Danielle

3

Dunne [Staff/Faculty [Business]]" <ddunne@fordham.edu>, dunnedanielle@hotmail.com,
aermolov1@fordham.edu, gonzalezalan@fordham.edu, agopaldas@fordham.edu,
ahir.gopaldas@gmail.com, BillDHerman@gmail.com, Danielle.Higgins@baruch.cuny.edu, Ying Hong
<yhong24@fordham.edu>, Yuliya Komarova <ykomarova@fordham.edu>, hsl210@lehigh.edu, Alex
Markle <amarkle@fordham.edu>, bmierzejewska@fordham.edu, Chaitra Nagaraja
<cnagaraja@fordham.edu>, chaitran@yahoo.com, mnejad@fordham.edu, geoconnor@fordham.edu,
nreisel@fordham.edu, jren11@fordham.edu, bsegal1@fordham.edu, ltong2@fordham.edu,
bwang46@fordham.edu, ywang151@fordham.edu, myan@fordham.edu, mengyan2005@gmail.com,
dobinyim@alumni.brown.edu, "Dobin Yim [Staff/Faculty]" <dyim@fordham.edu>,
hzhang45@fordham.edu, yzhou62@fordham.edu

Professor Chatterjee and Professor Wharton;

The current situation is out of hand largely due to the material misrepresentations of facts in the widely
distributed emails sent by you and Professor Wharton to all Gabelli faculty and the larger university
community, the failure of the Senate president to respond appropriately by inserting herself and taking sides in
the politics of a school, and a failure of the provost to clearly communicate his role and actions on the
matter.   Your and Professor Wharton's actions were not merely disrespectful, they were slanderous and caused
irreparable harm to both Professor Solomon and my reputations and careers.

You and Professor Wharton proceeded down this path knowingly.  I would like to remind you of my words in
the corresponded I initiate with you and Professor Wharton on 1/27/16 in an attempt to provide clarity and
correct your material misrepresentation.

> "So far Sris, you have called a meeting based on an inaccurate account of events which is in conflict
> with the written minutes published by the Senate.  And now you are now suggesting that the Senate
> Executive Committee of Gabelli is going to respond to the Senate and the University with only a
> partial knowledge of a very sensitive situation.  Is this in the best interest of Gabelli?"

Because other colleagues allegedly asked you to take actions based on the misinformation you supplied them
does not absolve you or Professor Wharton from responsibility for the resulting damage.

To begin the healing process, I have also copied my colleagues in Gabelli so that they begin to appreciate the
extent of the misrepresentation which has taken place.  Professor Solomon has been at Fordham for 32 years
and I for 26 years.  Both of us deserve a very public and sincerely apology from both you and Professor
Wharton.

Dorothy

[Quoted text hidden]

4



## Gabelli concerns
2 messages

**Anne Fernald** <fernald@fordham.edu>                                 Tue, Feb 2, 2016 at 11:18 AM
To: "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, "ESTHER Solomon [Staff/Faculty
[Business]]" <esolomon@fordham.edu>
Cc: Andrew Clark <anclark@fordham.edu>, "J. Hornbeck" <hornbeck@fordham.edu>, Jennie Park-
Taylor <parktaylor@fordham.edu>, Dorothy Klotz <dorothy.klotz@gmail.com>, Elaine Crosson
<ecrosson@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>

Dear Dorothy and Esther,

I'm writing to ask you to write up a full list of the complaints you have regarding governance in your school.
From there, we can work together to determine which among the extant remedies to try. When/if they don't
work, we can pursue the next level of complaint until the matter gets resolved. The Senate Exec (of which
Dorothy is a member) can help determine how to proceed going forward, but what is most urgently needed
now is a complete list--leaving nothing out--of the full measure of your concerns.

This list can be addressed to the Senate Exec., the Provost, and the General Counsel if you like. I have
spoken with them and they, too, are eager to see the list and work together to see that available remedies
have been exhausted before we move further. I have copied them on this message.

Thank you in advance for your help with this. In spite of the structural challenges, I remain hopeful that we
can work together for a stronger school and university.

Sincerely,

Anne
—
Anne E. Fernald
Professor of English and Women's Studies
President of the Faculty Senate
Fordham University
femald@fordham.edu
Cunniffe 117
718-817-3014 (Senate office, Rose Hill)
Lowenstein 921B
212-636-7613 (Department office, Lincoln Center)

*Mrs. Dalloway*, now available from Cambridge UP

**Dorothy Klotz** <dorothy.klotz@gmail.com>                                 Wed, Feb 3, 2016 at 11:49 AM
To: Anne Fernald <fernald@fordham.edu>
Cc: "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, "ESTHER Solomon [Staff/Faculty
[Business]]" <esolomon@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck"
<hornbeck@fordham.edu>, Jennie Park-Taylor <parktaylor@fordham.edu>, Elaine Crosson
<ecrosson@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>,
"Martin Chase [Staff/Faculty [A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>,
Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer [Staff/Faculty [GSS]]" <farmer@fordham.edu>,
Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt <gogwilt@fordham.edu>, Richard Gyug

<gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]"
<ekeller@fordham.edu>, Michelle McGee <mmcgee@fordham.edu>, Harry Nasuti
<nasuti@fordham.edu>, Henry Schwalbenberg <schwalbenber@fordham.edu>, Grace Vernon
<vernon@fordham.edu>

Dear Anne,

Would you like names so that other individuals too can be publicly humiliated and their character impugned
for saying something that damages Gabelli's reputation? Certainly, the provost and anyone copied on
Professor Chatterjee's email dated 1/2/16 would consider this a real possibility, given the "lynching" which
took place during the ad hoc meeting of a select group of Gabelli faculty. I am describing the meeting as a
lynching because, in my opinion, what happened was an extrajudicial punishment by an informal group. It
is particularly disturbing that the meeting was called under false pretenses. Specifically, the proceeding of
the Fordham University Senate and the actions taken by Gabelli Senators were misrepresented in the
meeting invitation. So I am not willing to provide names at this time and risk having those individuals suffer
a similar fate, especially given that I do not believe that there are extant remedies to address the full
measure of concerns associated with governance issues in Gabelli.

Elaine Crosson, Anastasi Coleman and I met on 1/12/16 to discuss the allegations made by Professor
Wright of a hostile and toxic work environment in Gabelli in the widely distributed email dated
12/14/15. We discussed the term averse job action with reference to EEOC regulations concerning
retaliation against members of a protected group. In that discussion, I pointed out that a fairly severe
adverse job action for senior faculty is damage to one's reputation that inhibits the ability to find
employment elsewhere. As you all know, it is very difficult for tenured faculty to move to a comparable
institution with tenure at the same rank, at least for those that are not as professionally accomplished as
Professor Wright. This is especially true for faculty members labeled as trouble causers who lack integrity.
I suspect the overwhelming majority of faculty in Gabelli who were invited to (not all were invited) and
attended the ad hoc meeting on 1/12/16, or who were a recipient of Professor Chatterjee's email on
1/12/16, were left with the opinion that both Professor Solomon and I are trouble causers who lack
character and good judgement. I do not believe there is an extant remedy for that.

Considering the manner in which concerns associated with Governance in Gabelli have been handled to
date, I am not convinced that the full measure of my concerns would be taken seriously and
investigated. In round one, in the provost's meeting with the Executive Committee on 11/3/16 when the
issue of retaliation was raised, the provost said he would speak with John Hollwitz to assess the
situation. He did not. I have repeatedly been told, as have other faculty who have raised similar concerns,
that unfair treatment of faculty is not a Faculty Senate matter and the only statutory recourse is to file
grievance with the Hearing Committee. The problem with harassment and retaliation is that it is often a
culmination of many small acts. The hearing committee is not appropriate remedy for individual acts when
viewed in isolation. Finally, in the most recent round, I was told to recuse myself from a meeting scheduled
on 1/26/16 in which the provost and the Executive Committee were going to consider how to move forward
in light of the Senate resolution on Governance Issues in Gabelli. Several of these email demands for me
to recuse myself were made with Diane Cuomo (from the provost's office) copied on the email. The reason
cited was that I am a member of the school and closely involved in the matter. What has changed between
now and then?

So to answer your request, I am not willing to accommodate your request for "a complete list –leaving
nothing out—of the full measure of my concerns", nor am I willing to provide a list of the concerns raised by
other Gabelli faculty, at least not at this time. It is a shame this request did not come sooner as I and
others have been seeking some sort appropriate remedy for quite some time.

Dorothy

2

13

**MEMORANDUM**

To:       Faculty Senate Chair and Executive Committee
From:    Marta Mooney, Professor, Management Systems
          Esther Solomon, Assoc. Professor Management Systems
Subject: Request for Review of Compliance with Faculty Statutes
Date:    April 2, 2003

The Management Systems Area, is one of several sub-divisions of Fordham's Business Schools.
We are respectfully requesting that the Faculty Senate Executive Committee review some
practices of this unit for their compliance with the spirit and wording of governing statutes.  A
few representative examples of these practices, along with the statute reference, are listed below.

Chapter 5: Faculty Personnel Policies and Procedures

Paragraph 4-05.1 General Personnel Procedures (a) and (g):

The Area is characterized by selective distribution of information requisite to enable
Management Systems Faculty to fulfill statutory obligations regarding promotion, tenure, and
more recently, transfer.  Orderly scheduling for personnel meetings and requirements for
secret ballots are regularly bypassed.   Recommendations on behalf of the Area as a whole are
frequently written and presented, unsigned, to the Faculty Personnel Committee without any
prior review and discussion by interested faculty.

Paragraph 4.05.02  Procedures for Initial Faculty  Appointments (1) and (8)

Actions are taken that preclude tenured Management Systems faculty from being involved in
new hiring initiatives.   Information tends to be closely held in most stages of the hiring
process including hiring criteria, job posting, applicant responses and referrals, interview,
evaluation and recommendations.  Specifically, much of the tenured faculty were not
informed about advertisements placed regarding openings in the Management Systems area,
and as of today we have not been allowed to see names and credentials of responding
candidates.   Appropriate staffing decisions would require that area faculty carefully evaluate
the credentials of qualified external applicants and internal candidates against area needs.
Openings tend to be filled through ad hoc rather than systematic procedures.  A recent request
by a Marketing professor to transfer to our unit is handled with a similar disregard for
systematic procedures. (See attachment 1).

Chapter 1 The University Faculty Paragraph 4-01.02

University statutes assign to faculty primary responsibility for curriculum design, delivery,
and assessment.  Over the past few years, the Graduate Business School has developed or is
developing a number of new Special MBA programs that are dominated by management
courses and involve extra compensation, course releases, and other special benefits and
privileges (Deming MBA, Global MBA, Transnational MBA, Beijing MBA,
Entrepreneurship).  Assignments are based on undisclosed criteria, so we do not know if they
are merit based, objective, or equitable. Information about these programs, including
development, staffing, and administration tends to be tightly controlled, blocking
opportunities for qualified interested faculty to contribute to their success.

1

A Systemic Problem

The general concern underlying these and other specific issues, is a pervasive absence of transparency.   The selectivity in gathering and disseminating information over a range of issues includes new hires, contract renewal, promotion, tenure, transfer, new program development, staffing and assessment; allocation of summer research stipends, grants, research assistants, course release, and specially compensated teaching and administrative opportunities.
This absence of transparency, we believe, is enabled by our unique structure and the power of the Management Systems Area Coordinator, who has held this position for fifteen years, and has been on multiple committees, which assign and dispense most business faculty resources.

We believe that these fundamental concerns with lack of appropriate faculty participation in areas of core faculty responsibility have implications for the quality of our educational processes and the attainment of our Business School and University objectives.   They pertain to appropriate shared governance, with broader implications for building strong scholarship and teaching capacity.  We respectfully request that the Executive Committee of the Senate examine the relevant data and provide direction on these matters.

2

14

--------- Forwarded message --------- From: **Sris Chatterjee [Business]**
<chatterjee@fordham.edu> Date: Thu, Feb 4, 2016 at 5:02 PM Subject: Summary
responses from Gabelli faculty To: Anne Fernald <fernald@fordham.edu>, Andrew Clark
<anclark@fordham.edu>, "J. Hornbeck" <hornbeck@fordham.edu>, "DOROTHY Klotz
[Staff/Faculty [Business]]" <klotz@fordham.edu>, Jennie Park- Taylor
<parktaylor@fordham.edu>

Dear Members of the Senate Executive Committee,

Prof. Bob Wharton and I have received a number of e-mails and notes from members of
our faculty who are clearly dissatisfied with the response from the Senate President
regarding the motions presented in our ad-hoc meeting which were sent to you.

We have summarized these sentiments and enclosed them with this e-mail as two memos
in order to keep you informed.

Both Bob Wharton and I share and concur with the sentiments expressed in these memos
and we intend to inform our faculty of the same before our Joint Council meeting which
our Senate President has kindly agreed to attend in order to address various
disagreements between the Senate and the Gabelli Faculty.

As you can see from the two memos, there is a very strong sentiment from some faculty
against the Senate's own governance and there is also a second school of thought which
wants to explore all options for an effective healing process to take place.

With best regards,

Sris. Bob Wharton and Sris Chatterjee

**2 attachments**

**Response from Gabelli Faculty to Senate President's e-mail_Memo1.docx 15K**

**Response from Colleagues to Senate President's e-mail_Memo2.docx**

16K

MEMO #1

To    :    University Faculty Senate President

From :    Members of  Gabelli Faculty

---

We write in response to your email dated January 29, 2016.  We remain deeply disappointed that, as Faculty Senate President, you oversaw a process that exceeded the Faculty Senate's statutory authority and that you have done so without full information (as you have conceded in your email). In his email of November 16, Professor Aditya Saharia aptly refuted the baseless accusations from Senators Klotz and Solomon. Later, Professor Saharia worked jointly with his Co-Chair of the PMBA Committee, Professor Benjamin Cole, to provide a full formal accounting of the chronology of the PMBA Committee's work **prior** to the January 22 Faculty Senate meeting. We believe that the Faculty Senate did, in fact, have full information available to it but chose to ignore it, and in doing so, both prejudiced the Gabelli School and undermined the implementation of the PMBA curriculum-revision.

You acknowledged in your email that the Gabelli School "deserve[s] as much information as [you] are able to provide."  We therefore would like to request access to all of the Faculty Senate's Executive Committee's communications (including emails and texts) with the Committee's counsel (including your "outside attorney"). As you know, the Gabelli School has historically participated in the Faculty Senate, and as members of the Faculty Senate, is entitled to all of the Senate's and its Committees' communications with its counsel. Our request for this information is intended to in some way remedy and understand the Faculty Senate's failures. We would appreciate receiving these communications by February10, 2016, because we need two weeks' time to include this in our Joint Council agenda items.

We also feel that it should be clear to the other members of the Faculty Senate that the conduct of Senators Klotz and Solomon was not only unprofessional but was predicated on a series of material misrepresentations made to the Faculty Senate in

connection with the PMBA Committee's processes. We request that the Faculty Senate join the Gabelli School in seeking the removal of these two Senators for their material misrepresentations as members of the Faculty Senate. A resolution seeking the resignations of the Senators in question carried 38 to 1 (with 2 abstentions) at the faculty meeting the Executive Committee called on January 27.

In light of these recent developments, as you know, the Gabelli School is seriously considering withdrawing from the Faculty Senate, and voted the investigate the possibility during the January 27 meeting. We find it deeply unfortunate that the Faculty Senate would allow a unit of the university to be so publicly impugned over so many months. While some of this damage may be irreparable, we feel the Faculty Senate could improve its standing by providing access to the aforementioned communications and by standing with the Gabelli Faculty to demand nothing but the highest standards of behavior among its Senators.

MEMO #2

To    :      University Faculty Senate President

From :      Members of the Gabelli Faculty

---

The Gabelli Faculty was disappointed in the Senate's response to our concerns. The response implied that since the provost did not delay the submission of our Professional MBA Program to NY State as the Senate had requested, and since the Senate was thwarted by the University Office of Legal Counsel in their attempt to "investigate" the governance procedures at Gabelli, that everything was now fine. We very much disagree.

We see the major source of distrust between the Gabelli Faculty and the Senate as arising from the desire on the part of the Senate to attempt these actions and not from the success or failure of the attempt. This distrust will have to be addressed as a part of any healing process.

A more immediate concern of our Faculty is the fact that one of our Senators has resigned and the Gabelli Faculty has overwhelmingly passed a motion of "no confidence" in the two remaining senators. As such the Faculty feels that they have no meaningful representation in the Faculty Senate and therefore view any action by the Senate directed at the Gabelli School alone as illegitimate until this situation is addressed.

We all want what is best for this University and its faculty and thus will search for a way forward to develop a healing process that can lead to a *rapprochement* between the Faculty of the Gabelli School of Business and the Fordham University Faculty Senate. The Gabelli Faculty looks forward to working with the Senate to overcome these difficulties and once again to be unified in our efforts to promote the best interest of all the Faculty of this University.

15

MEMORANDUM

To:    Dean Howard Tuckman

From: Victor Marek Borun    ν Μ νβ

Date:   November 30, 2006

Re:    3:2 teaching load

The estimation of costs for a reduction of teaching loads from 3:3 to 3:2 was based on the assumption that only 64 faculty members would be impacted. The cost estimate excluded chaired professors and newly hired faculty members who have contractual arrangements to teach lighter loads.

Assuming that new faculty would have to be hired on a 3:2 load basis, the total salary expense amounts to $ 1,560,000 based on: 13 professors (64 sessions: 5) at $120,000 per year.

Assuming that new faculty would have to be hired on a 2:2 load basis, the total salary expense amounts to $ 1,920,000 based on: 16 professors (64 sessions: 4) at $120,000 per year.

The above computations were based on the salary levels for 2005-2006 academic year and didn't consider any differences in academic ranks. The computations assumed recruiting full-time, tenure-track faculty.


CC.    Donna Rapaccioli
       Dean, CBA

16

Page Redacted

17

2/15/19, 9:41 AM

 FORDHAM

## Spring 2019 Unpaid leave

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>          Sun, Dec 16, 2018 at 3:56 PM
To: Fordham president <president@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>

Dear Father McShane,

This is to request that Fordham authorize my leave without pay for Spring 2019. I asked for the leave in
my December 12, 2018 Proposal (Exhibit A) and it was discussed at the December 13, 2018 Hearing in
Federal Court.
Copied in this email are Dean Rapaccioli and Provost Crystal.

On Friday afternoon, December 14, Fordham University replied to my December 12 Proposal by Dr.
Borun, Acting Area Chair (Exhibit B) with a response deadline by 12:00 noon, Monday, December 17. I
will not address here the incorrect statements in that December 14 letter, but will only address the
concluding statements. For additional context regarding the Spring, 2019 scheduling see Exhibit C.

In my December 12 Proposal (Exhibit A), I presented my estimate of a fair schedule for Spring 2018
which I am prepared to teach. Alternatively, as I wrote, I am willing to sacrifice my pay next semester and
requested an unpaid leave for Spring 2019 until these issues are properly resolved.

During the December 13 Court Hearing before the Hon. Edgardo Ramos, I indicated to the Court that,
given the circumstances, I had requested the Fordham administration for an unpaid leave during Spring
2019 until the issues are resolved. After that, the Fordham attorney represented to the Court the
University's position that "the time to resolve the case is now, at the beginning, and to discuss some of
these issues" which as I understand was a request for mediation.

However, Fordham had not disclosed their position to me before the December 13 Hearing and Order, but
only on December 14, the day after. I did not know that the plan was to reject my Proposal, that I might
be might denied the unpaid leave, and that my employment would be jeopardized if I do not accede to the
discriminatory, retaliatory assignments. Nor did the Fordham attorney disclose the plan to the Court
before it issued its Order. The Fordham December 14 Dr. Borun letter states:

> "I was informed that the Provost Office will not be willing to grant an unpaid leave of absence for
> the Spring 2019 except if required by law."

Thus, we were foreclosed from communicating that information to the Court on December 13, 2018
before the Court issued its Order.

During the December 13 Hearing, after the Fordham attorney statement on behalf of the University, the Court stated as follows:

> THE COURT: I take it, Dr. Solomon, that your ultimate
> goal is to remain at the university, correct?
> MS. SOLOMON: Yes.
> THE COURT: That suggests that mediation may be a good
> way to go.
> MS. SOLOMON: OK.

After the Hearing, the Court ordered mediation and discovery. It appears to me that both sides should be entering mediation in good faith.

I therefore respectfully request that you approve my request for unpaid leave of absence during Spring 2018.

Sincerely yours,


Esther Solomon, PhD
Gabelli School of Business


....



**3 attachments**

📄 **Exhibit A October 12 Prposal.pdf**
203K

📄 **Exhibit B -- Response to Esther's email of  12.12.2018.pdf**
173K

📄 **Exhibit C Correpondence Dec3.pdf**
217K

Exhibit A

 **FORDHAM**    **ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>**

## Proposal
1 message

**ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>**    Wed, Dec 12, 2018 at 10:04 AM

To: Victor Borun <borun@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>

Dear Dr. Borun,
and Dean Rapaccioli, and Provost Crystal,

Thank you for your December 11th reply. First, I will reply to your email of yesterday and then suggest some alternative proposals for consideration.

Unfortunately, your email does not provide the source I requested. Therefore, the argument in your December 7th email is unsupported that following a Family Medical leave a faculty should be penalized the next semester with a heavier than normal teaching load.

Regarding my teaching in Spring 2018, I taught one graduate and two undergraduate POM (Principles of Management) courses at the Bronx, the equivalent of 4 courses. Your December 11th email states "I have no knowledge of applying such a load to four courses." Below is the correspondence by Dean Rapaccioli supporting my calculation:

> "I have been thinking a great deal about the additional grading and student engagement responsibilities teaching multiple sections of Strategy I and Management I places on faculty. These responsibilities are especially challenging for tenure stream faculty and tenured faculty on 3/2 teaching loads. Until these additional responsibilities can be handled in a less onerous way, I will support the faculty most affected by allocating a 1.5 weight to these courses. This fall your 4 sections (6 credits) will translate into 9 credits so you will earn one course release or if you prefer you will be compensated for an overload. Let me know what you prefer".

As the Dean acknowledges, the undergraduate introductory Management I Core POM course at the Bronx is a very onerous course, time consuming, requires multi party coordination and, for me at the Bronx, involves additional long commutes. All of that interferes with faculty ability to engage in research and

Exhibit A

scholarship.  Because of these issues, Dean Rapaccioli designated that faculty should get 1.5 credits per credit taught for the undergraduate POM course.

According to the Dean's rule, all three schedule options you proposed involve 4 or more courses as follows:
>    Option 1 is equivalent to 4 courses in two campuses, one graduate at LC and two undergraduate POM at the Bronx.
>    Option 2 is equivalent to 4 ½ courses all undergraduate POM at the Bronx.
>    Option 3 is equivalent to 4 ½ courses all undergraduate POM at the Bronx.

In Spring, 2018 I taught one graduate and 2 undergraduate at the Bronx, equivalent of 4 courses.
It is fair that I should now teach 2 graduate classes consistent with a 2/3 schedule.

**Proposal**
In response to our earlier correspondence, I have an alternative proposal.

According to my estimate of a fair schedule, I should be teaching two graduate courses for the Spring 2019 semester, especially given my Spring 2018 teaching load.  Such a graduate teaching assignment would be consistent with past practice and similar to others in my position and expertise. I am prepared to teach such a schedule for Spring 2019.

Alternatively, I am willing to sacrifice my pay next semester and take unpaid leave for the Spring 2019 semester, until these issues are properly resolved.

Please let me know if possible by Friday, December 14, 2018.

Thanks,

Esther

## Exhibit B

**Victor Borun** <borun@fordham.edu>                    Fri, Dec 14, 2018 at 1:24 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>, Benjamin Crooker <crooker@fordham.edu>

Dear Esther,

Attached, please find a response to your email of December 12, 2018.

Warm regards,

Victor

[Quoted text hidden]
--
Victor Marek Borun
Interim Chair of the Leading People and Organizations Area
Associate Professor of Finance
Fordham University
Gabelli School of Business
140 West 62nd Street, office 304
New York, NY 10023
(212) 636-7428
email: borun@fordham.edu

 **Response to Esther's email of 12.12.2018.docx**
16K

## Exhibit B

Response to Esther's email of December 12, 2018

Dear Esther,

Let me respond to your email of December 12, 2018.

You claim that a person taking a Family Medical Leave is penalized the next semester with a heavier than normal teaching load. As explained in my previous emails, two courses are applied to a semester off given for any reason. Therefore, the teaching load is three courses once the faculty member returns to teaching. I have confirmed this policy with Ben Crooker of the Provost Office.

The quoted correspondence with Dean Rapaccioli is out of context (what 4 sections, which 6 credits?). I identified the original email sent to faculty in September 2013 and that email dealt with a completely different structure of the curriculum. The courses you quoted (Management I and Strategy I) were 1.5 credit courses and, therefore, all your computations are inappropriate under the current course structure.

One of the paragraphs in your email also states:

"As the Dean acknowledges, the undergraduate introductory Management I Core POM course at the Bronx is a very onerous course, time consuming, requires multi party coordination and, for me at the Bronx, involves additional long commutes. All of that interferes with faculty ability to engage in research and scholarship. Because of these issues, Dean Rapaccioli designated that faculty should get 1.5 credits per credit taught for the undergraduate POM course. "

Dean Rapaccioli confirmed that there is no such policy under the current course structure and mixing the 2013 pilot for 1.5 courses and the 3 credit current policy for PoM course is misleading and inappropriate. Again, there is no current policy to count 3 credit courses as 4.5 credits.

Your comment on Option 3 is incorrect since the load would be 2 undergraduate and 1 graduate courses and not 3 undergraduate courses.

Let me summarize the three options presented to you in my email of December 7, 2018:

**Option 1**
Rose Hill (undergraduate)
MGBU 3223 - ROX Principles of Management T/F 8:30-9:45 AM
MGBU 3223 - ROY Principles of Management T/F 10:00-11:15 AM

Lincoln Center (graduate)

2

## Exhibit B

MGGB 6613 - OP2 Leading People and Organizations Tue 8:00-10:00 PM

The above results in a two-day schedule.

**Option 2**
Al at Rose Hill (undergraduate)
This option also includes the undergraduate courses MGBU 3223 -
ROX and MGBU 3223 - ROY (please see Option 1).
But if you wish to have a single preparation, you may choose the following
undergraduate course as well

MGBU 3223 - E01 Principles of Management  Wed. 6:30 - 9:45 PM
instead of the graduate course at Lincoln Center (see Option 1).

Such a change would result in a three-day schedule.


**Option 3**

Rose Hill (undergraduate)
MGBU 3223 - RYZ Principles of Management Tue 2:30 – 5:15 PM
MGBU 3223 - E01 Principles of Management  Wed. 6:30 - 9:45 PM

Lincoln Center (graduate)
MGGB 6613 - OP2 Leading People and Organizations Tue 8:00-10:00 PM

Option 3 results in a two-day schedule.

In your email of December 12, 2018, under the heading "Proposal" you are making a
suggestion for your teaching schedule. I will reiterate again that your spring 2019
teaching schedule has nothing to do with the spring 2018 schedule. As explained earlier,
the loads are per academic year, in this case 2018-2019 – Fall 2018 and Spring 2019.
Since you were off in the Fall 2018, your load is three courses in the Spring 2019.

In light of all the details explained above, you are expected to teach any of the outlined
three options.

Please respond by noon on Monday, December 17 which is your preferred option.

I was informed that the Provost Office will not be willing to grant an unpaid leave of
absence for the Spring 2019 except if required by law.

Warm regards,

Victor

3

**Exhibit C**

 **FORDHAM**   ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>

## Request for a meeting on Monday, December 3.
4 messages

---

Victor Borun <borun@fordham.edu>                                    Fri, Nov 30, 2018 at 3:05 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>

Dear Esther,

I have to finalize the schedule for the spring 2019 semester on Monday.
Would you be able to meet with me on December 3?
Please suggest a block of time and we will see whether it is convenient to both of us.

Warm regards,

Victor

---

Victor Marek Borun
Interim Chair of the Leading People and Organizations Area
Associate Professor of Finance
Fordham University
Gabelli School of Business
140 West 62nd Street, office 304
New York, NY 10023
(212) 636-7428
email: borun@fordham.edu

---

ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu>    Mon, Dec 3, 2018 at 9:19 AM
To: Victor Borun <borun@fordham.edu>, DONNA RAPACCIOLI <rapaccioli@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>

Dear Dr. Borun,

and Dean Rapaccioli, and Provost Crystal,

This is to object again, as I did during our earlier meetings, regarding teaching assignments for the Spring 2019 semester.  The schedule is unfair, discriminatory and punitive.  It breaks multiple rules and practices to disadvantage me.

Please arrange a meeting with us and Dean Rapaccioli, who has authority in this matter. I hope we can arrive at a fair and appropriate schedule for next semester.

Best regards,

1

**Exhibit C**

Esther

...
[Quoted text hidden]

---

**Victor Borun** <borun@fordham.edu>                              Fri, Dec 7, 2018 at 4:38 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, Crystal Jonathan <crystal@fordham.edu>, An Yan
<ayan@fordham.edu>

Dear Esther,

As we discussed, in order to satisfy your requests and the needs of the area for the Spring 2019
semester, I have created two schedule options for you.

**Option 1**
Rose Hill (undergraduate)
MGBU 3223 - ROX Principles of Management T/F 8:30-9:45 AM
MGBU 3223 - ROY Principles of Management T/F 10:00-11:15 AM

Lincoln Center (graduate)
MGGB 6613 - OP2 Leading People and Organizations T 8:00-10:00 PM

The above results in a two-day schedule.

**Option 2**
All at Rose Hill (undergraduate)
This option also includes the undergraduate courses MGBU 3223 - ROX and MGBU 3223 - ROY
(please see Option 1).
But if you wish to have a single preparation, you may choose the following undergraduate course

MGBU 3223 - E01 Principles of Management Wed. 6:30 - 9:45 PM
instead of the graduate course at Lincoln Center (see Option 1).
Such a change would result in a three-day schedule.

Please let me know by Friday, December 14 which option you prefer.

Please remember that your contractual teaching load is five courses per academic year (2018-2019).
Leave of absence for a semester for any reason is applied to two courses. Since you were granted
the family medical leave for the Fall 2018 semester, your teaching load is three courses for the spring
2019.

Warm regards,

Victor

[Quoted text hidden]

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>    Mon, Dec 10, 2018 at 11:43
AM

2

## Exhibit C

To: Victor Borun <borun@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>

Dear Dr. Borun,

and Dean Rapaccioli, Dean Yan, and Provost Crystal,

This is to reiterate my earlier expressed concerns. Please kindly provide the
source supporting your statement, quoted below, arguing that 3 courses
would be appropriate next semester in the Spring 2018 - Spring 2019, time
frame:

"Leave of absence for a semester for any reason is applied to
two courses.
Since you were granted the family medical leave for the Fall 2018
semester, your teaching load is three courses for the spring 2019".
Please let me know.

Omitted from your December 7[th]e mail is the fact that on December 3[d] you
chose to cancel my Leadership course (see course description attached
below). This contrasts with the fact that you did not cancel Dr. Pirson's
Leadership course, which at the time had about the same enrollment as
mine.

This is to also note that Dean Rapaccioli has designated the undergraduate
POM courses I taught in Spring 2018 at the Bronx campus to count as 1½
courses for tenured faculty on 3-2 teaching schedules.
Accordingly, I should have been credited with of 4 courses for my Spring
2018 teaching.

I look forward to hearing from you.

Thanks,

Esther

[Quoted text hidden]

📄 **Solomon MGGB 7610 Leadership and Change.docx**
113K

# Exhibit C

## Solomon Graduate Leadership and Change Course Description

### Course cancelled on Dec 3 2018

MGGB 7610 Leadership and Change

This course prepares students to meet the requirements of today's economy, where leadership demands a combination of personal capabilities and insights, as well as in-depth knowledge of organizational change processes and practices. Through readings, cases, class discussions, self-development instruments, and leader-directed learning projects, participants gain important insights into their own management style and develop essential knowledge and skills for successful implementation of major change initiatives.

The course has three modules:

Module I addresses the systemic and strategic levels of analysis, focusing on the context, content, and processes of organizational transformation. This module highlights major types and drivers of large scale organizational change—e.g. strategic, leadership, cultural, and structural.  It examines leadership for innovation, highlighting transformation approaches incorporating technology cycles and cultural dimensions.

Module II focuses on the team and individual level, seeking to enhance student self-awareness and self-reflection as means for leadership development. Students will obtain an understanding of their own personal orientations, sources of resistance, and dynamics of team transitions, becoming more effective in leading organizational change.

Module III focuses on student development tools, techniques and processes for successful change management. Students will engage in a real world based simulation where teams will be change agents in an organization and engage in active learning while systematically implementing change. The simulation involves an organizational diagnosis, the development of a plan and implementation of the changes. Student teams will receive feedback as to its effectiveness in each part of the sequence.

The class will conclude with integrative sessions where teams of students will present their team projects and engage in class discussions integrating materials and learning from all three levels and experiences throughout the semester.

18

Home  /  About  /  Leadership and Administration  /  Board of Trustees  /  University

Board of Trustees

University Statutes

Article One: The University Charter

Article Two: By-Laws of The Board of Trustees

Article Three: The University Academic and Administrative Structure

Article Four: Policies and Procedures for Faculty

Article Five: Policies, Procedures, and Guidelines for Research and Training

Article Six: University Code of Conduct

Appendix 1: Academic Freedom and Tenure

Appendix 2: Constitution and Bylaws of the Fordham University Faculty Senate

Appendix 3: Faculty Policies

Appendix 4: Faculty Salary and Benefits

Appendix 5: Administrative Structure

# University Statutes

- Article One: The University Charter
- Article Two: By-Laws of The Board of Trustees
- Article Three: The University Academic and Administrative Structure
- Article Four: Policies and Procedures for Faculty
- Article Five: Policies, Procedures, and Guidelines for Research and Training
- Article Six: University Code of Conduct
- Appendix 1: Academic Freedom and Tenure
- Appendix 2: Constitution and Bylaws of the Fordham University Faculty Senate
- Appendix 3: Faculty Policies
- Appendix 4: Faculty Salary and Benefits
- Appendix 5: Administrative Structure

...rsity Statutes

...Four: Policies and
...dures for Faculty

...1: The University
Faculty

...apter 2: Ranks of
...nstructional Staff

...3: Responsibility
of Faculty

...oter 4: Academic
Freedom

...hapter 5: Faculty
...nnel Policies and
Procedures

...6: Faculty Role in
...sity Governance

...7: Academic Due
Process

...8: Faculty Salary
and Benefits

...9: Faculty of the
...tment of Military
Science

...0: Amendments

...11: Clinical Staff
and Lecturers

# Article Four: Policies and Procedures for Faculty

Chapter 1: The University Faculty

Chapter 2: Ranks of Instructional Staff

Chapter 3: Responsibility of Faculty

Chapter 4: Academic Freedom

Chapter 5: Faculty Personnel Policies and Procedures

Chapter 6: Faculty Role in University Governance

Chapter 7: Academic Due Process

Chapter 8: Faculty Salary and Benefits

Chapter 9: Faculty of the Department of Military Science

Chapter 10: Amendments

Chapter 11: Clinical Staff

)ur: Policies
cedures for
     Faculty

The University
     Faculty

# Chapter One: The University Faculty

### §4-01.01 - The Instructional Staff

The instructional staff of the University includes the Faculty [see §4-01.02] and non-tenurable ranks [see §4-02.02].

### §4-01.02 - The Faculty

The University Faculty consists of all distinguished professors, university professors, professors, associate professors, assistant professors who are tenured or have received tenure-track appointments to an Arts and Sciences Department or to a Professional School Faculty, and instructors who have received tenure-track appointments to an Arts and Sciences Department or to a Professional School Faculty. Visiting distinguished professors, professors and associate professors are also members of the University Faculty to the extent provided in §4-02.01.

The University Faculty has primary responsibility for such fundamental areas as curriculum, subject matter and methods of instruction, research, faculty status, and those aspects of student life which relate to the educational process. On these matters, the power of review or final decision lodged in the Board of Trustees or delegated by it to the President of the University should be exercised adversely only in exceptional circumstances and for reasons communicated to the faculty.

### §4-01.03 - The Various Faculties

a. The Faculty of a Professional School or Department consists of those members of the University Faculty who have received appointment to that unit.

b. All faculty members appointed to one of the Arts and Sciences Departments are members of the Faculty of Arts and Sciences. The Faculty of the Graduate School of Arts and Sciences is composed of those Arts and Sciences faculty members of Fordham College at Lincoln Center and Fordham College at Rose Hill who are delegated by their Departments to teach graduate courses on a continuing basis. The Faculty of Arts and Sciences shall consist of the following:

> 1. For purposes of personnel procedures, all faculty members of Fordham College at Lincoln Center and Fordham College at Rose Hill.
> 2. For purposes of representation in University governance, all faculty members of

IAM UNIVERSITY

☰ MENU   🔍

### §4-01.03 - The Various Faculties

a. The Faculty of a Professional School or Department consists of those members of the University Faculty who have received appointment to that unit.

b. All faculty members appointed to one of the Arts and Sciences Departments are members of the Faculty of Arts and Sciences. The Faculty of the Graduate School of Arts and Sciences is composed of those Arts and Sciences faculty members of Fordham College at Lincoln Center and Fordham College at Rose Hill who are delegated by their Departments to teach graduate courses on a continuing basis. The Faculty of Arts and Sciences shall consist of the following:

> 1. For purposes of personnel procedures, all faculty members of Fordham College at Lincoln Center and Fordham College at Rose Hill.
> 2. For purposes of representation in University governance, all faculty members of the Faculty of Arts and Sciences and the Graduate School of Religion and Religious Education.

c. The Faculty of Business is composed of all faculty members who have been appointed thereto.

### §4-01.04 - Joint Appointments

A person may be appointed to the faculty of more than one School or Department. Such appointment may be made when the appointee is expected to have continuing responsibilities beyond the teaching of a course or courses in each unit. The faculty rights and privileges of such appointee in each unit shall be determined at the time of initial joint appointment or within a reasonable time.

### §4-01.05 - Faculty with Administrative Appointments and Administrators with Faculty Status

a. An administrator is an officer of the University [see §3-02], an Administrator, a Dean, Associate Dean, Assistant Dean, Assistant to the Dean, or any other person designated as an administrator by the Trustees and the President of the University. A faculty member is a person described in §4-01.02 and appointed according to the provisions of §4-05. A person may hold a dual appointment as administrator and member of the University Faculty only if the prescribed procedures are followed [see §4-05 for faculty]. In such cases, status as administrator may impose suspension of certain faculty rights during the period of administrative appointment. In cases where the exercise of faculty rights has been challenged, the Faculty Senate shall decide which, if any, faculty rights may be exercised by the person in question during the period of administrative appointment or responsibility. The person whose status is thus challenged shall continue to exercise faculty rights until a

# Chapter Two: Ranks of Instructional Staff

## §4-02.01 - Tenurable Ranks

Persons appointed to the following ranks are eligible to receive tenure:

a. University Professor [see §4-02.03];
b. Distinguished Professor [see §4-02.04];
c. Professor [see §4-02.05];
d. Associate Professor [see §4-02.06];
e. Assistant Professor [see §4-02.07].

## §4-02.02 - Non-tenurable Ranks

a. The following positions are appointments which cannot lead to tenure:

1. Professor and Associate Professor Emeritus/a [see §4-02.08];
2. Research Professor and Research Associate Professor [see §4-02.09];
3. Distinguished Visiting Professor, Visiting Professor and Associate Visiting Professor [see §4-02.10];
4. Professor of Military Science and other Instructional staff in Military Science [see §4-02.11];
5. Instructor [see §4-02.12];
6. Distinguished Lecturer and Lecturer [see §4-02.13];
7. Adjunct Faculty [see §4-02.14];
8. Clinical Staff [see §4-02.15 and §4-11.01];
9. Teaching Fellow [see §4-02.16];
10. Graduate Assistant [see §4-02.17].

b. Any position designated by a title not specified in this Chapter, such as Artist-in-Residence, Field Instructor, and Research Associate, as well as positions which may be created in the future, shall be a non-tenurable position, unless the Board of Trustees determines otherwise.

## §4-02.03 - University Professor

Appointment as University Professor may be made by the President of the University, upon nomination by the Vice President for Academic Affairs, in rare cases in which the appointee is a person of exceptional achievement in areas of learning which span more than one discipline, who possesses the essential qualifications of a Professor ... who is deserving of special recognition. University professors may teach within any fac...y at the invitation of that faculty. If the nominee should seek an appointment in a faculty of a particular School or Department, the normal application process described in §4-05.06 will be followed.

majority vote of the tenured faculty in the School or Department and submitted to the Dean by November 1 who will forward the result to the Office of the Vice President for Academic Affairs by November 15.

The rationale for each Clinical Staff appointment and its functions and duties will also be determined by a majority vote of the tenured faculty in the School or Department and submitted to the Dean by November 1, who will forward the result to the Office of the Vice President for Academic Affairs by November 15.

Clinical Staff positions are outside the tenure-track. Clinical Staff positions with no additional duties involves teaching at least six but no more than eight courses in an academic year, or their equivalent in the Professional Schools. Clinical Staff positions with additional duties involve teaching at least four but not more than six courses in an academic year, or their equivalent in the Professional Schools. Clinical Staff are not eligible to carry out roles reserved to faculty as described in §4-06.01-.55.

Clinical appointees are designated as Clinical Professor, Clinical Associate Professor, Clinical Assistant Professor and Clinical Instructor. Service in these positions does not count toward tenure. Faculty who were denied tenure may not be appointed as Clinical Staff. For more about Clinical Staff see §4-11.

The Office of the Vice President for Academic Affairs will file with the Faculty Senate by December 1 of each year a report stating the number of Clinical Staff being employed by the University disaggregated by School and Department.

### §4-02.16 - Teaching Fellow
Appointment as a Teaching Fellow may be made from among the candidates for doctoral degrees at Fordham University. Such Appointments are part-time, may be made for a period not to exceed one academic year, and may be renewed. Service in this rank does not count toward tenure.

### §4-02.17 - Graduate Assistant
Appointment as a Graduate Assistant may be made from among the candidates for graduate degrees from Fordham University. Such appointments are part-time, may be made for a period not to exceed one academic year, and may be renewed.

# Chapter Three: Responsibility of Faculty

### §4-03.01 - Responsibilities

a. Appointment as a faculty member is a contract for full-time engagement in faculty responsibilities during the academic year. Responsibilities of the faculty include:

1. Satisfactory fulfillment of teaching duties in assigned courses or their equivalents;
2. Observance of academic regulations concerning the holding of classes, examinations, grades, etc.;
3. The preparation, proctoring and grading of student examinations;
4. The direction, reading, and evaluation of student papers, reports, theses, and dissertations where such has been the practice in the School, Division, or Department;
5. Academic counseling and guidance of students (a faculty member is expected to maintain scheduled office hours as required and be familiar with academic regulations and the curriculum of the School)
6. Involvement in significant scholarly research;
7. Scholarly publication;
8. Participation in learned societies and professional organizations;
9. Participation in University, School, Division and Department meetings, convocations and commencements;
10. Service on committees [see § 4-06];
11. Cooperation in the observance of University regulations.

b. The responsibilities of members of the instructional staff who are not members of the University Faculty include such portions of the responsibilities enumerated in subdivision (a) as are appropriate to their assigned duties, and as may have been agreed upon with the University.

### §4-03.02 - Teaching Load

a. The maximum teaching load for full-time faculty members shall not exceed in any year an average of three courses or sections per semester. Any modification of this teaching load applicable in individual Schools shall be approved by the Dean and the Vice President for Academic Affairs. At the School of Law the teaching load is governed by the standards of the Association of American Law Schools.

b. The course load may be reduced for individual faculty members engaged in major research projects, faculty with graduate teaching responsibilities who spend much of their time in the direction of graduate student research, and for faculty members heavily involved in laboratory instruction, the direction of field work or other activities which justify a reduction of course load. Chairpersons and other faculty with significant administrative responsibilities are given consideration in the reduction of their teaching loads.

# Chapter Five: Faculty Personnel Policies and Procedures

### §4-05.01 – General Personnel Procedures

1. **Obligation of Faculty**. The obligation of faculty members to participate in making recommendations regarding faculty status of colleagues is a serious responsibility which constitutes an essential element in the operation of the University. All eligible faculty members have a responsibility to participate in meetings of the Professional School, Faculty or Department Personnel Committees for the purposes of reappointment, tenure, promotion and emeritus status.

2. **Eligible Faculty**. The definition of faculty members eligible to participate in each type of personnel recommendation is set forth in §4-02.08 (emeritus status); §4-05.03(c) (reappointment); §4-05.04(f) (tenure) and §4-05.05(c) (promotion). For eligibility of faculty members with special status on personnel committees see §4-01.04; for those holding joint appointments as administrators see §4-01.05(d) and (e); for those approaching retirement see §4-05.09(a) and (b).

3. **Quorum**. A quorum for meetings of personnel committees is eighty per cent (80%) of the eligible faculty of the unit, but no fewer than five persons. In calculating that percentage, faculty on leave of absence or faculty fellowship, Interdisciplinary Committee representatives and administrators holding faculty status in the unit (if not otherwise disqualified) are included, only if they are present. [See §4-01.05(d)(3)]. In calculating the required number of persons, all fractions shall be disregarded.

4. **Minimum Size of Committees**. The minimum number of members composing a personnel committee shall be five. If there are fewer than five eligible faculty members in the unit to constitute the committee, the following procedure shall be followed:

1. If there are three or four eligible faculty members they shall nominate to the Dean two eligible faculty members from cognate areas for each vacancy. "Cognate area" is defined as the same (or a closely related) academic discipline as that of the faculty member under consideration.

2. If there are fewer than three eligible faculty, the Executive Committee of the Faculty Senate, after consultation with the Chairperson and the eligible faculty of the unit, Faculty Senators from the School or unit, and faculty from cognate areas shall nominate to the Dean for each vacancy two eligible faculty members from cognate areas.

3. The Dean shall appoint from among the nominees sufficient faculty members to constitute a personnel committee of five members.

Faculty Senate, after consultation with the Chairperson and the eligible faculty of the unit, Faculty Senators from the School or unit, and faculty from cognate areas shall nominate to the Dean for each vacancy two eligible faculty members from cognate areas.

3. The Dean shall appoint from among the nominees sufficient faculty members to constitute a personnel committee of five members.

5. **Calendar**. Unless otherwise specified in these statutes, the dates applicable to personnel procedures shall be listed in the Personnel Procedural Calendar (Appendix 3c to these Statutes). The Calendar shall be reviewed jointly each Spring by the Administration and the Faculty Senate. In the absence of agreement for change of dates, those specified in the last revision of the Calendar shall continue to apply.

6. **Interdisciplinary Programs**. In consultation with members of the executive committee of appropriate rank, the director asks for assessments and evaluations of the relevant areas of the applicant's participation in the program, including teaching and service, and contribution to the specific field represented in the program. The director is responsible for preparing the program report which can be in the form of a letter placed in the applicant's personnel dossier or a report to be read by the program representative at the personnel meeting. In either case, the report is reviewed by members of the executive committee of appropriate rank before it is presented to the departmental personnel committee.

7. **Conduct of Personnel Committee Meetings**. The Personnel Committee shall be provided with all relevant material concerning the qualifications of the candidate, including the candidate's education, experience at Fordham and other institutions, evaluation of teaching, research and publications, and University, professional and public service. The Dean has the option of offering material to the Committee. The Personnel Committee may utilize a sub-committee to gather and present such material, and secure such information as the Personnel Committee may require. Appropriate steps shall be taken to secure the opinion of students concerning the candidate's teaching effectiveness. Committee members shall review and discuss the materials concerning candidates. Votes shall be cast in person by secret ballot at the same meeting. To achieve an affirmative personnel recommendation, a majority of those present and eligible must vote in favor of the candidate, an abstention having the effect of a negative vote. The presiding officer of the Committee shall transmit the results of the vote and a written summary of the discussion to the Dean. Members of the Committee shall be provided with a reasonable opportunity to read and to comment upon the summary before it is transmitted to the Dean.

1. The presiding officer of the Committee shall be the Chairperson of the Department unless such person is ineligible or the School is not so organized, in which event the Dean shall convene the Committee, which shall elect its own presiding officer.

2. The Chairperson of a Department shall not be eligible to be a member of a Committee which is considering the Chairperson for a personnel recommendation.

**§4-05.03 - Reappointment**

a. **Reappointment Generally**. Probationary faculty members shall be considered for reappointment prior to the expiration of their contracts.

b. **Norms for Reappointment**

1. The decision to reappoint a faculty member shall be based upon the qualifications of the faculty member and the needs of the University.

1. The qualifications of the faculty member include educational background, performance as a teacher, research and publication, contribution to the work of the School or Department and University, professional and public service. The weight given to each of these factors may vary in the several Schools and Departments. Both past achievement and promise of future contributions shall be considered.

2. The needs of the University include the particular fields and specializations required by the School or Department, its present and future curricular and research activity, the distribution of the present faculty in terms of rank, tenure and field of specialization; and projected student enrollment.

c. **Composition of the Personnel Committee for Reappointment**
The School or Department Personnel Committee shall consist of all tenured faculty in the unit. In addition it includes an untenured Chairperson [see §4-05.01(g)]; administrators tenured in the unit [see §4-05.01(g)]; and additional faculty required to make up the minimum number of five members pursuant to §4-05.01(d). When a faculty member who also serves on a degree-granting Interdisciplinary Committee is presenting an application for reappointment, he/she may request representation by one representative of that interdisciplinary program at the personnel meeting. The Faculty member's formal request is made to the Dean of the Arts and Sciences Faculty on an application form specifically designed for the procedure. The office of the Dean of the Arts and Sciences Faculty forwards a copy of the faculty member's application to the director of the interdisciplinary committee concerned. In consultation with the executive committee, the director nominates, when possible, two members of the program of appropriate rank and familiarity with the applicant's credentials to participate in the personnel committee meeting and returns the information to the office of the Dean of the Arts and Sciences Faculty. The Dean of the Arts and Sciences Faculty, or his designated officer, chooses one of the director's nominees and notifies the director and the department chair of his/her actions.

d. **Procedure for Reappointment**

1. At the time indicated in the Personnel Procedural Calendar, the Personnel Committee of School or Department shall review the qualifications of probationary faculty members who have applied for reappointment.

2. Procedures for reappointment shall follow those set forth in §4-05.01, unless otherwise specifically provided in this section.

a. **Authority for Appointment**. All appointments to the Faculty and Instructional Staff are made by the President of the University acting through the Vice President for Academic Affairs, except that Teaching Fellows and Graduate Assistants are appointed by the respective Deans.

b. **Period of Appointment**. Faculty members are appointed for one or more years, each consisting of a twelve-month period commencing on September 1 (or such earlier date as may be specified in the academic calendar of a particular School). The period of service for each yearly appointment is the academic year of nine months (or its equivalent as specified in the academic calendar of a particular School). In exceptional cases, appointments may be made for a period of less than one year. Appendix 3a discusses normal periods of appointment to non-tenured faculty and instructional staff positions.

c. **Terms of Appointment**

1. Except in the case of appointment as visiting faculty (limited to a brief association with the University), and Clinical Staff, all full-time appointments to the Faculty shall be either probationary appointments or appointments with tenure. [See §4-02 for ranks of faculty and instructional staff].

2. The terms and conditions, in writing, of every appointment to the faculty and instructional staff, including a copy of these statutes, shall be transmitted to the appointee by the Vice President for Academic Affairs. Any subsequent modification of the terms of the agreement shall be in writing executed by both the appointee and the Vice President for Academic Affairs.

d. **Procedure in Initial Faculty Appointments**

1. All personnel searches must be conducted in accordance with the University's Equal Employment/Affirmative Action policies contained in Appendix 3b.

2. Schools and Departments may establish their own procedures for faculty consultation concerning initial faculty appointments, subject to the provisions of these Statutes.

3. The Chairperson of a Department, or the Dean of a School not so organized, shall initiate the process for authorization and recruitment of prospective faculty members.

4. In the spring, Interdisciplinary Program Directors forward to the Dean of the Arts and Sciences Faculty the program's desiderata and justifications for authorizations, with copies to the Department Chairs affected by the request and to the appropriate deans.

5. The Deans consult with the Department Chairs and the Program Directors to arrive at a determination of hiring priorities.

6. The Vice President for Academic Affairs establishes the official authorizations based on the needs of the Departments and Programs as well as budgetary constraints. The official notification of action will include a statement regarding participation of programs and the procedure regarding hiring.

7. Once a position has been authorized, the Director of the Program concerned by the position will appoint one representative to sit on the personnel committee of the

recommendation regarding the candidate directly to the Dean of Faculty or Dean, using the form "Recommendation by a Faculty Member for a Faculty Reappointment (or Promotion, or Tenure, or an Initial Faculty Appointment)". On the form each member shall indicate how he/she voted and why.

8. **Action by the Administration**

1. The Dean's recommendation, together with those of the Committee and its individual members, shall be transmitted to the Vice President for Academic Affairs.

2. If the Vice President for Academic Affairs does not concur with the recommendation of the Personnel Committee, an explanation of the reasons therefore shall be given to the Committee at a meeting thereof, after which the Committee may reconsider its recommendation. In any event, the recommendation of the Vice President for Academic Affairs shall be transmitted to the President of the University [see §4-05.04(g)(2)(A)].

3. The final decision shall be made by the President of the University in cases involving reappointment [see §4-05.03(d)(4)], promotion [see §4-05.05(d)(3)], and emeritus status [see §4-02.08].

4. In cases involving tenure, the final decision shall be made by the President of the University with the concurrence of the Board of Trustees, except that if the President does not agree with the negative recommendation of the Personnel Committee tenure may be granted only if the Tenure and Reappointment Appeals Committee, or the Faculty Senate so recommend [see §4-05.04(g)(2)(A)].

5. The faculty member shall be notified in writing of the final decision by the President of the University or the Vice President for Academic Affairs or his designee no later than the date specified in the Personnel Procedural Calendar.

6. Upon request, a written statement of the reasons for the recommendation of the Personnel Committee shall be given to an adversely affected faculty member. In cases where a decision is made upon the basis of a recommendation by an appeals or review committee, or an administrator, a similar written statement of the reasons therefore shall be given to the adversely affected faculty member upon request.

9. **Procedures for Informing Candidates for Contract Renewal, Tenure and Promotion**. The Academic Vice President's Office will send to a candidate for reappointment, tenure or promotion the reports by the Chair and the Dean (s) revised only to protect confidentiality. These reports from the Academic Vice President's office will accompany the letter concerning decisions regarding reappointment, tenure or promotion, at the time indicated in the Personnel Procedural Calendar.

10. **Confidentiality**. The provisions of §4-07.41 concerning confidentiality apply to all faculty members and administrators involved in the making of personnel recommendations and decisions.

11. **Reconsiderations**. Whenever reconsideration of a faculty committee decision is to occur, the committee shall consist of the eligible faculty in the unit together with available members of the original committee, all of whom shall be considered "eligible faculty" - for

7. **Conduct of Personnel Committee Meetings.** The Personnel Committee shall be provided with all relevant material concerning the qualifications of the candidate, including the candidate's education, experience at Fordham and other institutions, evaluation of teaching, research and publications, and University, professional and public service. The Dean has the option of offering material to the Committee. The Personnel Committee may utilize a sub-committee to gather and present such material, and secure such information as the Personnel Committee may require. Appropriate steps shall be taken to secure the opinion of students concerning the candidate's teaching effectiveness. Committee members shall review and discuss the materials concerning candidates. Votes shall be cast in person by secret ballot at the same meeting. To achieve an affirmative personnel recommendation, a majority of those present and eligible must vote in favor of the candidate, an abstention having the effect of a negative vote. The presiding officer of the Committee shall transmit the results of the vote and a written summary of the discussion to the Dean. Members of the Committee shall be provided with a reasonable opportunity to read and to comment upon the summary before it is transmitted to the Dean.

1. The presiding officer of the Committee shall be the Chairperson of the Department unless such person is ineligible or the School is not so organized, in which event the Dean shall convene the Committee, which shall elect its own presiding officer.

2. The Chairperson of a Department shall not be eligible to be a member of a Committee which is considering the Chairperson for a personnel recommendation.

3. Except as provided in §4-05.01(g)(2), the Chairperson of a Department shall be a member *ex officio*, but without vote, in a Personnel Committee which is considering candidates for a status which the Chairperson does not possess. In such cases a chairperson shall not be counted in computing the minimum of five members needed for some committees or the 80% quorum.

4. Administrators who possess the appropriate rank or tenure status who are faculty members in a School, Division or Department may vote as members of Personnel Committee provided they have no further role in making the personnel decision.

5. The Interdisciplinary Program representative at the personnel committee meeting enjoys full participation, voice and vote, in the deliberations and decision. As with other members of the personnel committee, the program representative at the meeting is responsible for justifying the program's vote in writing on the appropriate form to the Dean of the Arts and Sciences faculty.

6. Individual members of the Committee shall complete and transmit a recommendation regarding the candidate directly to the Dean of Faculty or Dean, using the form "Recommendation by a Faculty Member for a Faculty Reappointment (or Promotion, or Tenure, or an Initial Faculty Appointment)". On the form each member shall indicate how he/she voted and why.

8. **Action by the Administration**

1. The Dean's recommendation, together with those of the Committee and its individual members, shall be transmitted to the Vice President for Academic Affairs

8. **Action by the Administration**

    1. The Dean's recommendation, together with those of the Committee and its individual members, shall be transmitted to the Vice President for Academic Affairs.

    2. If the Vice President for Academic Affairs does not concur with the recommendation of the Personnel Committee, an explanation of the reasons therefore shall be given to the Committee at a meeting thereof, after which the Committee may reconsider its recommendation. In any event, the recommendation of the Vice President for Academic Affairs shall be transmitted to the President of the University [see §4-05.04(g)(2)(A)].

    3. The final decision shall be made by the President of the University in cases involving reappointment [see §4-05.03(d)(4)], promotion [see §4-05.05(d)(3)], and emeritus status [see §4-02.08].

    4. In cases involving tenure, the final decision shall be made by the President of the University with the concurrence of the Board of Trustees, except that if the President does not agree with the negative recommendation of the Personnel Committee tenure may be granted only if the Tenure and Reappointment Appeals Committee, or the Faculty Senate so recommend [see §4-05.04(g)(2)(A)].

    5. The faculty member shall be notified in writing of the final decision by the President of the University or the Vice President for Academic Affairs or his designee no later than the date specified in the Personnel Procedural Calendar.

    6. Upon request, a written statement of the reasons for the recommendation of the Personnel Committee shall be given to an adversely affected faculty member. In cases where a decision is made upon the basis of a recommendation by an appeals or review committee, or an administrator, a similar written statement of the reasons therefore shall be given to the adversely affected faculty member upon request.

9. **Procedures for Informing Candidates for Contract Renewal, Tenure and Promotion**. The Academic Vice President's Office will send to a candidate for reappointment, tenure or promotion the reports by the Chair and the Dean (s) revised only to protect confidentiality. These reports from the Academic Vice President's office will accompany the letter concerning decisions regarding reappointment, tenure or promotion, at the time indicated in the Personnel Procedural Calendar.

10. **Confidentiality**. The provisions of §4-07.41 concerning confidentiality apply to all faculty members and administrators involved in the making of personnel recommendations and decisions.

11. **Reconsiderations**. Whenever reconsideration of a faculty committee decision is to occur, the committee shall consist of the eligible faculty in the unit together with available members of the original committee, all of whom shall be considered "eligible faculty" - for the purposes of determining a quorum. The provisions of §4-05.01(d), which treat the size of personnel committees, shall apply.

**§4-05.02 - Appointment**

**§4-05.04 - Tenure**

a. **Definition**. Tenure is a guarantee of continuous appointment until a faculty member retires. The appointment of a tenured faculty member shall be terminated only pursuant to §4-07.13(c) or §4-05.06(b).

b. **Grant of Tenure**. The right to grant tenure resides with the Board of Trustees [see §4-05.04(g)(2)(B)].

c. **Tenure Policy**

　1. Fordham University has adopted the 1940 Statement of Principles of Academic Freedom and Tenure of the American Association of University Professors and the Association of American Colleges, except as modified in (2) below [see §4-04.02].

　2. Faculty members being considered for probationary appointment may negotiate with the Vice President for Academic Affairs the extent to which prior full-time teaching experience shall be counted toward tenure at Fordham, which period shall not exceed three years. The length of the probationary period shall be specified in the contract at the time of initial appointment and may not subsequently be changed except as provided in §4-05.10(f), which treats leaves of absence and the probationary period. The maximum full-time service at Fordham in a probationary status shall not exceed seven years.

d. **Norms for Granting Tenure**

　1. Tenure is granted only to faculty members holding the ranks specified in §4-02.01.

　2. The decision to grant tenure shall be based upon the qualifications of the faculty member and the needs of the University.

　　1. The qualifications of the faculty member include educational background, performance as a teacher, research and publication, contribution to the work of the School, Division or Department and University, professional and public service. The weight given to each of these factors may vary in the several Schools, Divisions and Departments. Both past achievement and promise of future contributions shall be considered.

　　2. The needs of the University include the present and future curricular and research activity in the particular fields and specializations required by the School, Division or Department, the distribution of the present faculty in terms of rank, tenure and field of specialization, and projected student enrollment.

e. **Faculty Role in Recommending Tenure**. The primary evaluation of the application for tenure is made by the tenured faculty of the applicant's School or Department. Their recommendations shall be accorded the greatest weight in the decision which is made by the University (see §4-01.02). No appointment conferring tenure shall be made without the

### §4-05.05 - Promotion

a. **Norms for Promotion**. The norms for promotion and qualifications for each rank are described in Chapter 4-02. Although each of the qualifications must be included in the evaluation of a particular candidate for promotion, the weight given to each may vary in the several Schools, Divisions and Departments. Length of service in a particular rank and adequate performance of regular duties do not in themselves constitute sufficient grounds for promotion. The greatest weight is given to evaluations of a candidate by faculty colleagues [see §4-01.02].

b. **Eligibility for Promotion**

   1. Eligible faculty are those who meet the qualifications for the desired rank and who make application for promotion, subject to the restriction in paragraph (2).

   2. An untenured faculty member is not eligible for promotion to the ranks of Professor and Associate Professor in the year immediately preceding the year in which a tenure decision is to be made. A promotion application may be filed in the year in which tenure is to be decided, but shall not be acted upon until after the tenure decision is announced.

   3. A faculty member appointed as Instructor who completes the terminal degree may be promoted to Assistant Professor by the President of the University, without formal application process, effective immediately upon receipt by the Vice President for Academic Affairs of official notification that all requirements for the degree have been completed.

c. **Composition of Personnel Committee for Promotion**. The School or Department Personnel Committee shall consist of all tenured members of the unit who hold the rank (or higher rank) for which the candidate is applying. In addition it includes the Chairperson regardless of rank [see §4-05.01(g)], administrators tenured in the unit [see §4-05.01(g), and additional faculty required to make up the minimum number of five pursuant to §4-05.01(d). In Schools organized by Departments the Dean shall appoint two additional faculty members from a School or Department other than that of the candidate, except where the application of §4-05.01(d) has resulted in the appointment of such members. When a faculty member who also serves on a degree-granting interdisciplinary Committee is presenting an application for promotion, he/she may request that at least one of the two personnel committee members from outside the department shall be from the interdisciplinary program. The applicant will submit a list of names from the program to the program director who will propose, when possible, two nominees to serve as one of the outside members of the departmental committee to the chair of the personnel committee and to the Dean of the Arts and Sciences Faculty. The chair of the personnel committee communicates his/her recommendations for the other outside member of the personnel committee to the office of the Dean of the Arts and Sciences Faculty. The Dean of the Arts and Sciences Faculty, or his designated officer, chooses one of the director's nominees and one of the chair's nominees to serve as outside members of the personnel committee and

program director who will propose, when possible, two nominees to serve as one of the outside members of the departmental committee to the chair of the personnel committee and to the Dean of the Arts and Sciences Faculty. The chair of the personnel committee communicates his/her recommendations for the other outside member of the personnel committee to the office of the Dean of the Arts and Sciences Faculty. The Dean of the Arts and Sciences Faculty, or his designated officer, chooses one of the director's nominees and one of the chair's nominees to serve as outside members of the personnel committee and notifies the director and the department chair of his/her actions. When additional faculty members from outside the unit are appointed, they are computed in establishing the minimum number of five at the 80% quorum.

d. **Procedure for Promotion**

> 1. The candidate shall apply on or before the date specified in the Personnel Procedural Calendar.
> 2. The procedure for promotion shall follow those of §4-05.01 unless otherwise specifically provided.
> 3. The decision to promote a faculty member shall be made by the President of the University, who shall notify the applicant of the decision.
> 4. With the exception of promotions to Assistant Professor, promotions become effective at the beginning of the academic year following notification.

e. **Grievance Relating to Promotion**

> 1. A faculty member who has been denied promotion may request an informal conference with the Vice President for Academic Affairs, who shall disclose the reasons for the decision. Following the informal conference, the Vice President for Academic Affairs shall supply upon request of the faculty member the reasons for the decision in writing.
> 2. A faculty member who has been denied promotion may petition the Faculty Hearing Committee pursuant to the provisions of §4-07.21.

**§4-05.06 – Procedure for the Appointment of University Professor**

For University Professor, the President of the University will consult with a faculty committee of five senior faculty members from appropriate disciplines to be chosen by the President in consultation with the Faculty Senate.

If the nominee should seek an appointment in a faculty of a particular school or department, the following procedures will be used. Supporting materials for nominees already appointed to the University will include recommendations from departmental chairs (where the nominee is a member of a department) or personnel committees, dean(s), and at least two external referees. Supporting materials for nominees being newly appointed to the university will include recommendations from members of personnel committees with the rank of full professor, departmental chairs (where the nominee will be appointed to a department) or search committees, dean(s), and at least two external

**§4-05.08 - Termination of Appointment**

a. **Termination by Faculty Member**. A faculty member may terminate an appointment effective at the end of the academic year, which for this purpose is deemed to be August 31. Notice should be given to the Chairperson, Dean and Vice President for Academic Affairs at the earliest opportunity.

b. **Termination by University**

1. **In General**. The University shall terminate a tenured appointment, or a probationary appointment before the end of the stated term, only pursuant to the provisions of §4-07.13, or as stated in paragraphs (2) or (3) herein.

2. **Termination Due to Financial Exigency or Discontinuance of a Program of Instruction**

(i) instructional staff other than those specified in (ii) and (iii) below.

(ii) untenured faculty.

(iii) tenured faculty.

Termination shall occur in inverse order of seniority within each category, and within each tenuring unit, based on date of appointment. Exception to the above order of termination may be granted in individual cases where it is essential for the maintenance of the integrity of academic programs, upon the recommendation of the Dean and/or the Chairperson and the University Tenure Review Committee. Such exceptions shall be granted only in rare cases and for compelling reasons.

1. Before formally determining the existence of financial exigency in the University or a School thereof, which may require the termination of appointment of any tenured faculty member, or any member of the faculty in probationary status before the end of the stated term of appointment, consultation shall be had with the Faculty Senate in executive session.

2. Before deciding to discontinue any program of instruction which may require the termination of appointment of any tenured faculty, or any member of the faculty in probationary status before the end of the stated term of appointment, the President of the University or designee shall consult with the relevant School Council, or if there is none, with the Faculty Senate.

3. Before the termination of appointment of any member of the tenured faculty, or any member of the faculty in probationary status before the end of the stated term of appointment, for reasons of financial exigency or discontinuance of a program of instruction, the President of the University shall consult with and receive the recommendations of the Faculty Senate.

4. The Board of Trustees shall ultimately determine the existence of financial exigency or the need to terminate a program of instruction.

5. Before terminating faculty appointments due to financial exigency or

### §4-05.08 - Termination of Appointment

a. **Termination by Faculty Member**. A faculty member may terminate an appointment effective at the end of the academic year, which for this purpose is deemed to be August 31. Notice should be given to the Chairperson, Dean and Vice President for Academic Affairs at the earliest opportunity.

b. **Termination by University**

1. **In General**. The University shall terminate a tenured appointment, or a probationary appointment before the end of the stated term, only pursuant to the provisions of §4-07.13, or as stated in paragraphs (2) or (3) herein.

2. **Termination Due to Financial Exigency or Discontinuance of a Program of Instruction**

(i) instructional staff other than those specified in (ii) and (iii) below.

(ii) untenured faculty.

(iii) tenured faculty.

Termination shall occur in inverse order of seniority within each category, and within each tenuring unit, based on date of appointment. Exception to the above order of termination may be granted in individual cases where it is essential for the maintenance of the integrity of academic programs, upon the recommendation of the Dean and/or the Chairperson and the University Tenure Review Committee. Such exceptions shall be granted only in rare cases and for compelling reasons.

1. Before formally determining the existence of financial exigency in the University or a School thereof, which may require the termination of appointment of any tenured faculty member, or any member of the faculty in probationary status before the end of the stated term of appointment, consultation shall be had with the Faculty Senate in executive session.

2. Before deciding to discontinue any program of instruction which may require the termination of appointment of any tenured faculty, or any member of the faculty in probationary status before the end of the stated term of appointment, the President of the University or designee shall consult with the relevant School Council, or if there is none, with the Faculty Senate.

3. Before the termination of appointment of any member of the tenured faculty, or any member of the faculty in probationary status before the end of the stated term of appointment, for reasons of financial exigency or discontinuance of a program of instruction, the President of the University shall consult with and receive the recommendations of the Faculty Senate.

4. The Board of Trustees shall ultimately determine the existence of financial exigency or the need to terminate a program of instruction.

5. Before terminating faculty appointments due to financial exigency or

# Chapter Six: Faculty Role in University Governance

### §4-06.01 - General Provisions

a. **Governance**. The Faculty role in University governance is carried on through participation at the University, School and Department levels through representative bodies, committees and meetings of the Faculty at large. The Faculty has primary responsibility for fundamental academic matters [see §4-01.02]. In these matters, the power of review, lodged in the Board of Trustees and delegated by it to the President of the University, should be exercised adversely only in exceptional circumstances and after consultation with Faculty. The Faculty responsibilities for governance are carried out primarily through the Faculty Senate, the faculty organizations of the Schools and Departments, and the committees described in this Chapter.

b. **Faculty Voting Privileges**. All full-time faculty members of a School or Department shall have the right to participate and vote in decisions of the unit, with the exception of certain restrictions in cases of joint appointments, personnel recommendations, and the nomination of Department Chairpersons [see §4-01.04 and .05, §4-05 and §4-06.50(c)].

c. **Faculty Representatives**. All faculty members shall be entitled to participate in choosing representatives for University, Campus and School bodies which represent the Faculty, subject to restrictions in these Statutes and the Constitution of the Faculty Senate.

d. **Selection Committees**. Representatives of the Faculty shall have the right to participate in Search Committees for Deans of Schools and higher academic officers of the University. Faculty members of such committees are normally appointed after consultation with the President of the Faculty Senate or faculty of the Schools involved, by authority of the President of the University, or in the case of Deans or the Director of University Libraries, by the Vice President for Academic Affairs.

### §4-06.02 - Faculty Senate

The Faculty Senate is the representative body of the University Faculty. It serves in an advisory capacity to the President of the University on all matters of concern to the University pursuant to the Constitution of the Faculty Senate, Article I, (B)(a) [see Appendix 2]. It has the right and duty to initiate recommendations and to speak for the Faculty in all areas of University activity.

### §4-06.03 - Committees

The faculty participates in several types of committees as part of its role in governance:

a. University Committees [see §4-06.04].

**§4-06.02 - Faculty Senate**

The Faculty Senate is the representative body of the University Faculty. It serves in an advisory capacity to the President of the University on all matters of concern to the University pursuant to the Constitution of the Faculty Senate, Article I, (B)(a) [see Appendix 2]. It has the right and duty to initiate recommendations and to speak for the Faculty in all areas of University activity.

**§4-06.03 - Committees**

The faculty participates in several types of committees as part of its role in governance:

a. University Committees [see §4-06.04]

    1. Committees of the Board of Trustees [see §4-06.05]
    2. Presidential Committees [see §4-06.06]
    3. Statutory Faculty Senate Committees [see §4-06.07, 08]

b. Other Faculty Senate Committees [see §4-06.07]
c. School Committees [see §4-06.10]
d. Department Committees [see §4-06.11]
e. Ad Hoc Committees [see §4-06.12]

**§4-06.04 - University Committees**

a. The Board of Trustees and/or the President of the University may establish University Committees to consider matters which affect more than one School of the University. Every reasonable effort shall be made to ensure appropriate representation of the several Schools.
b. Faculty representatives on University Committees may receive the advice of the Faculty Senate on the work of the Committees.

**§4-06.05 - Committees of the Board of Trustees**

a. **Appointment**. Faculty members of Committees established by the Board of Trustees containing faculty representation shall be appointed by the Faculty Senate for two-year renewable terms.
b. **List of Committees**. The following Committees of the Board of Trustees have faculty representation:

    1. **Academic Affairs Committee**. The Academic Affairs Committee shall review all major changes in the educational programs and policies of the University. The Committee shall include at least two faculty members.
    2. **Audit and Finance Committee**. The Audit and Finance Committee shall appraise the financial control and accounting system of the University. The

## §4-06.50 - Department Chairperson

a. **Chairperson**. A faculty member shall serve as Chairperson of each Department. The Chairperson's duties shall be carried out in consultation with the faculty members of the Department.

b. **Responsibilities of the Chairperson**. The Chairperson's duties shall be carried out in accordance with these Statutes and other policies of the University, Faculty, School or Department.

1. **Representational Duties**. The Chairperson shall represent the Department in dealing with units of the University and administrators, informing them of the needs, policies and procedures of the Department. The Chairperson shall communicate University and School policies to the members of the Department.

2. **Administrative Duties**. The Chairperson shall administer the Department including calling and presiding at meetings, implementing University, Faculty, School or Department policies and procedures, supervising the staff and facilities, preparing the budget and supervising expenditures of the unit.

3. **Curricular and Instructional Duties**. The Chairperson shall be responsible for planning and implementing the curriculum, instructional programs and schedules, and ensuring proper evaluation of teaching effectiveness, according to procedures established by the University, Faculty, School or Department.

4. **Counseling Duties**. The Chairperson shall arrange for the registration and counseling of students.

5. **Duties Relating to Faculty**. The Chairperson shall take an active role in recruitment of faculty and instructional staff, shall preside at meetings of personnel committees as provided in these Statutes and shall review progress with each probationary faculty member at least annually [see §4-05.02(e)(2)].

c. **Selection of Chairperson**

1. The Chairperson normally shall be selected from among the tenured Professors and Associate Professors of the Department.

2. The nominating committee shall consist of all full-time faculty with the rank of Assistant Professor or higher who have completed one academic year of service at the University.

A. If there are fewer than five faculty members who meet the above requirements, the full-time faculty members of the Department shall elect from among themselves by written secret ballot the number of persons necessary to secure a five member nominating committee.

B. In Departments where there are fewer than five full-time faculty members, the entire faculty shall constitute the nominating committee.

C. Any member of the faculty serving under a terminal notice of contract shall be eligible to participate in nominations for Chairperson only if such

c. **Selection of Chairperson**

1. The Chairperson normally shall be selected from among the tenured Professors and Associate Professors of the Department.

2. The nominating committee shall consist of all full-time faculty with the rank of Assistant Professor or higher who have completed one academic year of service at the University.

> A. If there are fewer than five faculty members who meet the above requirements, the full-time faculty members of the Department shall elect from among themselves by written secret ballot the number of persons necessary to secure a five member nominating committee.
>
> B. In Departments where there are fewer than five full-time faculty members, the entire faculty shall constitute the nominating committee.
>
> C. Any member of the faculty serving under a terminal notice of contract shall be eligible to participate in nominations for Chairperson only if such person will serve under the Chairperson to be appointed.
>
> D. Eighty (80) percent of a nominating committee shall constitute a quorum for the transaction of all business.
>
> E. Faculty members on faculty fellowship or leave of absence and administrators tenured in the unit may vote as members of a nominating committee if they are present at the meeting but they shall not affect the presence or absence of a quorum.

3. The Dean of Faculty shall meet with the nominating committee for the purpose of sharing perspectives.

4. The nominating committee shall vote separately on each nominee for Chairperson. The Committee shall forward all the names (up to three) from among those who received a majority of the votes cast. The vote shall be by written secret ballot. The Committee shall transmit the names to the Dean of Faculty. Each academic unit may use its own procedures for the process of nominating candidates for the unit's recommendation of a chair, but these procedures must be put in written form, must respect Robert's Rules for Order, and must be approved by the members of that academic unit prior to beginning the nomination process. These procedures should be forwarded by the unit to the appropriate deans, to the Office of the Provost, and to the Faculty Senate in the same way in which it must declare its procedures for merit considerations.

5. The Dean shall add comments, and transmit the names of the nominees to the Vice President for Academic Affairs, who shall appoint the Chairperson.

> A. If the Vice President for Academic Affairs declines to appoint any of the nominees, the Vice President shall meet with the Committee and the Dean to discuss the matter. A quorum is not required at this meeting, unless another nomination for a permanent chairperson is to be made by the committee, in which case the usual 80% quorum will be required.

the faculty served in the same way in which it must declare its procedures for merit considerations.

5. The Dean shall add comments, and transmit the names of the nominees to the Vice President for Academic Affairs, who shall appoint the Chairperson.

> A. If the Vice President for Academic Affairs declines to appoint any of the nominees, the Vice President shall meet with the Committee and the Dean to discuss the matter. A quorum is not required at this meeting, unless another nomination for a permanent chairperson is to be made by the committee, in which case the usual 80% quorum will be required.
>
> B. If agreement on a Chairperson is not achieved, the Vice President for Academic Affairs may appoint an Acting Chairperson [see §4-06.51]

d. **Term of Office**. The term of office of a Chairperson is three years, renewable for one sequential term. A shorter appointment may be made in special circumstances. Notwithstanding the foregoing, a Chairperson who has served two Consecutive three-year terms may be continued in Office by reappointment for one-year terms, subject to the nomination process described in §4-06.50(c).

e. **Stipend**. In addition to receiving a reduced teaching load, the Chairperson shall receive an appropriate stipend.

f. **Termination of Appointment**. A proceeding for termination of the appointment of a Chairperson may be commenced by petition to the Dean of Faculty made by at least two thirds of the eligible nominating committee; or by the Dean with the consent of a majority of the eligible nominating committee. If the Dean is unable to reconcile the matter, the Dean shall inform the Vice President for Academic Affairs, who shall conduct a hearing at which all parties may be represented. The decision of the Vice President for Academic Affairs shall be final.

## §4-06.51 - Acting Chairperson

a. If a Department is unable to make any nominations for Chairperson, the Vice President for Academic Affairs, after consultation with the Dean of Faculty, may appoint an Acting Chairperson for a period not to exceed one academic year.

b. In case of inability of a Chairperson to serve, the Vice President for Academic Affairs, after consultation with the Dean of Faculty and the Professors and Associate Professors of the Department, may appoint an Acting Chairperson to serve until a Chairperson is appointed pursuant to §4-06.50(c).

## §4-06.52 - Associate or Assistant Chairperson

The Chairperson with the concurrence of the Department may request that an Associate or Assistant Chairperson be appointed in cases where the administration and operation of Associate or the unit so require. Upon approval by the Dean of Faculty, such appointments are made by the Vice President for Academic Affairs for one-year renewable terms. Appropriate workload and compensation shall be arranged.

# Chapter Seven: Academic Due Process

### §4-07.01 - Procedure

The procedures for ensuring academic due process are divided as follows:

- Part I - Procedures Applicable to Grievances Relating to Denial of Reappointment or Tenure [§4-07.02 through .04].
- Part II - Procedures Applicable to Cases of Discipline, Suspension or Dismissal [§4-07.11 through .13].
- Part III - Formal Procedures of Faculty Hearing Committee [§4-07.21 through .23].
- Part IV - Procedures Applicable to Grievances Not Relating to Denial of Reappointment or Tenure, or to Discipline, Suspension or Dismissal [§4-07.31 through .33].
- Part V - Miscellaneous [§4-07.41 and .42].

## PART I

Procedures Applicable to Grievances Relating to Denial of Reappointment or Tenure

### §4-07.02 - Initiation of Grievance Relating to Denial of Reappointment or Tenure

a. Review by Tenure and Reappointment Appeals Committee
A member of the instructional staff with a grievance relating to denial of reappointment or tenure may petition the Tenure and Reappointment Appeals Committee [see §4-06.09(b)] only as provided in subdivision.
b. Scope of Review

1. Reappointment - University Faculty. If a member of the University Faculty asserts a grievance relating to denial of reappointment, the Committee may consider only whether the matter received adequate consideration, whether it was handled according to University policies and procedures, and whether the denial violated academic freedom or involved unlawful discrimination. If the Committee finds a violation of academic freedom or unlawful discrimination, it may substitute its judgment on the merits for that of the appropriate faculty body or the Administration.
2. Reappointment - Other Instructional Staff. If a member of the instructional staff who is not a member of the University Faculty asserts a grievance relating to denial of reappointment, the Committee may consider only whether the denial violated academic freedom or involved unlawful discrimination. If the Committee finds a violation of academic freedom or unlawful discrimination, it may substitute its

and transmit a copy thereof to the Vice President for Academic Affairs.

## §4-07.03 - Procedures of Tenure and Reappointment Appeals Committee

a. Proceedings. The Committee may conduct such investigation as it deems appropriate. The Committee shall consider the petition and any supporting documents filed with it, and may secure additional information as it deems necessary. The Committee shall establish rules of procedure not inconsistent with the provisions of these statutes. The rules of procedure shall be transmitted to the Faculty Senate for approval.

b. Disposition:

1. Reappointment. If the Committee determines that the petitioner has shown sufficient grounds [see §4-07.02(b)(1) or (2)], it shall indicate the grounds upon which the prior determination was found inadequate or improper, and direct the appropriate faculty body or administrative officer to reconsider the application of the candidate, having remedied any procedural errors identified by the Tenure and Reappointment Appeals Committee, and in accordance with the relevant norms of the General Personnel Procedures [see §4-05.01].  The Committee shall notify the Vice President for Academic Affairs of its decision and the grounds therefore. The reconsideration shall be conducted expeditiously. The Vice President for Academic Affairs or his designee shall advise the petitioner of the final decision.

2. Tenure

A. Committee recommendation contrary to initial faculty determination. Before the Committee makes a recommendation opposed to that of the faculty body which made the initial determination, it shall first direct that body to reconsider the application of the candidate, having remedied any procedural errors identified by the Tenure and Reappointment Appeals Committee, and in accordance with the relative norms of the General Personnel Procedures [see §4-05.01], stating its reasons for so doing.

B. Transmittal of Committee recommendation; decision. The Committee shall communicate its recommendations, including the results of any reconsideration by the faculty body [see §4-07.03(b)(2)(A)], to the President of the University, the President of the Faculty Senate and the Vice President for Academic Affairs. The President of the University, or his representative, shall advise the faculty member in writing of the final decision, and shall file a confidential copy thereof in the Office of the Faculty Senate.

C. Finality of Committee recommendation. The Committee's recommendation to grant or deny tenure ordinarily shall be determinative.

## §4-07.04 - Termination Date Not Modified

Neither the initiation of grievance procedures, nor any proceeding or recommendation by the Tenure and Reappointment Appeals Committee, shall by itself modify the effective date of a termination.

Miscellaneous

## §4-07.41 - Confidentiality

a. Except when otherwise directed by final order of or governmental tribunal of competent jurisdiction, faculty members and administrators engaged in procedures involving faculty personnel decisions shall treat as confidential all information disclosed during such procedures, as well as the fact of occurrence of the procedure and the result thereof except as otherwise provided in these statutes. Specifically, and without limiting the generality of the foregoing, this rule of confidentiality shall apply to all University Personnel serving on, testifying before, supplying information to and receiving information from the Tenure and Reappointment Appeals Committee, University Tenure Review Committee, Faculty Hearing Committee, and the Faculty Senate in executive session.

b. The result of such procedures, together with the appropriate meaningful reasons therefore, shall be communicated to those involved, and to the Faculty Senate Office, as specified in these statutes.

c. This rule of confidentiality shall also apply in other cases where these statutes so specify, and to prospective matters upon the request of the President or a Vice President of the University, or President of the Faculty Senate.

d. Faculty members serving as members of any of the Committees mentioned in subdivision (a) and members of the Faculty Senate while the Senate is sitting in executive session, shall have the right to review all relevant documents and to interview witnesses. All University personnel having relevant knowledge, information or documents shall disclose such, free of any restriction imposed by this section, upon competent request therefore by such bodies.

e. Failure to maintain the required confidentiality constitutes a breach of contract.

## §4-07.42 - Subpoenas

Personnel files are confidential [see §4-07.41]. No document in such file will be released by the University to any person without the written consent of the Vice President for Academic Affairs except in response to a final order of a court of competent jurisdiction, or a lawful subpoena duces tecum. The faculty member whose file is the subject of a subpoena duces tecum shall be notified promptly upon receipt of the subpoena, normally on the same day, both by telephone and by certified mail directed to the residence address of the faculty member. The purpose of the prompt notification is to afford the faculty member and his counsel, if any, sufficient time to move to quash the subpoena. In no case will file material which is not specifically subpoenaed be released in response to a subpoena or otherwise. Nothing in this statement of policy shall bar the University, sua sponte, from moving to quash the subpoena.

# Article Six: University Code o
# Conduct

Chapter 1: Rationale for University Discipline

Chapter 2: Jurisdiction

Home   .   About   ⋅   Leadership and Administration   .   Board of Trustees   .   University Statutes   .   Article Six: University Code of Conduct   .   Chapter One: Rationale for University Discipline

# Chapter One: Rationale for University Discipline

## §6-01.01 – Rationale for University Discipline

The reasonableness of university discipline must be judged in its relation to the educational purposes of the university. If those purposes may be described as the pursuit of truth and the advancement of knowledge, university discipline exists to assure a setting wherein those purposes may be achieved.

The educational purposes of the university can best be protected through the clear communication and enforcement of certain standards of behavior judged essential to the achievement of those purposes. What follows is a statement of these standards of behavior developed through the cooperative efforts of the students, faculty, and administrative officers.

# Chapter Two: Jurisdiction

## §6-02.01 – Jurisdiction

Persons: This Code shall apply to every member of the Fordham University community which includes faculty, students, administrative officials, and staff.

When any individual accused of violation of this University Code of Conduct maintains more than one of the above-mentioned statuses in the University, determination of his/her status in a particular situation will be made in the context of the surrounding facts.

Home   About   Leadership and Administration   Board of Trustees   University Statutes
Article Six: University Code of Conduct   Chapter Three: Violations

# Chapter Three: Violations

## §6-03.01 – Violations

The following actions are considered violations of the University Code of Conduct and are punishable by sanctions imposed in accordance with the published judicial procedures of the University:

a. All forms of dishonesty including cheating, plagiarism, supplying false information to any University official, as well as forgery or use of University documents or instruments of identification with intent to defraud.

b. Theft from or damage to University property and/or theft of, or damage to the property of another while located on property of the University. Knowingly receiving, retaining or disposing of the lost or mislaid property of a member of the University community or of the University itself.

c. Unauthorized entry, use or occupation of University facilities as well as the unauthorized possession, duplication or use of keys to University facilities.

d. Tampering with or misusing fire alarms, fire-fighting equipment or safety equipment.

e. Harassment (verbal or other) or physical abuse, threatening or attempting to inflict physical injury, or creating substantial risk of such injury to another member of the Fordham University community or to any person on University premises.

f. The unauthorized selling, purchasing, producing, or possessing of any lethal weapons, explosives, fireworks, or incendiary devices.

g. The unauthorized selling, purchasing, producing, possession or use of barbiturates, amphetamines, marijuana, hallucinogens, opiates, or other addictive and illegal drugs or drug paraphernalia.

h. Engaging in, or inciting others to engage in, conduct which interferes with or disrupts any University function, or which prevents or limits the free expression of ideas by others, or which physically obstructs or threatens to obstruct or restrain other members of the University community or visitors.

i. Failing to surrender upon request by clearly identified University personnel (this includes campus security guards) in the performance of their assigned duties, the University identification card which all members of the University community are required to carry.

j. Engaging in lewd, licentious or disorderly conduct.

k. Failing to comply with the direction of clearly identified University personnel (this includes campus security guards) in the performance of their assigned duties.

l. Violation of published University regulations including but not limited to those regarding motor vehicles, residence halls, and the McGinley Center.

19

Title IX Office

Nondiscrimination

How to Resolve
Discrimination-Based
Conflicts

Pregnancy and Parenting
Resources

File a Sex or Gender
Discrimination
Complaint



File a General
Discrimination
Complaint



Report an incident of
a Hate Crime



# Nondiscrimination

## Notice of University-Wide Nondiscrimination Policy and the Designation of the Title IX Coordinator

Fordham University admits students of any race, color, national and ethnic origin to all the rights, privileges, programs, and activities generally accorded or made available to students at the school. It does not discriminate on the basis of race, color, national and ethnic origin in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs.

Fordham University is an Equal Opportunity Employer committed to the principle of equal opportunity in education and employment in compliance with Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, Title VI and Title VII of the Civil Rights Act of 1964, the Age Discrimination Act of 1975, the Americans with Disabilities Act of 1990, the Violence Against Women Act, and other federal, state, and local laws.

The Title IX Coordinator oversees the University's Title IX compliance efforts and is responsible for coordinating the University's response to all reports on sexual and related misconduct, including sex- or gender-based discrimination involving educational programs, gender equity in athletic programs, employment, and admission. The Title IX Coordinator also collects data from all of the University's Title IX reports to monitor the process, including outcomes, to identify and address any patterns or systemic issues that may arise.

Inquiries concerning the application of Title IX and its implementing regulation may be referred to the University's designated Title IX Coordinator listed below or to the Assistant Secretary of the Office for Civil Rights (OCR), U.S. Department of Education, Lyndon Baines Johnson Department of Education Building, 400 Maryland Avenue SW, Washington, DC 20202-1100. Call the OCR main numbers toll free at 800-421-3481 or 800-877-8339 (TDD). Or contact the OCR's New York office at ocr.newyork@ed.gov or 646-428-3800.

Fordham's Title IX coordinator may be contacted at:
Kareem Peat
Title IX Coordinator
Faculty Memorial Hall Second Floor
Rose Hill Campus
718-817-3112

Academic Integrity Policy

Corporate Credit Cards

Credit Assignment Policy

Drug-Free Campus
Guidelines

Family Educational Rights
and Privacy Act (FERPA)
Policy

HR Policies and Guides

Information Technology
Acceptable Use Policy

Intellectual Property
Policy

Integrity Hotline

Merchant Credit Card
Acceptance Policy

Non-Discrimination Policy

Privacy Policy

Purchasing Manual

Records Retention and
Disposal Policy

Sexual Harassment
Prevention Policy

Sexual and Related
Misconduct Policy and
Procedures

Social Media Policy

Subpoena Policy and
Service of Process

Travel and Expense Policy

University Code of
Conduct

Undergraduate Academic
Integrity Policy

Undergraduate Faculty
Handbook

University Regulations

University Statutes

University Whistleblower
Policy

The following are a list of Fordham University Policies.

University Academic Bulletin

Academic Integrity Policy

Corporate Credit Cards

Credit Assignment Policy

Drug-Free Campus Guidelines

Family Educational Rights and Privacy Act (FERPA) Policy

Human Resources Policies and Guide

Information Technology Acceptable Use Policy

Information Technology Policies, Procedures, and Guidelines

Integrity Hotline

Intellectual Property Policy

Merchant Credit Card Acceptance Policy

Non-Discrimination Policy

Office of Finance Policies and Guidelines

Privacy Policy

Purchasing Manual

Records Retention and Disposal Policy

Sexual Harassment Prevention Policy

Sexual Misconduct Policy and Procedures for the Fordham University Comm

Social Media Policy

Subpoena Policy and Service of Process

Travel and Expense Policy

Policies

istleblower
Policy

# University Whistleblower Policy

Fordham University (the "University") requires its directors, officers, employees, student workers, interns, and volunteers, (as well as all persons who provide the University with contracted services) to observe high standards of business and personal ethics in the performance of their duties on the University's behalf.

The University is committed to protecting individuals from interference when making a "Protected Disclosure" (see definition below) and from retaliation for having made a Protected Disclosure or for having refused to follow an illegal instruction.

The principal objective of this Whistleblower Policy is to encourage and enable University representatives, without the fear of retaliation, to raise concerns regarding suspected unethical and/or illegal conduct or practices on a confidential and, if desired, anonymous basis, so that the University can address and correct inappropriate conduct and actions.

This policy is not intended to be the method for reporting violations of the University's applicable human resources policies, problems with colleagues, co-workers, or supervisors, or for reporting issues related to alleged employment discrimination or sexual or any other form of unlawful harassment, all of which should be handled in accordance with the University's Personnel and Student Conduct Policies. Those policies, found in the University Statutes, the Handbook for Administrators, the most current Collective Bargaining Agreements, and the Student Handbook, are designed to address individual grievances and personal complaints.

The University will exercise its authority to take whatever action may be needed to prevent and correct activities that are found to constitute wrongful conduct.

## Definitions

### A. Wrongful Conduct Concern ("Concern")

A violation of University policies; a violation of applicable local, New York State, and Federal laws; or the use of University property, resources, or authority for personal gain or other non-University-related purposes.

### B. Protected Disclosure

Communication about actual or suspected wrongful conduct engaged in by a University faculty member, staff member, student worker, volunteer, or contractor (who is not also

**B. Protected Disclosure**

Communication about actual or suspected wrongful conduct engaged in by a University faculty member, staff member, student worker, volunteer, or contractor (who is not also the disclosing individual) based on a good faith and reasonable belief that the conduct has both occurred and is wrongful under University policies and/or applicable laws. Individuals who are aware of, or have reason to suspect wrongful conduct should report the conduct promptly.

## Reporting Concerns

Concerns should be reported either verbally or in writing as soon as practicable to any one of the following:

1. The Provost or Vice President to whom the disclosing individual reports;

2. The following offices responsible for institutional compliance:
Office of Internal Audit: 718-817-4074
Office of Legal Counsel: 718-817-5810
Office of Institutional Equity and Compliance: 718-817-3112

3. The EthicsPoint Integrity Hotline: 1-888-278-1501 (toll free)
https://secure.ethicspoint.com/domain/media/en/gui/22342/index.html

## Handling Reporting Concerns

The Provost, Vice Presidents and compliance offices receiving reports shall report them immediately to the Office of Internal Audit which, in consultation with the Office of Legal Counsel, has the responsibility for investigating concerns and issuing reports to the Board Committee on Audit and Risk Management ("Board Committee"). The Board Committee shall forward, as required, reports of all corrective actions to the Executive Committee of the Board of Trustees.

## Investigations

The Office of Internal Audit will attempt to notify the disclosing individual (when identity is known) to acknowledge receipt of the reported concern. All reports will be promptly investigated, and appropriate corrective action will be taken when warranted by the investigation. The Office of Internal Audit shall determine the scope, manner, and parameters of any investigation and report to the Board Committee and appropriate University officers.

## Reporting Responsibility

It is the responsibility of all University representatives to report, in good faith, concerns they may have regarding actual or suspected activities which my be illegal or in violation of the

ethical standards.

## No Retaliation

No University representative who in good faith reports a concern shall suffer intimidation, harassment, retaliation, discrimination, or adverse employment consequences because of such report. Any employee of the University who retaliates against someone who has reported a concern in good faith is subject to discipline up to and including termination of employment.

## Acting in Good Faith

Anyone reporting a concern must act in good faith and have reasonable grounds for believing that the information disclosed may indicate a violation of a law, University policy and/or ethical standards. Any allegations that prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense.

## Confidentiality

The University takes seriously its responsibility to enforce this Policy, and therefore encourages any person reporting a concern to identify him or herself so as to facilitate any resulting investigation. Notwithstanding the foregoing, in reporting a concern, University representatives can request that their report be treated in a confidential manner (including that the University takes reasonable steps to ensure that the identity of the reporting person remains anonymous). Concerns may also be reported on an anonymous basis through the Integrity Hotline using the toll-free number 1-888-278-1501 or https://secure.ethicspoint.com/domain/media/en/gui/22342/index.html.

Concerns will be kept confidential to the extent possible, consistent with the need to conduct a thorough and complete investigation.

## Records

The University will retain on a strictly confidential basis for a period of seven (7) Years (or otherwise as required under the University's Record Retention and Disposal Policies in effect from time to time) all records relating to any reported Concern and to the investigation and resolution thereof. All such records are confidential to the University, and such records will be considered privileged and confidential, subject only to a lawful subpoena or other recognized government authorities.

## Distribution

The University shall inform and provide a copy of this Policy to all University employees, officers, directors, student workers, and all other persons or contractors who provide substantial service to Fordham University.

Home ⌁ Resources ⌁ Policies ⌁ Undergraduate Faculty Handbook ⌁ University Policies

ndergraduate
ty Handbook

University Policies

# University Policies

## 10.3 Affirmative Action Policy*

The University's Affirmative Action Program provides the means to recruit, employ, promote women and other underrepresented minorities in the interest of attaining workplace diversity. The director of institutional equity and compliance is available members of the Fordham community for consultation, training, and development o methods and initiatives that advance a more diversified workforce, and ensure nondiscrimination, access to equal employment opportunities and fair treatment of individuals. It is the responsibility of the director of institutional equity and complian monitor and report regularly on the University's efforts to achieve diversity and con with all laws pertaining to nondiscrimination. In addition, the director of institutional and compliance is a designated contact person for complaints alleging workplace discrimination, including complaints of sexual harassment.

* Due to changing legal guidelines, please refer to the Title IX/Institutional Equity ar Compliance web page at fordham.edu/ title_ix for Fordham's most up-to-date polic nondiscrimination, affirmative action, and sexual harassment. If you do not have web access, please contact the Office of Institutional Equity and Compliance directly for copy.

## Pages in University Policies

- 10.1 Non-Discrimination Policy*
- 10.2 Statement on Academic Rights and Responsibilities
- 10.3 Affirmative Action Policy*
- 10.4 Policy on Sexual Harassment*
- 10.5 Education Records Policy
- 10.6 Services for Students with Disabilities
- 10.7 Weather-Related Cancellations
- 10.8 What To Do In An Emergency: The Emergency Management Plan

FORDHAM UNIVERSITY

☰ MENU

Policies

HR Policies and Guides

Collective Bargaining
Agreements

University Attendance
Policy

University Code of
Conduct

Safe Harbor Policy

Handbook for
Administrators

## Contact Us

Faculty Memorial Hall,
Room 506

Rose Hill Campus

**Tel:** 718-817-4930

**Fax:** 718-817-4929

**Email:** hr@fordham.edu

# Human Resources Policies and Guides

## Reference by Classification

- Collective Bargaining Agreements
- Handbook for Administrators
- University Statutes

## University Policies

- University Attendance Policy
- University Code of Conduct
- Fordham Sexual Harassment Prevention Policy
- Sexual Harassment Complaint Form
- Safe Harbor Policy
- Recruitment Procedures and Internal Posting Policy for Administrative New Hires
- Tuition Remission Policy for Faculty and Administrators
- Independent Contractors Policy and Procedure
- IT Policies
- Additional University Policies

## Workplace Posters

- Equal Employment Opportunity

FORDHAM UNIVERSITY

≡

- Sexual Harassment Complaint Form
- Safe Harbor Policy
- Recruitment Procedures and Internal Posting Policy for Administrative New Hires
- Tuition Remission Policy for Faculty and Administrators
- Independent Contractors Policy and Procedure
- IT Policies
- Additional University Policies

# Workplace Posters

- Equal Employment Opportunity
- Fact Sheet for Nursing Mothers
- Family and Medical Leave Act
- New York City Earned Sick Time Act
- New York Correction Law
- New York State Minimum Wage
- Pregnancy and Employment Rights
- Stop Sexual Harassment Act Notice (English)
- Stop Sexual Harassment Act Notice (Spanish)

# U.S. Legislation

- HIPAA (Health Insurance Portability and Accountability Act of 1996)

# Equal Employment Opportunity is

# THE LAW

Applicants to and employees of most private employers, state and local governments, educational institutions, employment agencies and labor organizations are protected under Federal law from discrimination on the following bases:

## RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN

Title VII of the Civil Rights Act of 1964, as amended, protects applicants and employees from discrimination in hiring, promotion, discharge, pay, fringe benefits, job training, classification, referral, and other aspects of employment, on the basis of race, color, religion, sex (including pregnancy), or national origin. Religious discrimination includes failing to reasonably accommodate an employee's religious practices where the accommodation does not impose undue hardship.

## DISABILITY

Title I and Title V of the Americans with Disabilities Act of 1990, as amended, protect qualified individuals from discrimination on the basis of disability in hiring, promotion, discharge, pay, fringe benefits, job training, classification, referral, and other aspects of employment. Disability discrimination includes not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, barring undue hardship.

## AGE

The Age Discrimination in Employment Act of 1967, as amended, protects applicants and employees 40 years of age or older from discrimination based on age in hiring, promotion, discharge, pay, fringe benefits, job training, classification, referral, and other aspects of employment.

## SEX (WAGES)

In addition to sex discrimination prohibited by Title VII of the Civil Rights Act, as amended, the Equal Pay Act of 1963, as amended, prohibits sex discrimination in the payment of wages to women and men performing substantially equal work, in jobs that require equal skill, effort, and responsibility, under similar working conditions, in the same establishment.

## GENETICS

Title II of the Genetic Information Nondiscrimination Act of 2008 protects applicants and employees from discrimination based on genetic information in hiring, promotion, discharge, pay, fringe benefits, job training, classification, referral, and other aspects of employment. GINA also restricts employers' acquisition of genetic information and strictly limits disclosure of genetic information. Genetic information includes information about genetic tests of applicants, employees, or their family members; the manifestation of diseases or disorders in family members (family medical history); and requests for or receipt of genetic services by applicants, employees, or their family members.

## RETALIATION

All of these Federal laws prohibit covered entities from retaliating against a person who files a charge of discrimination, participates in a discrimination proceeding, or otherwise opposes an unlawful employment practice.

## WHAT TO DO IF YOU BELIEVE DISCRIMINATION HAS OCCURRED

There are strict time limits for filing charges of employment discrimination. To preserve the ability of EEOC to act on your behalf and to protect your right to file a private lawsuit, should you ultimately need to, you should contact EEOC promptly when discrimination is suspected:

The U.S. Equal Employment Opportunity Commission (EEOC), 1-800-669-4000 (toll-free) or 1-800-669-6820 (toll-free TTY number for individuals with hearing impairments). EEOC field office information is available at www.eeoc.gov or in most telephone directories in the U.S. Government or Federal Government section. Additional information about EEOC, including information about charge filing, is available at www.eeoc.gov.

# EMPLOYEE RIGHTS
## UNDER THE FAMILY AND MEDICAL LEAVE ACT

THE UNITED STATES DEPARTMENT OF LABOR WAGE AND HOUR DIVISION

**LEAVE ENTITLEMENTS**

Eligible employees who work for a covered employer can take up to 12 weeks of unpaid, job-protected leave in a 12-month period for the following reasons:

- The birth of a child or placement of a child for adoption or foster care;
- To bond with a child (leave must be taken within one year of the child's birth or placement);
- To care for the employee's spouse, child, or parent who has a qualifying serious health condition;
- For the employee's own qualifying serious health condition that makes the employee unable to perform the employee's job;
- For qualifying exigencies related to the foreign deployment of a military member who is the employee's spouse, child, or parent.

An eligible employee who is a covered servicemember's spouse, child, parent, or next of kin may also take up to 26 weeks of FMLA leave in a single 12-month period to care for the servicemember with a serious injury or illness.

An employee does not need to use leave in one block. When it is medically necessary or otherwise permitted, employees may take leave intermittently or on a reduced schedule.

Employees may choose, or an employer may require, use of accrued paid leave while taking FMLA leave. If an employee substitutes accrued paid leave for FMLA leave, the employee must comply with the employer's normal paid leave policies.

**BENEFITS & PROTECTIONS**

While employees are on FMLA leave, employers must continue health insurance coverage as if the employees were not on leave.

Upon return from FMLA leave, most employees must be restored to the same job or one nearly identical to it with equivalent pay, benefits, and other employment terms and conditions.

An employer may not interfere with an individual's FMLA rights or retaliate against someone for using or trying to use FMLA leave, opposing any practice made unlawful by the FMLA, or being involved in any proceeding under or related to the FMLA.

**ELIGIBILITY REQUIREMENTS**

An employee who works for a covered employer must meet three criteria in order to be eligible for FMLA leave. The employee must:

- Have worked for the employer for at least 12 months;
- Have at least 1,250 hours of service in the 12 months before taking leave;* and
- Work at a location where the employer has at least 50 employees within 75 miles of the employee's worksite.

*Special "hours of service" requirements apply to airline flight crew employees.

**REQUESTING LEAVE**

Generally, employees must give 30-days' advance notice of the need for FMLA leave. If it is not possible to give 30-days' notice, an employee must notify the employer as soon as possible and, generally, follow the employer's usual procedures.

Employees do not have to share a medical diagnosis, but must provide enough information to the employer so it can determine if the leave qualifies for FMLA protection. Sufficient information could include informing an employer that the employee is or will be unable to perform his or her job functions, that a family member cannot perform daily activities, or that hospitalization or

# FORDHAM UNIVERSITY
## THE JESUIT UNIVERSITY OF NEW YORK

Date: October 9, 2018

# Fordham University Sexual Harassment in Employment Prevention Policy

## Introduction

Fordham University is committed to maintaining a workplace free from sexual harassment. Sexual harassment is a form of workplace discrimination. All employees are required to work in a manner that prevents sexual harassment in the workplace. This Policy is one component of Fordham University's commitment to a discrimination-free work environment. Sexual harassment is against the law[1] and all employees have a legal right to a workplace free from sexual harassment and employees are urged to report sexual harassment by filing a complaint internally with Fordham University. Employees can also file a complaint with a government agency or in court under federal, state or local antidiscrimination laws.

All reports of sexual misconduct, including reports of sexual harassment, made against an individual in their capacity as a student are governed by the *Sexual Misconduct Policy and Procedures for the Fordham University Community*, which can be found on the Fordham website at:
*https://www.fordham.edu/download/downloads/id/11374/Sexual_Misconduct_Policy_and_Proc edure__Updated_8.24.18_.pdf*

## Policy:

1. This policy applies to all employees, applicants for employment, interns, whether paid or unpaid, contractors and persons conducting business, regardless of immigration status, with Fordham University. In the remainder of this document, the term "employees" refers to this collective group.

2. Sexual harassment will not be tolerated. Any employee or individual covered by this policy who engages in sexual harassment or retaliation will be subject to remedial and/or disciplinary action (e.g., counseling, suspension, termination).

3. Retaliation Prohibition: No person covered by this Policy shall be subject to adverse action because the employee reports an incident of sexual harassment, provides information, or

---

[1] While this policy specifically addresses sexual harassment, harassment because of and discrimination against persons of all protected classes is prohibited. In New York State, such classes include age, race, creed, color, national origin, sexual orientation, military status, sex, disability, marital status, domestic violence victim status, gender identity and criminal history.

- Sex stereotyping occurs when conduct or personality traits are considered inappropriate simply because they may not conform to other people's ideas or perceptions about how individuals of a particular sex should act or look.

- Sexual or discriminatory displays or publications anywhere in the workplace, such as:
  o Displaying pictures, posters, calendars, graffiti, objects, promotional material, reading materials or other materials that are sexually demeaning or pornographic. This includes such sexual displays on workplace computers or cell phones and sharing such displays while in the workplace.

- Hostile actions taken against an individual because of that individual's sex, sexual orientation, gender identity and the status of being transgender, such as:
  o Interfering with, destroying or damaging a person's workstation, tools or equipment, or otherwise interfering with the individual's ability to perform the job;
  o Sabotaging an individual's work;
  o Bullying, yelling, name-calling.
  o

## Who can be a target of sexual harassment?

Sexual harassment can occur between any individuals, regardless of their sex or gender. New York Law protects employees, paid or unpaid interns, and non-employees, including independent contractors, and those employed by companies contracting to provide services in the workplace. Harassers can be a superior, a subordinate, a coworker or anyone in the workplace including an independent contractor, contract worker, vendor, client, customer or visitor.

## Where can sexual harassment occur?

Unlawful sexual harassment is not limited to the physical workplace itself. It can occur while employees are traveling for business or at employer sponsored events or parties. Calls, texts, emails, and social media usage by employees can constitute unlawful workplace harassment, even if they occur away from the workplace premises, on personal devices or during non-work hours.

## Retaliation

Unlawful retaliation can be any action that could discourage a worker from coming forward to make or support a sexual harassment claim. Adverse action need not be job-related or occur in the workplace to constitute unlawful retaliation (e.g., threats of physical violence outside of work hours).

Such retaliation is unlawful under federal, state, and (where applicable) local law. The New York State Human Rights Law protects any individual who has engaged in "protected activity." Protected activity occurs when a person has:

- made a complaint of sexual harassment, either internally or with any anti-discrimination agency;

- testified or assisted in a proceeding involving sexual harassment under the Human Rights Law or other anti-discrimination law;

- Promptly notify the individual who reported and the individual(s) about whom the complaint was made of the final determination and implement any corrective actions identified in the written document.

- Inform the individual who reported of the right to file a complaint or charge externally as outlined in the next section.

## Legal Protections And External Remedies

Sexual harassment is not only prohibited by Fordham University but is also prohibited by state, federal, and, where applicable, local law.

Aside from the internal process at Fordham University, employees may also choose to pursue legal remedies with the following governmental entities. While a private attorney is not required to file a complaint with a governmental agency, you may seek the legal advice of an attorney.

### State Human Rights Law (HRL)

The Human Rights Law (HRL), codified as N.Y. Executive Law, art. 15, § 290 et seq., applies to all employers in New York State with regard to sexual harassment, and protects employees, paid or unpaid interns and non-employees, regardless of immigration status. A complaint alleging violation of the Human Rights Law may be filed either with the Division of Human Rights (DHR) or in New York State Supreme Court.

Complaints with DHR may be filed any time **within one year** of the harassment. If an individual did not file at DHR, they can sue directly in state court under the HRL, **within three years** of the alleged sexual harassment. An individual may not file with DHR if they have already filed a HRL complaint in state court.

Complaining internally to Fordham University does not extend your time to file with DHR or in court. The one year or three years is counted from date of the most recent incident of harassment.

You do not need an attorney to file a complaint with DHR, and there is no cost to file with DHR.

DHR will investigate your complaint and determine whether there is probable cause to believe that sexual harassment has occurred. Probable cause cases are forwarded to a public hearing before an administrative law judge. If sexual harassment is found after a hearing, DHR has the power to award relief, which varies but may include requiring your employer to take action to stop the harassment, or redress the damage caused, including paying of monetary damages, attorney's fees and civil fines.

DHR's main office contact information is: NYS Division of Human Rights, One Fordham Plaza, Fourth Floor, Bronx, New York 10458. You may call (718) 741-8400 or visit: www.dhr.ny.gov.

Contact DHR at (888) 392-3644 or visit dhr.ny.gov/complaint for more information about filing a complaint. The website has a complaint form that can be downloaded, filled out, notarized and mailed

to DHR. The website also contains contact information for DHR's regional offices across New York State.

## Civil Rights Act of 1964

The United States Equal Employment Opportunity Commission (EEOC) enforces federal anti-discrimination laws, including Title VII of the 1964 federal Civil Rights Act (codified as 42 U.S.C. § 2000e et seq.). An individual can file a complaint with the EEOC anytime within 300 days from the harassment. There is no cost to file a complaint with the EEOC. The EEOC will investigate the complaint, and determine whether there is reasonable cause to believe that discrimination has occurred, at which point the EEOC will issue a Right to Sue letter permitting the individual to file a complaint in federal court.

The EEOC does not hold hearings or award relief, but may take other action including pursuing cases in federal court on behalf of complaining parties. Federal courts may award remedies if discrimination is found to have occurred. In general, private employers must have at least 15 employees to come within the jurisdiction of the EEOC.

An employee alleging discrimination at work can file a "Charge of Discrimination." The EEOC has district, area, and field offices where complaints can be filed. Contact the EEOC by calling 1-800-669-4000 (TTY: 1-800-669-6820), visiting their website at www.eeoc.gov or via email at info@eeoc.gov.

If an individual filed an administrative complaint with DHR, DHR will file the complaint with the EEOC to preserve the right to proceed in federal court.

## Local Protections

Fordham University employees who work in New York City may file complaints of sexual harassment, including complaints of discriminatory harassment based on gender, with the New York City Commission on Human Rights. Contact their main office at Law Enforcement Bureau of the NYC Commission on Human Rights, 40 Rector Street, 10th Floor, New York, New York; call 311 or (212) 306-7450; or visit www.nyc.gov/html/cchr/html/home/home.shtml.

## Contact the Local Police Department

If the harassment involves unwanted physical touching, coerced physical confinement or coerced sex acts, the conduct may constitute a crime. Contact the local police department.

Approved by:

*Elaine Crosser /BF*

Elaine Crosson,
Fordham University Legal Counsel

Date:

10/9/18

20

**Dec 18, 2017 email from Dr. Solomon to Ms. Coleman**

**A**

**Fordham EEOC Complaint – First email Dec 18, 2017**
from Dr. Solomon to Ms. Coleman

 FORDHAM

ESTHER Solomon <esolomon@fordham.edu>

## EEOC Complaint
3 messages

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>        Mon, Dec 18, 2017 at
                                                                                   2:56 PM
To: acoleman11@fordham.edu, TitleIX@fordham.edu
Cc: Elaine Crosson <ecrosson@fordham.edu>

Dear. Ms. Coleman,

Following my earlier contacts with you, I am asking you as the EEOC officer to inform me about the Fordham
EEOC department investigation on my ongoing complains regarding retaliation and discrimination against me
which I have repeatedly addressed to Provost Freedman and Dean Rapaccioli.

Recently, in my October 27, 2017 letter which I sent to Provost Freedman, Dean Rapaccioli, Dr. Crystal, and
Vice President Dr. Fahey-Smith, I raised specific issues regarding ongoing retaliation and discrimination, as
follows:

> "The very negative effects lasted long after, and the pattern of actions by members of Fordham
> University against me have continued and escalated. I am being precluded from all administrative or
> quasi-managerial tasks at the Business School, discriminated in receiving credit or rewards for my
> significant contributions, precluded from appropriate leadership and teaching opportunities
> particularly in the graduate MBA, MS, MA, and PhD programs of the Business School, have had
> severe extraordinary actions taken against me for performing my duties as a Business School Senator,
> and am being marginalized to this very day. It does not appear appropriate that senior Fordham
> Administrators turn a blind eye to these ongoing actions.
> Neither has the reason for my abrupt removal from my Area Chair position, to which I was appointed
> in full compliance with the University Statutes, ever been explained to me, or to the Management
> Area faculty at the Department Chair Termination Hearing".

Provost Freedman has previously reiterated the University obligation to investigate discrimination and
retaliation complains, when he wrote as follows:
> "In your email, you have indicated that you have been subject to a hostile work environment and
> have been treated 'unequally'. The University has an obligation, under the law, to investigate such
> claims. I am referring the matter to the University's Counsel, Elaine Crosson for review".

Dr. Freedman and Dean Rapaccioli are also aware of the retaliatory and discriminatory course assignment
given to meregarding Spring 2018, with subsequent unfair cancelations, and continuously changing to the
worse. The three attachments below includet recent correspondence.

Please let me know as soon as possible regarding your investigation and results in response to my October 27,
2017 complaint to Provost Freedman regarding ongoing and escalating retaliation and discrimination against
me. Also please let me know how you plan to address and rectify the recent scheduling issues.

Thank you and best regards,

Esther Solomon
Associate Professor

**Fordham EEOC Complaint – First email Dec 18, 2017**
from Dr. Solomon to Ms. Coleman

Gabelli School of Business

Cc Elaine Crosson Esq.

**3 attachments**

 **Spring 2018 Correspondence Nov 30 2017.pdf**
149K

 **Spring 2018 Course Correspondence Dec 1, 2017.pdf**
89K

 **Spring 2018 Course Correspondence Dec 11, 2017.pdf**
205K

 FORDHAM

## Spring 2018
4 messages

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>

Thu, Nov 30,
2017 at 2:51
PM

To: "Michael Pirson [Staff/Faculty [BUS]]" <pirson@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, "DAWN Lerman [Staff-Faculty [GBA]]"
<lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]" <aksoy@fordham.edu>, "STEPHEN
Freedman [Staff/Faculty]" <sfreedman@fordham.edu>

Dear Michael,

After your lecture on Humanism yesterday, I asked again if you would reconsider my Spring 2018
schedule. I also asked to allow the removal of the prerequisite, which is blocking students from
enrolling to my Leadership & Change MGGB 7610 class scheduled for 8-10 pm. In addition to
refusing removal of the prerequisite, you told me:

> "Either you will teach in the Bronx, or you do not teach at all."

Regarding the Bronx schedule, this is to kindly request that you not change the schedule you
announced to me on September 26. When you wrote to me on September 26th regarding the Spring
2018 schedule at Rosehill, you included the 2 undergraduate Core Management courses listed below:

> Tuesday: 8:30- 945am  and  10-11:15am

> Friday:  8:30-9:45am  and  10-11:15am

These are sections RXZ and RXY. That email was copied to the deans, which I also found unusual
regarding a schedule assignment.

As I discovered by accident, that schedule was changed to a new schedule, which is even more
inconvenient than the official September 26 schedule copied above.

The 8:30am class was changed, without my knowledge, to a double session on Tuesdays from 2:30-
5:15pm, instead of a somehow balanced back to back Tuesdays and Fridays.

This is particularly inconvenient for me, because, rather than having back to back classes, I will have
to wait hours between. Additionally, I do not have an office at Rosehill. My office for the last 34 years
has been at the Lincoln Center campus.

Something else was very unusual. When I spoke with Roseanne Conte yesterday, she indicated that
she would not tell me who was now scheduled to teaching the 8:30am section, and was adamant that
she was not permitted to tell me. Please tell me who is teaching that 8:30 am course and why Ms.
Conte was forbidden from giving me this information.

Please kindly restore the original schedule of 8:30-11:15am for both Tuesday and Friday.

Spring 2018 Correspondence Nov 30 2017

Thanks,

Esther

_____

Michael Pirson <pirson@fordham.edu>        Tue, Sep 26, 2017 at 1:42 PM

To: "ESTHER E. SOLOMON"< esolomon@fordham.edu>, "DAWN Lerman [Staff-Faculty [GBA]]"< lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]"< aksoy@fordham.edu>

Cc: Donna Rapaccioli <rapaccioli@fordham.edu>

Dear Esther,

You are currently scheduled for these 2 classes, and in case you come back you would need to be scheduled for another Graduate class..

Please let me know what your plan is.

Thanks and best,

Michael

---------- Forwarded message ----------
From: Rosanne Conte <rconte@fordham.edu>
Date: Tue, Sep 26, 2017 at 1:13 PM
Subject: GSB Spring 18
To: Michael Pirson <pirson@fordham.edu>

| MGBU-3223 | PRINCIPLES OF MANAGEMENT | RXY | CB | 33003 | TF | 10:00AM - 11:15AM | Solomon, Esther E | TBA | 3.000 | 35 | 0 | 3! |
| MGBU-3223 | PRINCIPLES OF MANAGEMENT | RXZ | CB | 33004 | TF | 08:30AM - 09:45AM | Solomon, Esther E | TBA | 3.000 | 35 | | |

Rosanne Conte
Director of Course Scheduling
Gabelli School of Business
Hughes Hall Room 413
441 East Fordham Road
Bronx, NY 10458
718-817-4112 work
347-366-3012 cell
fax 718-817-5708
rconte@fordham.edu
--
**Michael Pirson**

Sign up for updates from the International Humanistic Management Association:

Spring 2018 Correspondence Nov 30 2017

http://eepurl.com/cTbBxL

---

**ESTHER Solomon [Staff/Faculty [Business]]< esolomon@fordham.edu>**   Wed, Sep 27, 2017 at 7:15 PM
To: Michael Pirson <pirson@fordham.edu>
Cc: "DAWN Lerman [Staff-Faculty [GBA]]"< lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]"< aksoy@fordham.edu>, Donna Rapaccioli <rapaccioli@fordham.edu>, "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>

Dear Michael,

I was very surprised by the opening statement in your email yesterday, in which you question whether I am coming back to Fordham for Spring 2018.

On the day before your email, I wrote to you asking what courses I would be teaching for Spring 2018.  Have I ever given you any indication that I would not be coming back?

Thanks,

Esther

---

**Michael Pirson <pirson@fordham.edu>**                         Thu, Nov 30, 2017 at 4:05 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, "DAWN Lerman [Staff-Faculty [GBA]]" <lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]" <aksoy@fordham.edu>, "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>

Dear Esther, et al.

I am happy to restore the original schedule. I wrongfully assumed having most of the teaching on Tuesday would be easier for you, so I had tried to accommodate for a wrong reason.

I have tried to get feedback from others on the removal of a prerequisite. There was no consensus in the area, and you may be right that you can decide by yourself. I am still waiting to hear back on that matter.

On the other hand I had suggested you prepare and send some information on your GBA course so we could help increase enrollment. You did not do that, which is fine.

Also, I would ask you very kindly to not misquote me, especially when cc'ing a number of other decision makers.

Best regards,
Michael

[Quoted text hidden]

Spring 2018 Correspondence Nov 30 2017

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>     Thu, Nov 30, 2017 at 4:40 PM
To: Michael Pirson <pirson@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, "DAWN Lerman [Staff-Faculty [GBA]]"
<lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]" <aksoy@fordham.edu>, "STEPHEN
Freedman [Staff/Faculty]" <sfreedman@fordham.edu>

Dear Michael,

Thank you for your reply.

1. As I asked you previously, if you could kindly provide a list of students so I could send an ad, or tell me
whom to ask about it, I will be happy to send information on the GBA course right away. However, as I
previously told you, during the previous month, if we do not remove the prerequisites, the ad will be
useless since students cannot enroll. So please kindly let me know as soon as possible, because it is getting
really late.

2. I am afraid I quoted you precisely, and your statement yesterday was very hard for me to hear, in response
to my request to you for consideration.

Thank you and best regards,

Esther

[Quoted text hidden]

---

**Michael Pirson** <pirson@fordham.edu>     Thu, Nov 30, 2017 at 4:48 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, "DAWN Lerman [Staff-Faculty [GBA]]"
<lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]" <aksoy@fordham.edu>, "STEPHEN
Freedman [Staff/Faculty]" <sfreedman@fordham.edu>, "JONATHAN Crystal [Staff/Faculty]"
<crystal@fordham.edu>

Dear Esther,

I will consult with Legal Council right away.

Thanks and best,
Michael
[Quoted text hidden]

Attachment 2 to Dec 18, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

Spring 2018 Correspondence Dec 1, 2017

 FORDHAM

## Esther Solomon teaching update
1 message

**Michael Pirson** <pirson@fordham.edu>                                Fri, Dec 1, 2017 at 10:01 PM
To: "ESTHER E. SOLOMON" <esolomon@fordham.edu>
Cc: "DAWN Lerman [Staff-Faculty [GBA]]" <lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]"
<aksoy@fordham.edu>

Esther,

1. The dean's office confirmed you owe the school 2 courses
2. The dean's office asks me to cancel your leadership and change class
3. The MBA program might offer you the opportunity to teach 1 extra section of fundamentals of management
4. As agreed for spring 2018  you are  scheduled to teach 2 pom undergraduate core classes.

Regards,
MP

Attachment 3 to Dec 18, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

Spring 2018 Course Correspondence Dec 11, 2017

 FORDHAM

## Follow Up S 18
4 messages

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>

Mon, Dec 11, 2017 at 4:25 PM

To: "Michael Pirson [Staff/Faculty [BUS]]" <pirson@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, "DAWN Lerman [Staff-Faculty [GBA]]"
<lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]" <aksoy@fordham.edu>

Hi Michael,

On November 30, in response to my inquiry regarding changes to the Bronx schedule
assigned to me in your September 26 email (below), you wrote to me that you would
restore the Bronx schedule to the original 8.30-9.45 TF and 10:00 am - 11:15 TF section ,
(rather than the 8.30-9.45 and 10:00 am TF 2:30 pm - 5:15 pm).

I have waited, but it has not been changed in my official schedule.
Please let me know when the change will occur.
Thanks,

Esther

---

Michael Pirson <pirson@fordham.edu>          Tue, Sep 26, 2017 at 1:42 PM

To: "ESTHER E. SOLOMON"< esolomon@fordham.edu>, "DAWN Lerman [Staff-
Faculty [GBA]]"< lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]"<
aksoy@fordham.edu> Cc: Donna Rapaccioli <rapaccioli@fordham.edu>

Dear Esther,

You are currently scheduled for these 2 classes, and in case you come back you
would need to be scheduled for another Graduate class.

Please let me know what your plan is.

Thanks and best,

Michael

---------- Forwarded message ---------

Spring 2018 Course Correspondence Dec 11, 2017

From: Rosanne Conte <rconte@fordham.edu>
Date: Tue, Sep 26, 2017 at 1:13 PM
Subject: GSB Spring 18
To: Michael Pirson <pirson@fordham.edu

| MGBU-3223 | PRINCIPLES OF MANAGEMENT | RXY | CB | 33003 | TF | 10:00AM - 11:15AM | Solomon, Esther E | TBA | 3.000 | 35 | 0 | 3! |
| MGBU-3223 | PRINCIPLES OF MANAGEMENT | RXZ | CB | 33004 | TF | 08:30AM - 09:45AM | Solomon, Esther E | TBA | 3.000 | 35 | | |

Rosanne Conte

Director of Course Scheduling
Gabelli School of Business
Hughes Hall Room 413
441 East Fordham Road
Bronx, NY 10458
718-817-4112 work
347-366-3012 cell
fax 718-817-5708
rconte@fordham.edu--

Michael Pirson

Sign up for updates from the International Humanistic Management Association:

http://eepurl.com/cTbBxL

**Michael Pirson** <pirson@fordham.edu>                              Mon, Dec 11, 2017 at 4:53 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, "DAWN Lerman [Staff-Faculty [GBA]]"
<lerman@fordham.edu>, "Lerzan Aksoy [Staff-Faculty [BUS]]" <aksoy@fordham.edu>

Dear Esther,

As you were initially very concerned about the 8:30 class schedule I had tried to arrange a better
schedule starting at 10.. In the meantime we needed to schedule someone else to take on the 8:30 to
9:45 section. Jim Teague who has agreed to teach it  now has scheduling issues as he arranged his
schedule around the class.

He told me you spoke already.

Best,
Michael

[Quoted text hidden]
--
Michael Pirson

Spring 2018 Course Correspondence Dec 11, 2017

Sign up for updates from the International Humanistic Management Association:
http://eepurl.com/cTbBxL

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>    Mon, Dec 11, 2017 at 7:21 PM

To: Michael Pirson <pirson@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, "DAWN Lerman [Staff-Faculty [GBA]]"
<lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]" <aksoy@fordham.edu>

[Quoted text hidden]

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>    Mon, Dec 11, 2017 at 9:14 PM

To: Michael Pirson <pirson@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, "DAWN Lerman [Staff-Faculty [GBA]]"
<lerman@fordham.edu>, "Lerzan Aksoy [Staff/Faculty [BUS]]" <aksoy@fordham.edu>

Hi Michael,

On Tue, September 26, 2017 you wrote to me regarding my official schedule, with copies to
Deans Rapaccioli, Lerman, and Aksoy, as follows:

> "You are currently scheduled for these 2 classes, and in case you come back you
> would need to be scheduled for another Graduate class
> Please let me know what your plan is."

The schedule you gave me on September 26, forwarded from Ms. Conte, is as follows:

| MGBU-3223 | PRINCIPLES OF MANAGEMENT | RXY | CB | 33003 | TF | 10:00AM - 11:15AM | Solomon, Esther E | TBA | 3.000 |
| MGBU-3223 | PRINCIPLES OF MANAGEMENT | RXZ | CB | 33004 | TF | 08:30AM - 09:45AM | Solomon, Esther E | TBA | 3.000 |

Since that day, September 26, 2017 I was never informed and never agreed to any change in
that undergraduate Bronx schedule you had given me.

My entire email of October 30th to you and all the Deans, whom you had originally copied,
was asking you to change it back, because I never agreed to your changing it.

You wrote back to me on October 30th:
> I am happy to restore the original schedule. I wrongfully assumed having most of the
> teaching on Tuesday would be easier for you, so I had tried to accommodate for a
> wrong reason.

Now, you tell me you will not do what you had committed to, either in the September 26 or
in your October 30th emails.

Spring 2018 Course Correspondence Dec 11, 2017

The reason I called Dr. Teague today is because the scheduling manager, Ms. Roseanne Conte, told me when I was at the Bronx last Wednesday that you were waiting for him to accept the change back to the original, before she could enter me back at the 8.30 time slot. Dr. Teague told me on the phone that Dr. Julita Haber and Dr. Larry King had given him the 8.30 teaching assignment, and since he teaches only one class he wants to come early from Westchester and be done teaching by 9.30. He informed me in our conversation that he is an ordained priest, and that he prefers the 8.30 time slot.

It seems that the commitments made to me regarding my schedule are being changed on an ongoing basis without my knowledge or consent. The changes are to accommodate preferences of others, disregarding my minimal request regarding the undergraduate Bronx schedule and creating further hardship for me. Since September 26, and again since October 30, apparently changes are being made to subsequently further disadvantage me, a female senior tenured faculty member, to accommodate a male, who is not even a faculty member of our Department at the Business school.

I have now been assigned 3 classes, in 2 campuses at the Bronx and Manhattan, on a 3-day schedule, at most inconvenient times and a scheduling pattern that I have not heard of in all my 34 years at the Gabelli Business School.

Once again, I urge you to reconsider.

Thanks,

Esther

[Quoted text hidden]

**Dec 20, 2017 email from Ms. Coleman to     Dr. Solomon to** 

**Reply by Fordham Officer on Dec 20 to EEOC Complaint - First email of Dec 18, 2017**
from Ms. Coleman to Dr. Solomon

**Anastasia Coleman** <acoleman11@fordham.edu>

Wed, Dec 20, 2017 at 4:00 PM

To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Elaine Crosson <ecrosson@fordham.edu>

Dear Prof. Solomon,

I am receipt of your email to me dated December 18, 2017. I have reviewed my files, emails and voicemail and have no previous contact with you for filing a discrimination and retaliation allegation with me. Stephen Freeman is not in the office this week and I do not have a copy of the letter that you reference in your email to me that you that you had sent to him on October 27th. Jonathan Crystal has provided me with an email dated Oct. 27th that was addressed to Jonathan and it is unclear if this is the letter that you refer to in your email to me. Please send me a copy of the letter to review.

I have reviewed the attachments you provided to me regarding your course assignments and scheduling for Spring 2018 teaching courses. It is not clear from the emails as to what basis you are alleging you have been discriminated against and what action has happened that has caused you to allege retaliation in the course assignment for spring 2018. Could you please clarify this for me?

I am very willing to investigate further but will need these clarifications from you. Please let me know as I look forward to hearing from you.

Thank you,
Anastasia

Anastasia Coleman
Director of Institutional Equity & Compliance
Title IX Coordinator / 504 Officer
Fordham University
441 East Fordham Road
Cunniffe House, Room 114
Bronx, New York 10458
Telephone: (718) 817 - 3112
Fax: (718) 817-3115
acoleman11@fordham.edu
Stay Connected:



[Quoted text hidden]

**Dec 21, 2017 email from Dr. Solomon to Ms. Coleman**

C

**Fordham EEOC Complaint – Second email Dec 21, 2017**
from Dr. Solomon to Ms. Coleman

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>
To: Anastasia Coleman <acoleman11@fordham.edu>

Thu, Dec 21, 2017 at
5:55 PM

Dear Ms. Coleman,

I personally spoke with you in 2014, when I contacted you by telephone to register a concern, and it was referenced in several letters in 2014. My colleague Professor Klotz registered complaints with you as the EEOC officer regarding the 2016 actions directed against both of us as the two female Business School Senators. My name appears in Dr. Klotz's extensive correspondence, and the issues were discussed in meetings you had together and with the Provost in 2016. Attached below are examples of correspondence in some of which you were copied, with my name referenced.

In my December 18 email I asked you for the results of the EEOC investigation that Provost Freedman should have launched based on my ongoing complains regarding retaliation and discrimination against me.

Since I only wrote one letter on October 27, 2017 addressed to Dr. Jonathan Crystal (at the Provost's request) with copies sent to Provost Freedman, Dean Rapaccioli, and Vice President Dr. Fahey-Smith, the email Jonathan gave you should contain the quoted paragraph in page 4 of the letter (attached to the 1-line email). If it does not, please send me what Jonathan gave you, so I can review it to resolve your question.

Attached below is the latest correspondence regarding the most recent actions of retaliation against me.

Please let me know what was the process and outcome of your EEOC investigation regarding that 2016 matter.

[Quoted text hidden]
[Quoted text hidden]

**3 attachments**

 **To  Wharton Chatterjee 2016.docx**
28K

 **Gabelli Concerns Feb 2016.docx**
27K

 **Code of Conduct.docx**
105K

**Attachment  1 – To  Wharton Chatterjee 2016**
Attachment 1 to Dec 21, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

**Dorothy Klotz** <dorothy.klotz@gmail.com>                    Fri, Feb 5, 2016 at 3:15 AM
To: "Sris Chatterjee [Business]" <chatterjee@fordham.edu>
Cc: Anne Fernald <fernald@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck" <hornbeck@fordham.edu>,
"DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, Jennie Park-Taylor <parktaylor@fordham.edu>, "ESTHER
Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>, "Martin Chase [Staff/Faculty
[A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>, Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer
[Staff/Faculty [GSS]]" <farmer@fordham.edu>, Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt
<gogwilt@fordham.edu>, Richard Gyug <gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "JUDITH Jones
[Staff/Faculty [GSAS]]" <jujones@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]" <ekeller@fordham.edu>, Michelle McGee
<mmcgee@fordham.edu>, Harry Nasuti <nasuti@fordham.edu>, Henry Schwalbenberg <schwalbenber@fordham.edu>, Grace
Vernon <vernon@fordham.edu>, Elaine Crosson <ecrosson@fordham.edu>, Anastasia Coleman <acoleman11@fordham.edu>

Professor Chatterjee and Professor Wharton;

I am very dismayed you have been misrepresenting your role.   It is true you are two of the elected
members of the Gabelli Joint Council's Executive Committee.  However, there are three other
members, including the Dean who is the chairperson (see attached Gabelli Joint Council
ByLaws).  I would also like to draw your attention to the Section II of the Gabelli Joint Council ByLaws
which state the Joint Council's powers and objectives, in particular the second item.

> "To be responsible for the academic policies of GSBA and GBA in accordance with
> University Statutes and subject to review by the Board of Trustees."

Professor Solomon asked Provost Freedman during the November senate meeting whether he was
aware of the process followed in developing the PMBA program.  She raised specific concerns that
the process was in violation of the University Statutes (see attached minutes).  It is Professor
Solomon responsibility as a faculty member and a Senator to make sure that academic polices are in
accordance with the University Statutes.

I would also like to make clear that the purpose of the Faculty Senate is to promote the best interests
of Fordham University (see attached Constitution and ByLaws of the Faculty Senate).  The schools of
business do elect three members, but a Senator's role is not as you claim to represent the interests of
an individual school; a senator's role is to promote the best interest of Fordham University.  I am sure
you'll agree that adherence to the University Statutes is in the best interest of Fordham University.

The factual inaccuracies in your accounts of events and lack of full disclosure are inexcusable.  You
indicate in the attached Memo #1 that Professor Saharia aptly refuted the baseless accusation from
Senator Klotz and Solomon in his email dated November, 16.  Please note that I did not even
address the issue until the December senate meeting.  You also failed to mention that I sent to all
Senators on 12/17/16 in response to Professor Saharia's email.  The contents of that same email
were discussed the previous week at the Executive Committee Meeting with the provost on
12/8/16.  The provost requested at that meeting that I provide written documentation with respect to
all my assertions on curriculum, which I did on 12/11/16.  Since there was an ensuing meeting
between the provost, dean and senate president to discuss the matter, for you to assert that the
concerns I have expressed about governance issues in Gabelli are baseless accusations is a true
material misrepresentation.  I would also like to point out that you did not seek clarification on these
matters from me or from Professor Solomon at any time before or after you sent out an invitation to
faculty on 1/25/16 for an ad hoc meeting of select Gabelli faculty.

I have copied the University Council on this email and am requesting that she stop this public
retaliation, defamation and harassment of myself and Professor Solomon by you and Professor
Wharton.

**Attachment 1 – To Wharton Chatterjee 2016**
Attachment 1 to Dec 21, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

Dorothy

[Quoted text hidden]

**3 attachments**

**Schools of Business Bylaws 4 17 2013.docx**
25K

**Approved Nov Senate Minutes.pdf**
295K

**Senate Constitution and ByLaws.pdf**
126K

---

**Sris Chatterjee [Business]** <chatterjee@fordham.edu>                        Fri, Feb 5, 2016 at 6:59 AM
To: Dorothy Klotz <dorothy.klotz@gmail.com>
Cc: Anne Fernald <fernald@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck"
<hornbeck@fordham.edu>, "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, Jennie
Park-Taylor <parktaylor@fordham.edu>, "ESTHER Solomon [Staff/Faculty [Business]]"
<esolomon@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>,
"Martin Chase [Staff/Faculty [A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>,
Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer [Staff/Faculty [GSS]]" <farmer@fordham.edu>,
Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt <gogwilt@fordham.edu>, Richard Gyug
<gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "JUDITH Jones [Staff/Faculty [GSAS]]"
<jujones@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]" <ekeller@fordham.edu>, Michelle McGee
<mmcgee@fordham.edu>, Harry Nasuti <nasuti@fordham.edu>, Henry Schwalbenberg
<schwalbenber@fordham.edu>, Grace Vernon <vernon@fordham.edu>, Elaine Crosson
<ecrosson@fordham.edu>, Anastasia Coleman <acoleman11@fordham.edu>

Dear Prof. Klotz,

You are correct about the responsibilities of a Senator and about the role of the Gabelli School's
Executive Committee. Prof. Wharton and I were requested to hold an ad-hoc faculty meeting by many
colleagues and we were subsequently asked to convey their sentiments to the Senate President.

It is clear to me that the current situation is getting out of hand. It cannot be a good thing that the
faculty of the University are fighting among themselves and that you and I are exchanging these e-
mails. I have the highest personal respect for you as a colleague (as I do for other Senators from
Gabelli and across the University) and I apologize to you if my actions have been disrespectful and
unnecessary.

We did communicate with each other before the ad-hoc meeting was called. But that is perhaps not
very important any more. For someone who has spent more than 25 years at Fordham and who is
proud of the achievements and progress at the Business School that you and I have jointly served, I
am as dismayed as you are that we have reached this inexplicable nadir in the history of the Senate.
Perhaps all of us share some responsibility.

I pray for good sense from all and at all levels. I'll speak to Ms. Anastasia Coleman at her
convenience.

With best wishes and best regards,
Sris.

**Attachment 1 -- To Wharton Chatterjee 2016**
Attachment 1 to Dec 21, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

[Quoted text hidden]

---

**Dorothy Klotz** <dorothy.klotz@gmail.com>                    Fri, Feb 5, 2016 at 11:14 AM
To: "Sris Chatterjee [Business]" <chatterjee@fordham.edu>
Cc: Anne Fernald <fernald@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck"
<hornbeck@fordham.edu>, "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, Jennie
Park-Taylor <parktaylor@fordham.edu>, "ESTHER Solomon [Staff/Faculty [Business]]"
<esolomon@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>,
"Martin Chase [Staff/Faculty [A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>,
Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer [Staff/Faculty [GSS]]" <farmer@fordham.edu>,
Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt <gogwilt@fordham.edu>, Richard Gyug
<gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "JUDITH Jones [Staff/Faculty [GSAS]]"
<jujones@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]" <ekeller@fordham.edu>, Michelle McGee
<mmcgee@fordham.edu>, Harry Nasuti <nasuti@fordham.edu>, Henry Schwalbenberg
<schwalbenber@fordham.edu>, Grace Vernon <vernon@fordham.edu>, Elaine Crosson
<ecrosson@fordham.edu>, Anastasia Coleman <acoleman11@fordham.edu>, "Stephen Bryan
[Staff/Faculty [Business]]" <sbryan@fordham.edu>, Stephen Bryan <stephenhbryan@aol.com>,
cakici@fordham.edu, John Carey <johncarey@fordham.edu>, johncarey@optonline.net,
rchen@fordham.edu, chidambaran@fordham.edu, "Benjamin M. Cole, Ph.D." <bmcole@fordham.edu>,
conrad@fordham.edu, Mark Conrad <sportslaw@aol.com>, "KENNETH Davis [Staff/Faculty [Business]]"
<kedavis@fordham.edu>, "HOOMAN Estelami [Staff/Faculty [Business]]" <estelami@fordham.edu>,
finnerty@fordham.edu, finnerty@finnecon.com, flicker@fordham.edu, jfortunato@fordham.edu,
"JFortch@aol.com" <jfortch@aol.com>, David Gautschi <dgautschi@fordham.edu>, Nicholas
Georgantzas <georgantzas@fordham.edu>, rogeorge@fordham.edu, fuinvestments@yahoo.com,
"GAUTAM Goswami [Staff/Faculty [Business]]" <goswami@fordham.edu>, gautam goswami
<gautamgoswami@yahoo.com>, "ALBERT N. GRECO" <agreco@fordham.edu>, angreco@gmail.com,
Iftekhar Hasan <ihasan@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>, "Brent Horton
[Staff/Faculty [Business]]" <horton@fordham.edu>, hovakimian@fordham.edu, Bob Hurley
<rohurley@fordham.edu>, Robert Hurley <drbobhurley@yahoo.com>, kjackson@fordham.edu,
keltyjack@fordham.edu, "SERTAN Kabadayi [Staff/Faculty [BUS]]" <kabadayi@fordham.edu>,
sertan50@hotmail.com, kachersky@fordham.edu, "Evangelos Katsamakas [Faculty-Business]"
<katsamakas@fordham.edu>, lking@fordham.edu, LARRY KING <king44@optonline.net>, Dorothy Klotz
<profklotz@verizon.net>, "DEAN Leistikow [Staff/Faculty [Business]]" <leistikow@fordham.edu>,
lothian@fordham.edu, jrmlothian@aol.com, Katalin Marton <marton@fordham.edu>,
kmartonfordham@aol.com, Paul McNelis <mcnelis@fordham.edu>, Paul McNelis
<pdmcnelis@gmail.com>, "HAIM Mozes [Staff/Faculty [Business]]" <mozes@fordham.edu>, HARRY
ALAN NEWMAN <hnewman@fordham.edu>, ypeng@fordham.edu, emmapennuo@hotmail.com,
Elizabeth Cosenza <pinho@fordham.edu>, elizabethpinho@yahoo.com, "Michael Pirson [Staff/Faculty
[BUS]]" <pirson@fordham.edu>, Wullianallur Raghupathi <raghupathi@fordham.edu>,
w_raghupathi@hotmail.com, Steven Raymar <raymar@fordham.edu>, "TRAVIS Russ [Staff/Faculty
[BUS]]" <russ@fordham.edu>, ADITYA SAHARIA <saharia@fordham.edu>, "ALLEN Schiff [Staff/Faculty
[Business]]" <schiff@fordham.edu>, "Falguni Sen [BUS]" <fsen@fordham.edu>, jshon@fordham.edu,
john.shon@gmail.com, "Mark S. Silver" <silver@fordham.edu>, simaan@fordham.edu,
"stoner@fordham.edu" <stoner@fordham.edu>, ytang@fordham.edu, veliotis@fordham.edu,
stanleyveliotis@sbcglobal.net, waisman@fordham.edu, FRANK MARTIN WERNER
<fwerner@fordham.edu>, Bob Wharton <whartonphd@fordham.edu>, Wharton Robert <robert-
wharton@comcast.net>, "Wright, Thomas" <twright17@fordham.edu>, Wu Sarah <jiwu@fordham.edu>,
jinhuiwu@gmail.com, yxie@fordham.edu, yuxu@fordham.edu, xu10000@yahoo.com,
syoung16@fordham.edu, Dongli Zhang <dzhang@fordham.edu>, Miguel Alzola <alzola@fordham.edu>,
Navid Asgari <nasgari@fordham.edu>, abuoye@fordham.edu, abuoye@gmail.com,
mcarnevale3@fordham.edu, ichiang@fordham.edu, Meghann Drury <mdrury@fordham.edu>, "Danielle

## Attachment 1 -- To  Wharton Chatterjee 2016
### Attachment 1 to Dec 21, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

Dunne [Staff/Faculty [Business]]" <ddunne@fordham.edu>, dunnedanielle@hotmail.com, aermolov1@fordham.edu, gonzalezalan@fordham.edu, agopaldas@fordham.edu, ahir.gopaldas@gmail.com, BillDHerman@gmail.com, Danielle.Higgins@baruch.cuny.edu, Ying Hong <yhong24@fordham.edu>, Yuliya Komarova <ykomarova@fordham.edu>, hsl210@lehigh.edu, Alex Markle <amarkle@fordham.edu>, bmierzejewska@fordham.edu, Chaitra Nagaraja <cnagaraja@fordham.edu>, chaitran@yahoo.com, mnejad@fordham.edu, geoconnor@fordham.edu, nreisel@fordham.edu, jren11@fordham.edu, bsegal1@fordham.edu, ltong2@fordham.edu, bwang46@fordham.edu, ywang151@fordham.edu, myan@fordham.edu, mengyan2005@gmail.com, dobinyim@alumni.brown.edu, "Dobin Yim [Staff/Faculty]" <dyim@fordham.edu>, hzhang45@fordham.edu, yzhou62@fordham.edu

Professor Chatterjee and Professor Wharton;

The current situation is out of hand largely due to the material misrepresentations of facts in the widely distributed emails sent by you and Professor Wharton to all Gabelli faculty and the larger university community, the failure of the Senate president to respond appropriately by inserting herself and taking sides in the politics of a school, and a failure of the provost to clearly communicate his role and actions on the matter.   Your and Professor Wharton's actions were not merely disrespectful, they were slanderous and caused irreparable harm to both Professor Solomon and my reputations and careers.

You and Professor Wharton proceeded down this path knowingly.  I would like to remind you of my words in the corresponded I initiate with you and Professor Wharton on 1/27/16 in an attempt to provide clarity and correct your material misrepresentation.

> "So far Sris, you have called a meeting based on an inaccurate account of events which is in conflict with the written minutes published by the Senate.  And now you are now suggesting that the Senate Executive Committee of Gabelli is going to respond to the Senate and the University with only a partial knowledge of a very sensitive situation.  Is this in the best interest of Gabelli?"

Because other colleagues allegedly asked you to take actions based on the misinformation you supplied them does not absolve you or Professor Wharton from responsibility for the resulting damage.

To begin the healing process, I have also copied my colleagues in Gabelli so that they begin to appreciate the extent of the misrepresentation which has taken place.  Professor Solomon has been at Fordham for 32 years and I for 26 years.  Both of us deserve a very public and sincerely apology from both you and Professor Wharton.

Dorothy

[Quoted text hidden]

4

EEOC Officer Ms. Coleman Reply to Dr Solomon December 20, 2017

**Anastasia Coleman** <acoleman11@fordham.edu>

Wed, Dec 20, 2017 at 4:00 PM

To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Elaine Crosson <ecrosson@fordham.edu>

Dear Prof. Solomon,

I am receipt of your email to me dated December 18, 2017. I have reviewed my files, emails and voicemail and have no previous contact with you for filing a discrimination and retaliation allegation with me. Stephen Freeman is not in the office this week and I do not have a copy of the letter that you reference in your email to me that you that you had sent to him on October 27th. Jonathan Crystal has provided me with an email dated Oct. 27th that was addressed to Jonathan and it is unclear if this is the letter that you refer to in your email to me. Please send me a copy of the letter to review.

I have reviewed the attachments you provided to me regarding your course assignments and scheduling for Spring 2018 teaching courses. It is not clear from the emails as to what basis you are alleging you have been discriminated against and what action has happened that has caused you to allege retaliation in the course assignment for spring 2018. Could you please clarify this for me?

I am very willing to investigate further but will need these clarifications from you. Please let me know as I look forward to hearing from you.

Thank you,
Anastasia

Anastasia Coleman
Director of Institutional Equity & Compliance
Title IX Coordinator / 504 Officer
Fordham University
441 East Fordham Road
Cunniffe House, Room 114
Bronx, New York 10458
Telephone: (718) 817 - 3112
Fax: (718) 817-3115
acoleman11@fordham.edu
Stay Connected:



[Quoted text hidden]

 FORDHAM

---

## Gabelli concerns
2 messages

---

**Anne Fernald** <fernald@fordham.edu>                              Tue, Feb 2, 2016 at 11:18 AM
To: "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, "ESTHER Solomon [Staff/Faculty
[Business]]" <esolomon@fordham.edu>
Cc: Andrew Clark <anclark@fordham.edu>, "J. Hornbeck" <hornbeck@fordham.edu>, Jennie Park-
Taylor <parktaylor@fordham.edu>, Dorothy Klotz <dorothy.klotz@gmail.com>, Elaine Crosson
<ecrosson@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>

Dear Dorothy and Esther,

I'm writing to ask you to write up a full list of the complaints you have regarding governance in your school.
From there, we can work together to determine which among the extant remedies to try. When/if they don't
work, we can pursue the next level of complaint until the matter gets resolved. The Senate Exec (of which
Dorothy is a member) can help determine how to proceed going forward, but what is most urgently needed
now is a complete list--leaving nothing out--of the full measure of your concerns.

This list can be addressed to the Senate Exec., the Provost, and the General Counsel if you like. I have
spoken with them and they, too, are eager to see the list and work together to see that available remedies
have been exhausted before we move further. I have copied them on this message.

Thank you in advance for your help with this. In spite of the structural challenges, I remain hopeful that we
can work together for a stronger school and university.

Sincerely,

Anne

--
Anne E. Fernald
Professor of English and Women's Studies
President of the Faculty Senate
Fordham University
fernald@fordham.edu
Cunniffe 117
718-817-3014 (Senate office, Rose Hill)
Lowenstein 921B
212-636-7613 (Department office, Lincoln Center)

*Mrs. Dalloway,* now available from Cambridge UP

---

**Dorothy Klotz** <dorothy.klotz@gmail.com>                           Wed, Feb 3, 2016 at 11:49 AM
To: Anne Fernald <fernald@fordham.edu>
Cc: "DOROTHY Klotz [Staff/Faculty [Business]]" <klotz@fordham.edu>, "ESTHER Solomon [Staff/Faculty
[Business]]" <esolomon@fordham.edu>, Andrew Clark <anclark@fordham.edu>, "J. Hornbeck"
<hornbeck@fordham.edu>, Jennie Park-Taylor <parktaylor@fordham.edu>, Elaine Crosson
<ecrosson@fordham.edu>, Stephen Freedman <sfreedman@fordham.edu>, "Dominic Balestra
[Staff/Faculty [FCRH]]" <balestra@fordham.edu>, William Baumgarth <baumgarth@fordham.edu>,
"Martin Chase [Staff/Faculty [A&S]]" <chase@fordham.edu>, James Cohen <jcohen@fordham.edu>,
Aimee Cox <acox10@fordham.edu>, "GREGORY Farmer [Staff/Faculty [GSS]]" <farmer@fordham.edu>,
Mary Ann Forgey <forgey@fordham.edu>, Christopher GoGwilt <gogwilt@fordham.edu>, Richard Gyug

**Attachment 2 - Gabelli Concerns February 2016**
Attachment 2 to Dec 21, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

<gyug@fordham.edu>, Hugh Hansen <hhansen@fordham.edu>, "EVE Keller [Staff/Faculty [FCRH]]"
<ekeller@fordham.edu>, Michelle McGee <mmcgee@fordham.edu>, Harry Nasuti
<nasuti@fordham.edu>, Henry Schwalbenberg <schwalbenber@fordham.edu>, Grace Vernon
<vernon@fordham.edu>

Dear Anne,

Would you like names so that other individuals too can be publicly humiliated and their character impugned
for saying something that damages Gabelli's reputation? Certainly, the provost and anyone copied on
Professor Chatterjee's email dated 1/2/16 would consider this a real possibility, who saw the "lynching" which
took place during the ad hoc meeting of a select group of Gabelli faculty. I am describing the meeting as a
lynching because, in my opinion, what happened was an extrajudicial punishment by an informal group. It
is particularly disturbing that the meeting was called under false pretenses. Specifically, the proceeding of
the Fordham University Senate and the actions taken by Gabelli Senators were misrepresented in the
meeting invitation. So I am not willing to provide names at this time and risk having those individuals suffer
a similar fate, especially given that I do not believe that there are extant remedies to address the full
measure of concerns associated with governance issues in Gabelli.

Elaine Crosson, Anastasi Coleman and I met on 1/12/16 to discuss the allegations made by Professor
Wright of a hostile and toxic work environment in Gabelli in the widely distributed email dated
12/14/15. We discussed the term averse job action with reference to EEOC regulations concerning
retaliation against members of a protected group. In that discussion, I pointed out that a fairly severe
adverse job action for senior faculty is damage to one's reputation that inhibits the ability to find
employment elsewhere. As you all know, it is very difficult for tenured faculty to move to a comparable
institution with tenure at the same rank, at least for those that are not as professionally accomplished as
Professor Wright. This is especially true for faculty members labeled as trouble causers who lack integrity.
I suspect the overwhelming majority of faculty in Gabelli who were invited to (not all were invited) and
attended the ad hoc meeting on 1/12/16, or who were a recipient of Professor Chatterjee's email on
1/12/16, were left with the opinion that both Professor Solomon and I are trouble causers who lack
character and good judgement. I do not believe there is an extant remedy for that.

Considering the manner in which concerns associated with Governance in Gabelli have been handled to
date, I am not convinced that the full measure of my concerns would be taken seriously and
investigated. In round one, in the provost's meeting with the Executive Committee on 11/3/16 when the
issue of retaliation was raised, the provost said he would speak with John Hollwitz to assess the
situation. He did not. I have repeatedly been told, as have other faculty who have raised similar concerns,
that unfair treatment of faculty is not a Faculty Senate matter and the only statutory recourse is to file
grievance with the Hearing Committee. The problem with harassment and retaliation is that it is often a
culmination of many small acts. The hearing committee is not appropriate remedy for individual acts when
viewed in isolation. Finally, in the most recent round, I was told to recuse myself from a meeting scheduled
on 1/26/16 in which the provost and the Executive Committee were going to consider how to move forward
in light of the Senate resolution on Governance Issues in Gabelli. Several of these email demands for me
to recuse myself were made with Diane Cuomo (from the provost's office) copied on the email. The reason
cited was that I am a member of the school and closely involved in the matter. What has changed between
now and then?

So to answer your request, I am not willing to accommodate your request for "a complete list –leaving
nothing out—of the full measure of my concerns", nor am I willing to provide a list of the concerns raised by
other Gabelli faculty, at least not at this time. It is a shame this request did not come sooner as I and
others have been seeking some sort appropriate remedy for quite some time.

Dorothy

[Quoted text hidden]

**Attachment  3 – Code of Conduct**
Attachment 3 to Dec 21, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

 FORDHAM

---

# (no subject)
4 messages

---

**Donna Rapaccioli** <rapaccioli@fordham.edu>                    Mon, Dec 18, 2017 at 10:24 AM

To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Michael Pirson <pirson@fordham.edu>, "JONATHAN M. CRYSTAL" <crystal@fordham.edu>

Dear Esther,
We have been informed that there has been some disagreement about course scheduling and
that you have engaged in conversation that was viewed as lacking civility. It is the responsibility
of all faculty to adhere to the Code of Conduct.  If you have a grievance you can make use of the
grievance process. In the mean time, we expect you to behave according to the Code of
Conduct.
Donna


---

Donna Rapaccioli, PhD
Fordham University
Dean of the Gabelli School of Business
718-817-4105 or 212-636-6205
rapaccioli@fordham.edu

---

**ESTHER Solomon [Staff/Faculty**                    Wed, Dec 20, 2017 at
**[Business]]** <esolomon@fordham.edu>                    11:49 AM
To: DONNA RAPACCIOLI <rapaccioli@fordham.edu>
Cc: Michael Pirson <pirson@fordham.edu>, "JONATHAN M. CRYSTAL" <crystal@fordham.edu>

Dear Dean Rapaccioli,

Regarding your December 18, 2016 email, can you please kindly clarify what day, time, and
event   you refer to, in the statement "disagreement about course scheduling and that you
have engaged in conversation that was viewed as lacking civility"?

Can you also please let me know what the violation was , and which part of the "Code of
Conduct" you refer to?

If there is any written documentation regarding such complaint, please send me all such
relevant documentation.

Thank you and best regards,

Esther

---

**Donna Rapaccioli** <rapaccioli@fordham.edu>                    Thu, Dec 21, 2017 at 12:50 PM

**Attachment 3 – Code of Conduct**
Attachment 3 to Dec 21, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Michael Pirson <pirson@fordham.edu>, "JONATHAN M. CRYSTAL" <crystal@fordham.edu>

Dear Esther,
As I explained I was informed that you engaged in a conversation that was viewed as
lacking civility.

The code I refer to is
Section 6-03.01. Violations of the Code of conduct include:
(e) Harassment (verbal or other)...
(h) Engaging in, or inciting others to engage in, conduct which interferes with or disrupts any
University function, or which prevents or limits the free expression of ideas by others...
(j) Engaging in ...disorderly conduct

Thank you,
Donna

[Quoted text hidden]
--
Donna Rapaccioli, PhD
Fordham University
Dean of the Gabelli School of Business
718-817-4105 or 212-636-6205
rapaccioli@fordham.edu

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>    Thu, Dec 21, 2017 at 2:13 PM
To: "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>, DONNA RAPACCIOLI
<rapaccioli@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>, "Michael Pirson
[Staff/Faculty [BUS]]" <pirson@fordham.edu>
Cc: Elaine Crosson <ecrosson@fordham.edu>

Dear Dean Rapaccioli, Provost Freedman, Dr. Crystal, and Dr. Pirson,

Although you have already drawn conclusions, you have not provided me with even a modicum of
information of what you are accusing me of.
Who launched the charges, what are they, and what is the statement which supposedly lacked
civility? What day, time, and event is this in reference to? What meeting was alleged to have been
disrupted?

I am entitled to any written documentation regarding such complaint if any exists. To the extent that
Dean Rapaccioli does not have that information and documentation, I am asking you Dr. Freedman,
Dr. Krystal and Dr. Pirson to send that to me if you have it.

Thank you and best regards,

Esther Solomon

cc Elaine Crosson, Esq.
[Quoted text hidden]

**Attachment  3 – Code of Conduct**
Attachment 3 to Dec 21, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

 FORDHAM

---

# (no subject)
4 messages

---

**Donna Rapaccioli** <rapaccioli@fordham.edu>      Mon, Dec 18, 2017 at 10:24 AM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Michael Pirson <pirson@fordham.edu>, "JONATHAN M. CRYSTAL" <crystal@fordham.edu>

Dear Esther,
We have been informed that there has been some disagreement about course scheduling and
that you have engaged in conversation that was viewed as lacking civility.  It is the responsibility
of all faculty to adhere to the Code of Conduct.  If you have a grievance you can make use of the
grievance process. In the mean time, we expect you to behave according to the Code of
Conduct.
Donna


---

Donna Rapaccioli, PhD
Fordham University
Dean of the Gabelli School of Business
718-817-4105 or 212-636-6205
rapaccioli@fordham.edu

---

**ESTHER Solomon [Staff/Faculty**      Wed, Dec 20, 2017 at
**[Business]]** <esolomon@fordham.edu>      11:49 AM
To: DONNA RAPACCIOLI <rapaccioli@fordham.edu>
Cc: Michael Pirson <pirson@fordham.edu>, "JONATHAN M. CRYSTAL" <crystal@fordham.edu>

Dear Dean Rapaccioli,

Regarding your December 18, 2016 email, can you please kindly clarify what day, time, and
event   you refer to, in the statement "disagreement about course scheduling and that you
have engaged in conversation that was viewed as lacking civility"?

Can you also please let me know what the violation was , and which part of the "Code of
Conduct" you refer to?

If there is any written documentation regarding such complaint, please send me all such
relevant documentation.

Thank you and best regards,

Esther

---

**Donna Rapaccioli** <rapaccioli@fordham.edu>      Thu, Dec 21, 2017 at 12:50 PM

**Attachment  3 – Code of Conduct**
Attachment  3 to Dec 21, 2017 email from Dr. Solomon to Fordham's EEOC Ms. Coleman

To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Michael Pirson <pirson@fordham.edu>, "JONATHAN M. CRYSTAL" <crystal@fordham.edu>

Dear Esther,
As I explained I was informed that you engaged in a conversation that was viewed as
lacking civility.

The code I refer to is
Section 6-03.01.  Violations of the Code of conduct include:
(e) Harassment (verbal or other)...
(h) Engaging in, or inciting others to engage in, conduct which interferes with or disrupts any
University function, or which prevents or limits the free expression of ideas by others...
(j) Engaging in ...disorderly conduct

Thank you,
Donna

[Quoted text hidden]

--
Donna Rapaccioli, PhD
Fordham University
Dean of the Gabelli School of Business
718-817-4105 or 212-636-6205
rapaccioli@fordham.edu

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>    Thu, Dec 21, 2017 at
                                                                          2:13 PM
To: "STEPHEN Freedman [Staff/Faculty]" <sfreedman@fordham.edu>, DONNA RAPACCIOLI
<rapaccioli@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>, "Michael Pirson
[Staff/Faculty [BUS]]" <pirson@fordham.edu>
Cc: Elaine Crosson <ecrosson@fordham.edu>

Dear Dean Rapaccioli, Provost Freedman, Dr. Crystal, and Dr. Pirson,

Although you have already drawn conclusions, you have not provided me with even a modicum of
information of what you are accusing me of.
Who launched the charges, what are they, and what is the statement which supposedly lacked
civility? What day, time, and event is this in reference to?  What meeting was alleged to have been
disrupted?

I am entitled to any written documentation regarding such complaint if any exists. To the extent  that
Dean Rapaccioli does not have that information and documentation, I am asking you Dr. Freedman,
Dr. Krystal and Dr. Pirson to send that to me if you have it.

Thank you and best regards,

Esther Solomon

cc Elaine Crosson, Esq.
[Quoted text hidden]

21



## COBRA CONTINUATION COVERAGE ELECTION FORM
### Fordham University

**IMPORTANT: PLEASE RETAIN A COPY OF THIS COBRA ELECTION FORM FOR FUTURE REFERENCE. THIS FORM CONTAINS INFORMATION ABOUT YOUR RIGHTS UNDER COBRA.**

You can elect COBRA continuation coverage in one of three ways – (1) you can log in to the member portal at https://cobra.discoverybenefits.com, (2) you can download the Discovery Benefits COBRA mobile app, or (3) you can complete and submit the enclosed COBRA Election Form to Discovery Benefits using the address provided below. Additional information regarding using the website or app to elect continuation coverage is provided in the New Member Welcome Letter (enclosed). Regardless of the method that you use, your election must be made no later than the Election Period End date ("Last Day to Elect") shown below. If the Election Form is mailed, it must be postmarked by the Last Day to Elect. If you do not elect COBRA continuation coverage on or before the Last Day to Elect, you will lose your right to elect coverage.

Important information about paying for continuation coverage is provided elsewhere in this letter. After electing COBRA coverage, payments can be made at https://cobra.discoverybenefits.com, through the Discovery Benefits COBRA mobile app, or by check/money order mailed to Discovery Benefits, PO BOX 2079, Omaha, NE 68103. Additional information is provided below.

Once you have elected and paid the full amount owed for COBRA continuation coverage, Discovery Benefits will send a notice to the carrier to reinstate your coverage (you must pay all premiums which have become due during your initial grace period). Please contact your carrier for any questions regarding your plan's coverage, member ID card or claims status.

**Please note: it can take up to 15 business days for the carrier to activate your coverage.

If you waive coverage under COBRA before the end of the enrollment period, you can change your mind and continue coverage by submitting your completed election form before the end of the enrollment period described below for each plan. However, if you change your mind after first waiving COBRA continuation coverage, your COBRA continuation coverage will begin on the date you submit the completed form.

You should read the important information about your rights included with this election form. If you have questions about COBRA or need assistance to complete your election form, please contact our Customer Service Department at (866) 451-3399 during business hours.

**Qualified Beneficiary(QB):**
ESTHER SOLOMON

Event Date:     2/1/2020
Event Type:     Termination
Second Event:   No

COBRA gives each Qualified Beneficiary the right to elect coverage independently. You, your spouse or dependent child(ren), if any, may elect single coverage and not include those individuals who do not wish to continue coverage. In addition, you or your spouse may elect COBRA continuation coverage on behalf of any covered dependent child(ren). For example, COBRA continuation coverage may be elected for only one, several, or for all your dependent children who are qualified beneficiaries.

**Premium Information:**

| Plan Name | Coverage Level | Monthly Premium |
|---|---|---|
| Cigna Dental DPO | QB + Family | $104.85 |
| DBI Medical FSA | QB Only | $199.41 |
| VSP Vision Premier | QB + Family | $19.14 |
| Bundle: UHC Medical Enhanced Standard Opt/DBI HRA | QB + Family | $3,174.84 |
|     DBI HRA | | |
|     UHC Medical Enhanced Standard Opt | | |
| | **Total Premium:** | **$3,498.24** |



00101 013 0014111930

22

 **FORDHAM**

## Spring 2020 Semester

**ESTHER Solomon** <esolomon@fordham.edu>                                                    Thu, Jan 2, 2020 at 9:09 PM
To: Fordham president <president@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>
Cc: Jonathan Crystal <crystal@fordham.edu>, DONNA RAPACCIOLI <rapaccioli@fordham.edu>

Dear Father McShane and Provost Jacobs,

This is to request clarification and express serious concerns regarding Dr. Crystal's December 23, 2019 email (Exhibit 1), responding to my December 20, 2019 appeal to you (Exhibit 2). His email informed me that I would not be teaching in the Spring 2020 semester while placed on unpaid leave without benefits. As I understand the implications, I would be removed from the Fordham payroll without due process, after ~35 years as a tenured faculty member.

I am reiterating and appeal again to you that I want to teach in Spring 2020. I believe that my teaching schedule of two graduate courses - comprising a regular, tenured faculty schedule -should be restored, and I should receive my full regular faculty salary during Spring 2020.

Since you, Dr. Jacobs, just recently joined Fordham in June 2019 as Provost and Senior Vice President for Academic Affairs, you are most likely unfamiliar with the relevant history and context. Since I received an automatic response to my December 20 that you were out of town, it is unclear if you had a chance to read my email or participated in Dr. Crystal's response. I hope this will lead to a reconsideration since faculty leaves are authorized by the Provost.

Faculty Leave?
The December 23 email conveys seemingly inconsistent messages on several issues. While stating that I am given leave, the same email also states the opposite: "The Provost's office is not prepared to approve your leave on either ground." The preceding sentence apparently refers to Fordham University Statutes §4-05.10(b): For faculty development purposes for "study and research" or "when deemed to be in the interest of the University". Please clarify what is true, am I given leave or not?

As I understand the December 23 email, I think it could be interpreted as charging me with violation of my faculty responsibilities and a breach of contract. It incorrectly states ([that I] "continued to choose not to teach" and [that I am not] "teach[ing] the courses [I] have been assigned." If there are such accusations, they would require official charges, a formal Hearing and findings potentially resulting in termination of a faculty's tenured position, if found true. As outlined in the Fordham Statutes, such adverse University action requires prior reviews and determination by the Faculty Hearing Committee §4-07.12, §4-07.12, and should involve the Faculty Senate Executive Committee. Instead, this appears to be an undisclosed, de facto tenure termination, bypassing due process. Please clarify, and if there are any implied charges, I am hereby requesting to be given notice, a formal hearing and the opportunity to be heard, exercise my full rights and defend myself.

<u>Untruly Implying I Refused to Teach in Spring 2020</u>
I am fully prepared to teach the two graduate courses at Lincoln Center, which I was assigned for Spring 2020 but instead I am precluded from teaching. I ask you to review the voluminous correspondence between October 7 through December 2019, with Dr. Pirson, Dr. Crystal, and Dean Rapaccioli, involving these issues. (examples in Exhibit 3) The correspondence and record document that I have been given what I believe are untenable assignments, discriminatory, retaliatory and a humiliating demotion. The Spring 2020 semester involves three different course preparations, commute between two campuses including the undergraduate Principles of Management Course (POM), also called CORE. The refusal to allow me to teach a two-course schedule during Spring 2020 and three in Fall as normal for tenured faculty, seems also inconsistent with the April 12, 2019 representations on "workload assessment" in the Faculty Senate Minutes (Exhibit 4).

Not mentioned is the fact that I already taught POM courses at the Bronx campus during Spring 2018, prior to my Fall 2018 Family medical leave.  Younger faculty were granted 1 ½ credit  per credit hour for teaching CORE courses, due to their onerous nature. Such credit is not granted to me. Younger faculty only teach 2-2 schedules vs.  2-3. The POM has become a sine qua non in all my assigned schedules since my 2017 demotion.  In November 2017,  I was warned prophetically: "either you teach at the Bronx, or you do not teach at all."

These actions against me follow a pattern involving other senior tenured faculty, also sent to teach elementary undergraduate courses. An older tenured professor described the process:
        "Thank you for your concerns.
        Yes, I am not coming back. I have been exposed to concerted efforts of the new regime to push me out. I
        have been requested to teach undergraduates basic statistics and criticized for some snow days I missed
        due to illness…… They stopped my salary already, now I have to get some health insurance, and then I
        will fight for my retirement income."

As I noted, I am currently the Acting President and organizer of the International Facet Theory Conference to take place in July 2020 in Prague. Among my suggestions for Spring 2020, was a request for one-course release, needed to allow time for scientific paper review and administrative duties for the upcoming conference, but I received no response. My Area just hired a young faculty who appears to be my replacement, receiving preferential treatment over me in all these matters. Similarly, preferential treatment is afforded other junior faculty, as well as tenured male faculty, non-faculty, clinical instructors, and visitors.

The December 23 email also states:
        "For next semester, the Provost's office considers it in the University's best interest for you to teach the
        courses you have been assigned; students have already enrolled in these and faculty schedules have been
        assigned with the expectation that you would be returning to teach.  It would have been our preference
        for you to have returned to teach…"
If all of the above is true, why am I not permitted to teach right now?

<u>Incorrect Citations to Fordham Statutes to Remove Me from Fordham Benefits</u>
The December 23 email concludes that I "may continue [my] medical coverage through Cobra."
The 1986 Cobra legislation allows continued health coverage in the case that "an employee <u>loses his or her job</u>…"  There is also a sentence "but notified you in May (for fall 2019)…" which I presume may refer to Dean Rapaccioli's May 24, 2019 email (Exhibit 5), which also references COBRA. The Dean's

email states in part: "I have granted you an exception to the statutory rules" and "the University Statutes provide for unpaid leave with paid benefits ONLY for faculty development purposes." [emphasis in the original] To me, that statement does not appear to be supported by the Statutes.

The December 23 response makes different references to the Statutes content, which in my view may not draw accurate conclusions. As I read it, granting unpaid leave with benefits is <u>not precluded</u>, but permitted by the Statutes, and is not limited to any type of unpaid leave.

> "Appendix 4:  Salary and Benefit Provisions for Active Faculty A-18 Benefits While on Leave  c.Faculty members [other than paragraph (b) above] while on a University-approved leave of absence without pay, and within the restrictions of the applicable insurance contracts with their parties, <u>may maintain coverage on the University life insurance, long-term disability, and medical plans</u>." [emphasis added]

I note that my health benefits were discontinued twice without notice during this summer: only reinstated after the intervention of Fordham's corporate attorney.  What exactly are the implications for my status with the University?

<u>Federal Court</u>
Fordham is taking these new adverse actions in the context of a pending Federal lawsuit (Case 1:18-cv-04615-ER) while the Court is currently reviewing some of these very matters.

On December 23, 2019, the same day as Dr. Crystal's email, Fordham attorneys filed a letter with Federal Court (Dkt #63). It referenced, in part, the "potential for a more global, amicable resolution of this matter" in the Federal case (December 23, 2019 at 1:33p).  At the same time Fordham asserts to the Court that they want an amicable resolution, they take an extreme adverse action against me in the December 23 4:41pm email on the very same day.

Previously, on April 10, 2019, Fordham had written to the Court, in what now appears to be an inaccurate statement:

> "More importantly, Dr. Solomon is a current tenured professor in Fordham's Gabelli School of Business and the status quo remains preserved."

If the Fordham latest actions against me per the December 23 email are realized, they may constitute a material change with direct bearing on Fordham's pending motion.  I believe Fordham may need to report that to the Court promptly.

<u>Conclusion</u>
I will appreciate your clarifying my status at Fordham University following the December 23, 2019 email, and I respectfully request that you reconsider.  I believe it would be in the best interests of Fordham University to let me teach the Graduate Courses at Lincoln Center to which I have already been assigned.  Alternatively, one should also consider whether it would also be preferable not to take further adverse actions against me, but continue my 2019 Leave without Pay with benefits for Spring 2020.

I look forward to your response and thank you for your consideration.

Sincerely yours,


Esther Solomon, Ph. D.

Fordham University Mail - Spring 2020 Semester

Gabelli School of Business

**5 attachments**

Dec 20, 2019 email to Fr McShane & Provost.pdf
415K

Dec 23, 2019 Dr. Crystal email.pdf
389K

Corresp Ex Dec 18, 2019.pdf
1215K

Faculty senate Minutes 4:11:2019 - Excerpt.pdf
928K

May 24, 2019 email Health Benefits.pdf
682K

Thu, Jan 2, 2020 at 9:10 PM

**Dennis Jacobs** <dcjacobs@fordham.edu>
To: esolomon@fordham.edu

I am out of town through Jan. 2, 2020 and will respond to your email as soon as I am able.
Best wishes for the holidays.

--

**Dennis C. Jacobs, Ph.D.**
Provost and Senior Vice President for Academic Affairs
Fordham University
Cunniffe House, Room 229
441 E. Fordham Road
Bronx, NY  10458

(718) 817-3053
dcjacobs@fordham.edu

Fordham University Mail – Spring 2020

 FORDHAM

## Spring 2020

**ESTHER Solomon** <esolomon@fordham.edu>                    Fri, Dec 20, 2019 at 3:47 PM
To: Fordham president <president@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>

Dear Father McShane and Provost Jacobs,

In my December 18, 2019 email regarding the upcoming 2020 Spring Semester, I respectfully requested your intervention. On December 19, 2019, Dr. Michael Pirson responded to that email. Since you were not copied on his email, it is copied below.

I will take Leave without Pay for the 2020 spring semester, instead of the untenable teaching schedule proposed. However, there an issue that needs to be addressed. I believe that the unpaid Leave should be with benefits, as the Statutes authorize.

Attached below are the relevant portions of the Fordham University Statutes. Contrary to Dr. Pirson's statement, the Spring 2020 unpaid leave with benefits is <u>consistent with the Statutes</u>regarding active tenured faculty. The Spring 2020 leave can be deemed to be under §4-05.08 b1 "for study and research" or under §4-05.08 b1 "in the interest of the University."

As I read Appendix 4, the following are both applicable. (b). All benefits are continued… for tenured faculty members who receive approval from the Office of the Provost for an unpaid leave of absence, when that leave is taken for faculty development purposes,
and also (c) Faculty members … while on a University approved leave of absence without pay, may maintain coverage on the University life insurance, long-term disability, and medical plans.

As indicated in my December 18, 2019 email, during the upcoming semester, I will be engaged in academic work preparing for an upcoming conference and other research activities. I believe, given my Spring 2020 responsibilities as Acting President of the Facet Theory Association, organizing the FTA Conference with my Fordham affiliation, scientific program committee work, the Conference Proceedings duties and, along with my ongoing research work, that it warrants benefits during the unpaid leave.

Also note that the Business School Research Committee granted me a Summer 2020 Research Grant for my project: *"CEO Perceptions of Governance and Values: Ethical Leadership and Integrity for Social Responsibility."* I do not know if they contemplate taking that grant away as well.

Given the above, I therefore respectfully request that you approve my request for leave with benefits.

Sincerely yours,

Esther Solomon, PhD

 FORDHAM

## Spring 2020

**Jonathan Crystal** <crystal@fordham.edu>                                          Mon, Dec 23, 2019 at 4:41 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Fordham president <president@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>

Dear Dr. Solomon,

Your email to the Provost and President dated December 20, 2019 was forwarded to me for response. I have also had the opportunity to review your email correspondence with Dr. Pirson, regarding your teaching schedule for spring 2020. Based on my review, the Provost's office will honor your request for an unpaid leave but will not cover the costs of medical benefits during the leave.

As you acknowledged in your email's reference to the University statutes, faculty leaves must be approved by the Provost. Unpaid leaves, with benefits, will be granted only when the leave is taken for faculty development purposes for "study and research" or "when deemed to be in the interest of the University." §4-05.10(b).

The Provost's office is not prepared to approve your leave on either ground. As you state in your email, you will have the opportunity to engage in research this summer since you have been awarded a research grant from Gabelli. For next semester, the Provost's office considers it in the University's best interest for you to teach the courses you have been assigned; students have already enrolled in these courses and faculty schedules have been assigned with the expectation that you would be returning to teach. It would certainly have been our preference for you to have returned to teach rather than to be on leave, although we will not force you to teach. As Dr. Pirson explained several times, he has sought to accommodate your preference to teach graduate courses and at Lincoln Center by assigning you two out of three courses that meet both criteria. In my view, you have been treated fairly, in line with other tenured faculty in your area who have also been assigned to teach a variety of courses.

Your request for unpaid leave with benefits for consecutive semesters is also highly unusual. We granted your request several times, but notified you in May (for fall 2019) that we would not continue providing benefits indefinitely if you continued to choose not to teach.

When the University reopens on January 6th, the Provost's office will inform the Office of Human Resources Management that you will be taking a leave without benefits. HR will provide details of how you may continue your medical coverage through COBRA.

Sincerely,

Jonathan Crystal, PhD
Vice Provost
Fordham University
Cunniffe House, Room 225
441 E. Fordham Road
Bronx, NY 10458

phone: (718) 817-0136
email: crystal@fordham.edu

Fordham University Mail – Spring 2020

## Spring 2020

**ESTHER Solomon** <esolomon@fordham.edu>
To: "Michael Pirson [Staff/Faculty [BUS]]" <pirson@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>, Fordham president
<president@fordham.edu>

Wed, Dec 18, 2019 at 2:30 PM

Hi Michael,

In response to your December 13, 2019 email below regarding my Spring 2020 teaching
schedule, I can teach the two courses you previously assigned me, "Leading People &
Organization" (LPGB-6613; Tuesdays, 8:00 pm) and "Leadership and Change" (LPGB-6613;
Tuesdays, 5:45 pm). This is explained in my December 2, 2019 email. Please see also my
previous emails dated December 10, 2019, and October 8, 10, 31, 2019, which are incorporated
below. They indicate why the assignments you present for me as a senior tenured faculty are a
demotion and discriminatory.

It does not appear to be an "accommodation" to require me to teach, as the third course, the
introductory undergraduate "Principles of Management" (POM) in the Bronx. The December 13
schedule replaces one Bronx POM for another. It substitutes the late evening section which meets
once a week, for a day POM section which meets twice a week, both in the Bronx. That would
still involve three different course preparations, commuting between two campuses and multi-
party coordination for the large, onerous POM classes.  However, there are other courses,
programs and responsibilities at Lincoln Center to which I could have been assigned as a third
course -- but was not done.  It is not too late.

During Spring 2020, I will have additional professional research responsibilities, further making
that schedule untenable. I am Acting President of the Facet Theory Association, and responsible
for the upcoming 17th International FTA Conference in July 2020, as I indicated during our
December 12th Area meeting. My responsibilities include reviewing the research submissions and
preparing the 2020 FTA Conference Proceedings since I am one of the three-member scientific
program committee.  I had previously brought the 15th International FTA Conference to Fordham
in 2015.  Its website is still maintained by Fordham, the new Proceedings will be included,
enhancing Fordham's Business School visibility in the scientific community and helping with our
accreditation.

There is precedent for giving course release for others undertaking such time consuming
responsibilities.  If you do not want to set up a 2-3 schedule, perhaps you can arrange such course
release as an alternative.

During my 2019 unpaid leave, I have participated in most Area and Business School meetings.
They include meetings on curriculum where we voted for new programs and new concentrations
to be offered by the Area. I participated as a tenured faculty in the process and voted in personnel
and tenure decision. I devoted time to interviewing candidates for Fordham at the August
Academy of Management meeting, etc. In 2019 I published two papers and was the Editor of the
"Special Issue on Facet Theory in  Organizational Research" in the *International Studies of*

*Management and Organization* journal. These indicate my commitment.

I believe we can come to a resolution satisfactory for all involved.  I would rather teach a reasonable schedule next semester.  However, if I have to, I will consider another leave without pay, as I have been on this year.  I reiterate my request to teach the above two-course Spring schedule and urge you to reconsider.

I also respectfully request President Fr. McShane and Provost Jacobs to intervene, if possible, to help address this matter.

Sincerely yours,

Esther

**Fordham Univ Statues - Excerpt.pdf**
526K

---

**Dennis Jacobs** <dcjacobs@fordham.edu>
To: esolomon@fordham.edu

Fri, Dec 20, 2019 at 12:48 PM

I am out of town through Jan. 2, 2020 and will respond to your email as soon as I am able.
Best wishes for the holidays.

--

**Dennis C. Jacobs, Ph.D.**
Provost and Senior Vice President for Academic Affairs
Fordham University
Cunniffe House, Room 229
441 E. Fordham Road
Bronx, NY  10458

(718) 817-3053
dcjacobs@fordham.edu

**Dennis C. Jacobs, Ph.D.**
Provost and Senior Vice President for Academic Affairs
Fordham University
Cunniffe House, Room 229
441 E. Fordham Road
Bronx, NY  10458

(718) 817-3053
dcjacobs@fordham.edu

---

**Michael Pirson** <pirson@fordham.edu>                    Tue, Nov 19, 2019 at 6:18 PM
To: "ESTHER E. SOLOMON" <esolomon@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>, dcjacobs@fordham.edu

Dear Esther,
At this point it looks like both graduate classes are close to minimum enrollment so it looks possible that you teach
those classes. Plus the rose hill undergraduate class.

I hope concerns are sufficiently addressed.

Thanks and best, Michael
[Quoted text hidden]

---

**ESTHER Solomon** <esolomon@fordham.edu>                    Mon, Dec 2, 2019 at 4:47 PM
To: Michael Pirson <pirson@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>

Hi Michael,

Regarding your question on my Spring 2020 schedule, this is to confirm that I can teach the two courses
you assigned me, "Leading People & Organization" LPGB-6613 on Tuesdays, 8:00PM - 10:00PM, and
"Leadership and Change" LPGB-6613 5:45PM - 07:45PM.

However, although I am a senior tenured faculty, the assignment of the third course, the elementary
undergraduate Principles of Management LPBU-3223 late in the evening at the Bronx, 6:30PM - 09:15
PM, is unacceptable.  It is discriminatory and a further demotion.

In addition to being extremely time consuming and requiring multi-party coordination, such an
assignment creates an over burdensome schedule.  It would involve three different course preparations on
two campuses and multiple late evening classes. As previously discussed, select junior faculty teaching
that course with its very large classes were given credit for 1.5 hours per credit hour due to its onerous
nature.

During the Spring 2020 semester, I believe I should teach the 2 first courses agreed upon above.  I believe
it is fair, since I can then teach my remaining 3 courses for the year during the Fall 2020 semester. Given

Fordham University Mail - Re Teaching Assignments

that the teaching load for faculty is a total of no more than 5 courses per year according to the Fordham University Statutes, I can do 2 in Spring and 3 in the fall.  Junior faculty teach 2 courses each semester - a total of 4 per year.

Please confirm whether we can agree on this schedule.

Thanks and best regards,

Esther

....

[Quoted text hidden]

---

**ESTHER Solomon** <esolomon@fordham.edu>                                Tue, Dec 10, 2019 at 6:45 AM
To: Michael Pirson <pirson@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>

Hi Michael,

I will greatly appreciate it if you please confirm my Spring 2020 teaching schedule.

Thanks and best regards,

Esther

...

[Quoted text hidden]

Faculty Senate Meeting                    Official Minutes # 457



Faculty Senate

faculty (including members of the Library Committee and Senators at large) to study holistically the needs of faculty, students, and librarians. Dr. Crystal and Dr. Fahey-Smith concurred and agreed to meet with Prof. Kowaleski to begin the work.

*Key Conversation: Workload Assessment*
After outlining the meeting's key conversation, Senate President Keller introduced Dr. Crystal and James P. McCartin, Acting Associate Vice President for Academic Affairs and Acting Associate Chief Academic Officer.

Dr. Crystal indicated that the conversation about faculty workload at the October meeting of the Senate had offered him and his office helpful feedback and direction. He highlighted the work of the Faculty Development Committee in refining ideas, and he asked Senators for additional input at this stage of the discussion.

Dr. McCartin surveyed the history of discussions about faculty workload. The core question, he said, is how can the University ensure that tenured and tenure-track faculty have more time for scholarly production while also maintaining Fordham's commitment to excellent instruction and small class sizes? Dr. McCartin articulated three principles that have guided the thinking of the Provost's Office on this topic: adjustments should be revenue-positive, -neutral, or close to -neutral; instruction of the highest quality should be maintained; and there should not be a hierarchy between teaching and research faculty.

Noting that some options (e.g., reducing the standard teaching load to 2-2, substantially increasing the size of the tenured/tenure-track faculty, and substantially increasing class sizes) are not viable in the short run, Dr. McCartin presented five possibilities, noting the advantages and disadvantages of each. He then solicited the Senate's feedback.

There are two options concerning courseload flexibility:

- Offer faculty the choice between a 3-3 load with eligibility for Faculty Fellowship every eight semesters, and a 2-2 load with fellowship eligibility every ten semesters.
- Permit course banking, so that a faculty person teaches an average number of courses per year but has flexibility as to the number of courses that s/he teaches in any given semester.

Two options would establish differentiated research and teaching loads:

- Give departments/areas discretion to assign a total number of sections per year to tenured/tenure-track faculty and permit chairs to assign course loads differentially to individual colleagues.
- Reduce course loads for research-active faculty by incentivizing excellent teachers to assume a 3-3 load for enhanced compensation; adjust merit norms accordingly.

Then, a final option would make a change to overall courseload:

- Reduce the standard teaching load to 3-2-2-2 (i.e., nine courses every two years).

Discussion ensued, in which the following questions were asked and points were made:

- Specific models might fit schools differently, so could different models therefore be adopted in different parts of the University? Dr. Crystal responded that he would be open to the possibility that schools might experiment with different models that fit their needs.
- Several Senators suggested that out of the models Dr. McCartin had presented, the "Fellowship choice" model seemed the best, at least in the short term.
- Whichever model is adopted, how can the University avoid creating a hierarchy among members of the faculty, where colleagues might feel "frozen" into either a teaching-oriented or research-oriented track? Dr. Crystal responded that this is a desideratum that he shares.
- Although retaining small class sizes is a priority for the Provost's Office, 35 students is not a small class. Should we consider super-sections or other ways to teach more students in fewer

3

📄 682K

📄 **Exhibit 6.pdf**
429K

---

**Donna Rapaccioli** <rapaccioli@fordham.edu>                    Fri, May 24, 2019 at 5:52 AM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Victor Borun <borun@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>, Benjamin Crooker
<crooker@fordham.edu>, Elaine Crosson <ecrosson@fordham.edu>, "Ryan, James" <JRyan@cullenanddykman.com>,
Fordham president <president@fordham.edu>

Dear Dr. Solomon

I am responding to your May 3rd e-mail in which you (1) dispute some portions of your completed workload history
and (2) request another semester of unpaid leave with paid benefits for the upcoming Fall 2019 semester.

I will respond to the details of your completed workload history at a later date, but I did want to inform you that your
request for an unpaid leave with paid benefits for the Fall 2019 semester has been approved.

I am compelled to remind you however that the University Statutes provide for unpaid leave with paid benefits ONLY
for purposes of faculty development. Since your requested leave for Fall 2019 is NOT for faculty development
purposes, there is no statutory basis to grant your request. I have nonetheless approved your request and the
University will pay the employer portion of your family medical benefits for the 2019 Fall semester.

As you know, this is not the first time I have granted you an exception to the statutory rules in this regard, but you
should not assume that the University will continue to grant you unpaid leave with paid benefits in the future. It is
customary that faculty on unpaid leave continue on the University health insurance plan through participation in
COBRA, which requires the employee to pay the full premium plus a minimal administrative fee.
Sincerely,
Donna

[Quoted text hidden]

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>          Wed, Jun 19, 2019 at 5:14 AM
To: Donna Rapaccioli <rapaccioli@fordham.edu>
Cc: Victor Borun <borun@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>, Benjamin Crooker
<crooker@fordham.edu>, Elaine Crosson <ecrosson@fordham.edu>, "Ryan, James" <JRyan@cullenanddykman.com>,
Fordham president <president@fordham.edu>

Dear Dean Rapaccioli,

I just received an official Notice from United Healthcare dated June 9, 2019.  It announced that my family
group coverage through the Fordham University Plan Group # 0902765 has ended as of last month,
5/31/2019.

The United Healthcare notice thanks me for being a valued member as of 2015, and suggest options for
seeking coverage after my benefits have ended, including COBRA which is for terminated employees.

The United Healthcare notice is contrary to your May 24, 2019 email.

Please let me know regarding the status of my healthcare coverage in reference to the Discontinuation
Notice of my Fordham Health Care benefits.

1/2/20, 12:47 AM

Fordham University Mail - May 3, 2019 Dr. Solomon Response

Thank you very much for your attention.

Sincerely,

Esther

....

[Quoted text hidden]

---

**Elaine Crosson** <ecrosson@fordham.edu>
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, Victor Borun <borun@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>, Benjamin Crooker <crooker@fordham.edu>, "Ryan, James" <JRyan@cullenanddykman.com>, Fordham president <president@fordham.edu>

Wed, Jun 19, 2019 at 6:32 AM

Dear Prof Solomon— Please let me respond on behalf of Dean Rapaccioli. The OLC will look into this matter and circle back to you when we have more information. The notice from UHC is indeed contrary to our understanding.

[Quoted text hidden]

---

**Elaine Crosson** <ecrosson@fordham.edu>
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, Victor Borun <borun@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>, Benjamin Crooker <crooker@fordham.edu>, "Ryan, James" <JRyan@cullenanddykman.com>, Fordham president <president@fordham.edu>, Kay Turner <kturner27@fordham.edu>

Thu, Jun 20, 2019 at 12:21 PM

Professor Solomon

I spoke with the HR department and our records indicate that your family health insurance coverage through UHC is still in effect. Please send me a copy of the letter you recieved from UHC so that we can contact them on your behalf.

Thank you.





---

*NOTICE: This e-mail message, and any attachments, contains privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you have received this*

Fordham University Mail - Spring 2020 Semester

4/9/20, 7:09 PM

 **FORDHAM**

## Spring 2020 Semester

**ESTHER Solomon** <esolomon@fordham.edu>                    Thu, Jan 2, 2020 at 9:09 PM
To: Fordham president <president@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>
Cc: Jonathan Crystal <crystal@fordham.edu>, DONNA RAPACCIOLI <rapaccioli@fordham.edu>

Dear Father McShane and Provost Jacobs,

This is to request clarification and express serious concerns regarding Dr. Crystal's December 23, 2019 email (Exhibit 1), responding to my December 20, 2019 appeal to you (Exhibit 2). His email informed me that I would not be teaching in the Spring 2020 semester while placed on unpaid leave without benefits. As I understand the implications, I would be removed from the Fordham payroll without due process, after ~35 years as a tenured faculty member.

I am reiterating and appeal again to you that I want to teach in Spring 2020. I believe that my teaching schedule of two graduate courses - comprising a regular, tenured faculty schedule -should be restored, and I should receive my full regular faculty salary during Spring 2020.

Since you, Dr. Jacobs, just recently joined Fordham in June 2019 as Provost and Senior Vice President for Academic Affairs, you are most likely unfamiliar with the relevant history and context. Since I received an automatic response to my December 20 that you were out of town, it is unclear if you had a chance to read my email or participated in Dr. Crystal's response. I hope this will lead to a reconsideration since faculty leaves are authorized by the Provost.

Faculty Leave?
The December 23 email conveys seemingly inconsistent messages on several issues. While stating that I am given leave, the same email also states the opposite: "The Provost's office is not prepared to approve your leave on either ground." The preceding sentence apparently refers to Fordham University Statutes §4-05.10(b): For faculty development purposes for "study and research" or "when deemed to be in the interest of the University". Please clarify what is true, am I given leave or not?

As I understand the December 23 email, I think it could be interpreted as charging me with violation of my faculty responsibilities and a breach of contract. It incorrectly states ([that I] "continued to choose not to teach" and [that I am not] "teach[ing] the courses [I] have been assigned." If there are such accusations, they would require official charges, a formal Hearing and findings potentially resulting in termination of a faculty's tenured position, if found true. As outlined in the Fordham Statutes, such adverse University action requires prior reviews and determination by the Faculty Hearing Committee §4-07.12, §4-07.12, and should involve the Faculty Senate Executive Committee. Instead, this appears to be an undisclosed, de facto tenure termination, bypassing due process. Please clarify, and if there are any implied charges, I am hereby requesting to be given notice, a formal hearing and the opportunity to be heard, exercise my full rights and defend myself.

Fordham University Mail - Spring 2020 Semester

Untruly Implying I Refused to Teach in Spring 2020

I am fully prepared to teach the two graduate courses at Lincoln Center, which I was assigned for Spring 2020 but instead I am precluded from teaching. I ask you to review the voluminous correspondence between October 7 through December 2019, with Dr. Pirson, Dr. Crystal, and Dean Rapaccioli, involving these issues. (examples in Exhibit 3) The correspondence and record document that I have been given what I believe are untenable assignments, discriminatory, retaliatory and a humiliating demotion. The Spring 2020 semester involves three different course preparations, commute between two campuses including the undergraduate Principles of Management Course (POM), also called CORE. The refusal to allow me to teach a two-course schedule during Spring 2020 and three in Fall as normal for tenured faculty, seems also inconsistent with the April 12, 2019 representations on "workload assessment" in the Faculty Senate Minutes (Exhibit 4).

Not mentioned is the fact that I already taught POM courses at the Bronx campus during Spring 2018, prior to my Fall 2018 Family medical leave.  Younger faculty were granted 1 ½ credit  per credit hour for teaching CORE courses, due to their onerous nature. Such credit is not granted to me. Younger faculty only teach 2-2 schedules vs.  2-3. The POM has become a sine qua non in all my assigned schedules since my 2017 demotion.  In November 2017,  I was warned prophetically: "either you teach at the Bronx, or you do not teach at all."

These actions against me follow a pattern involving other senior tenured faculty, also sent to teach elementary undergraduate courses. An older tenured professor described the process:
"Thank you for your concerns.
Yes, I am not coming back. I have been exposed to concerted efforts of the new regime to push me out. I have been requested to teach undergraduates basic statistics and criticized for some snow days I missed due to illness…… They stopped my salary already, now I have to get some health insurance, and then I will fight for my retirement income."

As I noted, I am currently the Acting President and organizer of the International Facet Theory Conference to take place in July 2020 in Prague. Among my suggestions for Spring 2020, was a request for one-course release, needed to allow time for scientific paper review and administrative duties for the upcoming conference, but I received no response. My Area just hired a young faculty who appears to be my replacement, receiving preferential treatment over me in all these matters. Similarly, preferential treatment is afforded other junior faculty, as well as tenured male faculty, non-faculty, clinical instructors, and visitors.

The December 23 email also states:
"For next semester, the Provost's office considers it in the University's best interest for you to teach the courses you have been assigned; students have already enrolled in these and faculty schedules have been assigned with the expectation that you would be returning to teach.  It would have been our preference for you to have returned to teach…"
If all of the above is true, why am I not permitted to teach right now?

Incorrect Citations to Fordham Statutes to Remove Me from Fordham Benefits

The December 23 email concludes that I "may continue [my] medical coverage through Cobra."
The 1986 Cobra legislation allows continued health coverage in the case that "an employee loses his or her job…"  There is also a sentence "but notified you in May (for fall 2019)…" which I presume may refer to Dean Rapaccioli's May 24, 2019 email (Exhibit 5), which also references COBRA. The Dean's

email states in part: "I have granted you an exception to the statutory rules" and "the University Statutes provide for unpaid leave with paid benefits ONLY for faculty development purposes." [emphasis in the original] To me, that statement does not appear to be supported by the Statutes.

The December 23 response makes different references to the Statutes content, which in my view may not draw accurate conclusions. As I read it, granting unpaid leave with benefits is <u>not precluded</u>, but permitted by the Statutes, and is not limited to any type of unpaid leave.

> "Appendix 4: Salary and Benefit Provisions for Active Faculty A-18 Benefits While on Leave c.Faculty members [other than paragraph (b) above] while on a University-approved leave of absence without pay, and within the restrictions of the applicable insurance contracts with their parties, <u>may maintain coverage on the University life insurance, long-term disability, and medical plans</u>." [emphasis added]

I note that my health benefits were discontinued twice without notice during this summer: only reinstated after the intervention of Fordham's corporate attorney. What exactly are the implications for my status with the University?

<u>Federal Court</u>
Fordham is taking these new adverse actions in the context of a pending Federal lawsuit (Case 1:18-cv-04615-ER) while the Court is currently reviewing some of these very matters.

On December 23, 2019, the same day as Dr. Crystal's email, Fordham attorneys filed a letter with Federal Court (Dkt #63). It referenced, in part, the "potential for a more global, amicable resolution of this matter" in the Federal case (December 23, 2019 at 1:33p). At the same time Fordham asserts to the Court that they want an amicable resolution, they take an extreme adverse action against me in the December 23 4:41pm email on the very same day.

Previously, on April 10, 2019, Fordham had written to the Court, in what now appears to be an inaccurate statement:

> "More importantly, Dr. Solomon is a current tenured professor in Fordham's Gabelli School of Business and the status quo remains preserved."

If the Fordham latest actions against me per the December 23 email are realized, they may constitute a material change with direct bearing on Fordham's pending motion. I believe Fordham may need to report that to the Court promptly.

<u>Conclusion</u>
I will appreciate your clarifying my status at Fordham University following the December 23, 2019 email, and I respectfully request that you reconsider. I believe it would be in the best interests of Fordham University to let me teach the Graduate Courses at Lincoln Center to which I have already been assigned. Alternatively, one should also consider whether it would also be preferable not to take further adverse actions against me, but continue my 2019 Leave without Pay with benefits for Spring 2020.

I look forward to your response and thank you for your consideration.

Sincerely yours,


Esther Solomon, Ph. D.

Fordham University Mail - Spring 2020 Semester

Gabelli School of Business

**5 attachments**

Dec 20, 2019 email to Fr McShane & Provost.pdf
415K

Dec 23, 2019 Dr. Crystal email.pdf
389K

Corresp Ex Dec 18, 2019.pdf
1215K

Faculty senate Minutes 4:11:2019 - Excerpt.pdf
928K

May 24, 2019 email Health Benefits.pdf
682K

---

**Dennis Jacobs** <dcjacobs@fordham.edu>                     Thu, Jan 2, 2020 at 9:10 PM
To: esolomon@fordham.edu

I am out of town through Jan. 2, 2020 and will respond to your email as soon as I am able.
Best wishes for the holidays.

--
————————————————————————

**Dennis C. Jacobs, Ph.D.**
Provost and Senior Vice President for Academic Affairs
Fordham University
Cunniffe House, Room 229
441 E. Fordham Road
Bronx, NY 10458

(718) 817-3053
dcjacobs@fordham.edu
————————————————————————

1/2/20, 5:03 PM

 **FORDHAM**

## Spring 2020

**ESTHER Solomon** <esolomon@fordham.edu>                    Fri, Dec 20, 2019 at 3:47 PM
To: Fordham president <president@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>

Dear Father McShane and Provost Jacobs,

In my December 18, 2019 email regarding the upcoming 2020 Spring Semester, I respectfully requested your intervention. On December 19, 2019, Dr. Michael Pirson responded to that email. Since you were not copied on his email, it is copied below.

I will take Leave without Pay for the 2020 spring semester, instead of the untenable teaching schedule proposed. However, there an issue that needs to be addressed. I believe that the unpaid Leave should be with benefits, as the Statutes authorize.

Attached below are the relevant portions of the Fordham University Statutes. Contrary to Dr. Pirson's statement, the Spring 2020 unpaid leave with benefits is <u>consistent with the Statutes</u>regarding active tenured faculty. The Spring 2020 leave can be deemed to be under §4-05.08 b1 "for study and research" or under §4-05.08 b1 "in the interest of the University."

As I read Appendix 4, the following are both applicable. (b). All benefits are continued... for tenured faculty members who receive approval from the Office of the Provost for an unpaid leave of absence, when that leave is taken for faculty development purposes,
and also (c) Faculty members ... while on a University approved leave of absence without pay, may maintain coverage on the University life insurance, long-term disability, and medical plans.

As indicated in my December 18, 2019 email, during the upcoming semester, I will be engaged in academic work preparing for an upcoming conference and other research activities. I believe, given my Spring 2020 responsibilities as Acting President of the Facet Theory Association, organizing the FTA Conference with my Fordham affiliation, scientific program committee work, the Conference Proceedings duties and, along with my ongoing research work, that it warrants benefits during the unpaid leave.

Also note that the Business School Research Committee granted me a Summer 2020 Research Grant for my project: "*CEO Perceptions of Governance and Values: Ethical Leadership and Integrity for Social Responsibility.*" I do not know if they contemplate taking that grant away as well.

Given the above, I therefore respectfully request that you approve my request for leave with benefits.

Sincerely yours,

Esther Solomon, PhD

 **FORDHAM**

## Spring 2020

**Jonathan Crystal** <crystal@fordham.edu>                    Mon, Dec 23, 2019 at 4:41 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Fordham president <president@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>

Dear Dr. Solomon,

Your email to the Provost and President dated December 20, 2019 was forwarded to me for response. I have also had the opportunity to review your email correspondence with Dr. Pirson, regarding your teaching schedule for spring 2020. Based on my review, the Provost's office will honor your request for an unpaid leave but will not cover the costs of medical benefits during the leave.

As you acknowledged in your email's reference to the University statutes, faculty leaves must be approved by the Provost. Unpaid leaves, with benefits, will be granted only when the leave is taken for faculty development purposes for "study and research" or "when deemed to be in the interest of the University." §4-05.10(b).

The Provost's office is not prepared to approve your leave on either ground. As you state in your email, you will have the opportunity to engage in research this summer since you have been awarded a research grant from Gabelli. For next semester, the Provost's office considers it in the University's best interest for you to teach the courses you have been assigned; students have already enrolled in these courses and faculty schedules have been assigned with the expectation that you would be returning to teach. It would certainly have been our preference for you to have returned to teach rather than to be on leave, although we will not force you to teach. As Dr. Pirson explained several times, he has sought to accommodate your preference to teach graduate courses and at Lincoln Center by assigning you two out of three courses that meet both criteria. In my view, you have been treated fairly, in line with other tenured faculty in your area who have also been assigned to teach a variety of courses.

Your request for unpaid leave with benefits for consecutive semesters is also highly unusual. We granted your request several times, but notified you in May (for fall 2019) that we would not continue providing benefits indefinitely if you continued to choose not to teach.

When the University reopens on January 6th, the Provost's office will inform the Office of Human Resources Management that you will be taking a leave without benefits. HR will provide details of how you may continue your medical coverage through COBRA.

Sincerely,

Jonathan Crystal, PhD
Vice Provost
Fordham University
Cunniffe House, Room 225
441 E. Fordham Road
Bronx, NY 10458

phone: (718) 817-0136
email: crystal@fordham.edu

## Spring 2020

ESTHER Solomon <esolomon@fordham.edu>                    Wed, Dec 18, 2019 at 2:30 PM
To: "Michael Pirson [Staff/Faculty [BUS]]" <pirson@fordham.edu>
Cc: DONNA RAPACCIOLI <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>, Fordham president
<president@fordham.edu>

Hi Michael,

In response to your December 13, 2019 email below regarding my Spring 2020 teaching
schedule, I can teach the two courses you previously assigned me, "Leading People &
Organization" (LPGB-6613; Tuesdays, 8:00 pm) and "Leadership and Change" (LPGB-6613;
Tuesdays, 5:45 pm). This is explained in my December 2, 2019 email. Please see also my
previous emails dated December 10, 2019, and October 8, 10, 31, 2019, which are incorporated
below. They indicate why the assignments you present for me as a senior tenured faculty are a
demotion and discriminatory.

It does not appear to be an "accommodation" to require me to teach, as the third course, the
introductory undergraduate "Principles of Management" (POM) in the Bronx. The December 13
schedule replaces one Bronx POM for another. It substitutes the late evening section which meets
once a week, for a day POM section which meets twice a week, both in the Bronx. That would
still involve three different course preparations, commuting between two campuses and multi-
party coordination for the large, onerous POM classes.  However, there are other courses,
programs and responsibilities at Lincoln Center to which I could have been assigned as a third
course – but was not done.  It is not too late.

During Spring 2020, I will have additional professional research responsibilities, further making
that schedule untenable. I am Acting President of the Facet Theory Association, and responsible
for the upcoming 17th International FTA Conference in July 2020, as I indicated during our
December 12th Area meeting. My responsibilities include reviewing the research submissions and
preparing the 2020 FTA Conference Proceedings since I am one of the three-member scientific
program committee.  I had previously brought the 15th International FTA Conference to Fordham
in 2015.  Its website is still maintained by Fordham, the new Proceedings will be included,
enhancing Fordham's Business School visibility in the scientific community and helping with our
accreditation.

There is precedent for giving course release for others undertaking such time consuming
responsibilities.  If you do not want to set up a 2-3 schedule, perhaps you can arrange such course
release as an alternative.

During my 2019 unpaid leave, I have participated in most Area and Business School meetings.
They include meetings on curriculum where we voted for new programs and new concentrations
to be offered by the Area. I participated as a tenured faculty in the process and voted in personnel
and tenure decision. I devoted time to interviewing candidates for Fordham at the August
Academy of Management meeting, etc. In 2019 I published two papers and was the Editor of the
"Special Issue on Facet Theory in  Organizational Research" in the *International Studies of*

*Management and Organization* journal. These indicate my commitment.

I believe we can come to a resolution satisfactory for all involved.  I would rather teach a reasonable schedule next semester.  However, if I have to, I will consider another leave without pay, as I have been on this year.  I reiterate my request to teach the above two-course Spring schedule and urge you to reconsider.

I also respectfully request President Fr. McShane and Provost Jacobs to intervene, if possible, to help address this matter.

Sincerely yours,

Esther

---

📎 **Fordham Univ Statues - Excerpt.pdf**
526K

---

**Dennis Jacobs** <dcjacobs@fordham.edu>
To: esolomon@fordham.edu

Fri, Dec 20, 2019 at 12:48 PM

I am out of town through Jan. 2, 2020 and will respond to your email as soon as I am able.
Best wishes for the holidays.

--

**Dennis C. Jacobs, Ph.D.**
Provost and Senior Vice President for Academic Affairs
Fordham University
Cunniffe House, Room 229
441 E. Fordham Road
Bronx, NY  10458

(718) 817-3053
dcjacobs@fordham.edu

**Dennis C. Jacobs, Ph.D.**
Provost and Senior Vice President for Academic Affairs
Fordham University
Cunniffe House, Room 229
441 E. Fordham Road
Bronx, NY 10458

(718) 817-3053
dcjacobs@fordham.edu

---

**Michael Pirson** <pirson@fordham.edu>                        Tue, Nov 19, 2019 at 6:18 PM
To: "ESTHER E. SOLOMON" <esolomon@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>, dcjacobs@fordham.edu

Dear Esther,
At this point it looks like both graduate classes are close to minimum enrollment so it looks possible that you teach
those classes. Plus the rose hill undergraduate class.

I hope concerns are sufficiently addressed.

Thanks and best, Michael
[Quoted text hidden]

---

**ESTHER Solomon** <esolomon@fordham.edu>                        Mon, Dec 2, 2019 at 4:47 PM
To: Michael Pirson <pirson@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>

Hi Michael,

Regarding your question on my Spring 2020 schedule, this is to confirm that I can teach the two courses
you assigned me, "Leading People & Organization" LPGB-6613 on Tuesdays, 8:00PM - 10:00PM, and
"Leadership and Change" LPGB-6613 5:45PM - 07:45PM.

However, although I am a senior tenured faculty, the assignment of the third course, the elementary
undergraduate Principles of Management LPBU-3223 late in the evening at the Bronx, 6:30PM - 09:15
PM, is unacceptable.  It is discriminatory and a further demotion.

In addition to being extremely time consuming and requiring multi-party coordination, such an
assignment creates an over burdensome schedule.  It would involve three different course preparations on
two campuses and multiple late evening classes. As previously discussed, select junior faculty teaching
that course with its very large classes were given credit for 1.5 hours per credit hour due to its onerous
nature.

During the Spring 2020 semester, I believe I should teach the 2 first courses agreed upon above.  I believe
it is fair, since I can then teach my remaining 3 courses for the year during the Fall 2020 semester. Given

that the teaching load for faculty is a total of no more than 5 courses per year according to the Fordham University Statutes, I can do 2 in Spring and 3 in the fall. Junior faculty teach 2 courses each semester – a total of 4 per year.

Please confirm whether we can agree on this schedule.

Thanks and best regards,

Esther

....

[Quoted text hidden]

---

**ESTHER Solomon** <esolomon@fordham.edu>
To: Michael Pirson <pirson@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, An Yan <ayan@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>

Tue, Dec 10, 2019 at 6:45 AM

Hi Michael,

I will greatly appreciate it if you please confirm my Spring 2020 teaching schedule.

Thanks and best regards,

Esther

...

[Quoted text hidden]



FORDHAM UNIVERSITY
THE JESUIT UNIVERSITY OF NEW YORK

Faculty Senate

faculty (including members of the Library Committee and Senators at large) to study holistically the needs of faculty, students, and librarians. Dr. Crystal and Dr. Fahey-Smith concurred and agreed to meet with Prof. Kowaleski to begin the work.

*Key Conversation: Workload Assessment*
After outlining the meeting's key conversation, Senate President Keller introduced Dr. Crystal and James P. McCartin, Acting Associate Vice President for Academic Affairs and Acting Associate Chief Academic Officer.

Dr. Crystal indicated that the conversation about faculty workload at the October meeting of the Senate had offered him and his office helpful feedback and direction. He highlighted the work of the Faculty Development Committee in refining ideas, and he asked Senators for additional input at this stage of the discussion.

Dr. McCartin surveyed the history of discussions about faculty workload. The core question, he said, is how can the University ensure that tenured and tenure-track faculty have more time for scholarly production while also maintaining Fordham's commitment to excellent instruction and small class sizes? Dr. McCartin articulated three principles that have guided the thinking of the Provost's Office on this topic: adjustments should be revenue-positive, -neutral, or close to -neutral; instruction of the highest quality should be maintained; and there should not be a hierarchy between teaching and research faculty.

Noting that some options (e.g., reducing the standard teaching load to 2-2, substantially increasing the size of the tenured/tenure-track faculty, and substantially increasing class sizes) are not viable in the short run, Dr. McCartin presented five possibilities, noting the advantages and disadvantages of each. He then solicited the Senate's feedback.

There are two options concerning courseload flexibility:

- Offer faculty the choice between a 3-2 load with eligibility for Faculty Fellowship every eight semesters, and a 2-2 load with fellowship eligibility every ten semesters.
- Permit course banking, so that a faculty person teaches an average number of courses per year but has flexibility as to the number of courses that s/he teaches in any given semester.

Two options would establish differentiated research and teaching loads:

- Give departments/areas discretion to assign a total number of sections per year to tenured/tenure-track faculty and permit chairs to assign course loads differentially to individual colleagues.
- Reduce course loads for research-active faculty by incentivizing excellent teachers to assume a 3-3 load for enhanced compensation; adjust merit norms accordingly.

Then, a final option would make a change to overall courseload:

- Reduce the standard teaching load to 3-2-2-2 (i.e., nine courses every two years).

Discussion ensued, in which the following questions were asked and points were made:

- Specific models might fit schools differently, so could different models therefore be adopted in different parts of the University? Dr. Crystal responded that he would be open to the possibility that schools might experiment with different models that fit their needs.
- Several Senators suggested that out of the models Dr. McCartin had presented, the "Fellowship choice" model seemed the best, at least in the short term.
- Whichever model is adopted, how can the University avoid creating a hierarchy among members of the faculty, where colleagues might feel "frozen" into either a teaching-oriented or research-oriented track? Dr. Crystal responded that this is a desideratum that he shares.
- Although retaining small class sizes is a priority for the Provost's Office, 35 students is not a small class. Should we consider super-sections or other ways to teach more students in fewer

3

Fordham University Mail – May 3, 2019 Dr. Solomon Response

📄 682K

📄 **Exhibit 6.pdf**
429K

---

**Donna Rapaccioli** <rapaccioli@fordham.edu>                              Fri, May 24, 2019 at 5:52 AM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Victor Borun <borun@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>, Benjamin Crooker
<crooker@fordham.edu>, Elaine Crosson <ecrosson@fordham.edu>, "Ryan, James" <JRyan@cullenanddykman.com>,
Fordham president <president@fordham.edu>

Dear Dr. Solomon

I am responding to your May 3rd e-mail in which you (1) dispute some portions of your completed workload history
and (2) request another semester of unpaid leave with paid benefits for the upcoming Fall 2019 semester.

I will respond to the details of your completed workload history at a later date, but I did want to inform you that your
request for an unpaid leave with paid benefits for the Fall 2019 semester has been approved.

I am compelled to remind you however that the University Statutes provide for unpaid leave with paid benefits ONLY
for purposes of faculty development. Since your requested leave for Fall 2019 is NOT for faculty development
purposes, there is no statutory basis to grant your request. I have nonetheless approved your request and the
University will pay the employer portion of your family medical benefits for the 2019 Fall semester.

As you know, this is not the first time I have granted you an exception to the statutory rules in this regard, but you
should not  assume that the University will continue to grant you unpaid leave with paid benefits in the future. It is
customary that faculty on unpaid leave continue on the University health insurance plan through participation in
COBRA, which requires the employee to pay the full premium plus a minimal  administrative fee.
Sincerely,
Donna

[Quoted text hidden]

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>        Wed, Jun 19, 2019 at 5:14 AM
To: Donna Rapaccioli <rapaccioli@fordham.edu>
Cc: Victor Borun <borun@fordham.edu>, Jonathan Crystal <crystal@fordham.edu>, Benjamin Crooker
<crooker@fordham.edu>, Elaine Crosson <ecrosson@fordham.edu>, "Ryan, James" <JRyan@cullenanddykman.com>,
Fordham president <president@fordham.edu>

Dear Dean Rapaccioli,

I just received an official Notice from United Healthcare dated June 9, 2019.  It announced that my family
group coverage through the Fordham University Plan Group # 0902765 has ended as of last month,
5/31/2019.

The United Healthcare notice thanks me for being a valued member as of 2015, and suggest options for
seeking coverage after my benefits have ended, including COBRA which is for terminated employees.

The United Healthcare notice is contrary to your May 24, 2019 email.

Please let me know regarding the status of my healthcare coverage in reference to the Discontinuation
Notice of my Fordham Health Care benefits.

Thank you very much for your attention.

Sincerely,

Esther

....

[Quoted text hidden]

---

**Elaine Crosson** <ecrosson@fordham.edu>                    Wed, Jun 19, 2019 at 6:32 AM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, Victor Borun <borun@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>, Benjamin Crooker <crooker@fordham.edu>, "Ryan, James" <JRyan@cullenanddykman.com>,
Fordham president <president@fordham.edu>

Dear Prof Solomon— Please let me respond on behalf of Dean Rapaccioli. The OLC will look into this matter and
circle back to you when we have more information. The notice from UHC is indeed contrary to our understanding.
[Quoted text hidden]

---

**Elaine Crosson** <ecrosson@fordham.edu>                    Thu, Jun 20, 2019 at 12:21 PM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Donna Rapaccioli <rapaccioli@fordham.edu>, Victor Borun <borun@fordham.edu>, Jonathan Crystal
<crystal@fordham.edu>, Benjamin Crooker <crooker@fordham.edu>, "Ryan, James" <JRyan@cullenanddykman.com>,
Fordham president <president@fordham.edu>, Kay Turner <kturner27@fordham.edu>

Professor Solomon

I spoke with the HR department and our records indicate that your family health insurance coverage through UHC is
still in effect. Please send me a copy of the letter you recieved from UHC so that we can contact them on your behalf.

Thank you.





---

*NOTICE: This e-mail message, and any attachments, contains privileged and confidential information intended solely
for the use of the addressee.  If you are not the intended recipient, you are hereby notified that you have received this*



**UNITED STATES**
PO

**TRACKED\***

Esther Solomon, Pro Se
140 West 62nd Street
New York, NY 10023
Case# 18 CV 4615 (ER)

**PRIOR
MAI**

Pro Se Intake Unit
Moynihan Court House
U S District Court – SDNY
500 Pearl Street
Room 200
New York, N.Y. 10007

)PE



USM 5W
SDNY



EP14 Oct 2018
OD: 11 5/8 x 15 1/8

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

PS00000000013

✱ Domestic only.   ✕ For Domestic shipments, the maximum weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.