UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ESTHER SOLOMON,

                              Plaintiff,

            – against –

FORDHAM UNIVERSITY,

                              Defendant.

**OPINION & ORDER**

18 Civ. 4615 (ER)

Ramos, D.J.:

        Esther Solomon, proceeding *pro se*, is an associate professor at Fordham University's

Gabelli School of Business.  She alleges that Fordham has paid her less than her male colleagues

for the same work, assigned her an overwhelming and retaliatory course load, discriminated

against her because of her gender, age, and religion, defamed her, and breached a contract and

other duties owed to her.  She also alleges that Fordham recently retaliated against her by

refusing to pay for her health insurance.  She brings these claims under both federal and New

York state law.[1]

        The Court previously dismissed Solomon's First Amended Complaint in its entirety.  *See*

---

[1] Solomon brings claims under the following federal statutes:

- Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*
- Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*
- The Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 to 634
- The Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 to 2654
- The Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d)

She also brings claims under the following New York statutes:

- The New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297
- The New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 8-131
- The Achieve Pay Equality Act of 2015, N.Y. Lab. Law § 194

Finally, she alleges defamation, breach of contract, breach of fiduciary duty, and tortious interference with current
and prospective business relations under New York common law.

*Solomon v. Fordham Univ.*, No. 18 Civ. 4615 (ER), 2020 WL 1272617 (S.D.N.Y. Mar. 17, 2020).

Before the Court is Fordham's motion to dismiss Solomon's Second Amended Complaint

("SAC"), Doc. 71.  For the reasons discussed below, the motion is GRANTED.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Some familiarity with the facts underlying this case is assumed.  Solomon's SAC

includes her First Amended Complaint ("FAC") in its entirety, as well as 127 new paragraphs

and four new exhibits.[2]  The new material includes:  (1) additional information about male, non-

Jewish, and/or younger faculty members at Fordham to supplement her disparate treatment and

Equal Pay Act allegations; (2) Fordham policies and statutes relating to faculty member

responsibilities and Fordham's antidiscrimination policies; (3) additional allegations about

Fordham's culture of secrecy in perpetuating the exclusion of women from administrative or

quasi-managerial tasks; (4) email attachments to correspondence between Solomon and Fordham

administrators in late 2017; and (5) allegations and exhibits regarding Fordham's allegedly

retaliatory termination of her paid benefits in connection with the unpaid leave she took in Spring

2020.

While Solomon's allegations span decades, the newly-pleaded material appearing in

Solomon's SAC largely focus on issues occurring after September 2017, when the dispute about

her Spring 2018 teaching load began.  Thus, events occurring prior to this period are summarized

briefly in Subsection I.A., *infra*, but are fully set out in the Court's March 17 Opinion on

Fordham's first motion to dismiss.  *See generally Solomon*, 2020 WL 1272617.

---

[2] Citations to allegations contained in the SAC itself are referred to by paragraph number, and citations to the text of her attached exhibits are referred to by ECF page number.  Newly alleged material appears at ¶¶ 200-327 and ECF 172–275.

### A.      Facts Prior to September 2017

Solomon is currently a tenured associate professor at Fordham's Gabelli School of

Business, which offers both graduate and undergraduate courses at the Rose Hill campus in the

Bronx and the Lincoln Center campus in Manhattan.  SAC ¶ 42.  She was sixty-eight years old at

the time her initial Complaint was filed.  *Id.* ¶ 43.  Solomon is the only woman on the tenured

faculty in her area[3] as well as the only Jewish full-time faculty member in the area.  *Id.*

### 1.      Denial of Promotions

Solomon joined the Gabelli School in 1984 and was granted tenure in 1987.  SAC ¶ 43.

She was denied promotion from associate professor to full professor twice:  once in 2001 and

again in 2003.  *Id.* ¶ 106.  The SAC alleges that in 2001, the promotion committee chair

rescheduled the meeting from a Wednesday to a Friday, preventing two Jewish professors from

voting due to their observation of the Jewish Sabbath.  *Id.*  ¶ 107–8.  Solomon alleges no facts

concerning the 2003 promotion denial.

### 2.      2013 Nomination to Area Chair

On September 25, 2013, 70 percent of the faculty in her area nominated Solomon to be

the area's chair, a short-term leadership position.  SAC ¶ 17.  She alleges that four days later the

dean of the Gabelli School, Donna Rapaccioli, called her to orally propose a contract for

Solomon to serve as the area's chair for three years for a stipend of between $18,000 and

$20,000, and a reduced course load of one class per semester.  *Id.* ¶ 16.  Solomon alleges that

Fordham reneged on this agreement on October 2, when the then-provost, Stephen Freedman,

spoke with Solomon, Dean Rapaccioli, and John Hollwitz — another professor in Solomon's

---

[3] The Gabelli School is organized into a number of departments, called "areas."  Solomon is currently a member of
the Organizational Behavior/Leading People and Organizations Area.  SAC ¶ 3.

area — and sought to jointly appoint Solomon, Hollwitz, and one other person to the chair position in a "tripartite" structure.  *Id.*  ¶ 117.  Later that day, Freedman and Rapaccioli announced that they would appoint Hollwitz alone to the chair position.  *Id.*  ¶ 18.

On October 7, 2013, Freedman conducted a "Chair Termination Hearing" to remove Solomon from the chair position.  *Id.*  ¶ 118.  In her SAC, Solomon newly alleges that Freedman demeaned her at this hearing, comparing her to a child.  She alleges that he likened her brief area chair appointment to a situation in which "[on] Sunday one is given a certain understanding and then on Monday morning, that's changed; we all deal with our children in this way . . . but changes happen; decisions change."  *Id.*  ¶ 259 (emphasis in original).  Freedman also referred to Solomon as having "strong opinions" about the chair appointment.  *Id.* ¶ 261.

On October 27, 2017, Solomon sent a letter to a vice president in the provost's office, copying Provost Freedman, Dean Rapaccioli, and another Fordham vice president.  *Id.* at ECF 108–12.  In that letter, she recounted her 2013 experience surrounding the offer and withdrawal of the area chair position.  She described having since been excluded from administrative and curricular tasks at the Gabelli School and being "marginalized."  *Id.*

### 3.      Objections to Actions as Faculty Senator

Solomon also alleges mistreatment regarding her input into a 2015–2016 curriculum revision in the Gabelli School.  SAC ¶ 124.  As a Faculty Senator representing the Gabelli School, Solomon raised concerns that a "lack of appropriate involvement of senior tenured faculty . . . precluded senior faculty from exercising their rights and contributing with expertise to the program quality."  *Id.*  On January 27, 2016, two members of Gabelli's Executive Committee convened a faculty meeting and passed a resolution seeking removal of Solomon and Dorothy Klotz, another professor concerned about the revision, as faculty senators.  *Id.* at ECF

153.  In a February email to the Faculty Senate's Executive Committee, Gabelli Executive Committee members Bob Wharton and Sris Chatterjee included a memo that called Klotz and Solomon's behavior "unprofessional" and "predicated on a series of material misrepresentations made to the Faculty Senate."  *Id.* at ECF 152.  In March 2016, one of the members of the faculty, Michael Pirson, described Solomon as having a strong personalit[y]."  *Id.* ¶ 75.

### B.    Disagreements Over Solomon's Spring 2018 Teaching Schedule

In May 2017, Pirson, then the director of one of the master's degree programs of the Gabelli School, first indicated that Solomon would be assigned two elective graduate courses for the Spring 2018 semester.[4]  *Id.* ¶ 76.  Pirson later assigned Solomon her Spring 2018 teaching schedule in September 2017 while Solomon was on leave, writing that the schedule was "in case you come back."  *Id.* ¶¶ 66, 88.  She was assigned to teach two sections of an undergraduate management course in the Bronx, and one graduate-level course in Manhattan.  *Id.* ¶ 68.

In her SAC, Solomon newly includes several emails exchanged between her and Pirson regarding the Spring 2018 schedule.  Solomon also included these emails as PDF attachments in her December 18, 2017 email to Fordham's Title IX coordinator, Anastacia Coleman, described in detail in Section I.C., *infra*.  The email attachments show that Pirson first wrote to Solomon on September 26, 2017, assigning her two undergraduate Principles of Management classes, both of which were scheduled for Tuesday and Friday mornings.  *Id.* at ECF 221.  At some point between this course assignment and November 30, 2017, Pirson changed one of her Principles of Management sections from the Tuesday/Friday slots to a single consolidated Tuesday afternoon section.[5]  *Id.* at ECF 221.  The exchange does not indicate that he made any other changes to the

---

[4] Ultimately, Solomon alleges, a male faculty member and an adjunct were assigned to these elective courses.  SAC ¶ 76.

[5] There is no contemporaneous correspondence attached to the SAC regarding the first scheduling change.

schedule at that time.  On November 30, 2017, Solomon wrote to Pirson, urging him to restore to her the teaching schedule assigned on September 26.  *Id.* at ECF 221.  She also asked that a prerequisite for her graduate course be dropped.  *Id.*  Pirson responded, stating that he had changed the Principles of Management section to a Tuesday afternoon because he "wrongfully assumed having most of the teaching on Tuesday would be easier for [Solomon]."  *Id.* at ECF 223.  Pirson indicated that he would again change the course schedule and further look into the prerequisite issue.  *Id.*

Pirson wrote back to Solomon on December 1, 2017, informing her that the graduate course she had been initially scheduled to teach in Spring 2018 would be cancelled.  *Id.* at ECF 225.  He stated that she may, however, have the opportunity to teach one MBA course*.  Id.*  His email made no further reference to changes to the course times of her two undergraduate courses.  *Id.*  Solomon replied to Pirson on December 11, 2017 to ask when the promised change to her Spring 2018 schedule would occur.  *Id.* at ECF 226.  Pirson wrote back that the professor who had agreed to take her prior Principles of Management Section "now has scheduling issues as he arranged his schedule around the class."  *Id.* at ECF 227.  Solomon urged Pirson to reconsider, noting that "changes are being made to disadvantage me, a female senior tenured faculty member, to accommodate a male, who is not even a faculty member."  *Id.* at ECF 229.

At some point during this exchange, Solomon was assigned a different graduate course as her third class, which was scheduled at an inconvenient evening time.  *Id.* ¶ 83.  Solomon's final schedule thus caused her to have class on three separate days per week — "unprecedented," she alleges, for a senior member of the faculty.  *Id.*  She alleges that the schedule "make[s] it very difficult for her to have substantial blocks of time to engage in research and scholarship" and was "physically taxing."  *Id.* ¶¶ 74, 99.  She also alleges that Pirson did not assign either himself or

Professor Hollwitz any sections of the introductory undergraduate course that she was assigned. *Id.* ¶ 73.  She further states that, while she was assigned 50 class sessions in Spring 2018, Pirson was only assigned 12 sessions and a student trip to Brazil, and Hollwitz was assigned between 4 and 16 class sessions.  *Id.* ¶ 73.  Finally, she alleges that her original graduate course was cancelled because Pirson failed to advertise it, causing too-few students to enroll.  *Id.* ¶ 79.

C.    <strong>Emails with Compliance Office Concerning Past Informal Complaints</strong>

On December 18, 2017,  Solomon emailed Anastasia Coleman, Fordham's Title IX coordinator and Director of Institutional Equity & Compliance, copying General Counsel Elaine Crosson.  SAC at ECF 70.  In this email, Solomon asked for information on steps taken to investigate the complaints she had raised in her October 27 letter to Rapaccioli and Freedman regarding her 2013 Chair Termination Hearing.  *Id.*[6]  Her email also referenced her recent conflict with the Gabelli administration regarding her course assignments, and asked for Coleman's "plan to address and rectify the recent scheduling issues."  *Id.*  Solomon included as attachments to this December 18, 2017 email the three email chains between her and Pirson regarding her Spring 2018 teaching schedule described in Section I.B., *supra*.

Coleman responded on December 20, 2017.  She indicated that she had no records of contact between herself and Solomon in reference to Solomon "filing a discrimination and retaliation allegation."  *Id.* at ECF 71.  Coleman asked Solomon to send a copy of the October 27 letter and clarify the basis of Solomon's allegations.  *Id.*  Coleman stated that she was "very willing to investigate further but will need these clarifications from [Solomon]."  *Id.*

Solomon wrote back on December 21, 2017.  Solomon indicated that she and Coleman

---

[6] Simultaneous to Solomon's exchange with Coleman, Solomon was also in correspondence with Dean Donna Rapaccioli about allegations that Solomon had "engaged in conversation that was viewed as lacking civility" with regard to the scheduling dispute.  SAC at ECF 74; *see also Solomon*, 2020 WL 1272617, at *6.

had previously spoken by telephone in 2014 and that Klotz, the other senator who had

complained about transparency in curriculum planning, had registered complaints with Coleman

in 2016.  *Id.* at ECF 72.  Solomon also wrote to Coleman in reference to her October 27, 2017

letter to Freedman, stating that "I asked you for the results of the EEOC investigation that

<u>Provost Freedman should have launched</u> based on my ongoing complains [sic] regarding

retaliation and discrimination against me."  *Id.* (emphasis in original).

Solomon included PDFs of three email chains as attachments to her December 21, 2017

email, two of which dealt with the fallout from the 2016 conflict about curricular revisions.  *Id.* at

ECF 234–44.  The emails show that on February 2, 2016, Anne Fernald, the Faculty Senate

president, had asked Solomon and Klotz to "write up a full list of the complaints you have

regarding governance in your school" so that the University could assess remedies moving

forward.  *Id.* at ECF 239.  Klotz refused, stating that she believed that doing so would lead to

other individuals being "publicly humiliated."  *Id.* at ECF 240.  Klotz also noted that she had met

with Ms. Coleman in January 2016 regarding the EEOC complaint of a "Professor Wright."  *Id.*

at ECF 240.  As her third email attachment, Solomon included an email chain between her and

Dean Rapaccioli regarding allegations that Solomon had engaged in an uncivil conversation and

advising her to adhere to Fordham's Code of Conduct.  *Id.* at ECF 244.

### D.    The EEOC Complaint and Subsequent Developments

Solomon filed a complaint with the U.S. Equal Employment Opportunity Commission

("EEOC") on January 11, 2018.  SAC ¶ 22.  On February 5, General Counsel Crosson sent an

email to Solomon indicating that she was aware of Solomon's EEOC complaint.  Crosson wrote:

[C]oncerns have been raised by some of your colleagues that you have accused them of
unlawful discriminatory behavior and that you have expressed this in both a public and private
forum.  We recommend that you limit your comments to assert only factual allegations such as "I
have filed a claim with the EEOC alleging discrimination by the University".  To render public

8

accusations of discrimination against other members of the University community concerning matters that have not yet been investigated may cause damage to the reputation of your colleagues and may subject you to legal exposure.

*Id.* at ECF 19.

The EEOC issued a Right to Sue letter on February 28, 2018. *Id.* ¶ 27. Solomon alleges that Fordham then escalated its discrimination by assigning her Fall 2018 classes in the Bronx that were scheduled for late Friday afternoons and for time slots ending at 9:15 p.m. *Id.* ¶ 27.

Solomon filed this action on May 24, 2018. Doc. 1. On June 4, 2018, a new acting chair of Solomon's area announced another course schedule for her, covering three classes in Fall 2018 and three classes in Spring 2019. *Id.* ¶ 187. Solomon alleges that the schedule "included multiple sections of courses which counted as 1.5 credit [sic] for male younger faculty," but did not count as much for her. *Id.* She characterizes this teaching load as "retaliatory" and "punitive," and she claims it was in excess of Fordham's "contractual teaching load." *Id.*

Solomon took leave pursuant to the FMLA during the Fall 2018 semester. *Id.* ¶ 192. She alleges that "non-existing rules were cited to penalize her with another heavier than normal teaching load the next semester . . . ." *Id.* Solomon requested a meeting in December 2018 with Dean Rapaccioli to discuss her Spring 2019 assignments. *Id.* at ECF 167. After attempting to negotiate a reduced spring course load, Solomon requested unpaid leave on December 12, 2018. *Id.* at ECF 163. In a December 14 email, the acting chair of Solomon's area indicated "that the Provost Office [would] not be willing to grant an unpaid leave of absence for the Spring 2019 except if required by law." *Id.* at ECF 166. On December 16, Solomon emailed Fordham President McShane, requesting that he personally approve her unpaid leave of absence for the spring. *Id.* at ECF 160. Solomon was granted unpaid leave shortly after.

## E.   The Termination of Solomon's Paid Benefits

Solomon's SAC contains a new allegation that Fordham stripped her of her paid health benefits on February 1, 2020 in retaliation for her activities in this case.  She alleges that as of February 1, 2020 she was required to pay for the continuation of her health benefits through COBRA for terminated employees.  *Id.* ¶ 315.[7]  She states that this is a continuation of a pattern of retaliation that began with lapses in her insurance in May and July 2019 that were later rectified.  *Id.* ¶ 313.

On December 2, 2019, Solomon emailed Pirson to object to her assignment of an undergraduate Principles of Management course in the Bronx, in addition to two other graduate courses.  *Id.* at ECF 269.  On December 18, Solomon again wrote to Pirson to state that teaching three classes would be burdensome, copying Fordham President McShane and suggesting a course release as an alternative.  *Id.* at ECF 267.[8]  On December 20, 2019, Solomon emailed Fordham President McShane and Provost Dennis Jacobs.[9]  *Id.* at ECF 265.  She stated that she would take unpaid leave in Spring 2020 rather than teach the proposed three class schedule.  *Id.* She also argued that Fordham Statute § 4-05.08 permitted her to maintain full health benefits during this leave period.

Vice Provost Jonathan Crystal responded to her email on December 23, 2019.  He informed her that the Provost's office would honor her request for unpaid leave but would not

---

[7] The COBRA form states that her qualifying event type was "Termination."  SAC at ¶ 317.  However, the parties agree that she went on unpaid leave without benefits during Spring 2020.  *See* Doc. 76, Defendant's Memorandum of Law in Support of its Motion to Dismiss the Second Amended Complaint ("Defs' Br."), at 22; Doc. 80, Plaintiff's Opposition to Defendant's Motion to Dismiss ("Pls. Opp."), at 2.

[8] The December 18 email references the fact that Pirson had replied on December 13, but his reply is not attached to the SAC.

[9] This email also includes a reference to a response from Pirson on December 19, 2019 to Solomon's December 18 email, but that response is not included in the SAC.

cover the cost of medical benefits during that period.  *Id.* at ECF 266.  Crystal informed her that Fordham's statutes permitted unpaid leave with benefits only when the leave is taken for faculty development purposes "for study and research" or "when deemed to be in the interest of the University."  *Id.*  He further stated that the University determined it was its best interest "for [Solomon] to teach the courses [she had] been assigned," rather than to go on unpaid leave, thus rendering her ineligible for unpaid leave with benefits.  *Id.*  Finally, Crystal wrote that HR would provide her with details regarding how she could continue medical coverage during this leave period through COBRA—that is, at her own expense.  *Id.*

Solomon responded to Crystal's email on January 2, 2020.  She reiterated that she was fully prepared to teach the two graduate courses but objected to the undergraduate Bronx course assignment on the grounds that it was discriminatory.  *Id.* at ECF 261–62.  She also claimed that if Fordham was trying to terminate her, it needed to follow applicable notice and hearing procedures.  *Id.* at ECF 261.  Finally, she reiterated her disagreement with Crystal's reading of Fordham's statutes regarding continuation of benefits.  *Id.* at 262.  Crystal again replied on January 9, 2020.  Doc. 82-1.[10]  He informed Solomon that she was not being terminated or accused of violating her contract, and that he did not seek to initiate the disciplinary process.  *Id.* at 2–3.  He also further denied her proposal to teach two classes instead of three, stating that Fordham's policy of a yearly 3/2 class load applied to academic years, not calendar years, and leaves of absence such as her Fall 2019 leave were weighed as two classes.  *Id.* at 2.  He again presented the university's position that unpaid leave with paid benefits was unavailable in her situation.  *Id.*  Sometime in early February 2020, Solomon received a COBRA election form

---

[10] This email was not attached to Solomon's SAC in its entirety, but it was incorporated by reference in the SAC through Solomon's discussion and quoting of an excerpt from it.  *See* SAC at ¶ 321.  Fordham attached the email in full in its reply brief.  *See* Doc. 82-1.

dated February 1, 2020.

### F.        Unequal Pay Allegations

Solomon also alleged that she has been underpaid compared to "similarly situated male faculty members and even younger faculty members" for much of her career at Fordham.  SAC ¶ 2.  During the 2017 and 2018 academic years, she was paid less than $123,000 as an associate professor.  *Id.* ¶ 8.  Citing to Glassdoor, a salary comparison website, Solomon alleges that lower-ranked assistant professors make, on average, $137,000 per year.  *Id.*

In her FAC, Solomon described the salary of two comparator professors:  Hollwitz and Pirson.  Hollwitz, she alleges, earned a salary of $400,000 in 2010 for "performing the same Professor job as she does."  *Id.*  ¶ 5.  Hollwitz was appointed area chair in 2013 and served in that capacity until 2016.  *Id.*  ¶¶ 18, 122.  Hollwitz also was Fordham's Vice President of Academic Affairs in 2004.  *Id.*  ¶ 113.  She does not allege whether he is an associate or full professor.  Pirson allegedly earns $300,000 per year and is director of two interdisciplinary programs.  *Id.*  ¶ 6. At the time Solomon filed her FAC, he served as acting chair of Solomon's area and was the "most recently tenured faculty."  *Id.*  Solomon does not allege whether he is an associate or full professor.

In her SAC, Solomon supplements these allegations by attaching several Fordham statutes pertaining to the roles and responsibilities of Fordham's faculty.[11]  According to the statutes, "Faculty" includes distinguished professors, university professors, professors, associate professors and assistant professors who are tenured or have received tenure-track appointments. SAC at ¶ 206.  She also cites Fordham Statute § 4-01.02, which indicates that Faculty members have responsibility over "curriculum, subject matter and methods of instruction, research, faculty

---

[11] She also proffers these allegations in support of her Title VII and ADEA claims that similarly situated professors were not given comparable teaching loads.

status, and those aspects of student life which relate to the educational process." *Id.*  She alleges that all faculty members are subject to "the same teaching, research and service standards."  *Id.* at ¶ 215.  The maximum faculty course load is no more than five courses per year, which can be reduced to two courses per semester, or even fewer annually, through course releases.  *Id.* at 213. Course releases may be granted for reasons such as "engage[ment] in major research projects," significant time spent "in the direction of graduate student research," "significant administrative responsibilities," or "other activities which justify a reduction of course load."  ECF 179.

Solomon joined the Management Systems Area in 1987, and was sixty-eight years old at the time she first filed her Complaint in 2018.  *Id.* ¶ 43.[12]  She alleges the names of fourteen male faculty members in the area, along with the dates they joined the area.  *Id.* ¶ 216.  Solomon also states the names of certain younger female professors in the Business School whom she alleges received higher salaries and better benefits than her.  *Id.* ¶ 244.  Solomon also newly alleges the higher salaries of two other male professors, one in his 40s and one in his 50s.  *Id.* ¶ 237.  She does not allege their names or additional details about their job content, title or responsibilities.

Solomon also recounts the experiences of professors who are either older, female, or Jewish who had various negative experiences regarding their course assignments.  These include Marek Hessel, a Jewish professor who was made to teach what he described as "baby math"; Janet Marks, a female professor who was allegedly not allowed to teach in conformance with her contract; Edmond Weiss, an older Jewish professor whose working conditions became "physically untenable"; and Milan Zeleny, an older professor who was also sent to the Bronx to teach undergraduates.  *See id.* at ¶¶ 304-311.

---

[12] The "Leading People and Organizations" Area was previously split off from a larger "Management Systems" area.

### G.   Procedural History

Solomon filed her *pro se* Complaint on May 15, 2018.  She filed an amended complaint on March 13, 2019.  Fordham moved to dismiss the Amended Complaint on May 6, 2019.  This Court granted Fordham's motion on March 17, 2020, but granted her leave to re-file a second amended complaint.  She did so on April 16, 2020.  Fordham moved to dismiss the SAC on May 29, 2020.

## II.   LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Koch v. Chrisite's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Even though "a discrimination complaint need not allege facts establishing each element of a *prima facie* case of discrimination" to survive a motion to dismiss, "it must at a minimum assert nonconclusory factual matter sufficient to 'nudge its claims' across the line from conceivable to plausible.'"  *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 680) (internal alternations omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Courts should read *pro se* pleadings "liberally and interpret them to raise the strongest arguments that they suggest."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)

(quotation marks omitted) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). The obligation to read a *pro se* litigant's pleadings leniently "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y. State Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). "However, even *pro se* plaintiffs asserting civil right claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Title VII and the ADEA require plaintiffs in New York to make a complaint to the EEOC within 300 days of the alleged adverse action in order for their claims to be considered timely in federal court. *Gindi v. N.Y.C. Dep't of Educ.*, 786 F. App'x 280, 282 (2d Cir. 2019) (citing 42 U.S.C. § 2000e-5(e)(1) and 29 U.S.C. § 626(d)). Given that this case was filed with the EEOC on January 1, 2018, only conduct occurring after March 7, 2017 is timely under Title VII and the ADEA. FMLA claims carry a statute of limitations of two years — three years if the violation of the statute is "willful." 29 U.S.C. § 2617(c); *see also Offor v. Mercy Med. Ctr.*, 676 F. App'x 51, 53 (2d Cir. 2017).

### III.   FEDERAL DISPARATE TREATMENT DISCRIMINATION

Because Solomon's SAC includes the First Amended Complaint in its entirety with additional allegations and exhibits, the Court construes her SAC to raise the same claims as the FAC, but with the additional facts in support described in Section I, *supra*. Thus, Solomon alleges disparate treatment discrimination under Title VII on the basis of her sex and religion as a Jewish woman, and brings an age discrimination claim under the ADEA as an older employee.

### A.        Title VII and ADEA Claims

"[T]o defeat a motion to dismiss . . . in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against [her], and (2) [her] race, color, religion, sex, or national origin was a motivating factor in the employment decision."  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).  When a plaintiff alleges that the discrimination is implicit, rather than direct and open, she must allege that "(1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (alterations and citation omitted).  This four-part analysis applies to the ADEA as well.  *See Mazzo v. Mnuchin*, 751 F. App'x 13, 14 (2d Cir. 2018) (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001)).

The parties do not dispute the first two prongs of this test.  In the Court's March 17 Opinion granting Fordham's motion to dismiss, the Court found that the FAC alleged four potential adverse employment actions that could provide a basis for a Title VII or ADA claim: (1) denial of promotions in 2001 and 2003; (2) allegations in connection with her failure to be appointed an acting area chair in June 2017 and Fordham's failure to reimburse her for conferences later in 2017; (3) changes made to her teaching schedule for Spring 2018 and after; and (4) allegations that she was denied research funding in December 2017.  *See Solomon*, 2020 WL 1272617, at *10–11.  Of these, the Court found that only the third—changes her to teaching load in Spring 2018—could plausibly constitute an actionable adverse employment action.  *Id.* at *11 ("Solomon was forced to teach more classes for the same amount of pay as before, with the added burden of having to commute between the two campuses when she had not been required

to do so before."). The Court found, however, that Solomon did not sufficiently allege any other facts that raised an inference of discrimination surrounding this action and dismissed the claim. *Id.* at *12–13.

Solomon does not allege any new adverse employment actions in connection with her Title VII or ADEA discrimination claims. She does, however, provide additional facts that she argues support an inference of discrimination regarding changes to her teaching schedule in Spring 2018 and beyond. Thus, to assess whether she has properly repleaded her Title VII and ADEA claims, the Court will consider whether these additional facts support an inference that changes to her teaching schedule were motivated by discrimination.

### 1.    New Comparator Allegations

To support an inference of discriminatory treatment, a plaintiff must plead facts "showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). To assess whether another employee is similarly situated in all material respects, courts must consider "(1) whether the plaintiff and [comparators] were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* at 40. Courts may also consider characteristics such as the employees' education, work experience, and specific job content and duties. *See McPherson v. NYP Holdings, Inc.*, No. 03 Civ. 4517(NGG)(LB), 2005 WL 2129172, at *4 (E.D.N.Y. Sept. 1, 2005), *aff'd*, 227 F. App'x 51 (2d Cir. 2007).

This Court previously found that Professors Hollwitz and Pirson, who earn more than Solomon and were not required to teach undergraduate courses in the Bronx in Spring 2018, were not similarly situated to her. *See Solomon*, 2020 WL 1272617 at *12. The Court cited the

fact that Pirson was the acting chair of Solomon's Area in 2018 when schedules were issued, and that Hollwitz had previously served in various administrative roles such as Area Chair and Vice President of Academic Affairs.  *Id.*

In her SAC, Solomon pleads the names of fourteen male professors whom she alleges are similarly situated to her, as well as the dates they joined Solomon's area.  SAC ¶ 216.  This list includes Hollwitz and Pirson.  *Id.*  In support of her ADEA claim, she provides the names of three female professors in the business school, whom she alleges are also comparators.  *Id.* at 244.  Finally, she alleges the names of several people who are "either older, female, or Jewish, or a combination" whom she alleges have also been treated in a disparate way similar to her.  SAC ¶ 304.

Solomon's core argument is that all tenured faculty members in her Area are similarly situated and thus proper comparators.  *See* Pls. Opp. at 7.  In support she cites Fordham Statute § 4–03.01, which delineates certain responsibilities common to all Fordham faculty members.  *See* SAC at ¶ 210.  She notes in particular that all full-time faculty members are subject to the same maximum teaching load of no more than five courses per year (2/3 or 3/2 per semester) and the same University Code of Conduct and disciplinary processes.  SAC ¶ 213; Pls. Opp. at 7–8.  On this basis, she argues that her position is "substantially equivalent" to that of other faculty members because she is subject to the "same performance evaluation and discipline standards."  SAC ¶ 217; *see also* Pls. Mem. at 7 n.15 (citing *Graham*, 230 F. 3d at 40).  With the exception of professors Pirson and Hollwitz, she does not specifically allege the Spring 2018 workloads of any comparator professors.

Solomon's argument that any faculty member in the business school is similarly situated to her by virtue of the Fordham statutes sweeps too broadly.  The faculty duties described by the

Fordham statutes are quite expansive and varied, and could describe the work of virtually any professor. *See* SAC at ECF No. 179 (listing faculty responsibilities such as "satisfactory fulfillment of teaching duties in assigned courses or their equivalent," "involvement in significant scholarly research," and "scholarly publication.").[13]  Indeed, the SAC includes allegations that would support a finding that the day-to-day responsibilities of faculty members vary significantly. *See* SAC at ¶ 221 (noting that many faculty members "are given administrative appointments such as Area Chairs, Directors of Programs, [and] Coordinators of Programs" which involve "additional compensation, course releases, power and privileges, [and] decision-making.").  Thus, listing faculty members and the years they joined the area is insufficient to establish those faculty members' comparator status without factual allegations about "how their workplace conduct compared to [Solomon's], or how they were treated." *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014); *see also Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 514 n.17 (E.D.N.Y. 2019) ("When determining whether employees are similarly situated, courts consider characteristics including the employees' education, work experience, and *specific work duties*.") (emphasis added) (quoting *McPherson*, 2005 WL 2129172, at *4).

The introduction of the Fordham statutes is also insufficient to supplement Solomon's prior allegations regarding Pirson and Hollwitz, who are the only professors whose Spring 2018 schedules she has explicitly compared to her own.  The Court previously found that Pirson and Hollwitz were not similarly situated to Solomon, both because they were "differentiated in their administrative roles or seniority," and because Solomon failed to allege that she was subject to

---

[13] This list appears to be nonexhaustive as well. *See* § 4-03.01 ("Responsibilities of the Faculty *include . . .*) (emphasis added).

the same job requirements as them. *See Solomon*, 2020 WL 1272617, at *12. Construing the facts most favorably to Solomon, she has now alleged that they are all subject to requirements of Fordham's statutes, including the maximum course load of five courses per year. However, Fordham's statutes provide a great deal of flexibility within this rule: § 4-03.02(b) states that:

> The course load may be reduced for individual faculty members engaged in major research projects, faculty with graduate teaching responsibilities who spend much of the time in the direction of graduate student research, and for faculty members heavily involved in laboratory instruction, the direction of field work or other activities which justify a reduction of course load. Chairpersons and other faculty with significant administrative responsibilities are given consideration in the reduction of their teaching loads.

*See* SAC at ECF 179.

Solomon's allegations that Pirson and Hollwitz had less rigorous teaching schedules than her therefore remain insufficient in light of the job requirements that she has presented. Solomon does not allege facts supporting an inference that she is similarly situated to either professor in terms of "major research projects," "graduate teaching responsibilities," "significant administrative responsibilities" or other factors that are considered in determining a reduced course load pursuant to Fordham's statutes. The SAC also includes some facts that suggest these factors differ among Solomon, Pirson and Hollwitz. *See, e.g.*, SAC ¶¶ 219–20 (recounting Pirson and Hollwitz's administrative experience); ¶ 232 (alleging that Pirson and Hollwitz, but not Solomon, teach in the Executive MBA program).[14] Nor does she argue that any of their course loads violated the Fordham statutes she cites. Thus, Solomon has failed to allege facts showing that Pirson and Hollwitz, or any other alleged comparator individuals, are similarly situated to her regarding her allegations of a discriminatory teaching load.

---

[14] Solomon argues that having *previously* held an administrative position does not automatically disqualify other faculty members from being similarly situated once they transition back into a non-administrative role. Pls. Opp. at 10. This may be true depending on the situation, but it is still Solomon's obligation to plead facts establishing that any such individuals are similarly situated to her in their present capacity as non-administrators. She has not done so with Pirson or Hollwitz.

## 2.    Pattern of Derogatory Statements

The Second Circuit has recognized that "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus may give rise to an inference of discriminatory motive" regarding an adverse employment action.  *Gregory v. Daly*, 243 F.3d 687, 697 (2d Cir. 2001) (internal quotation marks and citation omitted).  However, the more "remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."  *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

In the Court's March 17 Opinion, it found that Solomon had not alleged any statements of sufficient severity or pervasiveness to support her disparate treatment allegations.  *See Solomon*, 2020 WL 1272617, at *12.  Here, Solomon alleges two purportedly sexist comments that were made by then-Provost Freedman in 2013.  These statements both arose in connection with Solomon's "Chair Termination Hearing," in which Solomon was allegedly removed as area chair.  Solomon alleges that then-Provost Freedman said the following about Solomon's situation at this hearing, citing an audio transcript:

> PROVOST FREEDMAN: . . . but I've been in situations where individuals—on a Sunday—really believe something happened and on a Monday morning, the situation changes.  Those things happen . . .
>
> PROVOST FREEDMAN:   . . . and I agree with you:  what one has to do in a situation where on [a] Sunday one is given a certain understanding and then on Monday morning, that's changed; <u>we all deal with our children this way</u>, then end up being disappointed in the situations where they were led to believe a certain way and we all deal with professionals in the same way but changes happen; decisions change."

SAC at ¶ 259 (emphasis and alterations in original).

Solomon also alleges that Freedman made the following remarks in a telephone

conversation several days before the Chair Termination Hearing:

> Esther obviously has very strong opinions about this [her removal as Area Chair] for reasons that are hers.  I want to incorporate those <u>strong opinions</u> in my decision.  But I don't want her <u>strong opinions</u> and Esther, I'm saying this with all respect, I do not want your <u>strong opinion</u> to unduly influence what is best for the department going forward.  I want to make a judgment, a decision that really reflect[s] all of the input that I receive OK.

*Id.* at ¶ 261 (emphasis in original).

Solomon provides only a limited background to Freedman's statements, making their meaning somewhat ambiguous and difficult to divine.  However, viewed in the light most favorable to Solomon, Freedman's remarks could be interpreted as disrespectfully and pejoratively comparing her to a child, as well as denigrating women who hold "strong opinions." Even so, however, they do not plausibly give rise to an inference that Solomon's Spring 2018 teaching schedule was motivated by sex discrimination, for three reasons.  First, Freedman's comments were made in 2013, over four years before Solomon's Spring 2018 schedule was imposed, which is the only adverse employment action at issue here.  Second, and relatedly, Freedman made these remarks in a much different context from the scheduling dispute, as his comments arose in the context of a disagreement over whether Solomon would serve as Area Chair in 2013.  Third, Solomon alleges that it was Pirson, not Freedman, who was responsible for her Spring 2018 course assignment.[15]

Thus, even though Freedman's remarks may well have been discriminatory, the fact that they were made several years earlier, in a different context, by someone with no specifically alleged involvement in the later adverse employment action, does not suffice to allege an inference of discriminatory intent.  *See Tomassi*, 478 F.3d at 115 ("[R]emarks made by someone

---

[15] Freedman is copied on some, but not all, of the emails documenting Solomon's correspondence with Fordham administrators about her 2018 teaching schedule.  *See* SAC at ECF 221–229.  However, Freedman does not participate in this email chain, as Solomon's correspondence is exclusively with Pirson.

other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark."); *see also Minton v. Lenox Hill Hosp.*, 160 F. Supp. 2d 687, 695 (S.D.N.Y. 2001) (declining to weigh derogatory statements made by individuals who were not decisionmakers, or by decision-makers unrelated to the decision-making process).

### 3.      Failure to Investigate

An employer's noncompliance with its own anti-discrimination policy may give rise to an inference of discriminatory intent. *See Collins v. Cohen Pontani Lieberman & Pavane*, No. 04 Civ. 8983 (KMH)(MHD), 2008 WL 2971668, at *10 (S.D.N.Y. July 31, 2008) (citing *Reed v. Conn. Dep't of Transp.*, 161 F. Supp. 2d 73, 81 (D. Conn. 2001)).

Solomon alleges that Fordham failed to investigate her claims of gender and age discrimination, thus raising an inference that her Spring 2018 teaching load was retaliatory. The Court previously found that she failed to plead facts supporting this allegation in her FAC, noting that (1) she did not plead Fordham's policy for investigating complaints of discrimination; (2) she never filed a formal complaint; (3) the October 2017 letter that provided the basis of her complaint did not mention her gender, age or religion at all, nor did it mention scheduling issues. *Solomon*, 2020 WL 1272617, at *13.

Solomon now attaches Fordham statutes pertaining to its Whistleblower Policy. *See* SAC at ECF 205–7. She also cites to newly included attachments from a December 2017 email exchange between herself and Anastacia Coleman, Fordham's Title IX coordinator. *See* SAC at ECF 220–29.[16] These email attachments document the Spring 2018 teaching schedule dispute. Thus, viewed in the light most favorable to Solomon, she alleges that these email attachments

---

[16] Solomon's FAC had included the correspondence with Coleman, but not the email attachments.

show that Fordham failed to investigate Solomon's past complaints of unlawful discrimination

on the basis of age, religion and gender pursuant to Fordham's Whistleblower Policy, raising an

inference of discrimination regarding her Spring 2018 schedule.  *See* SAC at ¶ 287.

The Whistleblower Policy states in relevant part that employees are protected from

retaliation, and thus entitled to an investigation, when they make "wrongful conduct concerns."

SAC at ECF 205.  A wrongful conduct concern is a suspected "violation of University policies:  a

violation of applicable local, New York State, and Federal laws; or the use of University

property, resources, or authority for personal gain or other non-University-related purposes."  *Id.*

Concerns are to be "reported either verbally or in writing as soon as practicable."  *Id.* at ECF 206

(listing various entities to whom one can make reports).  Reports are to "promptly investigated."

*Id.*  The statutes also note, however, that "this policy is not intended to be the method for

reporting . . . issues related to alleged employment discrimination . . . which should be handled in

accordance with the University's Personnel and Student Conduct Policies."  *Id* at ECF 205.[17]

Thus, while it appears that there are additional requirements for lodging a formal internal

complaint not before the Court, Solomon at the very least alleges that she raised concerns of a

"violation of University policies" or of "applicable local, New York State, and Federal laws"

regarding discrimination against her on the basis of age, gender or religion, which would have

obligated Fordham to respond with some sort of investigation.

There is still, however, no basis for Solomon's allegation that Fordham failed to follow its

own investigatory procedures under the standard laid out by this Whistleblower Policy.

---

[17] These Personnel and Student Conduct Policies are not attached to the Complaint.  Solomon does attach a
document titled "Fordham University Sexual Harassment in Employment Prevention Policy."  *See* SAC at ECF
213–16.  While this document includes a summary of applicable state and local antidiscrimination law, it does not
explain Fordham's policy for lodging an internal complaint.

Solomon's December 18, 2017 email focused on a letter she had emailed to Freedman on October 27, 2017. But as described in the March 17, 2020 Opinion, this letter describes only the fallout from the dispute regarding her 2013 area chair appointment, and "did not mention any protected characteristic." *Solomon*, 2020 WL 1272617, at *15. Fordham's policy requires, at the very least, an allegation of a violation of state or federal law or university policies to trigger an investigation. *See* SAC at ECF 205–6. Solomon's October 2017 letter raised concerns about promises allegedly made to her in connection to the 2013 area chair appointment, but—as the Court recognized in its March 17 Opinion—that letter could not have reasonably put Fordham on notice of any complaints of discrimination regarding the imposition of her Spring 2018 schedule. *Cf. Int'l Healthcare Exchange, Inc. v. Global Healthcare Exchange, Inc.*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (holding, in the retaliation context, that ambiguous complaints not setting forth the alleged misconduct cannot put an employer on notice of allegations of discrimination).

The newly alleged attachments to Solomon's December 18, 2017 email to Anastacia Coleman do not change this analysis. As discussed, Solomon's December 18 email focused on her October 2017 letter to Freedman regarding her area chair appointment. However, Solomon also attached PDFs of three prior email chains to this email, totaling about ten pages, showing correspondence between Solomon and Pirson regarding the logistics of her Spring 2018 teaching schedule. *Id.* at ECF 220–29. This attached correspondence shows that on December 11, 2017, after over a month of discussion with Pirson about the schedule, Solomon for the first time pointed out that her proposed Spring 2018 teaching assignments "further disadvantage me, a female senior faculty member, to accommodate a male, who is not even a faculty member." *Id.* at ECF 229. In response to Solomon's December 18, 2017 email containing these attachments, Coleman asked for clarification, stating that "[i]t is not clear from [the attachments] as to what

basis you are alleging you have been discriminated against . . . I am very willing to investigate further but will need these clarifications from you." *Id.* at ECF 231.  In her December 21, 2017 reply to Coleman, Solomon does not address this attached correspondence with Pirson, but again urged Coleman to inform her about the university's response to her October 2017 letter about the 2013 Area Chair appointment.[18]  *Id.* at ECF 233.

Solomon's inclusion of these email attachments, and Coleman's response to them, also does not raise an inference that her Spring 2018 schedule was discriminatory.  Because the email correspondence with Coleman overwhelmingly focused on Solomon's complaints about the 2013 area chair termination, her inclusion of the attachments regarding her Spring 2018 teaching schedule was ambiguous and reasonably caused Coleman to ask for clarification.  Solomon's December 21 response, however, did not provide the requested clarification.  Rather, Solomon again invoked the October 2017 letter and 2013 area chair incident, and omitted further discussion of her Spring 2018 schedule.  While Solomon was not required to use any "magic words" to invoke a complaint of discrimination, she was required to make clear the basis of her complaint.  *See Ramos v. City of New York*, No. 96 Civ. 3787 (DLC), 1997 WL 410493, at *2–3 (S.D.N.Y. July 22, 1997) (employer was not on notice of a complaint of discrimination when plaintiff hoped that the employer "pick[ed] up the gist" of a complaint of general mistreatment).  She did not do that regarding the Spring 2018 teaching schedule, and did not provide clarification when given the opportunity.  Thus, Solomon fails to allege that Fordham's purported failure to investigate raises an inference of discrimination regarding her Spring 2018 course schedule.

---

[18] The December 21 email also references an unspecified 2014 correspondence between Solomon and Coleman, and a different set of complaints lodged by Klotz in 2016.  *See* ECF 233.

### 4.     Other Allegations of Disparate Treatment

Solomon makes several other allegations of disparate treatment. First, she references the experiences of several other professors who were dissatisfied with their assignments teaching undergraduates or teaching in the Bronx, all of whom were "either older, female, or Jewish, or a combination."  SAC at ¶ 304; *see also* ¶¶ 305-311.  However, many of these allegations are too conclusory from which to draw any inferences as to Solomon's treatment—for example, she notes that Professor Edmond Weiss left Fordham "after his working conditions were changed to intolerable" without specifying how those conditions changed.  *Id.* at ¶ 309.  Finally, none of these anecdotes show that these professors were subjected to the same type of adverse treatment that she alleges:  a "material increase in [their] responsibilities without additional compensation." *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015).

Solomon also argues that male area chairs have a culture of secrecy, and have "kept information secret about courses, programs, etc."  Pls. Opp. at 17.  However, these allegations are too conclusory for the Court to assess whether any of Fordham's alleged actions constitute a "departure from procedural regularity" so as to "raise a question as to the good faith" on Fordham's part.  *See Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984).  For example, Solomon does not allege the substance of Fordham's policies for sharing relevant information about courses or programs, or allege facts showing that analogous information was given to similarly situated individuals outside of Solomon's protected classes but hidden from her.

Thus, Solomon fails to sufficiently allege facts that plausibly show her Spring 2018 teaching schedule was discriminatory.

### IV.     Unequal Pay Claim

Solomon also brings claims under the federal Equal Pay Act, as well as the ADEA and

Title VII, alleging that she is not paid the same as her colleagues for equal work.  "[T]o prove a violation of the EPA, a plaintiff must demonstrate that (1) the employer pays different wages to employees of the opposite sex;  (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *E.E.O.C. v. Port Auth. of N.Y. & N. J.*, 768 F.3d 247, 254–55 (2d Cir. 2014) (internal quotation and alterations omitted).  Courts analyze equal pay claims under the ADEA and Title VII similarly to those brought under the EPA.  *See, e.g., Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 n.2 (2d Cir. 2015).

In this Court's March 17 Opinion, it found that Solomon had pleaded two comparators with specificity for her EPA claim:  Hollwitz and Pirson.  *See Solomon*, 2020 WL 1272617 at *13.  However, the Court found that Solomon had not sufficiently alleged that Hollwitz and Pirson's job content—as opposed to job title or description—was similar to her own.  *Id.* (citing *Chepak v. Metropolitan Hospital*, 555 F. App'x 74, 77 (2d Cir. 2014).

Solomon alleges no new facts to cure that deficiency here.[19]  Moreover, for the reasons stated in Section III.A, *supra*, her citations to the Fordham Statutes do not suffice to show that her job *content* was substantially similar to that of Hollwitz or Pirson.  Rather, her argument that all tenured faculty are similarly situated because they are subject to Fordham's faculty statutes is quite similar to the argument rejected by the Second Circuit in *E.E.O.C. v. Port Auth. of N.Y. & N. J.*, 768 F.3d 247 (2d Cir. 2014).  There, the E.E.O.C.'s argument that  "an attorney is an attorney is an attorney" was insufficient to support an Equal Pay Act claim when there were no allegations that different Port Authority attorneys had the same job duties.  *Id.* at 257.  The court

---

[19] In SAC ¶ 237, Solomon alleges that two younger male professors made more than her, citing their 2017 and 2018 salaries.  However, she does not include their names, or allege any specific job duties or responsibilities of these professors beyond a statement that their jobs required "equal skill, equal effort and equal responsibility."  This is insufficient to state a claim without more factual support.

similarly found it irrelevant that Port Authority attorneys who were paid differently were subject to the same job code and "broad [evaluative] criteria," because general evaluation standards are "peripheral to an EPA claim." *Id.* at 258. The same is true here with regard to the Fordham statutes. Moreover, as described in Section III.A., *supra*, the SAC contains allegations suggesting that Pirson and Hollwitz's respective job duties were different from Solomon's. *See* SAC at ¶¶ 219–20; 232.

### V.        Hostile Work Environment

To plead a claim for hostile work environment under Title VII, a plaintiff must allege that she was subject to harassment that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment," and "that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal citation and quotation marks omitted). The plaintiff must show that the workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.*

In its March 17, 2020 Opinion, the Court identified seven allegations on which Solomon based her hostile work environment accusations. *Solomon*, 2020 WL 1272617, at *14. However, it determined that events occurring before March 2017 were barred by the Title VII and ADEA statutes of limitations. *Id.* In her SAC, Solomon pleads additional events that the Court construes as being alleged in support of her hostile work environment claims: the 2013 comments from Freedman that "we all deal with our children in this way" and that Solomon had "strong opinions" about the 2013 Area Chair decision. *See* SAC ¶¶ 259–61.

However, these comments occurred in 2013, so they are also time-barred. Moreover, the Court has already found that the events surrounding her 2013 Chair Termination Hearing and her

timely-brought hostile work environment allegations were "not related and therefore do not form a single [hostile work] environment" for the purposes of tolling the statutes of limitations. *Solomon*, 2020 WL 1272617, at *14 n.14.  Solomon's allegations thus add more detail to her account of the 2013 hearing, but they do not change the fundamental problem that this hearing occurred years before the applicable limitations period.[20]  Solomon's hostile work environment claim is therefore dismissed.

## VI.    RETALIATION

Solomon argues that she was retaliated against in violation of Title VII and the ADEA. To properly allege retaliation, Solomon must plead four elements:  "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019) (internal quotation marks and citation omitted).

The Court previously determined that the first action for which she was plausibly entitled to protection from retaliation under Title VII and the ADEA was her December 18, 2017 email to Anastacia Coleman.  *See Solomon*, 2020 WL 1272617, at *15.  The Court found, however, that none of the events occurring after this email constituted adverse employment actions for the purposes of the civil rights laws.  *Id.* at *15–16.  Solomon now alleges an additional ground for retaliation:  the loss of her paid benefits while she went on unpaid leave for the Spring 2020

---

[20] Even if these claims were timely, they would not rise to the level of a hostile work environment.  A plaintiff alleging discrete incidents in support of a hostile work environment claim must "demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment."  *Alfano*, 294 F.3d at 374 (citation and quotation marks omitted). As described in Section III.A., *supra*, while Freedman's comments could be interpreted as rude and disrespectful, they are also somewhat ambiguous and Court cannot find that they were so severe as to state a hostile work environment claim on their own.  Moreover, the lack of additional related hostile work environment allegations between 2013 and 2016 undermines any inference that these comments were part of a "sufficiently continuous and concerted" pattern of similar incidents.  *Id.*

semester.  *See* SAC ¶ 312.

Solomon alleges that on February 1, 2020 Fordham stopped payment of her healthcare premiums, forcing her to pay for coverage through COBRA for terminated employees.  *Id.* ¶ 315. She alleges that this occurred in response to her protected activities, including her January 2018 EEOC Complaint and continuing litigation in this case.  She alleges that her coverage was removed just two days after she appeared in this Court for a hearing on her motion to compel. *Id.* ¶ 319.

There is no question that a material reduction in benefits could qualify as an adverse employment action.  *See Miksic v. TD Ameritrade Holding Corp.*, No. 12 Civ. 4446 (AJN), 2013 WL 1803956, at *3 (S.D.N.Y. Mar. 7, 2013).  Fordham moves to dismiss on the ground that this change in benefits did not plausibly occur in retaliation for any protected action, but rather was done pursuant to the applicable Fordham statutes following Solomon's decision to take a second consecutive semester of unpaid leave.  Even after drawing all inferences in Solomon's favor, she fails to adequately allege that this change in benefits was retaliatory, because the facts alleged support Fordham's account.

In December 2019, Solomon emailed Pirson, requesting that an undergraduate course be removed from her Spring 2020 teaching schedule.  SAC at ECF 269–70.  She offered to teach three classes in Fall 2020 instead, and later suggested that she be granted a course release.  *Id.* at 267.  Pirson's response to this email is not attached to the SAC, but on December 20, 2019, Solomon wrote to Fordham president McShane and Provost Dennis Jacobs to inform them she "will take Leave without Pay for the Spring 2020 semester, instead of the untenable teaching schedule proposed."  *Id.* at ECF 265.  Vice Provost Jonathan Crystal responded on behalf of Fordham on December 23, 2019, writing that the university would "honor [her] request for

unpaid leave but will not cover the cost of medical benefits during the leave." *Id.* at ECF 253.

In support of Fordham's position, Crystal stated that the Fordham statutes require leaves of absence to be approved by the Provost. *Id.* He noted that "unpaid leaves, with benefits, will be granted only when the leave is taken for faculty development purposes for 'study and research' or 'when deemed to be in the interest of the University.'" *Id.* (citing Fordham Statute § 4–05.10(b)). He declined to deem Solomon's leave as "in the interest of the University" because "it would certainly have been our preference for you to have returned to teach rather than to be on leave," thus rendering her ineligible for unpaid leave with benefits under Fordham Statute § 4–05.10(b). *Id.* Solomon replied on January 2 that she "want[ed] to teach in Spring 2020" but that she would not agree to teach the undergraduate course. *Id.* at ECF 261. Crystal replied, stating that when faculty are on leave for one semester, as Solomon had been in Fall 2019, "the University's policy is that the faculty member will teach three courses in the other semester of that academic year." Doc. 82-1, Ryan Aff. Ex. A, at 1. He reiterated that the university would not permit her to teach one course or to go on unpaid leave with benefits. *Id.*

With this context, it is clear that Fordham's termination of her paid benefits was made in response to Solomon's informed decision to take unpaid leave without benefits, not her activity in this case or any other protected activity leading up to it. [21] Solomon cites no facts or authority showing that Fordham was obligated to either grant her a course reduction or drop the undergraduate course, nor does she allege that her benefits would still have been terminated had she agreed to teach during Spring 2020. Moreover, while Solomon cites the fact that her

---

[21] To the extent that Solomon alleges that Fordham's request that she teach an undergraduate course in Spring 2020 was itself retaliatory, this fails to state a claim for the same reason her FLSA retaliation claim was dismissed in the March 17 Opinion: This schedule was no more onerous than the past two proposed course loads previously assigned to her. *See Solomon*, 2020 WL 1272617, at *16.

COBRA election form was received a few days after a hearing in this case, the record shows that she had been warned as early as May 2019 about the potential discontinuation of Fordham's paid benefits in the event she went on another unpaid leave.  *See* SAC at ECF 259.  Indeed, Crystal informed her on December 23, 2019 and January 9, 2020 that Fordham's human resources department would be providing details about continuation of coverage through COBRA.  *See* SAC at 266; Doc. 82-1 at 2.  The fact that she received an election form thereafter is merely consistent with Fordham's representation in this respect.  These facts undercut any inference that her discontinuation of paid benefits was done in retaliation for her motion to compel production in this case, or any other protected activity.

Solomon also argues that Fordham's statutes permitted it to pay for her benefits during this time.  *See* Pls Br. at 4 (citing Appendix A-18 to the Fordham statutes, stating that faculty on unpaid leave not for faculty development purposes "may maintain coverage on the University life insurance, long-term disability and medical plans") (emphasis in original).   While the statutory text does not explicitly *prohibit* Fordham from covering the cost of her benefits, it also does not *require* Fordham to do so.  Here, however, exhibits to the SAC show that Fordham's customary policy for faculty in such circumstances, consistent with Appendix A-18, was to permit continuation of coverage "through participation in COBRA, which requires the employee to pay the full premium . . ."  *See* SAC at ECF 259.  There is no basis for the Court to infer that Fordham's adherence to its customary policy in this situation was discriminatory.  This is particularly true given that, in May 2019, Fordham agreed to pay for Solomon's benefits during her Fall 2019 unpaid leave as "an exception to the statutory rules," but with the explicit warning that "[she] should not assume that the University will continue to grant [her] unpaid leave with paid benefits in the future."  *Id.*  Thus, the available evidence does not support the inference that

Fordham's behavior was retaliatory, or that it has enforced its policies disparately as applied to Solomon.[22]

## VII.    NEW YORK STATE LAW CLAIMS

Courts consider "traditional 'values of judicial economy, convenience, fairness, and comity'" in choosing to exercise supplemental jurisdiction over remaining state law claims when all claims providing for original jurisdiction have been dismissed.  *See Kolari v. N.Y. - Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).   When all federal claims have been dismissed before trial, as is the case here, these factors generally weigh in favor of the dismissal of state claims.  *Id.*  Solomon's supplemental New York state law claims are therefore dismissed.

## VIII.   FUTURE PLEADINGS

The foregoing claims are dismissed without prejudice because their defects are not "substantive" or "incurable."  *Cf. Larkem v. Dep't of Educ.*, No. 17 Civ. 7017 (ER), 2018 WL 1959555, at *6 (S.D.N.Y. April 23, 2018) (dismissing Title VII claims with prejudice because plaintiff committed the substantive and incurable error of failing to file an EEOC charge).

To amend her complaint again, however, Solomon must comply with Federal Rule of Civil Procedure 15(a)(2), which requires her to obtain either leave from the Court or the consent of all opposing parties.  As a general rule, leave to amend should be freely granted, and in the case of *pro se* plaintiffs in particular, the courts "should grant leave to amend if a 'liberal reading' provides 'any indication that a valid claim might be stated.'"  *Larkem*, 2018 WL 1959555, at *5 (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).  But the Court

---

[22] Solomon does not specify whether she repleads a retaliation claim under the FMLA.  To the extent she does, it is dismissed for the same reasons discussed in this subsection.

must be assured that she is likely to state a claim before granting leave. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . to the district court . . . how amendment would cure the pleading deficiencies in its complaint."). Accordingly, if Solomon seeks leave of the Court to amend, she must attach a proposed Third Amended Complaint *and* concisely explain how she has addressed the defects identified in this Opinion.

## IX.    CONCLUSION

For the foregoing reasons, Fordham's motion to dismiss the Second Amended Complaint is GRANTED. The claims therein are dismissed without prejudice. If Solomon wishes to file a Third Amended Complaint, she must, no later than February 1, 2021, move for leave to amend or obtain written consent from all opposing parties, in accordance with Federal Rule of Civil Procedure 15(a)(2). In seeking leave to amend, Solomon must provide a copy of her proposed Third Amended Complaint and a concise explanation of how she has addressed the defects identified in this Opinion and Order.

If Solomon chooses to move to file a Third Amended Complaint, discovery will continue to be stayed until Fordham answers this complaint or the Court denies a motion to dismiss it.

The Clerk is respectfully directed to terminate docket numbers 70 and 74.

It is SO ORDERED.

Dated:    December 29, 2020
          New York, New York

_____
          Edgardo Ramos, U.S.D.J.