**Exhibit 11**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------X

ESTHER SOLOMON,

                                                    Case No.:
                          Plaintiff,                1:18-cv-04615-ER

                                                    **AFFIDAVIT**

     - against -

FORDHAM UNIVERSITY,

                          Defendant.

--------------------------------------------------------------X

STATE OF NEW YORK     )
                      )  ss.:
BRONX COUNTY          )

     BENJAMIN CROOKER, being duly sworn, states:

     1.     I am the Associate Vice President at Fordham University (the "University" or "Fordham), defendant in the above-entitled action.

     2.     I make this affidavit solely to introduce documents discussed in the Amended Complaint (the "Amended Complaint" or "Am. Compl.") of *pro se* Plaintiff Esther Solomon ("Plaintiff" or "Dr. Solomon").

     3.     In my role as Associate Vice President, I am responsible for the coordination and facilitation of faculty appointment, reappointment, tenure, promotion, and merit awards. My office also maintains faculty files and the faculty activity report database.[1] It is in this capacity that I am familiar with the University's records related to professors' course schedules and assignments.

---

[1] *See* https://www.fordham.edu/info/24952/faculty_personnel.

1

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 198 of 621
Case 1:18-cv-04615-ER Document 70-3 Filed 03/17/20 Page 11 of 26

Case 1:18-cv-04615-ER Document 56 Filed 07/22/19 Page 2 of 2

4. Attached hereto as Exhibit "A" are true and correct copes of the course schedules for tenured faculty members who have taught the Principles of Management course since 2011. The Principles of Management course is course number 3223 on each professor's schedule.

5. Attached hereto as Exhibit "B" is a true and correct copy of Fordham's Building Abbreviation Guide which is also available at https://www.fordham.edu/info/24145/undergraduate_faculty_handbook/2208/building_abbreviation_guide. On each professor's course schedule (*see* Exhibit "A") under the "Building" column there is a two or three character abbreviation that corresponds to the building and campus where a professor taught a particular course. For example, in the fall of 2015, Professor Wright taught Principles of Management (3223) in Building "KE" in Room 120. *See* Exhibit A, pg. 5. As set forth in Fordham's Building Abbreviation Guide, "KE" is Keating Hall on Fordham's Rose Hill campus. *See* Exhibit B.

Dated: Bronx, New York
July 22, 2019

BENJAMIN CROOKER

Sworn to before me this
22 day of July, 2019

Notary Public

JAMES GERARD RYAN
Notary Public, State of New York
No. 02RY6029858
Qualified in Nassau County
Commission Expires August 30, 20 2 2

2

Case 1:18-cv-04615-ER Document 56-1 Filed 07/22/19 Page 2 of 13

Start Over

Term: 201110 ID: A05599749 Person: [illegible] Michael A.

FACULTY SCHEDULE QUERY

| CRN | Subject | Course | Section | Session Number | Start Date | End Date | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Begin Time | End Time | Building | Room | Cross List Group | Override | Time Conflict |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10272 | MGBU | 3223 | R0 | 01 | [illegible] | [illegible] | ✓ | | | ✓ | | | | 1430 | 1545 | KE | 312 | | | |
| 10274 | MGBU | 3223 | R05 | 01 | 09/01/2010 | 12/22/2010 | ✓ | | | ✓ | | | | 1600 | 1715 | KE | 312 | | | |

Record 1 of 2

[illegible] All rights reserved.

Case: 24-3056 11/22/2024 DktEntry: 1.1 Page 200 of 621
Case 1:18-cv-04615-ER Document 65-2 Filed 11/22/2024 Page 5 of 152
Case 1:18-cv-04615-ER Document 70-3 Filed 03/17/20 Page 13 of 26

Case 1:18-cv-04615-ER Document 56-1 Filed 07/22/19 Page 7 of 13

Case 1:18-cv-04615-ER Document 56-1 Filed 07/22/19 Page 9 of 13

Team: 201710   ID: A04703817   HrStaff: John C.

**FACILITY SCHEDULE CREW**

| CRN | Subject | Course | Section | Session Number | Start Date | End Date | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Begin Time* | End Time | Buildn | Room | Cross List Group | Override | Time Conflict |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31594 | MGGB | 6513 | 0C1 | 01 | 09/01/2016 | 10/20/2016 | | | | ✓ | | | | 1530 | 1730 | 140W | 324 | | | |
| 31796 | MGGB | 78AI | 00E | 01 | 09/04/2016 | 08/07/2016 | | | ✓ | ✓ | ✓ | | | 0900 | 1700 | NO | ROOM | | | |
| 31758 | CUGB | 7590 | 00E | 01 | 09/09/2016 | 09/09/2016 | | | | ✓ | | | | 0900 | 1230 | 140W | 214 | | | |
| | | | | 01 | 12/02/2016 | 13/02/2016 | | | | ✓ | | | | 0900 | 1700 | 140W | 214 | | | |
| | | | | 01 | 10/14/2016 | 10/14/2016 | | | | ✓ | | | | 0900 | 1700 | 140W | 214 | | | |
| | | | | 01 | 11/04/2016 | 11/06/2016 | | | | ✓ | | | | 0900 | 1230 | 140W | 214 | | | |
| | | | | 01 | 09/10/2016 | 09/10/2016 | | | | ✓ | | | | 0900 | 1730 | 140W | 214 | | | |
| | | | | 01 | 10/15/2016 | 10/15/2016 | | | | | | | | 0900 | 1230 | 140W | 214 | | | |

Record 1 of 9

Case 1:18-cv-04615-ER Document 56-1 Filed 07/22/19 Page 11 of 13

Case 1:18-cv-04615-ER Document 132 Filed 01/18/24 Page 93 of 112

Case 1:18-cv-04615-ER Document 70-3 Filed 03/17/20 Page 15 of 26

rm: 201910 ID: A04672240 Hurley, Robert

**FACULTY SCHEDULE QUERY**

Insert   Delete   Copy   Filter   Start Over

| EN | Subject | Course | Section | Session Number | Start Date | End Date | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Begin Time | End Time | Building | Room | Cross List Group | Override | Time Conflict |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 01 | 12/09/2018 | 12/09/2018 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | 0830 | 1030 | 140W | 213 | | | |
| 309 | MGBU | 3223 | LYA | 01 | 08/29/2018 | 12/20/2018 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | | 1600 | 1845 | LL | 518 | | | |
| 310 | MGBU | 3223 | LYB | 01 | 08/29/2018 | 12/20/2018 | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ | | 1000 | 1245 | 140W | 323 | | | |
| 311 | MGBU | 3223 | LYC | 01 | 08/29/2018 | 12/20/2018 | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ | | 1300 | 1545 | LL | 708 | | | |
| 417 | MGGB | 8691 | 00E | 01 | 10/13/2018 | 10/13/2018 | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | | 1330 | 1730 | 140W | 213 | | | |
| | | | | 01 | 12/08/2018 | 12/08/2018 | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | | 0830 | 1230 | 140W | 213 | | | |

1 of 1   1 . 1 Per Page      Record 1 of 1

Start Over
FACULTY SCHEDULE QUERY
CRN Subject Course Section Start Date End Date Mon Tue Wed Thu Fri Sat Sun Begin Time End Time Building Room Cross List Group Override Time Conflict
30401 MOCB 9990 002 01 01/14/2019 05/15/2019
Record 1 of 2

Case 1:18-cv-04615-ER Document 70-3 Filed 03/17/20 Page 17 of 26

# Exhibit 12

# Stanford

Published on *Administrative Guide* (https://adminguide.stanford.edu)
Home > 2.1.3 Personnel Files and Data

## 2.1.3 PERSONNEL FILES AND DATA

**Last updated on:**

06/06/2

### Formerly Known As Policy Number:

22.2

The University maintains personnel information for each employee in order to have a complete, accurate and current record of the employee's salary and job history at the University. This guide memo sets forth policies and procedures to facilitate the establishment, use and maintenance of personnel data, in whatever form maintained.

### Authority:

Approved by the Vice President for Human Resources.

### Applicability:

Applies to regular employees (as defined in Guide Memo 2.2.1 [1]: Definitions), Academic Staff - Research, and Academic Staff - Libraries. For policies that apply to employees covered by collective bargaining agreements, refer to the agreements between Stanford University and SEIU Higher Education Workers Local 2007 and the Stanford University and the Stanford Deputy Sheriffs' Association. Agreements can be found at Labor Relations & Collective Bargaining [2].

While these policy statements are applicable to all University staff, the SLAC Human Resources Department maintains its own centralized personnel files and should be contacted for specific procedural information relating to personnel files for SLAC employees.

## 1. Definition

Employee Personnel Files are defined to include the application for employment, and records which are used or have been used to determine an employee's qualifications for promotion, compensation, termination, or disciplinary action. A detailed list of appropriate contents is provided in Section 3.

Back to top

## 2. Location

Because of the decentralized personnel function at Stanford, the documents which form an employee's personnel file can be found (1) on computerized record-keeping systems and/or digital imaging systems, (2) locally in the Dean's, Director's, Vice Provost's or Vice President's office, (3) in the department head's or supervisor's office, (4) in the Payroll office, and/or (5) at the Personnel Records area at SLAC. All such documents comprise the personnel file.

Back to top

# 3. Contents

Employee personnel files should contain only that information which is directly related to the employee's job duties, salary, performance and general employment history. Medical files, where applicable, must be maintained separately from other files (see Guide to Supervisors on next page). Listed in the three following subsections are many types of documents which, if they exist, are appropriate for retention in employee personnel files. Documents that have not been shared with the employee and the supervisor do not belong in the file(s).

## a. Personnel Files and Data Maintained by the Department/Division:

* Attendance and Absence Records (Note: At SLAC, these items are located in Payroll)
* For areas that do not use PeopleSoft HRMS, and for periods of time that predate the implementation of PeopleSoft HRMS:
    * Leave of absence correspondence (includes vacation and PTO)
    * Time sheets: TTR, RHT, Hours Worked Record (SU-28); at SLAC, located in Payroll
    * Vacation and sick leave records; at SLAC, located in Payroll
    * Yearly leave records; at SLAC, located in Payroll
* Offer and/or confirmation of employment letters
* Classification review letters addressed to employee
* Copies of compliance agreements and other University-required agreements, such as HIPAA and those related to use of patents or confidential personnel information/data
* Disciplinary memos issued to employee
* I-9 documents and supporting documentation (SLAC)
* Job application and any attachments (resume, etc.)
* Job descriptions
* Job requisitions
* Layoff notice issued to employee
* Performance evaluations issued to employee; employee responses thereto
* Personnel action forms (PAF)
* Photo ID where required (SLAC)
* Resignation letter
* STAP forms and related documents
* Termination notice issued to employee
* Transfer or promotion requests
* Years of applicable experience calculation

## b. Payroll and Other Forms Maintained by Payroll:

* Automatic bank deposit form
* Disability insurance adjustment forms (DIA)
* Long term disability vouchers
* I-9 documents and supporting documentation
* One-time payment and reduction forms
* Time sheets (RHTs)
* Special salary processing form
* Wage attachments or garnishment notices (completed)

* W-4 form

**Guide to Supervisors**—Supervisors are cautioned that "notes to the file" and other documentation not addressed to the employee do not belong in the employee personnel file. The following list provides some examples of the types of documents that should be retained, but separate from the personnel file.

Contact your local Human Resources office if you are ever in doubt of what to retain and/or where to retain it.

* Auxiliary medical files:
  -Disability Claim Forms; SU-17: Accident/Injury Report
  -Physician evaluations
* Communications from or to University attorneys
* Employee settlement agreements
* Employee lawsuits
* Employee charges to outside agencies (EEOC, DFEH, OFCCP)
* Employee Relations advice
* Grievances, grievance responses, and grievance-related documents
* Memos between management and the Compensation office
* Personal financial information (loan applications)
* Records relating to workplace investigations, including reports related to such investigations, with the exception of any corrective action issued to an employee as a result of an investigation
* Letters of reference

Back to top

## 4. Access and Use

Personnel files are confidential and access is limited to protect employee privacy. See:
Guide Memo 1.1.1 [3]: University Code of Conduct, section 3
Guide Memo 1.5.2 [4]: Staff Policy on Conflict of Commitment and Interest, section 2.b and 2.e
Guide Memo 6.1.1 [5]: Administrative Computing Systems, section 3.c
Guide Memo 6.2.1 [6]: Computer and Network Usage Policy
Guide Memo 6.4.1 [7]: Identification and Authentication Systems, section 5

### a. Access by the Employee or Representative

Each employee or their authorized representative may review the employee's own local personnel files by requesting an appointment with the local Human Resources office during regular business hours and non-working time. An employee or their authorized representative may review the employee's own payroll and related forms by making an appointment with and presenting appropriate identification to the Payroll office. An authorized representative must present a written authorization signed by the employee permitting the representative to make such inspection. Such appointments generally will occur, unless agreed in writing, within 30 days after the written request for inspection is submitted.

A Human Resources or Payroll staff member will remain present during the time the file is reviewed, allowing sufficient inspection time commensurate with the volume of the file. The employee or authorized representative is permitted to take notes during the inspection.

An employee or their authorized representative may also request a copy of the personnel file. The authorized representative must present written proof, signed by the employee, that the representative is authorized to receive a copy of the personnel file. Such a copy will be provided at the employee's expense within 30 days after a written request is received from the employee or their authorized representative. Requests for a copy

of payroll records, however, must be provided within 21 days of receipt of the employee's request. Current employees can also access their payroll records, including W-2s and time and leave records, at any time at https://axess.sahr.stanford.edu/.

### b. Access by a Former Employee

A former employee of the University or their authorized representative may request a copy of their personnel file for up to three years after termination. The request must be in writing, and the representative must provide written proof signed by the employee authorizing the representative to request and receive a copy of the personnel file. Generally such requests will be granted once each year and the copy provided within 30 days after receipt of the written request, unless the University and the employee (or authorized representative) agree otherwise. The copy of the file may be provided at the former employee's expense. Requests by a former employee for a copy of their payroll records must be provided within 21-days of receipt of the former employee's request.

### c. Access by University Officials

University officers, managers, deans, department heads, Human Resources professionals, representatives of the General Counsel's office, and other University officials with a business need to do so may review individual files. This access is also extended to hiring officers within the University when the employee is a finalist for promotion or transfer.

### d. Access by Summons/Subpoenas

Process servers with summons or subpoenas for documents contained in an individual employee's personnel file should be directed to Payroll, or to the Manager of Employee & Labor Relations at SLAC. Departments are not authorized to accept service of summons or subpoenas.

### e. Outside Employment Verification Requests (Former and Current Employees)

Stanford does not respond directly to any employment verification requests. Stanford contracts with a third party service supplier to provide employment, salary, and immigration verification services. Employees should follow the instructions at Stanford's Gateway to Financial Activities [8] for employment verification. Requests for information on SLAC employees should be referred to the SLAC Human Resources Department.

### f. Access by Agents of the University

Agents of the University are required by contract to certify that University personnel data will be treated confidentially and only used for the purposes specified in the contract.

### g. Requests for Employment References (Former & Current Employees)

Requests from outside the University for employment references should be directed to the local Human Resources office. Requests for information about SLAC employees should be referred to the SLAC Human Resources Department. Information other than the dates of employment and job classification requires the employee's written consent before the release of information.

Back to top

# 5. Maintenance and Retention

## a. Current Employees

An employee's work history at Stanford may include service with many different departments. To streamline recordkeeping, the local personnel files should follow the employee from one department to the next, thereby creating a consolidated personnel file containing the employee's complete job history. Local personnel files must be kept in a secure location to prevent unauthorized access.

No one should be responsible for maintenance of their own personnel file or data. For example, the personnel file of a department or school's file administrator should be maintained by that individual's supervisor or manager, as appropriate.

## b. Terminated Employees

The final department where a former employee worked is responsible for ensuring that appropriate records are retained for the requisite length of time. Records of former Stanford employees should be retained for eight years following the date of termination.

## c. Destruction of Outdated Information

Personnel files contain confidential information and must be destroyed by shredding, incinerating or, in the case of digital records, purged by the system administrator. When the requisite period of data retention has passed, the records should be destroyed. Contact University Human Resources/Employee & Labor Relations or the SLAC Human Resources Department before the destruction or purging of any personnel information.

Back to top

**Source URL (modified on 06/06/2019 - 09:05):** https://adminguide.stanford.edu/chapter-2/subchapter-1/policy-2-1-3

**Links**

[1] https://adminguide.stanford.edu/2-2-1

[2] https://cardinalatwork.stanford.edu/hr-processes-policies/labor-relations-collective-bargaining

[3] https://adminguide.stanford.edu/1-1-1

[4] https://adminguide.stanford.edu/1-5-2

[5] https://adminguide.stanford.edu/6-1-1

[6] https://adminguide.stanford.edu/6-2-1

[7] https://adminguide.stanford.edu/6-4-1

[8] http://fingate.stanford.edu/staff/payemployee/emp_verification.html

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 210 of 621
Case 1:18-cv-04615-ER   Document 70-3   Filed 11/22/2024   Page 115 of 152
Case 1:18-cv-04615-ER   Document 70-3   Filed 03/17/20   Page 23 of 26

# Exhibit 13

Case: 24-3056 11/22/2024 DktEntry: 1.1 Page: 211 of 621
Case 1:18-cv-04615-ER Document 70-3 Filed 03/17/20 Page 24 of 26
Case 1:18-cv-04615-ER Document 65-2 Filed 11/26/24 Page 16 of 152

## Exhibit 13

## Examples Where No Responsive Document were Produced
## Responsive tp Plaintiff's January 7, 2019. First Set of Document Requests

Beyond the unauthorized redactions, Defendant has simply not produced a single document
responsive to multiple of Plaintiff's First Set of Document requests

| Document Request #3 | All documents regarding Plaintiff and Comparator Professors' job responsibilities, course assignments, course cancellations, course releases, administrative appointments, consulting assignments, research funding and professional activities for the relevant time period. *[Partial Production]* |
|---|---|
| Document Request # 5 | All documents regarding student evaluations of Plaintiff and Comparator Professors for courses taught at both the undergraduate and graduate level. |
| | *[No Documents]* |
| Document Request # 6 | All documents demonstrating the enrollment in any courses taught by Plaintiff and Comparator Professors in the relevant time period including enrollment for sections of these courses taught by other professors. |
| | *[No Documents]* |
| Document Request #7 | All documents demonstrating Core Principles of Management undergraduate business course assignments over the relevant time period. |
| | *[No Documents]* |
| Document Request # 9 | All minutes, transcripts or recordings of faculty Senate, Joint Council and Departmental Meetings discussing or relating to Plaintiff over the relevant time period. |
| | *[No Documents]* |
| Document Request # 11 | All documents concerning formal or informal claims or complaints made by Plaintiff against Defendant regarding discrimination and/or retaliation, including any documents reflecting Defendant's investigations of the same. |
| | *[No Documents]* |
| Document Request #12 | All documents concerning formal claims or complaints made in the relevant time period against Defendant by a current or former employee of Defendant (other than Plaintiff) regarding discrimination and/or retaliation and Defendant's investigations of the same. |
| | *[No Documents]* |
| Document Request # 16 | To the extent not otherwise produced, all documents regarding Plaintiffs claims and/or Defendant's defenses raised in the pleadings of this action. |
| | *[No Documents]* |
| Document Request #17 | All documents Defendant plans to rely on at trial. |
| | *[No Documents]* |

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 212 of 621
Case 1:18-cv-04615-ER Document 70-3 Filed 11/22/2024 Page 31 of 152
Case 1:18-cv-04615-ER Document 70-3 Filed 03/17/20 Page 25 of 26

**Exhibit 14**

## Exhibit 14

### Groups of Documents Stamped "Confidential"
### Contrary to ¶ 3 of the Court's Protective Order
### With Bates Numbers

Court's Protective Order

¶3. The following information shall not be stamped "CONFIDENTIAL" or otherwise be deemed to constitute Confidential Information under this Order:

a. information in the public domain;

b. information already known by the receiving party through proper means; and

c. information that is or becomes available to a party from a source other than the party asserting confidentiality and rightfully in possession of such information on a non-confidential basis.

### Plaintiff's own Fordham email correspondence & attachments

Solomon Emails (Deemed Confidential):
Bates # FORDHAM 0000498 to FORDHAM 0008539

Salary & Benefits Task Force on Indicators of Gender Salary Equity among Fordham Faculty (Deemed Confidential): Bates # FORDHAM 0000177 to FORDHAM 0000185

Solomon Transcript of 2013 Area Chair Hearing (Deemed Confidential):
Bates # FORDHAM 0012764 to FORDHAM 0012854

### Public Documents from the Fordham Website

Faculty Statutes and Policies (Deemed Confidential):
Bates # FORDHAM 0000001 to FORDHAM 0000133

Comparative Bios (All) (Deemed Confidential):
Bates # FORDHAM 0000134 to FORDHAM 0000176

Doc Request 10- Organizational Structure (Deemed Confidential):
Bates # FORDHAM 0012855 to FORDHAM00 12910

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 214 of 621
Case 1:18-cv-04615-ER Document 105-22 Filed 11/22/2024 Page 19 of 152
Case 1:18-cv-04615-ER Document 70-4 Filed 03/17/20 Page 1 of 8

**Exhibit 15**

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 215 of 621
Case: 18-cv-04615-ER Document 165-22 Filed 01/20/2424 Page 66 of 152

 FORDHAM

ESTHER Solomon <esolomon@fordham.edu>

## Spring 2020 Semester

1 message

---

**ESTHER Solomon** <esolomon@fordham.edu>                              Thu, Jan 2, 2020 at 9:09 PM
To: Fordham president <president@fordham.edu>, Dennis Jacobs <dcjacobs@fordham.edu>
Cc: Jonathan Crystal <crystal@fordham.edu>, DONNA RAPACCIOLI <rapaccioli@fordham.edu>

Dear Father McShane and Provost Jacobs,

This is to request clarification and express serious concerns regarding Dr. Crystal's December 23, 2019 email
(Exhibit 1), responding to my December 20, 2019 appeal to you (Exhibit 2). His email informed me that I
would not be teaching in the Spring 2020 semester while placed on unpaid leave without benefits. As I
understand the implications, I would be removed from the Fordham payroll without due process, after ~35
years as a tenured faculty member.

I am reiterating and appeal again to you that I want to teach in Spring 2020. I believe that my teaching
schedule of two graduate courses - comprising a regular, tenured faculty schedule -should be restored, and I
should receive my full regular faculty salary during Spring 2020.

Since you, Dr. Jacobs, just recently joined Fordham in June 2019 as Provost and Senior Vice President for
Academic Affairs, you are most likely unfamiliar with the relevant history and context. Since I received an
automatic response to my December 20 that you were out of town, it is unclear if you had a chance to read
my email or participated in Dr. Crystal's response. I hope this will lead to a reconsideration since faculty
leaves are authorized by the Provost.

### Faculty Leave?

The December 23 email conveys seemingly inconsistent messages on several issues. While stating that I am
given leave, the same email also states the opposite: "The Provost's office is not prepared to approve your
leave on either ground." The preceding sentence apparently refers to Fordham University Statutes §4-
05.10(b): For faculty development purposes for "study and research" or "when deemed to be in the interest
of the University". Please clarify what is true, am I given leave or not?

As I understand the December 23 email, I think it could be interpreted as charging me with violation of my
faculty responsibilities and a breach of contract. It incorrectly states ([that I] "continued to choose not to
teach" and [that I am not] "teach[ing] the courses [I] have been assigned." If there are such accusations,
they would require official charges, a formal Hearing and findings potentially resulting in termination of a
faculty's tenured position, if found true. As outlined in the Fordham Statutes, such adverse University action
requires prior reviews and determination by the Faculty Hearing Committee §4-07.12, §4-07.12, and should
involve the Faculty Senate Executive Committee. Instead, this appears to be an undisclosed, de facto tenure
termination, bypassing due process. Please clarify, and if there are any implied charges, I am hereby
requesting to be given notice, a formal hearing and the opportunity to be heard, exercise my full rights and
defend myself.

### Untruly Implying I Refused to Teach in Spring 2020

I am fully prepared to teach the two graduate courses at Lincoln Center, which I was assigned for Spring
2020 but instead I am precluded from teaching. I ask you to review the voluminous correspondence between
October 7 through December 2019, with Dr. Pirson, Dr. Crystal, and Dean Rapaccioli, involving these issues.
(examples in Exhibit 3) The correspondence and record document that I have been given what I believe are
untenable assignments, discriminatory, retaliatory and a humiliating demotion. The Spring 2020 semester
involves three different course preparations, commute between two campuses including the undergraduate

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 216 of 621
Case 1:18-cv-04615-ER Document 163-22 Filed 11/20/24 Page 216 of 252

1/2/2020          Case 1:18-cv-04615-ER Document 70-14 Spring Filed 03/13/20  Page 3 of 8

Principles of Management Course (POM), also called CORE. The refusal to allow me to teach a two-course schedule during Spring 2020 and three in Fall as normal for tenured faculty, seems also inconsistent with the April 12, 2019 representations on "workload assessment" in the Faculty Senate Minutes (Exhibit 4).

Not mentioned is the fact that I already taught POM courses at the Bronx campus during Spring 2018, prior to my Fall 2018 Family medical leave. Younger faculty were granted 1 ½ credit per credit hour for teaching CORE courses, due to their onerous nature. Such credit is not granted to me. Younger faculty only teach 2-2 schedules vs. 2-3. The POM has become a sine qua non in all my assigned schedules since my 2017 demotion. In November 2017, I was warned prophetically: "either you teach at the Bronx, or you do not teach at all."

These actions against me follow a pattern involving other senior tenured faculty, also sent to teach elementary undergraduate courses. An older tenured professor described the process:

"Thank you for your concerns.

Yes, I am not coming back. I have been exposed to concerted efforts of the new regime to push me out. I have been requested to teach undergraduates basic statistics and criticized for some snow days I missed due to illness...... They stopped my salary already, now I have to get some health insurance, and then I will fight for my retirement income."

As I noted, I am currently the Acting President and organizer of the International Facet Theory Conference to take place in July 2020 in Prague. Among my suggestions for Spring 2020, was a request for one-course release, needed to allow time for scientific paper review and administrative duties for the upcoming conference, but I received no response. My Area just hired a young faculty who appears to be my replacement, receiving preferential treatment over me in all these matters. Similarly, preferential treatment is afforded other junior faculty, as well as tenured male faculty, non-faculty, clinical instructors, and visitors.

The December 23 email also states:

"For next semester, the Provost's office considers it in the University's best interest for you to teach the courses you have been assigned; students have already enrolled in these and faculty schedules have been assigned with the expectation that you would be returning to teach. It would have been our preference for you to have returned to teach..."

If all of the above is true, why am I not permitted to teach right now?

### Incorrect Citations to Fordham Statutes to Remove Me from Fordham Benefits

The December 23 email concludes that I "may continue [my] medical coverage through Cobra." The 1986 Cobra legislation allows continued health coverage in the case that "an employee loses his or her job..." There is also a sentence "but notified you in May (for fall 2019)..." which I presume may refer to Dean Rapaccioli's May 24, 2019 email (Exhibit 5), which also references COBRA. The Dean's email states in part: "I have granted you an exception to the statutory rules" and "the University Statutes provide for unpaid leave with paid benefits ONLY for faculty development purposes." [emphasis in the original] To me, that statement does not appear to be supported by the Statutes.

The December 23 response makes different references to the Statutes content, which in my view may not draw accurate conclusions. As I read it, granting unpaid leave with benefits is not precluded, but permitted by the Statutes, and is not limited to any type of unpaid leave.

"Appendix 4: Salary and Benefit Provisions for Active Faculty A-18 Benefits While on Leave c.Faculty members [other than paragraph (b) above] while on a University-approved leave of absence without pay, and within the restrictions of the applicable insurance contracts with their parties, may maintain coverage on the University life insurance, long-term disability, and medical plans." [emphasis added]

I note that my health benefits were discontinued twice without notice during this summer: only reinstated after the intervention of Fordham's corporate attorney. What exactly are the implications for my status with the University?

### Federal Court

Fordham is taking these new adverse actions in the context of a pending Federal lawsuit (Case 1:18-cv-04615-ER) while the Court is currently reviewing some of these very matters.

On December 23, 2019, the same day as Dr. Crystal's email, Fordham attorneys filed a letter with Federal Court (Dkt #63). It referenced, in part, the "potential for a more global, amicable resolution of this matter" in the Federal case (December 23, 2019 at 1:33p). At the same time Fordham asserts to the Court that they want an amicable resolution, they take an extreme adverse action against me in the December 23 4:41pm email on the very same day.

Previously, on April 10, 2019, Fordham had written to the Court, in what now appears to be an inaccurate statement:

"More importantly, Dr. Solomon is a current tenured professor in Fordham's Gabelli School of Business and the status quo remains preserved."

If the Fordham latest actions against me per the December 23 email are realized, they may constitute a material change with direct bearing on Fordham's pending motion. I believe Fordham may need to report that to the Court promptly.

### Conclusion

I will appreciate your clarifying my status at Fordham University following the December 23, 2019 email, and I respectfully request that you reconsider. I believe it would be in the best interests of Fordham University to let me teach the Graduate Courses at Lincoln Center to which I have already been assigned. Alternatively, one should also consider whether it would also be preferable not to take further adverse actions against me, but continue my 2019 Leave without Pay with benefits for Spring 2020.

I look forward to your response and thank you for your consideration.

Sincerely yours,


Esther Solomon, Ph. D.
Gabelli School of Business


**5 attachments**

📄 **Dec 20, 2019 email to Fr McShane & Provost.pdf**
415K

📄 **Dec 23, 2019 Dr. Crystal email.pdf**
389K

📄 **Corresp Ex Dec 18, 2019.pdf**
1215K

📄 **Faculty senate Minutes 4:11:2019 - Excerpt.pdf**
928K

📄 **May 24, 2019 email Health Benefits.pdf**
682K

Case: 24-3056 11/22/2024 DktEntry: 1.1 Page: 218 of 621
Case 1:18-cv-04615-ER Document 65-22 Filed 01/28/2424 Page 23 of 152

1/2/2020          Case 1:18-cv-04615-ER Fordham University Mail 4 Spring 2020 3/2/7/20    Page 5 of 8

Fordham is taking these new adverse actions in the context of a pending Federal lawsuit (Case 1:18-cv-04615-ER) while the Court is currently reviewing some of these very matters.

On December 23, 2019, the same day as Dr. Crystal's email, Fordham attorneys filed a letter with Federal Court (Dkt #63). It referenced, in part, the "potential for a more global, amicable resolution of this matter" in the Federal case (December 23, 2019 at 1:33p).  At the same time Fordham asserts to the Court that they want an amicable resolution, they take an extreme adverse action against me in the December 23 4:41pm email on the very same day.

Previously, on April 10, 2019, Fordham had written to the Court, in what now appears to be an inaccurate statement:

"More importantly, Dr. Solomon is a current tenured professor in Fordham's Gabelli School of Business and the status quo remains preserved."

If the Fordham latest actions against me per the December 23 email are realized, they may constitute a material change with direct bearing on Fordham's pending motion. I believe Fordham may need to report that to the Court promptly.

Conclusion

I will appreciate your clarifying my status at Fordham University following the December 23, 2019 email, and I respectfully request that you reconsider. I believe it would be in the best interests of Fordham University to let me teach the Graduate Courses at Lincoln Center to which I have already been assigned. Alternatively, one should also consider whether it would also be preferable not to take further adverse actions against me, but continue my 2019 Leave without Pay with benefits for Spring 2020.

I look forward to your response and thank you for your consideration.

Sincerely yours,

Esther Solomon, Ph. D.
Gabelli School of Business

**5 attachments**

📄 **Dec 20, 2019 email to Fr McShane & Provost.pdf**
415K

📄 **Dec 23, 2019 Dr. Crystal email.pdf**
389K

📄 **Corresp Ex Dec 18, 2019.pdf**
1215K

📄 **Faculty senate Minutes 4:11:2019 - Excerpt.pdf**
928K

📄 **May 24, 2019 email Health Benefits.pdf**
682K

Case: 24-3056  11/22/2024  DktEntry: 1.1  Page 219 of 621
Case 1:18-cv-04615-ER  Document 70-4  Filed 03/17/20  Page 24 of 252
Case 1:18-cv-04615-ER  Document 70-4  Filed 03/17/20  Page 6 of 8

# Exhibit 16

Case: 24-3056 11/22/2024 DktEntry: 1.1 Page: 220 of 621
Case 1:18-cv-04615-ER Document 16522 Filed 11/28/24 Page 125 of 152
Case 1:18-cv-04615-ER Document 70-4 Filed 03/17/20 Page 7 of 8




## COBRA CONTINUATION COVERAGE ELECTION FORM
### Fordham University
**IMPORTANT: PLEASE RETAIN A COPY OF THIS COBRA ELECTION FORM FOR FUTURE REFERENCE.**
**THIS FORM CONTAINS INFORMATION ABOUT YOUR RIGHTS UNDER COBRA.**

You can elect COBRA continuation coverage in one of three ways – (1) you can log in to the member portal at https://cobra.discoverybenefits.com, (2) you can download the Discovery Benefits COBRA mobile app, or (3) you can complete and submit the enclosed COBRA Election Form to Discovery Benefits using the address provided below. Additional information regarding using the website or app to elect continuation coverage is provided in the New Member Welcome Letter (enclosed). Regardless of the method that you use, your election must be made no later than the Election Period End date ("Last Day to Elect") shown below. If the Election Form is mailed, it must be postmarked by the Last Day to Elect. If you do not elect COBRA continuation coverage on or before the Last Day to Elect, you will lose your right to elect coverage.

Important information about paying for continuation coverage is provided elsewhere in this letter. After electing COBRA coverage, payments can be made at https://cobra.discoverybenefits.com, through the Discovery Benefits COBRA mobile app, or by check/money order mailed to Discovery Benefits, PO BOX 2079, Omaha, NE 68103. Additional information is provided below.

Once you have elected and paid the full amount owed for COBRA continuation coverage, Discovery Benefits will send a notice to the carrier to reinstate your coverage (you must pay all premiums which have become due during your initial grace period). Please contact your carrier for any questions regarding your plan's coverage, member ID card or claims status.

\*\*Please note: it can take up to 15 business days for the carrier to activate your coverage.

If you waive coverage under COBRA before the end of the enrollment period, you can change your mind and continue coverage by submitting your completed election form before the end of the enrollment period described below for each plan. However, if you change your mind after first waiving COBRA continuation coverage, your COBRA continuation coverage will begin on the date you submit the completed form.

You should read the important information about your rights included with this election form. If you have questions about COBRA or need assistance to complete your election form, please contact our Customer Service Department at (866) 451-3399 during business hours.

**Qualified Beneficiary(QB):**
    ESTHER SOLOMON

    Event Date:    2/1/2020
    Event Type:   Termination
    Second Event: No

COBRA gives each Qualified Beneficiary the right to elect coverage independently. You, your spouse or dependent child(ren), if any, may elect single coverage and not include those individuals who do not wish to continue coverage. In addition, you or your spouse may elect COBRA continuation coverage on behalf of any covered dependent child(ren). For example, COBRA continuation coverage may be elected for only one, several, or for all your dependent children who are qualified beneficiaries.

**Premium Information:**

| Plan Name | Coverage Level | Monthly Premium |
|---|---|---|
| Cigna Dental DPO | QB + Family | $104.85 |
| DBI Medical FSA | QB Only | $199.41 |
| VSP Vision Premier | QB + Family | $19.14 |
| Bundle: UHC Medical Enhanced Standard Opt/DBI HRA | QB + Family | $3,174.84 |
|     DBI HRA | | |
|     UHC Medical Enhanced Standard Opt | | |

    **Total Premium:**    $3,498.24



SDNY

Esther Solomon
140 West 62nd street
New York, New York 10023

Case 18-cv-04615 (ER)

Pro Se Intake Unit
500 Pearl Street, Room 200
New York, New York 10007

# EXHIBIT 2

Esther Solomon
140 West 62nd Street
New York, NY 10023
212 636-6187

January 18, 2024

# MEMO ENDORSED

Hon. Edgardo Ramos, U.S.D.J.
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 619
New York, NY 10007

Re: Solomon v. Fordham University (Case # 18-cv-0461)

Dear Judge Ramos:

I am respectfully resubmitting my Motion to Compel Discovery, initially filed on March 17, 2020. The current submission implements the March 17, 2020 Order's (Dkt. 69) instructions in footnote 16. It granted leave to refile:

"The Court received a courtesy copy of the 'Motion to Compel Compliance with Subpoenas, Compliance with Document Requests, and Compliance with Representations to the Court' on March 17, 2020. Given the stay of discovery entered with this Order, the motion is DENIED without prejudice. She is granted leave to refile her motion should the stay on discovery be lifted." Dkt. 69, p. 31, fn. 16, March 17, 2020.

On November 29, 2023, I wrote to Defendant's counsel asking whether they would comply with the February 2019 subpoenas for my personnel file and those of comparator professors (Dkt 126 pp1-2). These subpoenas were served to the Fordham University General Counsel per Fordham Statutes, §4-07.42. There was no response to these questions.

On January 12, during our discussions while preparing the proposed Joint Discovery Schedule, I sought to address the Motion to Compel, the outstanding subpoenas, and the February 2019 Protective Order (Dkt 24). But opposing counsel reiterated a position that all necessary documents had been produced.

I respectfully request the Court to grant my "Motion to Compel Compliance with Subpoenas, Compliance with Document Requests, and Compliance with Representations to the Court."

Sincerely,

/s/ Esther Solomon
Esther Solomon
Plaintiff Pro Se

Defendant is directed to respond to this letter by
January 30, 2024. SO ORDERED.

Edgardo Ramos, U.S.D.J.
Dated: 1/22/24
New York, New York

# EXHIBIT 3

O1BBSOLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ESTHER SOLOMON,

                    Plaintiff,

          v.                              18 Civ. 4615 (ER)

FORDHAM UNIVERSITY
ADMINISTRATION, ROSE HILL
CAMPUS and FORDHAM UNIVERSITY,

                    Defendants.
                                          Teleconference
------------------------------x
                                          New York, N.Y.
                                          January 11, 2024
                                          11:30 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                          District Judge

                              APPEARANCES

ESTHER SOLOMON, Pro Se Plaintiff

CULLEN & DYKMAN, LLP
     Attorneys for Defendants
BY:  JENNIFER A. McLAUGHLIN

O1BBSOLC

1          (Case called)

2          MS. SOLOMON:  Good morning, your Honor.  My name is

3   Esther Solomon, and I'm a plaintiff, pro se.  Happy New Year to

4   everybody.

5          THE DEPUTY CLERK:  Counsel for defendant.

6          MS. McLAUGHLIN:  Good morning, your Honor.  This is

7   Jennifer McLaughlin with Cullen & Dykman, LLP, representing

8   Fordham University.

9          THE COURT:  Good morning to you all.  Welcome back.

10  This matter is on for a conference.  I note for the record that

11  it is being conducted by telephone.  As the parties are aware,

12  the Second Circuit recently vacated and remanded aspects of my

13  opinion and order from March of 2022, indicating that we should

14  consider certain aspects of Ms. Solomon's complaint that I

15  neglected to take into consideration for reasons because I

16  believed them to be time-barred.  First of all, Ms. Solomon,

17  how are you doing?

18         MS. SOLOMON:  I'm fine.  How are you, your Honor?

19         THE COURT:  I'm well.  Thank you.  Let me ask because

20  this matter has been pending for sometime, and there has been a

21  lot of effort put into it, both by my chambers and by all of

22  you.  Have you folks had an opportunity to discuss this matter

23  after the Second Circuit's opinion and before today,

24  Ms. McLaughlin?

25         MS. McLAUGHLIN:  We have not discussed the matter,

O1BBSOLC

1      your Honor.

2              THE COURT:  Ms. McLaughlin -- and I'll get to you as

3      well Ms. Solomon -- do you believe that there's an opportunity

4      or there's a likelihood that further discussions amongst the

5      parties either with the Court's help or without might resolve

6      this matter by way of settlement?

7              MS. McLAUGHLIN:  I did explore the aspect of mediation

8      internally with my client, and we were discussing if that was a

9      possibility.  I will admit this matter has been pending, and my

10     former colleagues are no longer with the firm that handled it.

11     I understand from my review of the file that there was an early

12     mediation that was not successful, but maybe it's a possibility

13     at this juncture.

14             THE COURT:  And, Ms. Solomon, let me ask you, do you

15     think that it might be useful for you and Fordham to engage in

16     the mediation?

17             MS. SOLOMON:  I believe it will be helpful at a later

18     point in time, your Honor.  Because I think right now there are

19     some important matters that are pending that need to be

20     clarified so that there could be informed discussions and fair

21     discussions.

22             If you may notice in my request to Ms. McLaughlin, I

23     requested my personnel file and the files of the comparative

24     professors which were pending.  I had submitted the subpoena

25     back in November 2019, and I had the motion to compel discovery

O1BBSOLC

1    with a subpoena which this Court actually dismissed without

2    prejudice to re-file in the first order.  And there has been no

3    discovery since 2019, March 2019.

4         And there is some very, very substantive issues here

5    which is my status at the university.  That is an issue that

6    has been disputed, but it is clear to me increasingly with even

7    more information that's coming up that I had clearly been

8    terminated as of February 1, 2020, secretly without cause,

9    without due process, which is an extraordinary event.  And also

10   Fordham has never involved me in anything.  I had did nothing

11   wrong.  The de-tenuring process is something very, very

12   elaborate.  It usually take two years.  None of this has

13   happened here.  What is very, very clear now is they filed this

14   termination report, the first in 2019 and the second in 2020

15   February 1st, actually three days after the last hearing with

16   this Court.

17        And basically there are some additional reports that I

18   keep getting from the IRS that say very clearly that I'm not

19   deemed to be full-time faculty.  So I think getting my

20   personnel file will be important so that I will know what there

21   is to discuss and how they can reinstate me and what there is

22   to negotiate about.  So what I'm discussing about is the form

23   by IRS that's annually.  It's mandated for large employers to

24   report how their employees are.  And they say that I was not a

25   full-time faculty for any part of that year.

O1BBSOLC

1           And according to university statute, Paragraph

2     4-03.01, which is in paragraph 210 of my complaint and in

3     exhibit 18, pages 107.  I'm quoting, "Faculty responsibility,

4     appointment as a faculty member is a contract for full-time

5     engagement in faculty responsibilities during the academic

6     year."  So this is how faculty are defined.  And now they have

7     filed their report to the department of labor and IRS, and

8     annually they're filing reports that I am not a full-time

9     member employee.  And that is in form 1095-G of the Internal

10    Revenue Service and the Department of Treasury.  So I have the

11    form from 2022.  All of this to me says clearly that they took

12    this adverse action, and that goes to the heart of the matter.

13    Although Fordham has denied it and has told the Second Circuit

14    that I remain a tenured professor, but it seems to be

15    inconsistent with the report to other federal authorities.

16           THE COURT:  I have to admit, Ms. Solomon, I'm not

17    familiar with the IRS documentation that you're referring to.

18    But as I understand it, the university has represented to the

19    IRS and to the department of labor that you are no longer

20    full-time faculty.  Is that correct?

21           MS. SOLOMON:  Yes, by stating I'm no longer full-time.

22           THE COURT:  Are you asking for limited discovery, that

23    is to say your personnel file before considering whether or not

24    you want to go to mediation?

25           MS. SOLOMON:  No. I need to have all of this data.

O1BBSOLC

 1   The Second Circuit clearly stated also the pay claim should be

 2   reinstated, and the comparators are critical for that, not for

 3   the motion to dismiss stage, but for a later point in time.

 4   And the comparison with comparators is critical to all the

 5   discrimination and retaliation claim; because I have been

 6   discriminated relative to males and younger females in my

 7   department, both in terms of assignment and the pay, so it is

 8   the heart of the case.

 9          So I think they should produce -- to honor the

10   subpoenas.  I filed the subpoenas consistent with the

11   university's statutes, and I should be getting these documents.

12   There's also in this case protective order, document 24, in

13   February 2019 that protect any confidentiality concern there

14   would be.  And I'm asking everything to be consistent with the

15   protective order.  And we need to have full discovery so that I

16   know what my rights are and what I should be settling.  I

17   should not be settling without the necessary information.  It

18   would be very unfair and disadvantageous to me at this point

19   now.

20          THE COURT:  Thank you.  Ms. McLaughlin, did you want

21   to say anything?

22          MS. McLAUGHLIN:  I will say that I know from again my

23   review of the file there was limited discovery produced at the

24   outset of the case including comparator information and also

25   Professor Solomon's personnel file.  And I agree to the extent

O1BBSOLC

1    she would like that updated, I agree that that would be

2    relevant to her what's going on since then.  I agree with that

3    request.  I have to work with her as to what she believes is

4    missing from the comparator files, and I'm happy to engage in

5    that conversation.

6            THE COURT:  So this is what we're going to do.  I will

7    hold off on making the referral to mediation and ask the

8    parties, cause I don't believe we have one, fill out the

9    discovery schedule form and submit that on consent by no later

10   than tomorrow end of day.  Ms. Solomon, this is simply a

11   schedule that I issue in every case.  I typically give the

12   parties six months to complete discovery.  We'll give you six

13   months to complete discovery.  There's no magic to the dates on

14   the form, and so you should discuss it with Ms. Solomon.  Give

15   yourself six months which will put us at July, so I'll give you

16   till July 12, to complete discovery.

17           And if you encounter any difficulty in the meantime,

18   you can come back and ask for further relief from that date;

19   but, Ms. McLaughlin, I'll ask you to take the lead in filling

20   out the form, fill out July 12 the date of discovery cut off,

21   and submit that by no later than end of day tomorrow.  And I

22   would greatly encourage the parties -- you don't have to wait

23   until July 12.  If at any point before then you believe you can

24   engage in fruitful settlement discussions, you can contact

25   chambers, and I can refer you again back to mediation or to the

O1BBSOLC

1    assigned magistrate judge as you wish.  Okay.  So with that,

2    Ms. Solomon, is there anything else to do today?

3             MS. SOLOMON:  Yes.  There is something not very major,

4    but I think there are some very important issues in terms of

5    the case and my allegations and to the fact that I was

6    replaced; that I was discriminated and replaced by people

7    outside of my protected class.  I think that's a very important

8    issue to be remembered.  And also the issue of due process, the

9    lack of due process.  There is an important case that the

10    Second Circuit came up with after your Honor's last order,

11    which is called *Vengalattore v. Cornell University.*  The points

12    there are of extreme importance for due process for tenured

13    professors, and also reverses the previous established pattern

14    that it wasn't clear whether Title IX applies to professors.

15    And what this case determined is that IX applies to intentional

16    discrimination of professors.  And I had Title IX claims, and I

17    think those also should be included in light of this later

18    development.  I hope is relevant.  Thank you for hearing me,

19    your Honor.

20             THE COURT:  Absolutely.  Obviously there's a lot of

21    issues involved here.  We're not going to resolve them today.

22    And so what we'll do is, we'll proceed to discovery.

23             Ms. Solomon, you are obviously required to engage in

24    discovery in good faith.  I don't anticipate that you will not.

25    However, you will also likely receive discovery requests from

O1BBSOLC

1   Ms. McLaughlin.  And when you do, you should respond to them

2   promptly.  And again, if there are any issues concerning

3   discovery between now and the end of or July 12, the parties

4   can come back and ask for relief.  And with that, unless

5   there's anything else, Ms. Solomon?

6          MS. SOLOMON:  No.  Thank you, your Honor.  Thank you

7   for setting up the schedule, and happy New Year and all the

8   best.

9          THE COURT:  Anything else from you, Ms. McLaughlin?

10          MS. McLAUGHLIN:  I just have one question.  Will the

11   Court be issuing a further order on the remand as it relates to

12   the discrimination claims and the motions to dismiss those,

13   because it's my understanding from my read of the order that

14   the district court would consider per the Second Circuit's

15   guidance certain items and determine whether its decision still

16   stands?  And that would narrow pieces of discovery presumably

17   because of the statute of limitations issues and also guide my

18   answer to the complaint.

19          THE COURT:  There's nothing before me.  There's the

20   remand.  It's not a motion that's been brought by Fordham.  You

21   can and in the ordinary course move to dismiss again I suppose,

22   and we could consider that.

23          But as things stand now, we are required to consider

24   whether or not Ms. Solomon can make out her case and we're in

25   discovery.

O1BBSOLC

1          MS. McLAUGHLIN:  Okay.  Thank you for the

2     clarification.

3          THE COURT:  We are adjourned.  Stay well, everyone.

4          (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
ESTHER SOLOMON,

                                         Plaintiff,

    - against -

FORDHAM UNIVERSITY,

                                         Defendant.
-----------------------------------------------------------------------X

Case No.:
1:18-cv-04615-ER

**DECLARATION**

RYAN SOEBKE, declares, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am an attorney-at-law and am associated with the law firm of Cullen and Dykman LLP, attorneys for defendant Fordham University (the "University" or "Fordham), in the above-entitled action.

2.      I submit this declaration in in opposition to Plaintiff Esther Solomon's ("Plaintiff") "Motion to Compel Compliance with Subpoenas, Compliance with Document Requests, and Compliance with Representations to the Court" (ECF 70)[1] and in support of Fordham's cross-motion to compel Plaintiff to conduct a reasonable search of all potentially relevant documents and communications in her possession.

3.      Plaintiff takes issue with Fordham's response to several subpoenas served by Plaintiff which sought the production of Plaintiff's personnel file as well as the personnel files of several alleged comparator professors.

4.      Specifically, Plaintiff claims that Fordham's redaction of the comparator professors' names in their production is improper.

---

[1] "ECF" references are to the Docket Entries in this matter.

1

5.      Plaintiff also claims that Fordham has only provided a "limited response" to her document requests to date and takes issue with Fordham's designation of the documents it has produced as "Confidential."

6.      Plaintiff's own production to date is significantly deficient.

7.      Plaintiff has not produced any electronic files but rather a random assembly of documents that she has compiled over the years.

8.      Plaintiff has also admitted that she has not conducted a search of either her personal or Fordham issued email account for possibly responsive documents or communications.

9.      For the reasons set forth below and in the accompanying memorandum of law, Plaintiff's motion should be denied in its entirety and Fordham's cross-motion should be granted.

**Fordham's Production to Date**

10.     Plaintiff's motion mainly concerns Fordham's response to several subpoenas she served on November 6, 2019.

11.     Those subpoenas sought the production of Plaintiff's personnel file as well as the personnel files of several comparator professors.

12.     As has been previously explained to Plaintiff, personnel files at Fordham consist of a faculty member's Human Resources ("HR") File, a Provost File, and a file maintained by the faculty member's individual school, which in this case is known as a Gabelli File.

13.     Plaintiff's HR file was produced prior to the issuance of the subpoena under documents numbered FORDHAM0000325-FORDHAM0000497.

14.     Plaintiff's Provost file was produced prior to the issuance of the subpoena under documents numbered FORDHAM0009046-FORDHAM0009190 and consists of documents

related to Plaintiff's initial appointment to the Fordham faculty and documents related to Plaintiff's salary increases over the years.

15.     Finally, Plaintiff's Gabelli file was produced prior to the issuance of the subpoena under documents numbered FORDHAM0010124-FORDHAM0010491 and consists of documents related to Plaintiff's promotion applications, her tenure review, and related faculty evaluations.

16.     While Plaintiff seems to take issue with the lack of documents in her file related to her alleged chairperson appointment in 2013 and the various matters that she has raised concerning her issues with the Faculty Senate, it was explained to Plaintiff that Fordham does not include every document or communication related to a faculty member in that faculty member's personnel file.

17.     For example, emails among colleagues, meeting minutes among colleagues such as meetings of the Faculty Senate, and emails from administrators, are not the types of records that would be included in a faculty member's personnel file and indeed, as Plaintiff is aware, the items that can be included are limited pursuant to various provisions of the University Statutes and Handbook.

18.     To the extent Fordham had relevant document documentation outside of that which is maintained in the aforementioned categories of files, Fordham produced the documents it possesses related to the issues Plaintiff outlined in her complaint and in her document requests. (*See* FORDHAM0000186-FORDHAM0000201, FORDHAM0000498-FORDHAM00008539, and FORDHAM0012911-FORDHAM0013435).

3

19. With respect to twelve of the Subpoenas addressed to her alleged "comparators" as identified in Plaintiff's document requests, the HR, Provost and Gabelli files were produced for each.

20. For those twelve comparators, Fordham also produced faculty activity reports and W-2 records for each.

21. The documents produced by Fordham contain sensitive salary and biographical information related to the comparator professors.

22. Fordham's document production also includes many documents related to Fordham's peer review process, including the indemnities of peer reviewers.

23. The biographical information of comparator professors was redacted to ensure their anonymity in accordance with the University Statutes.

24. A key was provided to Plaintiff that contains the gender, year of birth, and title of each comparator professor so that Plaintiff can review all of the pertinent information relevant to her alleged causes of action.

25. Within Plaintiff's files, the names of peer reviewers were redacted to ensure the integrity of Fordham's peer review process and to prevent the inadvertent disclosure of sensitive salary and other biographical information.

26. Fordham has an undeniable interest in maintaining the anonymity of peer reviewer as professors would be reluctant to accurately participate in this process in the future knowing there is a possibility that their anonymity could be compromised.

**Fordham's Rolling Production**

27. Although Fordham has already produced over 14,500 pages of documents already in this matter, its production is not complete.

28.     Fordham intends to produce course schedules and student evaluations for Plaintiff and all of the comparator professors, to the extent not already produced, in accordance with the current discovery schedule.

29.     In addition, Fordham plans to produce the personnel files for the three additional comparator Professors Zeleney, Chatterjee, and Saharia, who were referenced in Plaintiff's motion.

**Confidentiality Designations**

30.     Plaintiff also takes issue with Fordham's use of a "Confidential" designation for its production.

31.     As stated above, Fordham has an interest in protecting potentially sensitive information including peer review information as well as the salary and biographic information of the comparator professors.

32.     Given the breadth of information sought in this matter and to avoid any inadvertent disclosures, out of an abundance of caution, Fordham has marked the documents it has produced as "Confidential."

33.     Plaintiff has not articulated how her defense in this matter has been hindered by Fordham's use of the "Confidential" designation.

**Plaintiff's Deficient Search and Production**

34.     Plaintiff's search for relevant documents and production to date has been entirely deficient.

35.     On January 7, 2019, Fordham served Plaintiff with Defendant's First Request for the Production of Documents, a copy of which is attached hereto as Exhibit A.

36. Fordham's requests sought "documents and communications" related to Plaintiff's claims in this action. *See generally* Exhibit A.

37. Fordham also requested "[a]ll non-privileged documents concerning any communications between Plaintiff and any person concerning or relating to any allegation in the Complaint or any incidents, events, facts, or occurrences that support or relate to said allegations." *See Id.* at p. 17.

38. To date, Plaintiff has not produced any electronic files and has instead only produced a random assembly of documents that she compiled over the years, most of which are academic articles.

39. Plaintiff has similarly not produced any documents directly from her personal Gmail account (etaki33@gmail.com) or any other personal email she may have used.

40. Plaintiff has also not produced any notes to herself or others despite making claims that span decades.

41. The emails Plaintiff has provided were produced as scanned image files, many of which appear to be incomplete.

42. For example, the documents produced as ES17 and ES18 appear to be the final two pages of a five-page letter. The first three pages are not included in Plaintiff's production. Exhibit B.

43. Further, the documents produced as ES112-ES119 are an email chain in which it is indicated that multiple emails in the chain contained attachments. Exhibit C. None of those attachments were produced with the corresponding emails.

44. Plaintiff has admitted both to counsel for Fordham and to the Court that she has not conducted a search of either her personal email accounts or her Fordham issued email account.

45. During a meet and confer call on December 5, 2019, Plaintiff did not deny that she has additional responsive documents that she has failed to produce, but rather simply stated that she did not have to produce such documents as Fordham should "have what it needs."

46. During that same meet and confer call, Plaintiff refused to produce any documents form her personal email account or her computer and refused to discuss the issue further.

47. During a conference with the Court on January 29, 2020, Plaintiff stated that she did not know that she was required to produce emails from her personal email accounts. Exhibit D, January 29, 2020 Tr. at p. 5.

48. Plaintiff also stated that she believed it would be "extremely burdensome" for her to search through her emails. *Id.* at p. 32.

49. The Court advised Plaintiff that it is her responsibility to search for all relevant documents and communications and ordered Plaintiff to turn over all relevant emails from her personal and Fordham issued email accounts. *Id.*

50. To date, Plaintiff has failed to make any such production.

**Fordham's Prior Good Faith Efforts to Confer with Plaintiff**

51. Fordham has made several previous attempts to meet and confer with Plaintiff regarding her deficient search and production of documents to date.

52. Fordham participated with two meet and confer calls with Plaintiff on November 13, 2019 and December 5, 2019.

53. During those meet and confer calls, Plaintiff refused to undertake an additional search and review of the documents and communications in her possession.

54. As stated above, as a result of the parties' failure to resolve their discovery disputes, a discovery conference was held with the Court on January 29, 2020.

7

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 1st day of March, 2024, at Uniondale, New York.

/s/Ryan Soebke
Ryan Soebke

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

ESTHER SOLOMON,

                            Plaintiff,

     - against -

FORDHAM UNIVERSITY,

                          Defendant.
-----------------------------------------------------------------------X

Case No.:
1:18-cv-04615-ER

**DEFENDANT'S FIRST**
**REQUEST FOR THE**
**PRODUCTION OF**
**DOCUMENTS**

Defendant Fordham University ("Fordham" or "Defendant"), by and through its attorneys

Cullen and Dykman LLP, hereby request pursuant to Rule 34 of the Federal Rules of Civil

Procedure that Plaintiff Esther Solomon ("Plaintiff"), produce the documents identified below for

inspection and copying at the offices of Cullen and Dykman, LLP, 100 Quentin Roosevelt

Boulevard., Garden City, New York 11530, within 30 days of the service of this request.

     These requests shall be deemed continuing so as to require the filing of supplementary

responses in the event that further or different information becomes known at any time before the

close of trial.

## DEFINITIONS

     Defendants hereby incorporate by reference the definitions and instructions set forth in the

Federal Rules of Civil Procedure and the Local Rules. The following additional or more specific

definitions and instructions are also to be used in responding to these Document Requests:

     1.    **Communication**. The term "communication" means the transmittal of information

(in the form of facts, ideas, inquiries or otherwise).

2. **Document**. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A), which includes, in relevant part, writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations – stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the word "document."

3. **Identify (with respect to persons)**. When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

4. **Identify (with respect to documents)**. When referring to documents, "to identify" means to give, to the extent known, the (i) type of the document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s). In the alternative, the responding party may produce the document, together with identifying information sufficient to satisfy Fed. R. Civ. P. 33(d).

5. **Parties**. The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

2

6. **Person**. The term "person" is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

7. **Concerning**. The term "concerning" means relating to, referring to, describing, evidencing or constituting.

8. **All/Any/Each**. The terms "all," "any," and "each" shall each be construed as encompassing any and all.

9. **And/or**. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed outside of its scope.

10. **Number**. The use of the singular form of any word includes the plural and vice versa.

11. **Including**. "Including" shall mean including but not limited to.

12. **Complaint**. The word "Complaint" shall mean the Complaint filed by Plaintiff in this action under Civil Action No. 1:18-cv-04615 in the United States District Court for the Southern District on May 24, 2018.

13. **Plaintiff**. The word "Plaintiff" shall refer to plaintiff Esther Solomon.

14. **Defendant**. The word "Defendant" shall refer to defendant Fordham University.

## INSTRUCTIONS

1. If Plaintiff claims any document to be immune from discovery on the grounds of privilege, please provide statements setting forth:

        i.     the name and title of the author;

        ii.    the name and title of the person to whom the document was addressed;

3

iii.    the name and titles of all persons to whom copies were sent;

iv.    the date of the document;

v.    a brief description of the subject matter;

vi.    the nature of the claimed privilege; and

vii.    the paragraph to which the document is otherwise responsive.

2.    If Plaintiff claims any document cannot be produced, please specify why the document cannot be produced.

3.    If any document cannot be produced in full, please produce the document to the extent possible, specifying the reasons why the remainder of the document cannot be produced.

4.    These requests apply to any and all documents in Plaintiff's possession or known to Plaintiff, as well as any and all documents which are in the possession of any agent or representative of Plaintiff and being maintained on his behalf.

5.    Questions regarding the interpretation of the within requests for production of documents should be resolved in favor of the broadest possible construction.

6.    If any document requests to be produced was, but no longer is, in Plaintiff's possession or control, or is no longer in existence, state where it is (i) missing or lost; (ii) destroyed; (iii) transferred voluntarily to others, and if so, to whom; and/or (iv) otherwise disposed of. In each instance, explain the circumstances surrounding the authorization for such disposition and state the approximate date thereof.

7.    These requests seek documents from and relating to Plaintiff.

8.    With respect to each document procured, Defendants request that Plaintiff specify the request(s) to which the document is responsive.

## DOCUMENTS TO BE PRODUCED

1.      All documents and communications concerning the allegation that Defendant discriminated against Plaintiff on the basis of her religion, as alleged in Point III(A) paragraph 1 of the Complaint in this action.

2.      All documents and communications concerning the allegation that Defendant discriminated against Plaintiff on the basis of her sex, as alleged in Point III(A) paragraph 1 of the Complaint in this action.

3.      All documents and communications concerning the allegation that Defendant discriminated against Plaintiff on the basis of her age, as alleged in Point III(A) paragraph 3 of the Complaint in this action.

4.      All documents and communications concerning the allegation Defendant "provided me with terms and conditions of employment different from those of similar employees," as alleged in Point IV(A) paragraph 1 of the Complaint in this action.

5.      All documents and communications concerning the allegation that Defendant "retaliated against me," as alleged in Point IV(A) paragraph 1 of the Complaint in this action.

6.      All documents and communications concerning the allegation that Defendant "harassed me or created a hostile work environment," as alleged in Point IV(A) paragraph 1 of the Complaint in this action.

7.      All documents and communications concerning the allegation that Plaintiff was "effective [sic] demoted [and] denial of faculty support," as alleged in Point IV(A) paragraph 1 of the Complaint in this action.

5

8. All documents and communications concerning any complaint of harassment, discrimination, or retaliation that Plaintiff alleges was committed by any employee of the Defendant between 2013 and the present.

9. Copies of all social media postings by Plaintiff concerning the allegations in the Complaint, including but not limited to postings on Facebook, LinkedIn, Twitter, YouTube, Instagram, Snapchat, blogs, and other social media sites.

**Pay Inequity Allegations**

10. All documents and communications concerning employees who allegedly were similarly situated to Plaintiff, but treated more favorably than Plaintiff with respect to pay.

11. All documents and communications concerning the allegation that "[t]hroughout Dr. Solomon's employment at the University and continuing to date, Dr. Solomon's pay has been significantly lower than similarly situated male faculty members and even younger faculty members," as alleged in Point IV(B) paragraph 2 of the Complaint in this action.

12. All documents and communications concerning the allegation that Plaintiff "is the only Female tenured faculty member in the Organizational Behavior/Leading People and Organization Area of the Business School," as alleged in Point IV(B) paragraph 2 of the Complaint in this action.

13. All documents and communications concerning the allegation that Plaintiff "is the only Jewish full-time faculty member in the entire former Management Systems Area of the Business School," as alleged in Point IV(B) paragraph 43 of the Complaint in this action.

6

14. All documents and communications concerning the allegation that Plaintiff "is significantly underpaid relative to the other male colleagues, for performing the same work," as alleged in in Point IV(B) paragraph 3 of the Complaint in this action.

15. All documents and communications concerning the allegation that Plaintiff "is not afforded the administrative and other special appointments, accommodations and teaching opportunities afforded her male colleagues, which carry significant compensation and benefits," as alleged in Point IV(B) paragraph 3 of the Complaint in this action.

16. All documents and communications concerning the allegation that Plaintiff's "male colleagues earn over $200,000, through upwards of $400,000 annually, while she is significantly underpaid relative to the male business school faculty," as alleged in Point IV(B) paragraph 4 of the Complaint in this action.

17. All documents and communications concerning the allegation that "[a]lthough gender-based pay discrimination had been admitted ten years ago as occurring at Fordham University, this has not been corrected to date," as alleged in Point IV(B) paragraph 4 of the Complaint in this action.

18. All documents and communications concerning the allegation that Dr. John Hollwitz "is among the high [sic] paid faculty performing the same Professor job as she [Plaintiff] does," as alleged in Point IV(B) paragraph 5 of the Complaint in this action.

19. All documents and communications concerning the allegations set forth in Point IV(B) paragraph 6 of the Complaint regarding Dr. Michael Pirson's compensation.

20. All documents and communications concerning the allegation that "Dr. Solomon's compensation is far lower than other longtime faculty members in the Management Systems Area

7

such as Drs. Robert Wharton, Falguni Sen, Robert Hurley, and faculty that joined most recently such as Drs. Thomas Wright and Benjamin Cole," as alleged in Point IV(B) paragraph 7 of the Complaint in this action.

21.    All documents and communications concerning the allegation that "Dr. Solomon's salary was $122,947 for the 2017-21018 [sic] academic year, which is lower than the average for Assistant Professor salary, although she has been a Fordham faculty member for 37 years," as alleged in Point IV(B) paragraph 8 of the Complaint in this action.

22.    All documents and communications concerning the allegations regarding "salary compression" set forth in Point IV(B) paragraph 9 of the Complaint in this action.

23.    All documents and communications concerning the allegation that "[t]hroughout Dr. Solomon's employment at Fordham, she has received a significantly lower salary than similarly situated male, non-Jewish or younger faculty of lesser academic rank," as set forth in Point IV(B) paragraph 49 of the Complaint in this action.

**Administrative, Teaching and Other Opportunities (Class Schedule and Research)**

24.    All documents and communications concerning the allegation that Plaintiff, as "another female faculty who expressed such concerns, were [sic] deprived of administrative, teaching and other opportunities afforded to similarly situated males," as alleged in Point IV(B) paragraph 12 of the Complaint in this action.

25.    All documents and communications concerning employees of Defendant who allegedly were similarly situated to Plaintiff, but treated more favorably than Plaintiff with respect to scheduling of classes.

8

26.     All documents and communications concerning the allegation that "[i]n addition to being paid less than her colleagues because of her sex and age, Dr. Solomon has also been discriminated against in multiple ways, including recently in the nature, time and location of the classes she has been assigned to teach," as alleged in Point IV(B) paragraph 45 of the Complaint in this action.

27.     All documents and communications concerning the allegations set forth in Point IV(B) paragraph 47 of the Complaint in this action, including having been "exiled to the Bronx campus and given many low-level courses, placed under the supervision of a younger non-tenure track contract clinical instructor" in September 2017.

28.     All documents and communications concerning the allegations set forth in Point IV(B) paragraph 28 of the Complaint in this action, including but not limited to complaints of discrimination relating to teaching assignments for the Fall 2018 semester made to the Provost and Dean.

29.     All documents and communications concerning the allegations set forth in Point IV(B) paragraph 66 of the Complaint in this action regarding Plaintiff's Spring 2018 course schedule.

30.     All documents and communications concerning the allegations set forth in Point IV(B) paragraph 67 of the Complaint in this action regarding "the long standing policy and practice at Fordham that full-time tenured faculty have priority in choosing the classes they are assigned to teach."

9

31.     All documents and communications concerning the allegation that "there was no legitimate business reason to assign these courses to Dr. Solomon" as alleged in Point IV(B) paragraph 68 of the Complaint in this action.

32.     All documents and communications concerning the allegations that male faculty have received extra credit for undergraduate Core POM, as alleged in Point IV(B) paragraph 69 of the Complaint in this action.

33.     All documents and communications concerning the allegation that "Dr. Pirson has made sexist comments about Dr. Solomon and other women" as alleged in Point IV(B) paragraph 75 of the Complaint in this action.

34.     All documents and communications concerning the allegation that "Dr. Pirson failed to advertise Dr. Solomon's course" as alleged in Point IV(B) paragraph 79 of the Complaint in this action.

35.     All documents and communications between Plaintiff and Dr. Michael Pirson, Dr. Stephen Freedman and Dr. Donna Rapaccioli regarding Plaintiff's schedule and course assignments for the years 2016, 2017 and 2018.

36.     All documents and communications concerning employees who allegedly were similarly situated to Plaintiff, but treated more favorably than Plaintiff with respect to research funding.

37.     All documents and communications concerning the allegations that "younger faculty had their expenses fully covered by Fordham," as alleged in Point IV(B) paragraph 14 of the Complaint in this action.

10

38.     All documents and communications concerning the allegation that "males and the younger faculty have lower course loads, receive higher pay than Dr. Solomon and receive summer research funding," as alleged in Point IV(B) paragraph 94 of the Complaint in this action.

39.     All documents and communications concerning the allegation that Defendant is "trying to force Dr. Solomon to resign from her position," as alleged in Point IV(B) paragraph 45 of the Complaint in this action.

40.     All documents and communications concerning the allegation that the "Business School has a pattern and practice of forcing tenured Professors to resign from their positions by engaging in the same conduct it is currently undertaking with respect to Dr. Solomon, i.e. assigning them primarily to the Bronx campus, requiring them to teach undergraduate instead of graduate courses and then accusing them of some sort of 'misconduct'" as alleged in Point IV(B) paragraph 136 of the Complaint in this action.

**Promotion Allegations**

41.     All documents and communications concerning employees who allegedly were similarly situated to Plaintiff, but treated more favorably than Plaintiff with respect to promotion opportunities.

42.     All documents and communications concerning the allegation that "Dr. Solomon as a female faculty has been twice improperly denied promotion to Professor," as alleged in Point IV(B) paragraph 11 of the Complaint in this action.

2013

43.     All documents and communications concerning any conversation between Plaintiff and Dr. Donna Rapaccioli regarding Plaintiff's alleged promotion to Chair, including but not

11

limited to the conversation that allegedly occurred on Sunday, September 29, 2013, as alleged in Point IV(B) paragraph 16 of the Complaint.

44.     All documents and communications concerning the "contract to be the Area Chair of Management Systems for a 3-year appointment," as alleged in Point IV(B) paragraph 16 of the Complaint in this action.

45.     All documents and communications between Plaintiff and Defendant concerning an "annual stipend of $18-20.000 and a one-course teaching load per semester (teaching two rather than five courses per year)" as alleged in Point IV(B) paragraph 16 of the Complaint in this action.

46.     All documents and communications concerning the allegation that "[p]reviously, on September 25, 2013, the Management Systems Area faculty had endorsed Dr. Solomon with a 70% majority vote supporting her for the Area Chair position" as alleged in Point IV(B) paragraph 17 of the Complaint in this action.

47.     All documents and communications concerning the allegation that the Dean and the Provost "appointed" Dr. Solomon to be the Department Chair, as alleged in Point IV(B) paragraph 51 of the Complaint in this action.

48.     All documents and communications concerning the allegation that "on October 2, 2013, the Provost and Dean announced that they would terminate Dr. Solomon's appointment as Chair, and appoint Dr. John Hollwitz, instead," as alleged Point IV(B) paragraph 18 of the Complaint in this action.

49.     All documents and communications concerning the telephone conversation that allegedly occurred on October 2, 2013 between Dr. Rapaccioli, Plaintiff, Dr. Freedman and Dr. Hollwitz, as alleged in Point IV(B) paragraph 117 of the Complaint in this action.

12

50. All documents and communications concerning any conversation between Plaintiff and any employee of Defendant regarding the stipend and/or course release referred to in Point IV(B) paragraph 18 of the Complaint in this action.

51. All documents and communications concerning the allegations set forth in Point IV(B) paragraph 52 of the Complaint in this action, including but not limited to any correspondence regarding the "Provost's promise to compensate Dr. Solomon."

52. All documents and communications concerning the "very public and defamatory Hearing involving the senior administration and Faculty disseminated to both Lincoln Center and Rose Hill campuses by video feed," as alleged in Point IV(B) paragraph 37 of the Complaint in this action.

53. All documents and communications concerning the allegation that "[t]o this day, the University has not fulfilled its contract with Dr. Solomon," as alleged in Point IV(B) paragraph 20 of the Complaint in this action.

2015

54. All documents and communications concerning the allegation that the administration appointed Dr. John Hollwitz as Chair and "abruptly removed Dr. Solomon as Area chair without explanation in 2015," as alleged in Point IV(B) paragraph 5 of the Complaint in this action.

55. All documents and communications concerning the allegation that "Dr. Solomon had been voted by her colleagues and was appointed Area Chair in 2015," as alleged in Point IV(B) paragraph 13 of the Complaint in this action.

13

56.     All documents and communications concerning the allegation that Plaintiff "was immediately removed without explanation," as alleged in Point IV(B) paragraph 13 of the Complaint in this action.

57.     All documents and communications concerning the alleged "contract" contained in Point IV(B) paragraph 13 of the Complaint, including, but not limited to, any correspondence between Plaintiff and any individual of Defendant regarding same.

58.     All documents and communications concerning the terms and conditions of Plaintiff's employment with Defendant and any change in Plaintiff's job duties, promotions, or job transfers, including but not limited to all offer letters, contracts, agreements, memoranda, policies, handbooks, performance reviews, student evaluations, performance improvement plans, warnings, disciplinary actions, termination notices, resignation letters, and reports.

59.     All documents and communications concerning any training or continuing education Plaintiff applied for or received from 2013 through and including the present.

60.     All documents and communications concerning the allegation that Dr. Solomon's "abilities and accomplishments are equal to or better than her colleagues," as alleged in Point IV(B) paragraph 44 of the Complaint in this action.

**EEOC/Discrimination/Retaliation Allegations**

61.     All documents and communications concerning any complaints or reports of discrimination that Plaintiff made to or about Defendant, including but not limited to correspondence to and from Fordham's Office of Institutional Equity and Compliance/Title IX.

62.     All documents and communications concerning allegations of retaliation, as set forth in Point IV(B) paragraphs 21-23 of the Complaint in this action.

14

63. All documents and communications concerning the allegation set forth in Point IV(B) paragraph 25 of the Complaint that Plaintiff complained to "Fordham's EEOC."

64. All documents submitted to or received from, and all communications with, the U.S. Equal Employment Opportunity Commission including but not limited to documents relating to Plaintiff's Charge of Discrimination, EEOC Charge No. 520-2018-01611.

65. All documents and communications concerning Plaintiff's filing with any administrative agency in connection with any claims Plaintiff has or has had against Defendant or any individual employed with or by Defendant at any time including, but not limited to, all documents provided to or received by such administrative agency.

66. Documents or communications concerning any administrative charge or proceeding or lawsuit to which Plaintiff was a party between 2013 and the present relating to Plaintiff's employment with any employer, including Defendant, that rely on the same factual allegations or claims as those at issue in this lawsuit.

**Defamation Allegations**

67. All documents and communications concerning the allegations set forth in Point IV(B) paragraph 30 of the Complaint in this action, including but not limited to any correspondence between Plaintiff and any individual regarding the University Code of Conduct and/or Civility Policy.

68. All documents and communications concerning the "defamatory communications" set forth in Point IV(B) paragraph 36 of the Complaint in this action.

69. All documents and communications concerning the "defamatory statements" alleged in Point IV(B) paragraph 38 of the Complaint in this action.

15

**Other**

70.    All documents and communications concerning how Plaintiff's reputation suffered as alleged in Point IV(B) paragraph 35 of the Complaint in this action.

71.    Plaintiff's federal and state income tax returns for the tax years 2013 through and including the present, including all supporting documentation and schedules.

72.    Documents sufficient to show any income or other compensation received by or owed to Plaintiff, including but not limited to paychecks, paystubs, invoices, settlement payments, statements of work, Form W-2s, Form 1099s, social security benefits, social security disability benefits, unemployment insurance benefits, workers' compensation benefits, and long-term or short-term disability benefits from 2013 through and including the present.

73.    All documents concerning any and all sources of income and/or employment during the time of Plaintiff's employment with the Defendant.

74.    All documents concerning all damages Plaintiff seeks as a result of the allegations contained in the Complaint, including any calculation of Plaintiff's damages.

75.    All documents and communications concerning any alleged injuries, including physical, mental, and emotional injuries, Plaintiff allegedly sustained as a result of Defendant's allegedly discriminatory conduct, from 2013 through and including the present, including but not limited to all medical records and psychotherapy notes.

76.    All documents concerning all administrative complaints, lawsuits, actions, or proceedings, or grievances Plaintiff has commenced or has been involved with over the last (5) years.

77. All claims, complaints, charges, affidavits signed by Plaintiff, or settlement agreements or other documents settling any other lawsuits brought by Plaintiff claiming violations of the Title VII of the Civil Rights Act of 1964, New York State Human Rights Law, New York City Human Rights Law, Equal Pay Act, Title IX of the Education Amendments Act of 1972, the Americans with Disabilities Act of 1990 and the New York Labor Laws.

78. All documents, ledgers, notes, diaries or other records, made, kept or maintained or created by the Plaintiff in connection with such Plaintiff's employment with the Defendant.

79. All non-privileged documents concerning any communications between Plaintiff and any person concerning or relating to any allegation in the Complaint or any incidents, events, facts, or occurrences that support or relate to said allegations.

80. All documents that Plaintiff may use, or seek to use, to support Plaintiff's claims in this action.

81. All documents not already produced in response to the above requests that relate to, bear upon, or provide evidence concerning the matters and allegations in the Complaint.

82. All documents Plaintiff intends on introducing into evidence during the depositions or the trial of this action.

83. All documents and communications concerning each expert Plaintiff intends to call as a witness at trial, including but not limited to all documents and communications sent to or received from each expert, resumes, curriculum vitae, and reports.

84. All documents Plaintiff referred to, relied upon, consulted, or used in any way to draft the Complaint and Initial Disclosures Pursuant to Federal Rule of Civil Procedure Rule 26(a)(1), dated December 31, 2018.

17

85.     All documents that contain or otherwise relate to facts that Plaintiff contends refute,

in any way, any of Defendant's defenses.

Dated: Garden City, New York
        January 7, 2019

                                                CULLEN AND DYKMAN LLP


                                                By: _____
                                                Hayley B. Dryer (HD5682)
                                                *Attorneys for Defendant Fordham University*
                                                100 Quentin Roosevelt Boulevard
                                                Garden City, New York 11530
                                                Phone: (516) 357-3745
                                                Email: hdryer@cullenanddykman.com

TO:

**VIA FEDEX**
Jeffrey Then
*Attorneys for Plaintiff Esther Solomon*
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Phone: (212) 474-1908
Email: jthen@cravath.com

18

Benjamin Cole invites Bob Hurley and Esther Solomon to submit a concrete joint proposal introducing a behavioral component to the pre-MBA Bootcamp. Email CCed to Aditya Saharia and Dean Rapaccioli.

9/27/15   Written Feedback received from Esther Solomon received by all Committee Members requesting that Management course not be removed from required "Fixed" Core. Email CCed to Bob Hurley, Dorothy Klotz, Bob Wharton, Falguni Sen, Dean Rapaccioli, An Yan, Dawn Lerman, and Adam San Miguel.

9/28/15   Written Feedback and Reference Material received from Miguel Alzola

9/30/15   Reminder email received from Esther Solomon regarding behavioral science content highlighted in 9/27/15 email correspondence

9/30/15   Written Feedback received from Miguel Alzola

9/30/15   Committee Meeting Discusses Feedback on Initial Draft and Concrete Proposals to Address Concerns Raised

10/2/15   Written Feedback received from Steven Raymar

10/6/15   Request received from Esther Solomon to Benjamin Cole for follow up. Reply that her concerns were being addressed at forthcoming meeting (10/7/15).

10/7/15   Written Feedback received from Bob Hurley

10/7/15   Committee Meeting to Discuss Feedback and Concrete Proposals

Notification to Dean Rapaccioli that Committee Consensus had been Reached on Proposal

Proposal from Bob Hurley regarding Pre-MBA Bootcamp sent to Committee members by Bob Hurley. Email CCed to Dean Rapaccioli and Esther Solomon.

10/9/15   Curriculum Revision Proposal Finalized. Committee Work Concluded Formally.

Proposal Document forwarded to members of Curriculum Committee with Cover Letter Summary Document.

10/14/15  Curriculum Committee Discussion and Vote. Proposal passes.

10/21/15  Management Systems Area meeting

10/27/15  Bob Hurley submits proposal to change Professional MBA Program to Management Systems Area

4

11/2/2015  Management Systems Area meeting for 11/4/15 postponed due to scheduling conflicts

11/4/15  Joint Council Discussion and Vote. Proposal passes.

    11/4/15  Bob Hurley introduces motion to modify Professional MBA Proposal. Motion fails.

As one can see, the Committee received substantial commentary from non-members, including Written Proposals, Reference Material and Direct Feedback on Committee Proposals. Each of these contributions was welcomed and shared among all members in a transparent manner throughout the term of the Committee. The points highlighted in these various submissions were discussed at the meeting immediately following their receipt. Some of the points were adopted, while others were not—while all received a fair showing.

In summary, concerns raised by the Senator that "the new curriculum was approved too hastily and without appropriate faculty involvement as would be required by the Statutes" are not supported by the facts. Additional claims that "expert tenured faculty in an entire Area/Department such as Management Systems were never appropriately consulted" are also not supported by the facts. Representatives of the Management Systems Area provided more Feedback and Reference Material than any other Area of the Gabelli School of Business, all of which were reviewed by the Committee. The final proposal culminating from this six-month, multi-stakeholder dialog ultimately was reviewed and approved by faculty vote in two bodies—the Graduate Curriculum Committee and the Business School faculty at Joint Council.

We hope this document lays to rest the concerns raised to the Senate. If any further clarifications regarding the Committee's activities are necessary, please do not hesitate to contact us.

Best personal regards,

Benjamin M. Cole, PhD
Co-Chair, Professional MBA Program Committee

Aditya Saharia, PhD
Co-Chair, Professional MBA Program Committee

5



FORDHAM

## Faculty Meeting on Wednesday, Jan 27, at 2:30 pm

**Sris Chatterjee [Business]** <chatterjee@fordham.edu>                    Mon, Jan 25, 2016 at 11:04 AM

Dear Colleagues,

The attached Memo explains the reason for the invitation to a faculty meeting. The meeting will take place at 2:30 pm on Wednesday, Jan 27, simultaneously in LC (room LL 816, confirmed) and RH (location to be confirmed).

We hope that you will be able to attend. Many thanks and all best,

Sris.
(on behalf of the GSB Executive Committee)

---

**2 attachments**

📄 **Faculty Senate Meeting Minutes 417 - Nov 13.pdf**
   301K

📄 **Invitation to Faculty Meeting.docx**
   17K

---

**Thomas Wright** <twright17@fordham.edu>                    Wed, Jan 27, 2016 at 1:00 AM
To: "Sris Chatterjee [Business]" <chatterjee@fordham.edu>, Robert Wharton <whartonphd@fordham.edu>
Cc: Dorothy Klotz <dorothy.klotz@gmail.com>, "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>, Benjamin Cole <bmcole@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>, Steven Raymar <raymar@fordham.edu>, Thomas Wright <twright17@fordham.edu>

Dear Sris and Bob,

I am confused about the purpose of your email and would greatly appreciate your clarification on a couple of relevant facts. First, I was under the impression that any agreed upon "delay" in submitting the PMBA proposal was only until the first of this year (now since passed). Is that not correct? If so, has the proposal already been submitted to the appropriate New York State Accreditation Agency? If it has not been submitted, am I not also correct in assuming that any delay has nothing to do with the Faculty Senate?

I do agree with your assertion that several "decision-making processes at Gabelli...." have been called into question. I do appreciate your efforts to bring these problems to the consideration of the Gabelli faculty at large. However, it is my understanding that not all of the principals involved want their cases made public at this time. As a result, it may not even be appropriate for this type of meeting at the present time until each one of the Gabelli faculty involved has been directly consulted and their permission is given for a public fact-based discussion of the various complaints.

As I am sure you both do as well, I appreciate the continued excellent representation of our hard-working Senators from Gabelli.

I have a medical appointment conflict and will not be able to call in to the Wednesday meeting.

I look forward to hearing back from you with a clarification of my raised questions.

Best regards,

Tom Wright
[Quoted text hidden]

---

**Sris Chatterjee [Business]** <chatterjee@fordham.edu>    Wed, Jan 27, 2016 at 7:26 AM
To: Thomas Wright <twright17@fordham.edu>
Cc: Robert Wharton <whartonphd@fordham.edu>, Dorothy Klotz <dorothy.klotz@gmail.com>, "ESTHER Solomon
[Staff/Faculty [Business]]" <esolomon@fordham.edu>, Benjamin Cole <bmcole@fordham.edu>, John Hollwitz
<hollwitz@fordham.edu>, Steven Raymar <raymar@fordham.edu>

Dear Tom,

Thank you for joining this discussion which we all feel is important. Bob and I have requested all eligible faculty
colleagues to attend today's meeting in order to get more clarity on why and how the Senate arrived at this juncture
vis-a-vis our School, especially the legitimacy of the PMBA redesign. I am sure that the Provost's Office has its own
reasons for selecting the best time for submitting the PMBA program proposal to NY State and Dorothy told me in
verbal communication that it was her assumption that everyone knew that the Senate was not blocking the Provost's
Office from moving ahead.

For a couple of reasons (which I explained to Dorothy), it is not obvious to me why Dorothy's assumption is so
obvious. First, when Steve Raymar spoke to the Senate on Jan 22, he requested the Senate to separate the PMBA
from other alleged governance issues. His request fell on deaf ears. No one in the Senate (our senators included) told
Steve that the Provost's Office could move ahead and that the Senate did not intend to block it. Secondly, the Senate
has received Aditya Saharia's resignation note which clearly shows that the reason for his decision to resign is based
on the Senate's continued questioning of its process since its November meeting. I am puzzled as to why the Senate
President has not written to Aditya that this cannot not be a valid reason for his resignation. It would be very helpful if
the Senate had clarified this to Aditya in writing.

I also asked Dorothy during my conversation yesterday as to why a Senator would request the Provost in the Senate's
December meeting that the submission of the PMBA program be delayed till January when the program was approved
by an overwhelming majority. The Senator's request seems to go against our collective interest and it is not clear to
me as to why the PMBA should have been held hostage after so many months of work by all faculty.

Many of my colleagues are quite baffled by the Senate's decision regarding the fact-finding mission. We hope that
today's meeting will give everyone an opportunity to articulate their questions so that we can send a coherent
message back to the Senate and the University.

I am only speaking for myself and I am not responding to you on behalf of Area Chairs or the PMBA Committee.

I am sorry to hear that you may miss today's meeting because of your medical appointment. I hope this is nothing
serious. Please let me know if I can be of any help.

With best regards,
Sris.
[Quoted text hidden]

---

**ESTHER Solomon [Staff/Faculty [Business]]** <esolomon@fordham.edu>    Wed, Jan 27, 2016 at 8:38 AM
To: "Sris Chatterjee [Business]" <chatterjee@fordham.edu>
Cc: Thomas Wright <twright17@fordham.edu>, Robert Wharton <whartonphd@fordham.edu>, Dorothy Klotz
<dorothy.klotz@gmail.com>, Benjamin Cole <bmcole@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>, Steven
Raymar <raymar@fordham.edu>

Hi Sris,

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 266 of 621

Fordham University Mail - Faculty Meeting on Wednesday, Jan 27, at 2:30 pm    Case 1:18-cv-03409-ERK Document 163-2-3 Filed 12/04/24    Page 71 of 152    1/13/19, 8:30 AM

1. Can you please clarify who is the unnamed Senator you are referring to as in your email above as follows:

"why a Senator would request the Provost in the Senate's December meeting that the submission of the PMBA program be delayed till January when the program was approved by an overwhelming majority."

2. Did you not already get an answer to your question in your personal conversation yesterday?

Regards,

Esther

[Quoted text hidden]

---

**Sris Chatterjee [Business]** <chatterjee@fordham.edu>    Wed, Jan 27, 2016 at 8:50 AM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: Thomas Wright <twright17@fordham.edu>, Robert Wharton <whartonphd@fordham.edu>, Dorothy Klotz
<dorothy.klotz@gmail.com>, Benjamin Cole <bmcole@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>, Steven
Raymar <raymar@fordham.edu>

Dear Esther,

I did not get an answer to all my questions yesterday, but this may be due to my own inability to grasp those subtleties that are obvious to others. I have tried to explain in my last e-mail why I think I did not get answers to all of my questions.

I am going by public Senate records when it comes to public e-mails. Yes, I know who the Senator is, but the identity of a Senator is less important to me compared to the Senate as a whole. You may not realize how shocked and disturbed I was on Jan 22 after hearing the language being used by several members of the Senate against our school. Let me just say that the language was not civilized. But, that is my personal view.

With best regards,
Sris.
[Quoted text hidden]

---

**Dorothy Klotz** <dorothy.klotz@gmail.com>    Wed, Jan 27, 2016 at 9:47 AM
To: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>
Cc: "Sris Chatterjee [Business]" <chatterjee@fordham.edu>, Thomas Wright <twright17@fordham.edu>, Robert Wharton
<whartonphd@fordham.edu>, Benjamin Cole <bmcole@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>, Steven
Raymar <raymar@fordham.edu>

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 267 of 621

Dear all,

Attached is a clarifying email which I sent to Bob and Sris yesterday (I have also copied the email at the end of this email.). Since I am unable to attend the meeting today in person, I would appreciate either Bob or Sris printing a copy of the attached and distributing it at the meeting.

As I and others have indicated, there are many other governance issues are as **not** things that can/should be discussed in public at this time. The PMBA curriculum and the question of whether faculty were adequately consulted is hardly relevant in and of itself. I have meet with the University Council to discuss the larger issues. Although Sris and others seem up and arms about the precious PMBA curriculum, it was not even a topic of conversation. The issues are primarily personnel matters which may very well result in legal action and/or an EEOC complain. I have been told the university is trying to assess their validity and I was asked to not bring them up at the Senate meeting. Again, I made a motion that "Governance Issues in Gabelli" be added to the Senate agenda, as I indicate in the attached, primarily to encourage the university to deal with the larger issues in a timely manner.

So far Sris, you have called a meeting based on an inaccurate account of events which is in conflict with the written minutes published by the Senate. And now you are now suggesting that the Senate Executive Committee of Gabelli is going to respond to the Senate and the University with only a partial knowledge of a very sensitive situation. Is this in the best interest of Gabelli? If such an email or letter is sent, I will happily resign as a Senator.

Dorothy

PS - Below, I have copied what is in the attached. I hope it will be distributed at the meeting today and that Sris has already distributed it to the area chairs as he indicated he would do yesterday.

There appears to be some confusion over the PMBA curriculum and the stream of events which lead up to "Governance in Gabelli" being placed on the January Senate Agenda. First, let me emphasize that **there had been no action taken by the Senate which prevent the PMBA curriculum from being submitted to New York State for approval.**

There was a request made a senator at the December to delay submission of the PMBA curriculum until the new year. I have copied the account which appears in the minutes of the December Senate Meeting.

> *"A Senator asked Dr. Freedman about the issues concerning governance in the Gabelli School of Business that had been raised at the November meeting of the Senate. The Senator asked whether Dr. Freedman would commit to delaying to the submission of the part-time MBA curriculum to the New York State Education Department until after the new year. Dr. Freedman responded that the curriculum would not be submitted to the State before the end of 2015 and until further discussion takes place."*

I am the Senator identified above. The provost and I discussed the matter during a during a break in the proceedings during the December meeting. The January 1, 2016 date was agreed to knowing that it would **not** delay the submission of the PMBA curriculum to New York State.

My motivation for raising this issue at the December meeting was to make clear to the provost that the Senate (at least not Dorothy) would not tolerate him scrubbing the Senate minutes and removing substantive content. I believed

this happened with the minutes of the November Senate Meeting. The following is the account appears in the minutes.

> "Dr. Freedman said that he was aware of the concerns that had been expressed and had scheduled a conversation with the Dean of the Gabelli School for later in the day. He indicated that Dean Rapaccioli would ensure that the process used to approve curricular changes respects the fact that faculty play the primary role in the development of the curriculum."

As Sris noted in his account, the provost did in fact say he would get back to the Senate on the issue after. However, as you can see from the above, the provost scrubbed the statement from the minutes, so that he would not be compelled to address the issue further. So I asked the question at the December meeting, so that he would have to address the issue.

As you may have noticed, on the December Senate Agenda which was distributed prior to the meeting, the item "University Governance Issues" appeared." I made a motion at the start of the January meeting to place "Governance Issues in Gabelli" on the agenda. I did so because the provost and university council have been made aware of multiple **non-curriculum** related issues associated with governance in Gabelli. Multiple faculty (other than Esther and I) have come forward with complains and concerns related to personnel related matters, issues surround the lack clear polices related to teaching load reduction, and other issues related to a lack of transparency. The Senate Executive Committee has discussed these matters with provost. It is my impression that the provost is unwilling to address these issues, at least not in a timely manner. So I made the motion to have "Governance Issues in Gabelli" on the agenda in an attempt to prevent the provost from sweeping these issues under the rug. Because of the sensitive nature of many of the issues, the only "Governace Issues in Gabelli" which senators were willing to discuss in an open session was administrative overreach into curriculum.

The position which the overwhelming majority of the Senators expressed at the December Senate Meeting was that the Senate will not and should not adjudicate or take sides in conflicts within schools, unless there has been clear violation of the University Statutes. Although there were attempts at the meeting to make the case that the administrative overreach in the development of the PMBA program was a statutory violation, most of the Senators did not concur as evidence by the motion which appears in the January Senate Action Minutes.

> "The Senate tasks the Executive Committee of the Senate to investigate, along with a trained mediator from the School of Law, current concerns raised in the Gabelli School of Business with respect to issues of governance. The Executive Committee should report back to the Senate at the next meeting whether this mechanism is a viable one for dealing with future issues that emerge and what the process of any future mechanism should be."

Finally, in terms of administrative overreach into curriculum, although one of the examples Esther mentioned at the December meeting that there was no face-to-face meeting of the Management Systems Area, Senators had previously been made aware of other concerns about the process (i.e., whether faculty were adequately and appropriately consulted) and administrative overreach. At the end of this email, I have copied an email I send out to all Senators in response to the email Aditya sent out after the November meeting. You'll note that that there is no mention of the Management System's Area in the email. The objections were related to the selection of committees which played a role in the developed the curriculum and that no feedback was provided to those that submitted alternative proposals. As I hope you will agree, the complaints were not based solely on the example Esther cited at the meeting.

Again, let me emphasize **that there is currently no stop by the Senate on the PMBA curriculum being submitted to NYS.** Moreover, as you can see from the motion from the January action minutes copied above, there is no indication that the Senate is going to take up the issue in the future. I will follow through with a phone call to each of you later today, but I wanted to provide you with my understanding of the current situation.

All the best,

Dorothy

PS - Below is the email I sent out in response to Aditya's email and prior to the December meeting. You'll note that there is no reference to the Management System's Area and the focus and main issue of concern and most senators conveyed to me was of concern was the composition of the comittees.

*Dear Senators,*

*I apologize for communicating on this matter by email. However, I am concerned that Aditya's account of events will impact decision making, and since the item is not on today's agenda, there will likely not be an opportunity to provide a detailed response in the meeting today. But I feel strongly that all Senators need to be aware of what transpired.*

*Esther's question to the provost at the last Senate meeting pertained to faculty input in the development of the new Professional MBA curriculum. In his email, Aditya contents that the process was faculty driven. It was not. Aditya provided only a partial account of what transpired. There were two committees which played key roles in the development of the new Professional MBA curriculum: the MBA Task Force and the subsequent Professional MBA Program Committee. I have highlighted below several concerns with respect to the composition of each of those committees and Aditya's email account of process. I have documentation to support each concern.*

*1. Composition of the MBA Task Force*

    ○ *The dean appointed the members of the committee. The co-chairs of the committee were Ren-Raw Chen (a faculty member) and Dawn Lerman (an administrator). The committee consisted of both faculty and administrators.*

    ○ *Prior to the formation of the committee, several faculty made requests to the dean to be appointed to the committee. Those faculty members either did not receive a response or were told they did not meet the criteria to be placed on the committee. It should be noted that not all of the subsequently appointed members met the dean's stated criteria.*

    ○ *The faculty co-chair, Re Wa Chan, requested that a particular faculty member be added to the committee. The administrative co-chair, Dawn Lerman, denied the request.*

*2. Composition of the Professional MBA Program Committee*

    ○ *The dean determine the composition of the committee. The dean appointed two faculty co-*

chairs, Aditya Saharia and Ben Cole. She designated the area chairs as the other members.

○ Aditya inquired as to whether one of the area chairs could be replaced by another member from the same area. Aditya reported that the administration would not permit the replacement of an area chair by another representative of the area.

3. Aditya's email with regard to faculty consultation and input

○ Multiple proposal were submitted to the Professional MBA Program Committee. But there was no dialog between the committee and many of the individuals/groups who submitted proposals as to the merits of their proposal.

○ There were multiple concern expressed and issues raised at the Faculty Forum which the co-chairs of the committee attended. On many of these issues, there was no subsequent dialog or feedback provided by the committee. Moreover, many of the issues raised were not addressed or mentioned in the justification of the final proposal.

○ Although the co-chairs of the committee may have encouraged the area chairs to discuss the proposal with their area's faculty and bring the area's feedback to the committee, the co-chairs were aware that not all area chairs discussed the curriculum with their area.

○ Finally, the GBA curriculum committee report provided to the Joint Council consisted of one sentence. The sentence merely stated their vote to approve the curriculum. The dean is the chairperson of the GBA curriculum committee.

Please be aware that similar administratively driven processes were followed with respect to recent changes in both the undergraduate core curriculum and the previously adoption full-time MBA curriculum.

Again, I apologize for communicating via email.

Respectfully,

Dorothy Klotz

Professor of Management Systems

Gabelli School of Business

On Wed, Jan 27, 2016 at 8:38 AM, ESTHER Solomon [Staff/Faculty [Business]] <esolomon@fordham.edu> wrote:
[Quoted text hidden]

 **PMBA and Senate.docx**
19K

Fordham University Mail Casase 24:3056 FBR/Document 165-2 Filed 12/04/24 Page 76 of 152 1/13/19, 8:50 AM

**Steven Raymar** <raymar@fordham.edu>          Wed, Jan 27, 2016 at 10:06 AM
To: Dorothy Klotz <dorothy.klotz@gmail.com>
Cc: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>, "Sris Chatterjee [Business]"
<chatterjee@fordham.edu>, Thomas Wright <twright17@fordham.edu>, Robert Wharton <whartonphd@fordham.edu>,
Benjamin Cole <bmcole@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>, Falguni Sen <fsen@fordham.edu>

Dear Tom, Dorothy, Esther // cc Sris, Bob, Ben, John, Falguni

As always, feel free to circulate this email to anyone.

First, as you know, I was at the Senate meeting last week. Second, I spoke to Esther and she was concerned we
might think she asked the Provost to delay the PMBA for a short period. Third - thank you Dorothy for clarifying in
your recent email that it was not Esther. Fourth - irrespective of what anyone puts into any email, and irrespective of
the formal rules of the Senate and the relationship between the Senate and the Provost - it is quite disingenuous to
assert that the actions and comments of the Senate and Senators surely have had no impact on the timing of the
Provost's decision to pass the PMBA along to the state. Maybe / maybe not !

Fifth - to be clear, it is my understanding that the main point of the meeting today is to urge the Provost to act quickly
on that submission to the state and to urge the Senate to clearly state that the Senate does not wish to block that
submission. The reason being - it did receive a large majority vote at GSB JC. I read the minutes, and the emails,
and was at the meeting, and it certainly seems to me that the Senate is linking governance with PMBA.

Sixth - if the Senate, or the Senators, or other members of GSB wish to discuss issues of governance - that is their
right, and any open forum would seem to be appropriate. I believe that many are concerned that an Executive
Senate Committee is not an open forum.

Sincerely,
Steve Raymar
=======================================

[Quoted text hidden]

---

**Dorothy Klotz** <dorothy.klotz@gmail.com>          Wed, Jan 27, 2016 at 11:04 AM
To: Steven Raymar <raymar@fordham.edu>
Cc: "ESTHER Solomon [Staff/Faculty [Business]]" <esolomon@fordham.edu>, "Sris Chatterjee [Business]"
<chatterjee@fordham.edu>, Thomas Wright <twright17@fordham.edu>, Robert Wharton <whartonphd@fordham.edu>,
Benjamin Cole <bmcole@fordham.edu>, John Hollwitz <hollwitz@fordham.edu>, Falguni Sen <fsen@fordham.edu>

Dear Sris and Bob,

I would like to make sure that the faculty meeting meeting is audio taped. In addition, it is important that there is a
written record of what is said at the meeting. As such, written minutes of the meeting should be distributed prior to the
next Joint Council, so that all faculty in attendance today can vote on whether to accept the minutes as an accurate
account of the meeting. I would also suggest that, at the beginning of the meeting, all participates in the meeting be
made aware that meeting is being audio taped and minutes are being taken.

Thank you,

Dorothy

[Quoted text hidden]

K1TESOLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

SOLOMON,

                Plaintiff,

        v.                          18 Cv. 04615 (ER)

FORDHAM UNIVERSITY,

                Defendant           Conference

-------------------------------x
                                    New York, N.Y.
                                    January 29, 2020
                                    10:30 a.m.

Before:

                HON. EDGARDO RAMOS,

                                    District Judge


                        APPEARANCES

ESTHER SOLOMON, pro se

CULLEN AND DYKMAN LLP
     Attorneys for Plaintiff
BY:  HAYLEY B. DRYER, ESQ.
     RYAN SOEBKE, ESQ.

1              (Case called)

2              THE COURT:  Parties, please state your name for the

3     record.

4              MS. SOLOMON:  Esther Solomon, the plaintiff.

5              THE COURT:  Would you mind terribly bringing the

6     microphone as close to you as possible?

7              MS. SOLOMON:  Thank you, and I apologize.  I have a

8     little bit of a cold so my voice is not too good so I'll do the

9     best I can.

10             THE COURT:  OK.

11             MS. DRYER:  Good morning.  Hayley Dryer with Cullen

12    and Dykman on behalf of the defendant Fordham University.

13             My colleague, Ryan Soebke, is admitted in the Eastern

14    District.  Would it be OK if he sat here?

15             THE COURT:  Absolutely.  And the spelling of his last

16    name?

17             MR. SOEBKE:  S-O-E-B-K-E.

18             THE COURT:  Good morning to you all.  This matter is

19    on for a discovery conference.  Apparently, there are a number

20    of disputes both with respect to Ms. Solomon's requests and

21    Fordham's requests.

22             Will it be you, Ms. Dryer, or Mr. Soebke speaking?

23             MS. DRYER:  I will be, your Honor.

24             THE COURT:  What is it that you are looking for that

25    you haven't received?

 1              MS. DRYER:  Your Honor, Fordham has produced over

 2    15,000 --

 3              THE COURT:  Bring the microphone closer.

 4              MS. DRYER:  Fordham has produced over 15,000 documents

 5    in response to Dr. Solomon's discovery demands.  It has yet to

 6    receive any electronic discovery from Dr. Solomon.  It has yet

 7    to receive any personal emails from Dr. Solomon's Gmail

 8    account.  It has yet to receive a single note or a single

 9    medical record or any documents at all relating to her claims

10    for damages.  It has yet to receive any attachments that are

11    set forth in her physically-printed emails.

12              THE COURT:  What have you received from her?

13              MS. DRYER:  We've received really a mish-mash of

14    physically-printed emails of which pages are missing,

15    attachments are missing.  We've received one production on

16    February 13th, and we haven't received anything since.

17              THE COURT:  OK.

18              Ms. Solomon?

19              MS. SOLOMON:  First of all, I want to thank you, your

20    Honor, for scheduling this conference because this is a very

21    important case and it has not gone anyplace for the last year,

22    and the defendants, basically, have completely stopped all

23    discovery de facto.

24              Should I respond first to what they've said?

25              THE COURT:  Yes.  They said that they've asked you for

1    medical records, for emails, and for other electronic

2    documents.  Have you turned over any of that stuff?

3            MS. SOLOMON:  I have produced about 2500 documents --

4    or more even because some of them are packages.  I just wanted

5    to mention that the university owns the server, the Fordham

6    server, and possesses all the email correspondence so a lot of

7    my emails that were relevant, which are produced, are

8    definitely from their server.  They also have received from me

9    some transcripts of tapes regarding the area chair hearing.

10           THE COURT:  Regarding what?

11           MS. SOLOMON:  My removal in 2013 as Department Area

12   Chair.  There was a hearing.  I produced all these documents

13   and I don't know what they mean by "electronic."  These are the

14   printouts of the emails as I have them.  If anything is

15   missing, they are in possession of the server.  I don't think

16   anything is missing and I tried my very best to give

17   everything.  Of course, there is more to come up; however, on

18   the other side, what happened is --

19           THE COURT:  I'm sorry.  Do you have email addresses?

20           MS. SOLOMON:  I'm sorry?

21           THE COURT:  Do you have an email address?

22           MS. SOLOMON:  My email address?

23           THE COURT:  Yes.

24           MS. SOLOMON:  Yes:  esolomon@fordham.edu.

25           THE COURT:  Do you have any others?

 1            MS. SOLOMON:  Yes.  I have etaki33@gmail.com.

 2            THE COURT:  And have you produced any emails from that

 3    email account?

 4            MS. SOLOMON:  I didn't know that it was required to

 5    produce the personal emails.  What I usually use that email for

 6    is I store all my research and I store all my work product when

 7    I was thinking about litigating over the years.  I don't

 8    understand why they could have access to my personal email

 9    account.

10            THE COURT:  Because there may be relevant documents,

11    relevant communications.

12            MS. SOLOMON:  Relevant to what?

13            THE COURT:  To your charges.  I mean, given where we

14    are today as a society, many of our communications are

15    electronic.

16            MS. SOLOMON:  Yeah.

17            THE COURT:  And to the extent -- and it is likely, I

18    am guessing -- from over the course of many years that you have

19    engaged in communications with others concerning the events and

20    the charges that are contained in your complaint.  So you are

21    absolutely required to turn over any relevant documents from

22    your personal email.

23            To the extent that you have a Fordham email account,

24    you are still required to go through that yourself.  I mean,

25    regardless of whether or not Fordham has access to it or not

1   -- I mean I'll ask -- but as to whether or not they have

2   complete access to your account, you're still required to go

3   through and to turn over all relevant documents that are in

4   your personal account, OK? That's a responsibility that you

5   have.

6           MS. SOLOMON: Yeah. I have done it to the best of my

7   ability, and I have been trying and I have a whole bunch of

8   others that I plan to do because I would like to use them at

9   trial as well. That's the key issue. I have done the best I

10  can to produce whatever I found was relevant from thousands and

11  thousands of emails -- and I produced 2500 at least -- and now

12  I wanted to point out also one more thing that, among the

13  documents that the defendants say they have produced to me,

14  half are my own emails to myself, to different people. So they

15  produced me my emails, which I possess, so half the production

16  is useless to me because I have those emails.

17          THE COURT: I'm sorry. What?

18          MS. SOLOMON: In the server, there are my own emails,

19  so half of the defendant's production is not new documents that

20  they requested, but they produced my own emails from the

21  server. And although there is a confidentiality stipulation

22  dated February 14, 2019 that says that if either party has

23  access to documents independently, they can't be deemed

24  confidential.

25          So what the defendants did, they put, basically, about

K1TESOLC

```
1    8,000 of my own emails and they deemed them confidential from

2    me in violation of the stipulation.  So this was part of their

3    production and I think that's a very serious issue.

4              I want to go further.  Essentially, what the

5    defendants have done is they have very serious redactions in

6    most of the documents that make them useless, and this goes way

7    beyond what the --

8              THE COURT:  I want to take these issues one at a time.

9              Ms. Dryer, what about that?  What about the fact that

10   you're designating documents confidential that ought not be

11   designated confidential because she has them?

12             MS. DRYER:  Your Honor, with regard to the designation

13   of confidentiality, or the designation of confidential, these

14   documents that we've turned over to Dr. Solomon -- in addition

15   to her emails -- include sensitive, nonpublic information

16   including comparator professor files, 12 different comparator

17   professor files.

18             These documents consist of human resource files,

19   provost files, Gabelli files, business school files.  These are

20   very sensitive documents that are, in fact, confidential that

21   should be marked and are marked as confidential.

22             THE COURT:  What she's indicated is that she has

23   documents that are her own emails that you've marked

24   confidential.  Is that true?

25             MS. DRYER:  Yes.  Those emails contain attachments and
```

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 279 of 621
Case 1:18-cv-04616-ERD Document 1642-4 Filed 12/04/24 Page 84 of 152    8

K1TESOLC

1   those emails are, in fact, sensitive and nonpublic, so in an

2   abundance of caution they have been marked confidential.

3           THE COURT:  OK.

4           MS. SOLOMON:  We're talking about 8,000 documents:

5   8,539.  This is, in my view, totally inconsistent with the

6   stipulation.

7           THE COURT:  Do the documents contain sensitive

8   information?

9           MS. SOLOMON:  These are my emails to my colleagues, to

10  the deans, to the administrative.  These are my own emails from

11  -- I mean, I should have access to them and I don't deem them

12  confidential.

13          THE COURT:  Well, you do have access to them.

14          MS. SOLOMON:  Yeah, but why are they deemed

15  confidential?

16          THE COURT:  How is the designation of confidentiality

17  impeding your ability to fight your case?

18          MS. SOLOMON:  That's not the issue.  That's one of the

19  issues, but why should they be deemed confidential even though

20  the stipulation says otherwise?  I mean, they can take my --

21          THE COURT:  I guess what you can do is say:  Look,

22  here's an email that's just an email from me.  There is no

23  attachment.  It's to the dean and says "let's have a call," and

24  they have designated that confidential and you say:  Well, that

25  shouldn't be confidential.

 1          But is that the kind of thing they designated as

 2   confidential?

 3          MS. SOLOMON:  What I'm concerned with, in the

 4   stipulation there are penalties for revealing confidential

 5   information.  If I reveal my own emails to do whatever I want,

 6   I can be penalized.  This was a very rigorous stipulation.

 7          THE COURT:  That's the reason for the stipulation.

 8   There's a protective order in place, and there's a protective

 9   order in place for a very good reason in this case because

10   you're dealing with -- you're alleging particular decisions

11   that were made with respect to your tenure; and in order to

12   prove your case, you have to necessarily rely on information

13   concerning comparators, and that is very highly sensitive

14   information that neither you nor anyone else want disseminated

15   publically.

16          MS. SOLOMON:  Right.  That's a different group of

17   documents we're talking about.  What I was talking about before

18   were simply emails that were exchanges between me and members

19   of the faculty -- members of the faculty were the first group

20   that I was talking about -- and it was an agreement between the

21   parties that that should not be confidential, and yet they

22   deemed them.  We're talking about 8,000 documents.

23          Now, regarding the second group that you mentioned,

24   that's an extremely important point.

25          THE COURT:  No, no.  We're going to talk about them,

K1TESOLC

 1    but just not now.

 2              Ms. Dryer?

 3              MS. DRYER:  With regard to the confidentiality issue?

 4              THE COURT:  Yes.  She says there's 8,000 documents and

 5    that you're using this willy nilly and designating too many

 6    documents confidential.

 7              MS. DRYER:  Your Honor, I don't see how that affects

 8    Dr. Solomon's ability to prosecute her case.  She just

 9    indicated that she is going to reveal things to her fellow

10    faculty or her colleagues.  We have a legitimate interest here

11    to protect very sensitive information of Fordham's faculty and

12    employees of Fordham.

13              In an abundance of caution, yes, documents that have

14    be produced to Dr. Solomon, including her emails, have been

15    designated as confidential.  I'm having a hard time

16    understanding how that has affected at all her ability to

17    prosecute her case, and this is the first time we're hearing,

18    quite frankly, of this; and pursuant to the confidentiality

19    order and your Honor's rules, she has an obligation to bring

20    this to our attention at a meet and confer, and this is the

21    first time we're hearing of any type of designation issue.

22              THE COURT:  OK.  So, Ms. Solomon, this is what we're

23    going to do.

24              To the extent possible, we're going to try this case

25    and handle this case as we would any other case.  So with any

1    other case what I would tell the lawyer is, to the extent that

2    you believe any particular designation has been applied

3    inappropriately, you are required in the first instance to

4    bring that designation to the attention of the other side.

5           So what you need to do is you need to speak with Mr.

6    Soebke or Ms. Dryer -- or whoever else from Cullen and Dykman

7    is on this case -- and say to them:  Look.  You've designated

8    this document confidential.  That is an inappropriate

9    designation.

10          Now, there may be several dozen, several hundred, a

11   couple of thousand, and what you need to consider is whether

12   that is an efficient use of your time, OK?  Because, again, the

13   fact that it's confidential doesn't prevent you from seeing it

14   or using it appropriately in this case, OK?

15          It may be of no moment to you or to the prosecution of

16   your case that it has been designated confidential, so you need

17   to consider how you want to do that.  But in the first

18   instance, you have to identify particular documents --

19   particular documents -- and then go to them and say:  We

20   believe that this is inappropriate designation.  OK?

21          MS. SOLOMON:  Sir, I thought if there is a

22   confidentiality stipulation that the parties have to abide by

23   it.  I have been at every meet and confer.  I initiated the

24   meet and confer before this conference and I said to them that

25   there are improper redactions, and they have designated every

 1    single item they produced as confidential.  This is in strict
 2    opposition to the stipulation.
 3              THE COURT:  You're saying that every single document
 4    they've produced has been designated confidential?
 5              MS. SOLOMON:  Yes.
 6              THE COURT:  Ms. Dryer, is that true?
 7              MS. DRYER:  Yes, your Honor.
 8              MS. SOLOMON:  I told them this is a big problem, and I
 9    told them every issue they I want to discuss when I meet with
10    you today, in the meeting with your Honor, I think that should
11    be addressed as well.
12              Can I ask you a question?
13              THE COURT:  Yes.
14              MS. SOLOMON:  First of all, I wanted to thank you for
15    allowing this hearing.  I would like to talk about three issues
16    in terms of the motion to compel.  Basically, I served the
17    subpoena to Fordham University to which there have been no
18    responses to interrogatories.  As to that, I produced mine and,
19    in my view, they have an opposition which is invalid.
20              Number three, previous discovery requests as of
21    January, 2019 have been completely without a response, so it's
22    basically very poor discovery.
23              I wanted to mention one more thing before that.
24    Something happened since I wrote to you the letter, and I think
25    I need to mention this to the Court because it does relate to

1    the discovery issue directly.  Basically, it seems to me that

2    the defendants say to you one thing and do the opposite.  They

3    have written to you in the letter in response to my -- this

4    request that they are trying to send, and they're trying to

5    find an applicable agreement.  The same day that they sent that

6    letter to you, I received the letter saying, essentially, the

7    way I see it, that they removed me from Fordham payroll,

8    essentially, basically cutting me out after 35 years.

9              And what I say is, essentially, that's taking my

10   tenure without due process of law, and then under the eyes of

11   the Court they are saying they're trying to be helpful.

12             They did not allow me to teach for a semester and I've

13   been without a salary for a year and a half.

14             THE COURT:  You've been without what?

15             MS. SOLOMON:  I have been without a salary for a year

16   and a half.  I have not been paid for a year and a half.  They

17   took off my tenure, so I wrote the letter to the president of

18   the university and to the provost saying this is what happened.

19             Then the provost wrote me back:  Oh, no, no, there's

20   no problem.  You've done nothing wrong.

21             But the idea is they wanted to deny me the right to a

22   hearing.  Basically, I'm here in a very difficult situation and

23   I've essentially lost my tenure without them allowing me to

24   have a hearing, and I am in a very, very difficult situation.

25   That's one more reason why I need my personnel file, which is

Case: 24-3056, 11/22/2024, DktEntry 1.1, Page 285 of 621
Case 1:18-cv-04615-ER Document 168-24 Filed 12/04/24 Page 90 of 152    14

K1TESOLC

1    very complete. I need my personnel file to find out what my

2    status is at the university.

3         THE COURT: Let me stop you there. It has been

4    represented to me by the counsel for the university that, so

5    far as they are concerned, they have turned over everything

6    that they have concerning your personnel file, or everything

7    that they've found, and why shouldn't I take that

8    representation?

9         MS. SOLOMON: I have many, many examples of why this

10   is not so.

11        THE COURT: Have you turned over those examples?

12        MS. SOLOMON: I have spoken with Mr. Ryan on the phone

13   on two occasions and I told him -- I went through my list and I

14   told him number one, number two, number three -- no response --

15   and that's because they don't want to give me this information.

16        THE COURT: So let me stop you there.

17        Ms. Dryer --

18        MS. DRYER: Yes, your Honor.

19        THE COURT: -- who is this Mr. Ryan? Was he provided

20   with a list of items that Ms. Solomon believed to be missing

21   from her file?

22        MS. DRYER: Mr. Ryan is my colleague at Cullen and

23   Dykman. Your Honor, Dr. Solomon is a tenured faculty member at

24   Fordham University and remains a tenured faculty member at

25   Fordham University. We were not provided with a list of items

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 286 of 621
Case 1:18-cv-04615-ER Document 168-24 Filed 02/04/24 Page 91 of 152    15

K1TESOLC

1    that Dr. Solomon believed is missing from her file.

2              THE COURT:  I'm sorry.  She's remains a tenured

3    professor?

4              MS. DRYER:  Yes, she remains a tenured professor at

5    Fordham University today.

6              THE COURT:  OK.

7              MS. DRYER:  What we were provided with, Dr. Solomon

8    believes that emails and documents -- excuse me.  Let me back

9    up.

10             A personnel file at Fordham University consists of an

11   HR file, a provost file, and an individual school file, in this

12   case, a Gabelli file.  Dr. Solomon believes that every email or

13   document related to her tenure -- her time at Fordham -- should

14   be in her personnel file.

15             For example, the emails relating to this alleged chair

16   position or other extraneous documents, Fordham does not keep

17   those documents in a personnel file.  So what Dr. Solomon may

18   believe will be in a personnel file is not what Fordham

19   actually keeps in a personnel file.  Fordham has turned over

20   the entirety of Dr. Solomon's personnel file.

21             MS. SOLOMON:  OK.  So, your Honor, so far there have

22   been three versions by defendants as to whether I do or do not

23   have my personnel file.  The first version was, when they

24   communicated with the Cravath firm, they used to tell them that

25   whatever they gave me -- this fiction that there are three

1  groups of files and these are all the files that exist, so they

2  were telling them that everything is there.

3          Then Cravath asked them a very simple question:  Do

4  these three files that you gave us comprise everything or is

5  there anything else that should be there, and also, can you

6  please tell us why you do not provide the redactions.

7  Redactions are inconsistent with the Federal Rules of Civil

8  Procedure.  I could read it to you.  Basically, when they asked

9  them this question, Ms. Dryer in her letter to them basically

10  admitted that they had not provided everything, and that

11  they -- that essentially what was needed to provide the

12  personnel files was the subpoena and so that's what I did.

13          THE COURT:  Let me stop you there.

14          Ms. Dryer?

15          MS. DRYER:  Your Honor, Fordham has faculty statutes

16  that say personnel files are confidential and should not be

17  produced without a lawful subpoena.

18          In this case, Dr. Solomon is correct, that we had

19  conversations with Cravath about the faculty statutes.  In

20  light of those faculty statutes, we produced the entirety of

21  the comparator professor files, personnel files, but we have

22  redacted the names of the comparator professors.

23          However, we provided Dr. Solomon with the agreement of

24  her counsel with a key, and this key assigned each professor a

25  number:  Professor 1, Professor 2, Professor 3, Professor 4,

1   and the key also had the birth date of each professor, their

2   salary, their title -- all of the information that Dr. Solomon

3   needs to make her case.

4          Fordham is not hiding anything.

5          THE COURT: Was there anything substantive in the

6   files of the comparators that was redacted?

7          MS. DRYER: No, your Honor. Assuming Dr. Solomon has

8   a case -- a discrimination case, a pay equity case, any other

9   type of claim -- nothing was redacted but the biographical

10  information or irrelevant information.

11         If the file had HIPAA-protected information, medical

12  information, that's not relevant to this case, but is otherwise

13  sensitive to each professor and we redacted that because that's

14  not relevant to this case.

15         The only other thing that was redacted from the

16  files -- and this was according to the faculty statute -- was

17  the names related to the tenure and promotion process.

18         THE COURT: Are these the names of the individuals who

19  made those determinations?

20         MS. DRYER: Yes, so the determination is still there.

21         For example, if professor -- and I'll use this as an

22  example -- if Professor Jones wrote about Professor Smith: 'I

23  think Professor Smith is great. I think Professor Smith should

24  get tenure' -- that evaluation is still there, but Professor

25  Jones's name is redacted in accordance with the faculty

Case: 24-3056, 11/22/2024, DktEntry: 1.1, Page 289 of 621
Case 1:13-cv-04615-ER Document 168-24 Filed 12/04/24 Page 94 of 152    18

K1TESOLC

1    statutes.

2            THE COURT:  OK.

3            MS. DRYER:  And this is critical to the university.

4    This is the heart of the university's process here.

5            THE COURT:  Was that in accordance with an agreement

6    or an understanding that had you with Ms. Solomon's prior

7    counsel?

8            MS. DRYER:  We explained this to Dr. Solomon's prior

9    counsel.  This is in accordance with the university's faculty

10   statutes, which require anonymity to be effective, and this

11   really requires -- faculty statutes require the sharing of

12   constructive criticism without fear of reprisal.

13           If this were to change, if people could just get this

14   information by filing a lawsuit, it would essentially silence

15   professors at the university.  It would negatively affect the

16   day-to-day operations of the university.

17           THE COURT:  When you said these are faculty statutes,

18   what does that mean?

19           MS. DRYER:  They are, essentially, law of the

20   university.  The university runs and complies with these

21   statutes of the university.

22           MS. SOLOMON:  May I approach your bench, sir?  I have

23   this exhibit in my letter to you that says exactly what the

24   statutes say about this issue.

25           THE COURT:  Wait.  No.  No need.

1          MS. DRYER:  Your Honor, these faculty statutes, as

2    acknowledged by Dr. Solomon, mean something.  They mean

3    something to Fordham, and they mean something to Dr. Solomon.

4          THE COURT:  So this is what I'm going to do.

5          First of all, with respect to Dr. Solomon's personal

6    personnel file, the representation has been made that the

7    entirety of it has been turned over.  There's no reason for me

8    to question that representation.

9          If you want to make a motion to compel with specific

10   things that you believe should be in there that are not

11   there -- again, to the extent that you think the university

12   needs to put in every email from you to whomever, that may not

13   be the case.

14         So with respect to that, I'm not requiring the

15   university to do anything more.  With respect to the

16   redactions, with respect to the comparators, that the

17   representation has been made that those redactions have been

18   done in accordance with these faculty statutes which exist, or

19   reasons which I suspect that you would understand and you would

20   appreciate, to the extent that you want to make a motion to

21   compel that, you may make that motion.

22         But again, I think that you're probably going up a

23   steep hill with respect to that unless there is some very, very

24   good reason why we should tell -- at least within the context

25   of this case -- why particular professors had particular things

K1TESOLC

1    to say about either you or the comparators.

2              Yes, ma'am.

3              MS. SOLOMON:  OK.  I think here Ms. Dryer is confusing

4    different issues.  There are two types of redactions.  One type

5    is that they redacted the names of the personnel files of the

6    people whose personnel files that presumably have been

7    produced -- which have not been produced.

8              So I have Professor 1, Professor 2, Professor 3, so

9    they have turned discovery into a guessing game and this is

10   inconsistent with the stipulation.

11             Number two, what Ms. Dryer is talking about is

12   whenever there's a peer review evaluation of different faculty,

13   they redacted those numbers.  There is case law that says that

14   that should be revealed as well, but that's a different issue.

15   So when they represent that they gave every professor's

16   personnel file, this is so accurate it's hard to imagine.

17             THE COURT:  So "inaccurate"?

18             MS. SOLOMON:  Inaccurate.

19             First of all, there is no way for me to say who is who

20   because there are numbers, there is no personnel file of, you

21   know, a professor that --

22             THE COURT:  Why do you need the names?

23             MS. SOLOMON:  I need to know who the people are and

24   how to connect the information and connect the emails.

25             THE COURT:  Do you want to make a motion to compel?

1    Let's make a motion to compel that.  I have other cases that I

2    need to get to today.

3          MS. SOLOMON:  I think I want to compel this -- the

4    subpoenas -- because I don't know -- I do not have the complete

5    personnel file.  From my personnel file and from the

6    professors' files that I have --

7          THE COURT:  Let me stop you there.

8          Have you turned over the complete personnel files and

9    the comparators in a redacted fashion?

10          MS. DRYER:  Yes.

11          THE COURT:  If you want to make a motion to compel,

12    then you have to have some basis for me to say -- I mean, I

13    have a representation from a lawyer, a member of the bar of

14    this court, and if any member of the bar of this court makes a

15    misrepresentation to the Court knowingly, they have bigger

16    problems than just the problems involving that particular case.

17          The representations that they are making make some

18    sense to me in terms of the redactions that are being made and

19    why they are being made.  You may have some argument that maybe

20    they are redacting too much, but if you're going to make a

21    motion, you have to have particular items that you believe are

22    being kept from you, items that are being redacted, and why

23    they are important, OK?

24          MS. SOLOMON:  I just wanted to mention, your Honor,

25    this is the email from Cravath to them on April 10, 2018:

 1                  (Reading):

 2                  With regard to the personnel file, as discussed during

 3       the parties's March 21st meet and confer, please confirm that

 4       the three files produced to date, the human resource, provost,

 5       and Gabelli files, comprise the entirety of Dr. Solomon's

 6       personnel file and that there are no other components to that

 7       file.

 8                  THE COURT:  Let me stop you there.

 9                  Ms. Dryer, are there other components?

10                  MS. DRYER:  No.  A personnel file at Fordham consists

11       of human resources files, provost files and the individual

12       school file, which in this case is the Gabelli file.

13                  MS. SOLOMON:  On April 11, you indicated that missing

14       there are teaching schedules, teaching evaluations, and they

15       are going to be produced but on a rolling fashion, and nothing

16       has been produced.  That's an admission by you that they're not

17       complete.  Now you say that they are complete.

18                  Regarding my file, for example, they have --

19                  THE COURT:  Let me stop you there.

20                  Ms. Dryer?

21                  MS. DRYER:  In response to plaintiff's discovery

22       demands, we indicated to counsel that additional documentation

23       would be forthcoming.

24                  THE COURT:  Has it been produced?

25                  MS. DRYER:  Most of that documentation has been

 1    produced.  There are one or two outstanding items.

 2              THE COURT:  What items?

 3              MS. DRYER:  Student evaluations are outstanding, and I

 4    believe that emails might be outstanding.

 5              THE COURT:  What is outstanding?

 6              MS. DRYER:  Student evaluations are outstanding.

 7              THE COURT:  And?

 8              MS. DRYER:  And a few emails might be outstanding.

 9    That I would have check.

10              THE COURT:  OK, so turn those over.

11              MS. SOLOMON:  (Reading):  With regard to the

12    redaction of documents, you represented to us during the

13    parties' March 15th meet and confer that you needed to confirm

14    whether Fordham University would agree to produce unredacted

15    HR, provost, and Gabelli files.  You made this promise during

16    our March 21st meet and confer, and again during the parties'

17    April 1st meet and confer.  We have now been awaiting for a

18    response from you for more than three weeks.  Please confirm

19    immediately whether Fordham will agree to produce these

20    materials without redaction as required by the Federal Rules.

21              THE COURT:  What materials are these?

22              MS. SOLOMON:  The personnel files that I'm asking

23    about now, they told me that I have to put the subpoenas, and

24    now they say:  Oops, you have them already.

25              THE COURT:  Ms. Dryer?

1              MS. DRYER:  Your Honor, all of the information that

2     has been requested in the subpoenas have been produced.  The

3     comparator sheets -- Dr. Solomon requested the comparator files

4     be subpoenaed.  That has been produced.  She now contests that

5     we had not agreed to a period starting 2008.  That was

6     requested by Dr. Solomon in her document demands.

7              The purpose of the subpoenas though, your Honor, is to

8     harass Fordham.

9              THE COURT:  I'm sorry.  If she served you with a

10    subpoena, does that permit you to turn over the files in an

11    unredacted fashion of the comparators?

12             MS. DRYER:  With a lawful subpoena.  It is Fordham's

13    position this is not a lawful and correct subpoena.

14             THE COURT:  Why not?

15             MS. DRYER:  Because we have turned over all the

16    information that's sought in the subpoena.  The purpose of this

17    subpoena is to harass Fordham.

18             Dr. Solomon has, on more than one occasion, asked if

19    the comparator professors have been informed of the subpoena.

20    She is trying to cause an uproar on the Fordham campus.  She

21    has -- the subpoenas asked for information before the 2008

22    period.  We previously agreed with counsel that the discovery

23    would start at 2008.  Any information that is sought before

24    then is way outside the statute of limitations.

25             MS. SOLOMON:  Two issues, your Honor.

K1TESOLC

```
 1              Number one, I find it very insulting that there are
 2    untrue statements of facts that are against me.  I am trying to
 3    harass them?  The statutes say that once the university gets
 4    the subpoena, they have to notify within 24 hours the faculty
 5    clerk.  They have not notified them.  I'm just following the
 6    statutes.  What the statutes say, I follow letter by letter.
 7              THE COURT:  OK.  Again, file a motion to compel.
 8              MS. SOLOMON:  Second, Ms. Dryer, they came up with --
 9    after the subpoenas, they came up with the fiction that it
10    supposedly was in the agreement that everything started 2008.
11    There is no such agreement.
12              THE COURT:  Let me stop you there.
13              Ms. Dryer, what is that agreement from?
14              MS. DRYER:  Your Honor, in Dr. Solomon's document
15    demand it was Dr. Solomon's definition that the discovery will
16    start in 2008.
17              THE COURT:  OK.
18              MS. DRYER:  We have gone back and forth with Dr.
19    Solomon in various meet and confers regarding objections to the
20    subpoenas.
21              We asked Dr. Solomon on numerous occasions to engage
22    in a settlement process or in mediation with the Court again.
23              We would greatly appreciate the Court's assistance
24    with regard to either mediation or a settlement conference
25    before your Honor or a magistrate judge.
```

1              THE COURT:  Let me ask Ms. Solomon.

2              Ms. Solomon, this is a yes or no question.

3              MS. SOLOMON:  About what?  What was the question?

4              THE COURT:  Now, I'm going to focus you.

5              In your document request, in your discovery request --

6       whether drafted by you or drafted by your prior counsel -- in

7       document requests and other discovery requests, there's always

8       a definition period section where it says:  All documents from

9       a certain date forward.  Do your requests, do your discovery

10      requests indicate 2008 forward?

11             MS. SOLOMON:  Yes.  The first document request

12      indicated that for the purposes of that request that the

13      relevant time period would be 2008 to 2019, and it says below

14      that, that no definition in this request will be deemed to be

15      an agreement or acknowledgment of anything, and that's the only

16      place in which they put 2008.

17             In our interrogatories, there is no time limitation.

18      In their document request, there is no time limitation.  There

19      is nothing that appeared in their objection to the document

20      request that doesn't say why didn't you put the 2008

21      limitation, so it just indicates that in this case this is

22      another fiction created.

23             My complaint is talking about the 2003 promotion, the

24      2001 promotion, and that's the critical issues in this case

25      because even the pay discrepancy is imparted by the unfair

1    promotion decision, which artificially reduced the salary.

2         In this instance, these dates are critical for me.  I

3    have ongoing violations claims.  I have hostile work

4    environment.  There is no way I could possibly have made an

5    agreement with them that is contrary to my complaint and to my

6    amended complaint, and this doesn't exist anywhere so they are

7    trying to stop me from getting the subpoena through.  This is a

8    new fiction.

9         THE COURT:  OK.  Make your motion.

10        With respect to the interrogatories, my understanding

11   is that you were asking questions, or requiring them to provide

12   information, beyond that which is allowed by the local rule.

13        MS. SOLOMON:  No.  What Ms. Dryer has put down is that

14   she took her ruling that says it's a commencement of discovery,

15   you're only allowed to ask for names, etc.  The interrogatories

16   was served on Cravath in March or April.  They claim they gave

17   all the discovery.  The questions asked in the interrogatories

18   are very pertinent because one of my claims is that,

19   basically -- as part of the claims and others -- that I was

20   discriminated against in terms of course assignments and not

21   being allowed to be part of special programs, and all we're

22   asking for is what are the rules, what are the criteria and

23   also --

24        THE COURT:  All right.  I'm going to stop you there.

25        Ms. Dryer?

```
 1              MS. DRYER:  The interrogatories that were served that
 2    we responded to are beyond the scope of Rule 33, Local Rule 33.
 3              THE COURT:  OK.  The university will not be required
 4    to respond to interrogatories beyond that information that's
 5    allowed by Local Rule 33.
 6              MS. SOLOMON:  Local Rule 33 does not --
 7              THE COURT:  Ms. Solomon --
 8              MS. SOLOMON:  It says the Court can allow to order
 9    other interrogatories.
10              THE COURT:  And I'm not allowing it, OK?  So maybe at
11    some point down the line, but right now you're required to
12    comply with Local Rule 33.
13              MS. SOLOMON:  It's not just Rule 33, but 33(a).
14              THE COURT:  Ms. Solomon, I've ruled on that issue, OK?
15              MS. SOLOMON:  OK.
16              THE COURT:  Next.
17              MS. SOLOMON:  There are discovery requests from my
18    first discovery request that simply have not been responded to.
19              Give me one second, your Honor.
20              THE COURT:  Sure.
21              MS. SOLOMON:  For example, discovery number three:
22              All documents regarding plaintiff comparators, course
23    assignment, course cancellations, course --
24              THE COURT:  Ms. Solomon, please slow down.  Slow down.
25              MS. SOLOMON:  And they gave me nothing.
```

```
 1              THE COURT:  But you need to slow down.  We have a
 2    court reporter.
 3              MS. SOLOMON:  Because I feel there is a pressure.
 4              THE COURT:  I know.
 5              MS. SOLOMON:  Thank you.
 6              With regard to request number three:  All documents
 7    regarding plaintiff and comparator professors job
 8    responsibilities, course assignments, course cancellations,
 9    course releases, administrative appointments, consulting
10    appointments to be certified and to be provided for the
11    relevant time period.  Zero response.
12              By the way, I just wanted to mention that, although
13    the defendants say that the names of professors are superfluous
14    for me, I don't need to know them, in their motion to dismiss
15    they use records with the names of professors to claim that my
16    case should be dismissed.  They used schedules with professors
17    and they accuse me of not knowing enough about the job
18    responsibilities, and therefore I should have all my claims
19    dismissed on that.
20              THE COURT:  So these are particular document requests
21    that you're --
22              MS. SOLOMON:  Yes.  One, two, three, four, five, six,
23    seven, eight, nine, and nothing.  No response.
24              THE COURT:  OK.
25              Ms. Dryer?
```

1          MS. DRYER:  Your Honor, we responded to those

2     requests, and if there are any requests that we're not

3     responding to, they were objected to.

4          With regard to the documentation that we had talked

5     to, the motions to dismiss, we only used the professors' names

6     that were actually named in the complaint.  That motion is

7     still pending before the Court -- as is our motion -- oral,

8     letter motion -- for a stay of discovery pending the motion to

9     dismiss.  I'll stop there.

10          THE COURT:  OK.

11          MS. SOLOMON:  Can I give the list of the things that

12     were not given to her?

13          THE COURT:  Why don't you hold onto that, and again,

14     if you want, if there are particular items that you believe

15     were not responded to or that were objected to because the

16     university has the ability to say "I'm not going to respond to

17     this request for the following reasons" -- and so they've given

18     you a reason -- if you believe that reason to be unsatisfactory

19     or insufficient, you can move to compel.  So you can keep that

20     and you can, in your motion to compel, indicate which of those

21     either were not responded to or where the objection is not

22     properly asserted.

23          MS. SOLOMON:  OK.

24          Now, regarding the financial information, they say

25     they gave W-2 forms.  They gave W-2 forms from 2011 to 2008.

K1TESOLC

1    That's what they felt like. For some professors, they gave the

2    explanation; for some they did not. I wanted to just show the

3    Court that, basically, a hole in my -- in my W-2 form, there

4    is, like, the salary and then what is afterwards there's

5    nothing else, and for some people there is 15 other things with

6    compensation.

7         So all of that stuff is very, very relevant to the

8    discrimination claims, so the way the discovery is currently,

9    I'm totally unable to establish either work history or

10   compensation history, for me, the comparator. I have been

11   totally handicapped for that, so there's no way for me to

12   proceed in this case.

13        THE COURT: Ms. Dryer?

14        MS. DRYER: Your Honor, Fordham has nothing to hide.

15   We have turned over everything Dr. Solomon needs to make her

16   case, assuming that she has one. We have turned over all of

17   the W-2's for the comparator professors and for Dr. Solomon.

18   We turned over Dr. Solomon's personnel file in full, and that

19   2008 benchmark, just to be clear, did not apply to Dr.

20   Solomon's personnel file.

21        THE COURT: I understand. OK.

22        MS. DRYER: We want to give her, and we have given

23   her, the tools to make her case, assuming she has one.

24        THE COURT: Very well. I do need to bring this to an

25   end.

 1              As I indicated, the university will be required to
 2      turn over, at the earliest possible time, the student
 3      evaluations and whatever other emails may be contained in her
 4      personnel file.
 5              The university will be not required to respond any
 6      further to the interrogatories which requested information
 7      beyond that allowed by Local Rule 33.
 8              Ms. Solomon will be allowed to make a motion to compel
 9      with respect those items that she believed have not been turned
10      over, and with respect to those items that she believed have
11      been unduly redacted or inappropriately designated as
12      confidential.
13              Ms. Solomon will be directed to turn over at the
14      earliest possible time any and all personal emails, whether on
15      her Fordham email or on her personal email -- I think it's a
16      Gmail account that she mentioned -- that are relevant to the
17      discovery requests made by the university that have not
18      otherwise been objected to.
19              MS. SOLOMON:  There is no discovery request from my
20      personal emails and I didn't know that was an issue.  And for
21      me as a person to get thousands of emails and sort them and
22      give them to them is extremely burdensome.
23              THE COURT:  That's the responsibility that all parties
24      have.
25              MS. SOLOMON:  However, there are some other personal

 1    emails that are much more at issue.  The emails, for example by

 2    the dean, by the people who accused me falsely, all those

 3    personal emails made should be also requested.

 4           Can I make a second document request?

 5           THE COURT:  You can make whatever appropriate request

 6    you're entitled to.  My only determination here is that you are

 7    required to go through your emails and through all of your

 8    documents.  This is your case and your responsibility to move

 9    it forward and to provide each relevant document that is

10    responsive to a document request or whatever other discovery

11    request that's an appropriate request and that has not

12    otherwise been objected to.

13           MS. SOLOMON:  Your Honor, we have made 17 discovery

14    requests.  They have made 85 discovery requests.  There is no

15    way for me answer this kind of stuff.  They did not ask for my

16    emails in a separate discovery request.  There was no discovery

17    request for my personal emails.  Maybe they should make it now

18    and I can object appropriately.

19           THE COURT:  Ms. Dryer?

20           MS. DRYER:  Your Honor, we asked for her personal

21    emails, including the etaki33@gmail.com address, through a

22    discovery request.

23           MS. SOLOMON:  Can you send it to me?

24           MS. DRYER:  We also asked Dr. Solomon on several

25    different occasions to engage, in addition to a discovery

 1    conference, in a settlement conference for mediation, so any

 2    assistance the Court may provide on that would be welcome.

 3            THE COURT:  Do you want to have a settlement

 4    conference, Ms. Solomon?

 5            MS. SOLOMON:  Excuse me?

 6            THE COURT:  Do you want to have a settlement

 7    conference?

 8            MS. SOLOMON:  What's a settlement conference?

 9            THE COURT:  A settlement conference is where you sit

10    down in this case with the assigned magistrate judge and you

11    try to come to a determination as to how this case can be

12    resolved, and the way that I describe settlement is that each

13    party comes to an agreement and walks away equally unhappy.

14            MS. SOLOMON:  OK.  Your Honor, there has already been

15    so-called mediation and they offered me nothing.  That was last

16    February.  Right now I think the university is trying to put me

17    in a position of cutting my healthcare, cutting my salary, have

18    me in the street and then negotiate from that.  I need my

19    discovery to get the information to move forward with my case.

20            I would like to have some kind of settlement

21    eventually.  I think we should wait for the motion to dismiss

22    to be decided and for me to make my discovery request, and then

23    maybe after all these issues are resolved, we would be in a

24    position to be in a de minimus level.  Right now, they have

25    succeeded in me having zero position.  They say to you one

K1TESOLC

1  thing and do something different.  I am at a tremendous

2  disadvantage currently.

3           THE COURT:  OK.

4           We're adjourned.

5           MS. DRYER:  Thank you, Your Honor.

6           THE COURT:  Thank you for your time.

7           (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

ESTHER SOLOMON,

                            Plaintiff,

    - against -

FORDHAM UNIVERSITY,

                            Defendant.

-------------------------------------------------------------------------X

Case No.:
1:18-cv-04615-ER

 

**DEFENDANT FORDHAM UNIVERSITY'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL AND IN SUPPORT OF
FORDHAM UNIVERSITY'S CROSS-MOTION TO COMPEL**

**TABLE OF CONTENTS**

Page(s)

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 2

    A.    Procedural History ...................................................................................... 2

    B.    Discovery Disputes ..................................................................................... 3

LEGAL STANDARD ............................................................................................................... 3

ARGUMENT ........................................................................................................................... 4

POINT I

FORDHAM HAS PRODUCED DOCUMENTS RESPONSIVE TO PLAINTIFF'S
SUBPOENAS ......................................................................................................................... 4

POINT II

FORDHAM'S REDACTIONS ARE PROPER ............................................................................ 6

    A.    Plaintiff Has Failed to Establish the Relevance of the Names of Comparators and
    Peer Reviewers ........................................................................................... 7

    B.    Fordham is Entitled to a Protective Order ..................................................... 8

POINT III

FORDHAM'S DESIGNATION OF DOCUMENTS AS CONFIDENTIAL IS PROPER .......... 12

POINT IV

FORDHAM WILL PRODUCE ADDITIONAL DOCUMENTS SOUGHT BY PLAINTIFF ... 13

POINT V

PLAINTIFF'S DEMAND TO "COMPEL COMPLIANCE WITH REPRESENTATIONS" IS
NOT PROPERLY SET FORTH IN THIS MOTION .................................................................. 13

POINT VI

PLAINTIFF HAS NOT UNDERTAKEN A REASONABLE SEARCH FOR RELEVANT
DOCUMENTS.................................................................................................................... 14

CONCLUSION........................................................................................................................ 16

## TABLE OF AUTHORITIES

Page(s)

Cases

*Black v. New York University Medical Center,*
    1996 WL 294310 (S.D.N.Y. 1996)......................................................................................... passim

*Citizens Union of City of New York v. Attorney Gen. of New York,*
    269 F. Supp. 3d 124 (S.D.N.Y. 2017)................................................................................... 8, 11

*Duling v. Gristede's Operating Corp.,*
    266 F.R.D. 66 (S.D.N.Y. 2010) ....................................................................................... 8, 9, 10

*EEOC v. Univ. of Notre Dame Du Lac,*
    715 F.2d 331 (7th Cir. 1983) ......................................................................................... 12, 14, 15

*EM Ltd. v. Republic of Argentina,*
    695 F. 3d 201 (2d Cir. 2012)....................................................................................................... 8

*Fireman's Fund Ins. Co. v. Great American Ins. Co. of New York,*
    284 F.R.D. 132 (S.D.N.Y. 2012) ................................................................................................ 8

*Gambale v. Deutsche Bank AG,*
    377 F.3d 133 (2d Cir. 2004)........................................................................................................ 8

*Mandell v. The Maxon Co., Inc.,*
    No. 06-CV-0460, 2007 WL 3022552 (S.D.N.Y. Oct. 16, 2007)................................................ 8

*Pennsylvania,*
    493 U.S. .................................................................................................................................... 13

*University of Pennsylvania v. E.E.O.C.,*
    493 U.S. 182 (1990)........................................................................................................... 11, 13

*Urban Outfitters v. Hype Outfitters,*
    2006 U.S. Dist. LEXIS 117835 (S.D.N.Y. Oct. 30, 2006) ................................................ 18, 19

*Vuksanovich v. Airbus Ams., Inc.,*
    No. 1:21-cv-03454-JHR, 2023 U.S. Dist. LEXIS 209751 (S.D.N.Y. Nov. 17, 2023) ............. 18

*Weinstock v. Columbia University,*
    1996 WL 658437 (S.D.N.Y. 1996).......................................................................................... 11

*Zaustinsky v. Univ. of Cal.*,
  96 F.R.D. 622 (N.D. Cal. 1983)............................................................................................. 13

Rules

Federal Rule of Civil Procedure 26 ..................................................................................... 7, 8, 18

Federal Rule of Civil Procedure 37 ............................................................................................. 18

## PRELIMINARY STATEMENT

Defendant Fordham University ("Fordham" or the "University") by its attorneys Cullen and Dykman LLP, respectfully submits the Declaration of Ryan Soebke, dated March 1, 2024 (the "Soebke Dec.") and this memorandum of law in opposition to Plaintiff Esther Solomon's ("Plaintiff") "Motion to Compel Compliance with Subpoenas, Compliance with Document Requests, and Compliance with Representations to the Court" (ECF 70) and in support of Fordham's cross-motion for a protective order and to compel Plaintiff to conduct a reasonable search of documents and communications in her possession and to produce additional relevant documents and communications in her custody and control.

In her motion to compel, Plaintiff takes issue with Fordham's response to several subpoenas served by Plaintiff which sought the production of Plaintiff's personnel file as well as the personnel files of several alleged comparator professors. Specifically, Plaintiff claims that Fordham's redaction of the comparator professors' names in their production is improper. Plaintiff also claims that Fordham has only provided a "limited response" to her document requests to date and takes issue with Fordham's designation of the documents it has produced as "Confidential."

Plaintiff's own production to date is significantly deficient. Plaintiff has not produced any electronic files, but rather a random assembly of documents that she has compiled over the years. Plaintiff has also admitted that she has not conducted a search of either her personal or Fordham issued email account for possibly responsive documents or communications. For the reasons set forth below and in the accompanying Soebke Dec., Plaintiff's motion should be denied in its entirety and Fordham's cross-motion should be granted.

## BACKGROUND

### A. Procedural History

Plaintiff commenced this action on May 24, 2018 by filing a summons and complaint. ECF 1. Plaintiff seeks redress for a number of perceived grievances and slights that span most of Plaintiff's thirty-four-year employment at Fordham. Plaintiff claims that she has been discriminated against on the of sex, religion and age in terms of the nature, time and locations of the classes she has been assigned to teach. Plaintiff also claims that she is paid less than many younger, male faculty members at Fordham.

On March 13, 2019, the Court granted Plaintiff's application for leave to file her first amended complaint. ECF 35, 37. Fordham moved to dismiss the first amended complaint on May 3, 2019. ECF 45-50. On March 17, 2020, that motion was granted in full by the Court. ECF 69. In its first order, this Court granted Plaintiff leave to amend her complaint for a second time. On April 15, 2020, Plaintiff filed her second amended complaint. ECF 71. On December 29, 2020, the Court granted the University's motion in its entirety. ECF 85. In the Second Order, this Court stated that if Plaintiff wished to file a third amended complaint, she must file a motion for leave to amend and include a concise explanation of how she addressed the defects identified by the Court in its Second Order. Plaintiff filed a third amended complaint on June 11, 2021. ECF 95. On March 29, 2022, this Court dismissed Plaintiff's third amended complaint in its entirety. ECF 121.

On April 22, 2022, Plaintiff filed a notice of appeal. ECF 123. On September 5, 2023, the United States Court of Appeals for the Second Circuit issued an order affirming in part and reversing in part the Court's order dismissing Plaintiff's third amended complaint and remanded the matter for further proceedings.

2

## B. **Discovery Disputes**

The parties' current discovery disputes pre-date this Court's prior dismissal of Plaintiff's complaints. Plaintiff, through her prior counsel, initially issued her First Set of Requests to Defendant for the Production of Documents to Fordham on January 7, 2019. Fordham issued its First Request for the Production of Documents that same day. Soebke Dec. at ¶ 35. On November 8, 2019, Plaintiff served Fordham with 15 subpoenas making mostly duplicative requests for her personnel file as well as the personnel files of alleged comparator professors. *Id.* at ¶ 10. As explained in detail herein, Fordham has produced nearly 15,000 documents through rolling productions to date in response to Plaintiff's discovery requests, including Plaintiff's and the comparator professor's personnel files. *Id.* at ¶ 19, 27. Plaintiff has made only a single production which was highly deficient for the reasons set forth herein.

The parties held two meet and confer calls in an effort to address alleged deficiencies in production. Those calls were held on November 13, 2019 and December 5, 2019. Soebke Dec. at ¶ 52. The parties were unable to resolve their disputes during their meet and confer calls. As a result, a conference was held with the Court on January 29, 2020. *Id.* at ¶ 54. At that conference, Plaintiff was granted leave to file a motion to compel. Plaintiff initially filed a motion to compel on March 17, 2020. ECF 70. That motion was denied as moot that same day with leave to refile should any of Plaintiff's claims progress past a motion to dismiss. ECF 69. Plaintiff re-filed her motion to compel on January 18, 2024. ECF 132. The Court granted Fordham leave to file a motion to compel in a memo endorsement dated February 1, 2024. ECF 137.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 26(b)(1) a party is entitled to discover "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs

of the case." F.R.C.P. 26(b)(1). "The party seeking discovery bears the initial burden of proving

the discovery is relevant." *Citizens Union of City of New York v. Attorney Gen. of New York*, 269

F. Supp. 3d 124, 139 (S.D.N.Y. 2017); *Mandell v. The Maxon Co., Inc.*, No. 06-CV-0460, 2007

WL 3022552, at *1 (S.D.N.Y. Oct. 16, 2007). Once the requesting party makes a *prima facie*

showing of relevance, the responding party must justify curtailing discovery. *Fireman's Fund Ins.*

*Co. v. Great American Ins. Co. of New York*, 284 F.R.D. 132, 134 (S.D.N.Y. 2012). "A district

court has broad latitude to determine the scope of discover and to manage the discovery process."

*EM Ltd. v. Republic of Argentina*, 695 F. 3d 201, 207 (2d Cir. 2012).

Under Rule 26(c), "[a] party or any person from whom discovery is sought may move for

a protective order in the court where the action is pending." F.R.C.P. 26(c)(1). "The party seeking

a protective order has the burden of showing that good cause exists for issuance of that order."

*Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004). "Good cause is established by

'demonstrating a particular need for protection.'" *Flores v. Stanford*, 18 Civ. 2468 (VB) (JCM),

2021 WL 4441614, at *4 (S.D.N.Y. Sept. 28, 2021) (quoting *Duling v. Gristede's Operating*

*Corp.*, 266 F.R.D. 66, 71 (S.D.N.Y. 2010)). "Ordinarily, good cause exists when a party shows

that disclosure will result in a clearly defined, specific and serious injury." *Id.*

## ARGUMENT

## POINT I

## FORDHAM HAS PRODUCED DOCUMENTS RESPONSIVE TO PLAINTIFF'S SUBPOENAS

Plaintiff's motion mainly concerns Fordham's response to several subpoenas she served

on November 6, 2019. Those subpoenas sought the production of Plaintiff's personnel file as well

as the personnel files of several comparator professors.

4

As has been previously explained to Plaintiff, personnel files at Fordham consist of a faculty member's Human Resources ("HR") File, a Provost File, and a file maintained by the faculty member's individual school, which in this case is known as a Gabelli File. Soebke Dec. at ¶ 12. Plaintiff's HR file was produced prior to the issuance of the subpoena under documents numbered FORDHAM0000325-FORDHAM0000497. *Id.* at ¶ 13. Plaintiff's Provost file was produced prior to the issuance of the subpoena under documents numbered FORDHAM0009046-FORDHAM0009190 and consists of documents related to Plaintiff's initial appointment to the Fordham faculty and documents related to Plaintiff's salary increases over the years. *Id.* at ¶ 14. Finally, Plaintiff's Gabelli file was produced prior to the issuance of the subpoena under documents numbered FORDHAM0010124-FORDHAM0010491 and consists of documents related to Plaintiff's promotion applications, her tenure review, and related faculty evaluations. *Id.* at ¶ 15.

While Plaintiff seems to take issue with the lack of documents in her file related to her alleged chairperson appointment in 2013 and the various matters that she has raised concerning her issues with the Faculty Senate, it was explained to Plaintiff that Fordham does not include every document or communication related to a faculty member in that faculty member's personnel file. *Id.* at ¶ 16. For example, emails among colleagues, meeting minutes among colleagues such as meetings of the Faculty Senate, and emails from administrators, are not the types of records that would be included in a faculty member's personnel file and indeed, as Plaintiff is aware, the items that can be included are limited pursuant to various provisions of the University Statutes and Handbook. *Id.* at ¶ 17. To the extent Fordham had relevant document documentation outside of that which is maintained in the aforementioned categories of files, Fordham produced the documents it possesses related to the issues Plaintiff outlined in her complaint and in her document

requests. (*See* FORDHAM0000186-FORDHAM0000201, FORDHAM0000498-FORDHAM00008539, and FORDHAM0012911-FORDHAM0013435). *Id.* at ¶ 18.

With respect to twelve of the subpoenas addressed to her alleged "comparators" as identified in Plaintiff's document requests, the HR, Provost and Gabelli files were produced for each. *Id.* at ¶ 19. For those twelve comparators, Fordham also produced faculty activity reports and W-2 records for each. *Id.* at ¶ 20. The biographical information of comparator professors was redacted to ensure their anonymity in accordance with the University Statutes. *Id.* at ¶ 23. A key was provided to Plaintiff that contains the gender, year of birth, and title of each comparator professor so that Plaintiff can review all of the pertinent information relevant to her alleged causes of action. *Id.* at ¶ 24. Within Plaintiff's files, the names of peer reviewers were redacted to ensure the integrity of Fordham's peer review process and to prevent the inadvertent disclosure of sensitive salary and other biographical information. *Id.* at ¶ 25.

<div align="center">

**POINT II**

**FORDHAM'S REDACTIONS ARE PROPER**

</div>

As set forth herein and in the Soebke Dec., Fordham has already produced Plaintiff's personnel file as well as the personnel files of the twelve comparator professors for which Plaintiff served subpoenas and who were previously identified in her complaint and discovery demands. Soebke Dec. at ¶ 19. Fordham has also produced faculty activity reports and W2 forms related to Plaintiff and the comparator professors. *Id.* at ¶ 20. These documents contain sensitive biographical and personal information related to the comparator professors. *Id.* at ¶ 21. Moreover, many of the documents that Fordham has produced are related to Fordham's peer review process and contain the identities of peer reviewers. *Id.* at ¶ 22. To ensure that its peer review process is not undermined and that the privacy of the comparator professors is maintained, Fordham redacted the names of

the peer reviewers and comparator professors from its production. Fordham did not redact any substantive information related to Plaintiff's claims in this action, including salary information. These redactions were aligned with the University Statutes, which direct that personnel files and the peer review process are confidential. *See* Fordham Statute 4-07.41.[1] For the reasons stated below, Plaintiff's claim that Fordham should be compelled to produce unredacted versions of these documents is unavailing.

A.   **Plaintiff Has Failed to Establish the Relevance of the Names of Comparators and Peer Reviewers**

Plaintiff has failed to establish that the names and other identifying information of her comparators and peer reviewers is relevant to her claims. In the context of a claim of employment discrimination, a plaintiff must demonstrate that peer review materials and the personnel files of alleged comparators are relevant to require disclosure. *University of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 194 (1990); *Weinstock v. Columbia University*, 1996 WL 658437, *7 (S.D.N.Y. 1996); *Black v. New York University Medical Center*, 1996 WL 294310, *3 (S.D.N.Y. 1996). Further, as stated above, it is Plaintiff's burden to establish the relevance of the information sought to succeed on a motion to compel. *Citizens Union of City of New York v. Attorney Gen. of New York*, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017). Plaintiff has entirely failed in this regard.

While Plaintiff spends much of her motion describing why she subjectively believes Fordham should produce unredacted files that contain the names of the comparators and peer reviewers, Plaintiff does not establish why this information is relevant to her claims. Plaintiff entirely ignores the fact that Fordham provided her with a key that contains the gender, year of birth, and title of each comparator professor so that Plaintiff can review all of the pertinent

---

[1] Relevant sections of the Fordham University Faculty Statutes can be viewed at https://www.fordham.edu/about/leadership-and-administration/board-of-trustees/university-statutes/article-four-policies-and-procedures-for-faculty/chapter-seven-academic-due-process/.

information relevant to her alleged causes of action. Soebke Dec. at ¶ 24. In her motion, Plaintiff states that she has been precluded from reviewing "evidence that would allow her to prove her case by considering the totality of the evidence." Plaintiff's Motion at p. 11. However, Plaintiff does not in any way describe how the specific names of the comparators and peer reviewers are relevant and necessary to the pursuit of her claims.

During the January 29, 2020 conference, the Court specifically asked Plaintiff "[w]hy do you need the names" of the comparator and peer reviewers? January 29, 2020 Tr. at p. 20. Plaintiff responded by stated that she needs to "know who the people are and how to connect the information and connect the emails." *Id.* Plaintiff entirely ignored that she has been provided with the a key which contains all of the information necessary for her to establish her causes of action in this matter. Moreover, any redactions contained an indication as to which comparator professor the redaction corresponded to. As such, Plaintiff has all of the information she needs to make her case in this matter.

Simply put, Plaintiff has failed to establish that the information she is seeking is relevant to her claims. As such, for this reason alone, Plaintiff's motion to compel should be denied.

**B.  Fordham is Entitled to a Protective Order**

Even if Plaintiff had established the information she seeks is relevant, Fordham is nevertheless entitled to a protective order due to the sensitive nature of the information sought. While generally, the standard for production of peer review materials is mere relevance, redaction of relevant documents is permissible to "protect the privacy of the evaluators" and others involved with such sensitive decision making, like faculty serving on promotion and tenure committees. *Black v. N.Y. Univ. Med. Ctr.*, 94 Civ. 9074 (SS) (NRB), 1996 U.S. Dist. LEXIS 7632, at *4 (S.D.N.Y. June 3, 1996). Courts around the country have recognized that the "peer review process

is essential to the very lifeblood and heartbeat of academic excellence and plays a most vital role in the proper and efficient functioning of our nation's colleges and universities." *EEOC v. Univ. of Notre Dame Du Lac*, 715 F.2d 331, 336 (7th Cir. 1983). Further, "confidentiality is a prerequisite to the effectiveness of a peer evaluation system of faculty selection and promotion." *Zaustinsky v. Univ. of Cal.*, 96 F.R.D. 622, 625 (N.D. Cal. 1983).

In *University of* Pennsylvania *v. E.E.O.C.*, the United States Supreme Court declined to extend a common law privilege to preclude disclosure of confidential peer review materials in the context of an employment discrimination investigation by the E.E.O.C., opining that a mere relevance standard applied. *Pennsylvania*, 493 U.S. at 585. However, the Court specifically left open the question of whether an academic institution can "engage in any redaction of the disputed records before producing them." *Id.* at 187 n.2. Six years later, in *Black*, the United States District Court for the Southern District of New York answered that exact question, noting that the Court's relevance determination in *Pennsylvania*, "does not mean, however, that these documents should not be subject to an appropriate protective order, pursuant to which the names and other language identifying the outside evaluators and committee members *could be redacted*." *Black* at \*4.

In *Black*, plaintiff brought an employment discrimination claim against a medical center, alleging that failure to promote her was sex discrimination. Plaintiff sought disclosure of documents, including letters of outside evaluators submitted in the promotion review process, deliberation materials regarding her candidacy for promotion and the personnel files of comparators. *Id.* at \*1. The Court ultimately held that the materials were relevant and discoverable, however, in so ruling, the Court also stated that the documents could be subject to an appropriate protective order, pursuant to which names and other identifying information could be redacted. *Id.* at \*4. The Court reasoned that redactions of personally identifying information were permissible,

9

because plaintiff had not yet made a sufficient showing that disclosure of the identities of the outside evaluators was "necessary or important (or even relevant)." *Id.*

As in *Black*, Plaintiff has not made a sufficient showing that disclosure of the identities of peer reviewers and comparators is itself relevant to pursuing her claims. As stated above, Plaintiff already has in her possession all of the information needed to pursue her causes of action. Fordham has provided her personnel file. Fordham has provided the personnel files of the initial twelve comparators, as well as faculty activity reports and W-2 records for each. Although the biographical information of the comparators was redacted, Fordham provided a key that contains the gender, year of birth and title of each comparator professor so that Plaintiff can review all of the pertinent information relevant to her alleged causes of action. Soebke Dec. at ¶ 24. With all of this information already in her possession, Plaintiff cannot demonstrate how the disclosure of the specific names of these individuals is necessary, important or relevant to her claims. Fordham's position is, and always has been, that the identities of these individuals is superfluous. Congruent with the Court's holding in *Black*, Fordham's initial redactions to these materials was appropriate and Plaintiff has failed to demonstrate why further disclosure is necessary.

Furthermore, Fordham has an undeniable interest in maintaining the anonymity of the peer review process and maintaining the privacy of its employees. Fordham's interest in this regard clearly outweighs Plaintiff's subjective desire to receive unredacted copies of the documents Fordham has already produced. Courts have long recognized that academic institutions have an interest in confidentiality of the peer review process. *See Pennsylvania* at 193; *Black* at *4. As encapsulated by the United States Court of Appeals for the Seventh Circuit in *E.E.O.C. v. University of Notre Dame Du Lac*:

> *It is clear that the peer review process is essential to the very lifeblood and heartbeat of academic excellence and plays a most vital role in the proper and*

10

*efficient functioning of our nation's colleges and universities. The process of peer evaluation has evolved as the best and most reliable method of promoting academic excellence and freedom by assuring that faculty tenure decisions will be made objectively on the basis of frank and unrestrained critiques and discussions of a candidate's academic qualifications. Moreover, it is evidence that confidentiality is absolutely essential to the proper functioning of the faculty tenure review process. The tenure review process requires that written and oral evaluations submitted by academicians be completely candid, critical, objective and thorough in order that the University might grant tenure only to the most qualified candidates based on merit and ability to work effectively with colleagues, students, and the administration. For these reasons, academicians who are selected to evaluate their peers for tenure have, since the inception of the academic tenure concept, been assured that their critiques and discussions will remain confidential. Without this assurance of confidentiality, academicians will be reluctant to offer candid and rank evaluations in the future.*

715 F.2d 331, 336 (7th Cir. 1983) (internal citations omitted).

Employers have a similarly robust interest in maintaining the privacy of its employees, including the confidentiality of documents containing their biographical and personally identifiable information, such as names, addresses and dates of birth. Fordham's duty in protecting the anonymity of the peer review process and the privacy of its employees is underscored by the fact that Plaintiff is still employed by the University. This heightens the risk of disclosure and makes the potential impact of any disclosure more consequential to the University community.

Finally, the issuance of the November 6, 2019 subpoenas does not change the University's responsibility to protect the identities of peer reviewers or the privacy of its employees. While Plaintiff is entitled to relevant and responsive documents and information as part of the discovery process and in response to the subpoena, Defendant has already met its obligations under both standards. Plaintiff's argument that a subpoena entitles her to the specific identities of these individuals represents a stark misinterpretation of Fordham Statute 4-07.42. The University Statutes specifically direct that personnel files and the peer review process are confidential. *See* Fordham Statute 4-07. Fordham Statute 4-07.42 informs faculty of a limited mechanism by which

11

their otherwise confidential personnel records may be disclosed – through subpoena or court order. However, nothing in Statute 4-07.42 entitles the recipient of subpoenaed documents to completely unredacted materials. Instead, it merely notifies faculty of a circumstance in which the University may be required to disclose their personnel records. Furthermore, nothing in Statute 4-07.42 limits the University's discretion to appropriately redact subpoenaed documents to maintain the privacy of the impacted employees. As held by the Court in *Black*, an institution must provide relevant peer review materials and personnel files of comparators, but may appropriately redact the names and any personally identifying information contained in those materials. *Black at \*4.* Fordham has done exactly that.

As such, it is clear that Fordham is entitled to a protective order permitting the redaction of the identities of the comparator professors and peer reviewers.

<div align="center">**POINT III**</div>

**FORDHAM'S DESIGNATION OF DOCUMENTS AS CONFIDENTIAL IS PROPER**

Plaintiff also takes issue with Fordham's use of a "Confidential" designation for its production. As stated above, Fordham has an interest in protecting potentially sensitive information including peer review information as well as the salary and biographic information of the comparator professors. Given the breadth of information sought in this matter and to avoid any inadvertent disclosures, out of an abundance of caution, Fordham has marked the documents it has produced as "Confidential. Plaintiff has not articulated how her defense in this matter has been hindered by Fordham's use of the "Confidential" designation. Plaintiff was also asked at the January 29, 2020 conference about how the designation of confidentiality was impeding her ability to fight the case. January 29, 2020 Tr. at p. 8. Plaintiff stated in response "[t]hat's not the issue" and failed to provide any example of how her case has been hindered because of Fordham's

confidentiality designations. As such, Plaintiff has failed to establish why Fordham's designation of documents as confidential should be disrupted.

## POINT IV

## FORDHAM WILL PRODUCE ADDITIONAL DOCUMENTS SOUGHT BY PLAINTIFF

Plaintiff also claims that Fordham has failed to produce several categories of documents that she has requested throughout this litigation. Specifically, Plaintiff claims that Fordham has failed to produce course schedules and student evaluations related to the comparator professors. Plaintiff's Memorandum of Law at p. 15. Plaintiff also refers to three additional comparator professors in her motion for which she did not previously identify. *Id.* at p. 7. To date, Fordham has produced nearly 15,000 pages of documents and its production is not complete. Soebke Dec. at ¶ 24. Fordham is in the process of reviewing its files for additional responsive documents including course schedules, student evaluations and personnel files for the three additional comparator professors referred to in Plaintiff's motion. Fordham will produce such responsive documents in accordance with the current discovery schedule. Soebke Dec. at ¶ 29.

## POINT V

## PLAINTIFF'S DEMAND TO "COMPEL COMPLIANCE WITH REPRESENTATIONS" IS NOT PROPERLY SET FORTH IN THIS MOTION

Finally, Plaintiff seeks to compel Fordham to "compl[y] with representations" made regarding her employment with Fordham. Specifically, Plaintiff cites to issues related to her health insurance benefits while she has remained on unpaid leaves of absence. Plaintiff's Memorandum of Law p. 19-20. Plaintiff further describes these issues in her Third Amended Complaint. ECF 95. It is wholly improper for Plaintiff to raise such issues on a motion to compel discovery. Plaintiff has already included allegations related to her health insurance benefits in her operative complaint and they will be addressed at the appropriate time along with the rest of her allegations.

**POINT VI**

**PLAINTIFF HAS NOT UNDERTAKEN A REASONABLE SEARCH FOR RELEVANT DOCUMENTS**

By her own admission, Plaintiff has failed to undertake a reasonable search for relevant documents in this matter. Further, the documents Plaintiff has produced are deficient in a number of ways. For the reasons set for the below, Fordham's motion to compel Plaintiff to undertake a reasonable search for responsive documents, including, but not limited to, searches of her personal and Fordham issued email accounts, and to produce any additional responsive documents in Plaintiff's custody or control.

Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Further, parties may move for an order compelling production or disclosure where a party fails to produce documents. F.R.C.P. 37; *Vuksanovich v. Airbus Ams., Inc.*, No. 1:21-cv-03454-JHR, 2023 U.S. Dist. LEXIS 209751, at *5 (S.D.N.Y. Nov. 17, 2023). This Court has previously held that "[p]arties have an obligation to conduct reasonable searches for documents responsive to discovery requests." *Urban Outfitters v. Hype Outfitters*, 2006 U.S. Dist. LEXIS 117835, at *2 (S.D.N.Y. Oct. 30, 2006). In the instant matter, not only is Plaintiff's production deficient, but Plaintiff, by her own admission, has failed to conduct a reasonable search for responsive documents.

On January 7, 2019, Fordham served Plaintiff with Defendant's First Request for the Production of Documents. Soebke Dec. Exhibit A. Fordham's requests sought documents and communications related to Plaintiff's claims in this action. *See generally* Soebke Dec. Exhibit A. Fordham also requested "[a]ll non-privileged documents concerning any communications between Plaintiff and any person concerning or relating to any allegation in the Complaint or any incidents, events, facts, or occurrences that support or relate to said allegations." *See Id.* at p. 17.

14

To date, Plaintiff has not produced any electronic files and has instead only produced a random assembly of documents that she compiled over the years, most of which are academic articles. Soebke Dec. at ¶ 38. Plaintiff has similarly not produced any documents directly from her personal Gmail account (etaki33@gmail.com) or any other personal email she may have used. *Id.* at ¶ 39. Plaintiff has also not produced any notes to herself or others despite making claims that span decades. *Id.* at ¶ 40.

The emails Plaintiff has provided were produced as scanned image files, many of which appear to be incomplete. *Id.* at ¶ 41. For example, the documents produced as ES17 and ES18 appear to be the final two pages of a five-page letter. *Id.* at ¶ 42. The first three pages are not included in Plaintiff's production. Soebke Dec. Exhibit B. Further, the documents produced as ES112-ES119 are an email chain in which it is indicated that multiple emails in the chain contained attachments. Soebke Dec. Exhibit C. None of those attachments were produced with the corresponding emails.

Plaintiff has admitted both to counsel for Fordham and to the Court that she has not conducted a search of either her personal email accounts or her Fordham issued email account. During a meet and confer call on December 5, 2019, Plaintiff did not deny that she has additional responsive documents that she has failed to produce, but rather simply stated that she did not have to produce such documents as Fordham should "have what it needs." Soebke Dec. at ¶ 45. During that same meet and confer call, Plaintiff refused to produce any documents form her personal email account or her computer and refused to discuss the issue further. *Id.* at ¶ 46. During a conference with the Court on January 29, 2020, Plaintiff stated that she did not know that she was required to produce emails from her personal email accounts. January 29, 2020 Tr. at p. 5. Plaintiff also stated that she believed it would be "extremely burdensome" for her to search through her emails. *Id.* at

p. 32. The Court advised Plaintiff that it is her responsibility to search for all relevant documents and communications and ordered Plaintiff to turn over all relevant emails from her personal and Fordham issued email accounts. *Id.* To date, Plaintiff has failed to make any such production.

Based on the foregoing, it is clear that Plaintiff's production to date is deficient and that Plaintiff has failed to undertake a reasonable search for responsive documents. As such, Fordham's motion to compel Plaintiff to undertake a reasonable search of documents and communications in her possession, including, but not limited to, her personal and Fordham email accounts, and to produce any additional responsive documents in her custody or control should be granted.

## CONCLUSION

For the foregoing reasons, Fordham respectfully requests that the deny Plaintiff's motion to compel in its entirety and grant Fordham's cross-motion for a protective order and to compel and award to Fordham such other and further relief as the Court deems appropriate.

Dated: Uniondale, New York
    March 1, 2024

                    Respectfully submitted,

                    CULLEN AND DYKMAN LLP

              By:     /s/ Ryan Soebke
                    Ryan Soebke
                    Jennifer A. McLaughlin
                    *Attorneys for Defendant Fordham University*
                    333 Earle Ovington Blvd., 2nd Floor
                    Uniondale, New York 11553
                    (516) 357-3700

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ESTHER SOLOMON,                               :          18-CV-4615 (ER)
                                              :
                        Plaintiff,            :
                                              :
                - against -                   :
                                              :
FORDHAM UNIVERSITY,                           :
                                              :
                        Defendant.            :
------------------------------------------------------------X


PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL
COMPLIANCE WITH SUBPOENAS,
COMPLIANCE WITH DOCUMENT REQUESTS, and
COMPLIANCE WITH REPRESENTATIONS TO THE COURT

# Table of Contents

PRELIMINARY STATEMENT ................................................................................................... 1

COMPEL COMPLIANCE WITH PLAINTIFF'S SUPBPOENA FOR HER PERSONNEL FILE
AND OTHER REQUESTS ...................................................................................................... 3

   Five Year Failure to Supplement - Inconsistent with FRCP Rule 26(e).................................... 4

   Plaintiff requests for documents and interrogatories with Fordham's responses........................ 6

COMPEL COMPLIANCE WITH SUBPOENAS FOR COMPARATOR PROFESSOR FILES
WITH NAMES UNREDACTED .............................................................................................. 8

   Defendant disregards the Fordham Statutes on Subpoenas to Comparator Professors ............. 8

THE SECOND CIRCUIT MANDATE ON DISCOVERY ISSUES........................................... 8

   Comparator Evidence............................................................................................................. 8

   Time Scope of Discovery........................................................................................................ 9

   Fordham Refuses Discovery on the Pattern Against Protected class professors...................... 10

   Fordham's Confidentiality Designation of every single document violates the Stipulation and
Protective Order.................................................................................................................... 11

III: COMPEL DEFENDANT'S COMPLIANCE WITH REPRESENTATIONS TO COURT... 11

CONCLUSION...................................................................................................................... 14

   Exhibits ................................................................................................................................ 15

# Table of Authorities

**Cases**

*Bagley v Yale University*, 318 F.R.D. 234 (D. Conn 2016) ........................................................... 5

*Malzberg v. New York Univ.* 2020 U.S. Dist. LEXIS 116678 (S.D.N.Y. 2020) .......................... 10

*Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198 (2d Cir. 2014) .................................................. 10

*Solomon v. Fordham Univ. Admin.*, 2023 U.S. App. LEXIS 23494 (2d Cir. 2023) ....................... 8

*Suber v. VVP Servs.*, LLC, 2023 U.S. Dist. LEXIS 102665 (S.D.N.Y. 2023) ............................... 9

*University of Pennsylvania v. EEOC*, 493 U.S. 182, 110 S. Ct. 577, 107 L. Ed. 2d 571 .............. 3

*Vengalattore v Cornell Univ.*, 36 F.4th 87 (2d Cir. 2022) ............................................................ 10

**Fordham Statutes and Policies**

*Fordham Human Resources Operational Policies*: 2-3, Employee Personnel File ....................... 3

Fordham Statute §4-07.42 on Subpoenas ...................................................................................... 8

**Transcript References**

Audio, Oral Argument, *Solomon v. Fordham University*, Second Circuit Court of Appeals, June
9, 2023; https://www.courtlistener.com/audio/87154/solomon-v-fordham-university/; starts at
minute 15:38 ................................................................................................................................. 9

Transcript, January 11, 2024 District Court Hearing (Dkt. 138) .............................................. 1, 13

Transcript, January 29, 2020 District Court Hearing for Plaintiff's Motion to Compel .............. 12

Transcript, Oral Argument, *Solomon v. Fordham University*, Second Circuit Court of Appeals,

June 9, 2023, ............................................................................................................................. 9

## PRELIMINARY STATEMENT

Plaintiff Pro Se Esther Solomon respectfully submits this Reply Memorandum of Law in Support of her *Motion to Compel Compliance with Subpoenas, Compliance with Document Requests, and Compliance with Representations to the Court,* Dkt.132. In a separate document, Plaintiff will address Defendant's *Cross-Motion to Compel* and their *Motion for Another Protective Order.*

The Court should order Defendant's compliance with their discovery obligations. Defendant has failed to produce and obstructed discovery by multifaceted violations of Federal Rules, the Court's Stipulated Protective Order, the Fordham University Statutes, and the Second Circuit's Mandate --combined with lack of candor to the Court. This has created an information vacuum precluding Plaintiff from essential data in Defendant's sole possession. On September 5, 2023 the Second Circuit Court of Appeals issued its Mandate, reinstating the case. During the January 11, 2024 Court Hearing (Dkt. 138, Transcript), the Court ordered discovery reopened and, on January 16 ordered a new Civil Case Discovery Plan and Scheduling Order for a six-month discovery period, Dkt. 130.

Three months into the discovery schedule, Defendant refuses to produce. Despite Defendant's outstanding serious 2019 Discovery deficiencies and violations (see this Motion to Compel with 16 exhibits, Dkt 132) and despite the February 16, 2024 Second Set of Document Requests and Interrogatories from Plaintiff, Defendant has not produced any information either on Plaintiff's records at the University since 2019, or any other documents with one exception,[1] essentially stonewalling discovery.

---

[1] A set of student evaluations with the comparator's names redacted, which ignores the Second Circuit Mandate

1

As part of this Reply, Plaintiff supplements her detailed motion further, explaining why

Fordham lacks the basis for refusing to comply with Plaintiff's subpoenas, document requests,

and interrogatories. Plaintiff will also request that Fordham abide by the Second Circuit's

mandate by obeying its directives, including:

(a) regarding the need for names of comparators to be disclosed in discovery for this discrimination, pay, and retaliation case.

(b) The temporal scope of discovery should have begun in 2001 when Fordham initially denied Plaintiff's promotion.

As these papers demonstrate, Fordham has attempted to disadvantage this pro se Plaintiff

by a series of sharp tactics and shifting statements of fact. Although Plaintiff has tried to point

out some discordant issues to the Court, some may have escaped her.

Plaintiff filed the current Motion according to the March 17, 2020 Order that granted leave

to refile, as follows:

"The Court received a courtesy copy of Solomon's "Motion to Compel Compliance with Subpoenas, Compliance with Document Requests, and Compliance with Representations to the Court" on March 17, 2020. Given the stay of discovery entered with this Order, the motion is DENIED without prejudice. She is granted leave to refile her motion should the stay on discovery be lifted." Dkt. 69, *Order on Motion to Dismiss*, p. 31, fn. 16, March 17, 2020."

However, Fordham misrepresented to the Court its own Order (Dkt. 69) untruly asserting:

"Plaintiff's original motion to compel was denied as moot," Dkt. 137, January 30, 2024 Letter to the Court, p 1, Dkt. 137

Defendant repeated the incorrect characterization "denied as moot" in their March 1, 2024

*Memorandum*, Dkt 143, p. 8.

Regarding good faith attempts to resolve the issues, Plaintiff initiated an email exchange

with Fordham on November 29, 2023 and a phone meet and confer on January 12, 2024 asking

Fordham whether they would comply with the 2019 subpoenas for her personnel file and the

subpoenas for the files of the comparator professors. These exchanges revealed that Defendant

had no intention to comply with their obligations. See Exhibit 1, Plaintiff's January 18, 2024

*Letter to the Court,* Dkt. 133.

### COMPEL COMPLIANCE WITH PLAINTIFF'S SUPBPOENA FOR HER PERSONNEL FILE AND OTHER REQUESTS

Up to this point, Fordham has successfully obstructed data potentially shedding light on

alleged discrimination discovery that Universities produce in such cases.[2] The denial of access to

Plaintiff's complete unredacted personnel file, including compensation and work history at

Fordham, her tenure or promotion files with peer reviewer names redacted, and other wholesale

pages redacted without explanation required by the rules. The unauthorized redactions are made,

although a confidentiality stipulation and Protective Order address the Fordham Statutes, and the

redactions are inconsistent with legal precedent. As the Supreme Court stated in *University of*

*Pennsylvania v. EEOC*, 493 U.S. 182, 110 S. Ct. 577, 107 L. Ed. 2d 571:

> "There may be evidence of discriminatory intent and pretext in the confidential notes and memoranda which the [college] seeks to protect. Likewise, confidential material pertaining to other candidates for tenure in a similar time frame may demonstrate that persons with lesser qualifications were granted tenure or that some pattern of discrimination appears."

Given the fact that Defendant goes back and forth as to what is and what is not included

in Fordham Personnel files, the excerpt below is taken from *Fordham Human Resources*

*Operational Policies*: 2-3, Employee Personnel File. (Exhibit 2)

> "An employee's personnel file is composed of personnel records that may be a hybrid of both paper and electronic records and is stored in the Office of Human Resources Management or digitally. A "personnel record" may include but is not limited to: Employment application; bio-demographic information, address, phone number, reference letters; offer letters and/or employment contract; forms and supporting documentation related to an employee's hiring or changes in employment status and/or position duties; employee acknowledgment or consent forms related to hiring, orientation or employment; current salary and salary history; copies of required certification/licensing/educational degree; any required university or unit training certification; disciplinary action; and performance evaluation.

---

[2] Examples of University documents produced in similar cases as here, on pay claims, discrimination. retaliation, improper promotion denial impacting pay, etc. can be found in *Barber v Regents of the University of Calif.*, 2008 U.S. Dist. LEXIS 130669 (D.N.M. 2008). These include Salary history for comparators; Personnel files for Plaintiff and alleged comparators; university electronic data bases with salary and position history and demographics including gender, race and age etc. Such required information is still not produced.

"For example, none of the status changes that Plaintiff underwent and should have been reflected in the personnel file per the above expansive list has been produced. Attached as an exhibit to Plaintiff's initial Memorandum to Compel (Dkt 132) is Stanford University's description of its personnel file content.

Five Year Failure to Supplement - Inconsistent with FRCP Rule 26(e)

In addition to the highly inadequate production described in the main motion, Fordham has not updated any records since prior to the April 2019 secret termination report.

- When Plaintiff filed the subpoenas in November 2019, Fordham was already in violation for about seven months of Rule FRCP 26(e) on Duty to Supplement Discovery.[3]

- During the January 29, 2020 Pre Motion Conference, contrary to their untrue assertions to the Court that they "had produced everything requested in the subpoenas," in addition to the multiple deficiencies some of which they admitted, per Rule FRCP 26(e) were one full year of failure to supplement and disclose significant information.

- When opposing the Motion to Compel, their violation of Rule FRCP 26(e) was five years of failing to supplement— and still they refuse to produce.

Defendant's unauthorized redactions are more fully outlined in the other Plaintiff's Memorandum Opposing their Motion for Another Protective Order. They have refused to address the unauthorized redactions of comparator names, the unauthorized redactions everywhere without specifying what is redacted, what privilege is asserted, or providing a privilege log. They have not de-designated from "confidential" every document they produced,

---

[3] 26 (e) Supplementing Disclosures and Responses.

(1) In General. A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. (B) as ordered by the court.

violating the Stipulated Protective Order. Despite requests, they have not provided data on any

litigation hold from the University to preserve documents for this seven-year litigation, although

that is discoverable information, as seen in another professor discrimination case. *Bagley v Yale*

*University*, 318 F.R.D. 234 (D. Conn 2016)

Seven years into this litigation, Defendant has refused to provide any internal University

records on Plaintiff since April 2019, and there are no documents, reports, communications, or

emails. As Fordham's first secret termination report was on April 12, 2019 the records they

refuse to produce would reflect their extraordinary actions against Plaintiff (secret detenuring

and termination without cause or due process, change in status, loss of salary, loss of pension, all

faculty benefits, denial of due process, and ongoing retaliatory adverse actions). Nor did they

produce documents in response to Plaintiff's Second Set of Document Requests or

Interrogatories.

In a further attempt to and take advantage of Plaintiff's pro se status, Defendant files

pretextual cross-motions to compel Plaintiff's discovery and falsely accuse her of Defendant's

misconduct. Then, after violating the Stipulated Protective Order (Dkt. 24), Defendant omits its

existence and seeks to procure another new-Protective Order under dubious circumstances

without court authorization and with terms that would contradict legal precedent and the

mandate. Defendant's Court submissions, letters and *Declaration* continue to present untrue facts

and show disrespect for this Court's Orders, the Second Circuit mandate, and Federal Discovery

rules. [4]

---

[4] These include the Court Stipulated Protective Order dated 2-4-2019, failing to follow the *Individual Practices of Judge Edgardo Ramos,* a Defendant letter of 1-30-2024 untruly declaring the current Motion denied as "moot" when the Court gave leave to refile, a 3- 1-2024 Defendant Declaration untruly stating " ¶50. To date, Plaintiff has failed to make any such production" when she had produced three days earlier etc. in ¶38. To date, Plaintiff has not produced any electronic files -- when she produced thousands of pages by email.

On April 10, 2019 the Cravath firm wrote to Fordham on their ongoing violations:

> "With regard to the redacted documents, you represented to us during the parties' March 15 meet
> and confer that you needed to confirm whether Fordham would agree to produce unredacted HR,
> Provost and Gabelli files. You reiterated this promise during our March 21 meet and confer, and
> again during the parties' April 1 meet and confer. We have now been awaiting a response from
> you for more than three weeks. Please confirm immediately whether Fordham will agree to
> produce these]/ materials without redactions, as required by the Federal Rules."

Fordham, in responding, admitted that they had not produced complete personnel files, and

indicated for the first time their new position that subpoenas would be required to produce

unredacted personnel files.

Plaintiff requests for documents and interrogatories with Fordham's responses

- Plaintiff's First Request for Production of Documents with Defendant's Response
  (Served 2019), Exhibit 3

- Plaintiff's Second Request for Documents with Defendant's Response (Served February
  16, 2024), Exhibit 4

- Plaintiff's First Set of Interrogatories with Defendant's Response (Initially served in 2019
  and served again on February 16, 2024), Exhibit 5

- Plaintiff's Second Set of Interrogatories with Defendant's Response (Served 2024)
  Exhibit 6

January 7, 2019 Plaintiff's First Set of Document Requests

Plaintiff's First Set of Document Requests were served on January 7, 2019 and,

notwithstanding the number of pages electronically produced, responsive documents are

incomplete beyond the unauthorized redactions and other selective responses. Simply no

documents were produced responsive to multiple of Plaintiff's requests, as for Document

Requests # 3, 6, 7, 9, 11, 12, with no information as to what was withheld.

No Responses to the March 25, 2019 Interrogatories

Defendant's August 1, 2019 Response to Plaintiff's Interrogatories consists of objections

and no answer to a single question. Although served by the Cravath firm on March 25, 2019,

Defendant never objected to the interrogatories previously, but on August 1st, they cited Local Rule 33.3(a) for the "commencement of Discovery," inapplicable here.

February 16, 2024 Plaintiff's Second Set of Document Requests

Plaintiff's Second Set of Document Requests (were served on February 16, 2024. No documents were produced with the only exception student evaluations with comparator names improperly redacted).

Regarding the need for this Motion, Fordham has not provided a single document related to the multiple secret status changes against Plaintiff, including documents on the generation of her terminations and her "status change" reports or to the IRS or the Department of the Treasury-IRS Form 1095c for 2022. Plaintiff has been deprived of salary and all other faculty benefits due to Fordham's career-ending actions, which they refuse to disclose. This is despite the subpoena and multiple discovery requests.

Examples of undisclosed documents include Plaintiff's correspondence with the University President, Fordham's internal emails seeking to address the discrimination, the false Code of Conduct charges, and failures to investigate, which should all be in her personnel file. Nor have they produced any underlying documentation for Fordham's two secret Termination Reports or the Post-termination change of status report to Federal authorities.

Other examples include failure to provide documents to support COBRA as "customary" for faculty on unpaid leave or IRS Reports documentation regarding tenured professor. Fordham provided no discovery on the COBRA notices sent to other tenured faculty on leave to back up Dean Rapaccioli's defense statement that COBRA was supposedly "customary." Plaintiff believes this was a false statement of fact used by Fordham to influence the Court's decisions.

7

COMPEL COMPLIANCE WITH SUBPOENAS FOR COMPARATOR PROFESSOR FILES
WITH NAMES UNREDACTED

Fordham Statute §4-07.42 on Subpoenas states:

"Personnel files are confidential [see Fordham Statute §4-07.41]. No document in such file will be released by the University to any person without the written consent of the Vice President for Academic Affairs except in response to a final order of a court of competent jurisdiction, or a lawful subpoena duces tecum. The faculty member whose file is the subject of a subpoena duces tecum shall be notified promptly upon receipt of the subpoena, normally on the same day, both by telephone and by certified mail directed to the residence address of the faculty member. The purpose of the prompt notification is to afford the faculty member and his counsel, if any, sufficient time to move to quash the subpoena. In no case will file material which is not specifically subpoenaed be released in response to a subpoena or otherwise. Nothing in this statement of policy shall bar the University, sua sponte, from moving to quash the subpoena."

Defendant disregards the Fordham Statutes on Subpoenas to Comparator Professors

Defendant disregarded the Fordham Statutes by not serving the subpoenas or notifying

the subpoenaed professors within 24 hours as mandated.

Shifting Representations regarding Subpoenas and Personnel Files

Defendant applied shifting representations to the Court, in trying to obstruct the

Subpoenas. First Fordham represented to the Court at the 1-29-2020 Premotion Conference that

their redactions in violation of the Protective were required by the Fordham Statutes. This is

untrue.

THE SECOND CIRCUIT MANDATE ON DISCOVERY ISSUES

Comparator Evidence

The Second Circuit was explicit in their recognition of the comparators as appropriate

and the need for unredacted names to address the needs of this discrimination, retaliation, and

pay case:

"As discussed above, she alleged that she and the tenured male professors were paid different wages, though they had the same job responsibilities, were subject to the same evaluation standards, and were in the same practice area (Management Systems).[1]" *Solomon v. Fordham Univ. Admin.*, 2023 U.S. App. LEXIS 23494 (2d Cir. 2023)

Footnote 1 in the excerpt above addresses the problems of redacting the names of

comparators in connecting information from different sources:

"Solomon alleges that Fordham redacted the comparators' names when it sent to her counsel a list of male professors' salaries, which may explain why she does not allege the specific job duties of each professor." (Footnote 1 from *Solomon v. Fordham Univ. Admin.*)

Nor did Fordham acknowledge the statements of Judge Calabresi or Judge Lee in the

Oral Argument, demonstrating the need for discovery information of comparators integrated to

flesh out the comparators and establish their status as such:

Judge Calabresi: "Counsel, counsel. This is 12(b)(6). We have said that in summary judgment, there has to be a fair sign that the things are the same, and often that's a jury question. But isn't it premature for such a thing to be decided in 12(b)(6)? When, she could come in evidence which shows that though titles and things [00:29:30] are somewhat different, but basically these people are valid comparators. Haven't we done that in any number of cases?" p. 8

Judge Lee: "Wasn't there an issue with regard to the information that was provided, it didn't fully disclose the salaries for specific professors for specific positions. I mean, isn't that a little bit of a hindrance to fully fleshing out the comparators?" p. 9

See the Transcript of the Oral Argument *Solomon v. Fordham University*, Second Circuit Court

of Appeals, June 9, 2023 (Exhibit 7) and the Audio of the Oral Argument;

https://www.courtlistener.com/audio/87154/solomon-v-fordham-university/; starts at minute

15:38

Time Scope of Discovery

Regarding the time scope, although the Second Circuit emphasized that the case should

include incidents, including the denial of promotion in 2001, Fordham still insists that in 2024, it

will only produce "information dated on or after January 1, 2008." March 18, 2024 Defendant's

Response to Plaintiff's Second Set of Document Requests, ¶3. Time scope is one of Defendant's

2019 main objections to subpoenas. Now Defendant's 2019 position contradicts the Mandate

ruling that information needed as of at least 2001, since allegations span years and are part of a

pattern against Plaintiff and other professors in protected classes.

As defined in *Suber v. VVP Servs.*, LLC, 2023 U.S. Dist. LEXIS 102665 (S.D.N.Y.

2023), Fordham should abide by the Second Circuit Mandate:

9

"Plaintiff's request is barred by the mandate rule. 'Under the law of the case doctrine, where a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court. *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry.* Co., 762 F.3d 165, 175 (2d Cir. 2014)"'

Fordham Refuses Discovery on the Pattern Against Protected class professors

Importantly, Fordham has refused to give any documents on the other protected class professors

who have also been discriminated against, evidence of a management systems business school

practice.Such data is needed to establish the pattern. *Malzberg v. New York Univ.* 2020 U.S. Dist.

LEXIS 116678 (S.D.N.Y. 2020) noted:

"Evidence relating to company-wide practices may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual masks a discriminatory motive." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 204 (2d Cir. 2014);

This evidence will be essential, and it should be compelled. Plaintiff requested discovery about

other targeted protected class professors in both Document Requests.

Nor did they provide records relating to Defendant's failures to investigate Plaintiff's

complaints and lack of cause, notice, or due process with respect to Plaintiff's secret detenuring

and termination, of significance regarding tenure and university professors. See *Vengalattore v*

*Cornell Univ.*, 36 F.4th 87 (2d Cir. 2022)

Fordham refuses to clarify Plaintiff's status at the University and whether they retracted

the 2-1-2020 termination. When Plaintiff wrote to Fordham's in-house counsel, Plaintiff was

referred to outside counsel. Recently, on March 13, 2024, Chair Pirson announced, "Esther, you

are on leave permanently." This goes along with their contradictory representations to different

federal authorities.

No Responses to the 2019 First Interrogatories Nor the 2024 Second Interrogatories

Defendant's August 1, 2019 Response to the First Set of Interrogatories (Exhibit 10)

consists of objections and no answer to a single question. Cravath had served them on March 25,

2019. Defendant objected to Cravath's Interrogatories on August 1, almost six months later,

citing Local Rule 33.3(a). But Fordham incorrectly cited and interpreted Rule 33.3(a), wrong

about the time frame and allowable scope. See Dkt. 62-3, Defendant's Response to Plaintiff's

First Set of Interrogatories, December 17, 2019

Once again, in 2024, Defendant refused to answer any of Plaintiff's Second Set of

Interrogatories, citing Local Rule 33.3 for each question. But under Rule 33.3(a),

> "at the commencement of discovery, interrogatories will be restricted to those seeking
> names of witnesses … and the existence, custodian, location and general description of
> relevant documents …"

In her Interrogatories, Plaintiff asked about names and documents. Fordham should be

compelled to answer both sets

## Fordham's Confidentiality Designation of every single document violates the Stipulation and Protective Order

However, Fordham's confidentiality markings violated the *Stipulation and Protective Order,*

which they co-signed with Cravath on February 12, 2019. As #3 states (Dkt. 24, p.2):

3. The following information shall not be stamped "CONFIDENTIAL" or otherwise be

deemed to constitute Confidential Information under this Order:

      a)    Information in the public domain;

      b)    information already known by the receiving party through proper means; and

      c)    information that is or becomes available to a party from a source other than the party asserting confidentiality and rightfully in possession of such information on a non-confidential basis.

For one instance among many, Plaintiff's emails were known to herself through proper means

and should not have been stamped confidential.

## III: COMPEL DEFENDANT'S COMPLIANCE WITH REPRESENTATIONS TO COURT

Compel Defendant's Compliance with Representations to Court

Throughout this litigation, Defendant repeatedly made representations to this Court regarding compliance, while they were taking actions to the opposite. This is to respectfully request that Defendant be directed to comply with their representations to the Court.

For example, they repeatedly asserted that Plaintiff's status remained unchanged, while they secretly stripped her of her tenure without cause or due process and secretly reported to Federal authorities. Defendant seemingly systematically waits for the Court hearing and then takes adverse actions under the radar shortly after. Table 1 indicates actions following opposite representations to the Court and Plaintiff, taken in 2019 and 2020.

| Fordham Notice to Plaintiff of Upcoming Action Against Plaintiff | Fordham Notice to the Court of Upcoming Action Against Plaintiff | Fordham Secret Report to COBRA/ERISA through Discovery Benefits |
|---|---|---|
| *3/17/2019 Filed 1st Amended Complaint*<br><br>No Notice of Action | 4/10/2019 Fordham to Court Dkt. 39<br><br>"Dr. Solomon will not be prejudiced by a stay of discovery pending Fordham's motion to dismiss. …More importantly, Dr. Solomon is a current tenured professor in Fordham's Gabelli School of Business and the status quo remains preserved." | 4/12/2019<br><br>Action: Termination |
| 1/9/2020 Dr. Crystal<br><br>…. "During Spring, 2020 you will retain your status as a tenured faculty member. [Def Reply Ex A, Dkt-82-1, 08/24/2020)]<br><br>12/23/2019 Dr. Crystal:<br>"The Provost's office will honor your request for an unpaid leave but will not cover the costs of medical benefits during the leave". [SAC p 266-Ex 22] | 1/29/2020<br><br>Fordham Atty: ... "Your Honor, Dr. Solomon is a tenured faculty member at Fordham University and remains a tenured faculty member at Fordham University…. Yes, she remains a tenured professor at Fordham University today".<br>(Court Hearing Dkt. 67) | 2/1/2020<br><br>Action: Termination |
| 8/14/2020 Dean Rapaccioli:<br><br>"As you have requested, the University will grant your request for an unpaid leave for the fall semester… the leave will be without benefits". | 8/24/2020 Reply Dk.81<br>Not Mentioned | 8/31/2020<br><br>Action: Status Change- Reduction in Hours |

At the January 29, 2020 Hearing, when the Court indicated that Fordham had represented that the Plaintiff continued to be a tenured faculty and asked the Fordham attorney to respond, the Fordham attorney stated:

"Dr. Solomon … remains a tenured faculty member at Fordham University." (Transcript, page 14)

Three days later, they reported Plaintiff "terminated" The COBRA/ERISA Election Form states:

Election Event Date:    2/1/2020"
Event Type:    Termination"

Fordham has been filing contradictory reports to different Federal authorities regarding Plaintiff's status at Fordham. They represent to Federal Court, the Second Circuit Court of Appeals, and Plaintiff, that she remains a tenured Professor at Fordham. They represent to the US Department of Labor and the IRS that she is terminated, so they cut all her benefits required for tenured professor as of 2020. The IRS records sent to her by the Department of the Treasury to Plaintiff on her status at the University during 2022 was that Fordham reported her as *not* a full-time employee, i.e., not a tenured professor.

A more recent example is during the January 11, 2024 Court Hearing. After Plaintiff said that she needed her records to find out her status at the University, after all these contradictory reports and the IRS report she received regarding 2022, the Fordham attorney indicated they would cooperate in discovery and update Plaintiff's files (Transcript, January 11, 2024 Hearing

Ms. McLaughlin: "I will say that I know from again my review of the file there was limited discovery produced at the outset of the case including comparator information and also Professor Solomon's personnel file. And I agree to the extent she would like that updated, I agree that that would be relevant to her what's going on since then. I agree with that request. (*ES_003477*)

However, Fordham has not complied with any of their discovery obligations three months later. They produced no update of either five years of missing records from Plaintiff's Personnel file or any post-April 2019 discovery.

This is to respectfully request that Defendant be directed to comply with their representations to the Court.

CONCLUSION

The Plaintiff's Motion to Compel should be granted in its entirety.

Dated: April 15, 2024                                   Respectfully submitted,

                                                        /s/ *Esther Solomon*
                                                        Esther Solomon
                                                        Plaintiff Pro Se

Exhibits

_____

1. Plaintiff's January 18, 2024 *Letter to the Court Accompanying Motion to Compel*, Dkt 134

2. Fordham Employee Personnel File Content - Human Resources Policies

3 Plaintiff's First Request for Production of Documents with Defendant's Response (2019)

4 Plaintiff's Second Request for Documents with Defendant's Response

5 Plaintiff's First Set of Interrogatories with Defendant's Response

6 Plaintiff's Second Set of Interrogatories with Defendant's Response

7 Transcript of the Oral Argument, *Solomon v. Fordham University*, Second Circuit Court of
    Appeals, June 9, 2023